1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9       FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   HERBERT JAMES CODDINGTON,                No.  2:01-cv-01290 KJM CKD
12              Petitioner,                   **DEATH PENALTY CASE**
13      v.
14   MICHAEL MARTEL,                          FINDINGS AND RECOMMENDATIONS
15              Respondent.
16

17          Petitioner is a state prisoner under sentence of death. Pending before the Court are the

18   parties' briefs on the application of 28 U.S.C. § 2254(d) to each claim in the operative amended

19   petition (ECF Nos. 189, 209, 211)[1] and the parties' briefs on the application of procedural bars to

20   several of Petitioner's claims. (ECF Nos. 99, 101, 102, 131, 148.) After careful consideration of

21   the parties' briefs and of the state court record, the undersigned concludes that Petitioner has

22   satisfied the requirements of section 2254(d) for claims 47, 54, 82, 157, and 160(A); has shown

23   that claim 7 is not procedurally barred; and has failed to satisfy the requirements of section

24   2254(d) for the remaining claims in the amended petition that were decided on the merits in state

25   court. Respondent has shown that claim 58 is procedurally barred. Accordingly, the undersigned

26   recommends that these federal proceedings continue on claims 47, 54, 82, 157, and 160(A), and

27   _____

28   [1] "ECF" refers to this court's electronic case filing and docketing system.

1    the remaining claims of the Amended Petition be dismissed.

2                                      **FACTS**

3         The following facts are derived from the California Supreme Court's July 3, 2000, opinion

4    affirming the judgment. See People v. Coddington, 23 Cal.4th 529, 553-566 (2000). The state

5    court's factual recitation is entitled to deference absent clear and convincing evidence to the

6    contrary. Mejia v. Garcia, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008). Here, neither party disputes

7    the factual accuracy of the evidentiary record, as described in the California Supreme Court's

8    direct appeal opinion. (See ECF No. 59 at 13-43; ECF No. 189 at 3 n.2; ECF No. 209 at 1-2.)

9                      **A. Prosecution Guilt Phase Evidence.**

10
11
12
> [Maybelle (Mabs)] Martin and [Dorothy] Walsh were murdered on May 16, 1987, when they accompanied [minors] Alecia and Monica, as chaperones, to what all four believed was the filming of an antidrug video in which the girls were to appear.

13
14
15
16
17
18
19
20
21
22
23
> The evidence established that Alecia and Monica were lured to a South Lake Tahoe mobile home appellant occupied on May 16, 1987, for the ostensible purpose of acting in the antidrug video. Prior to May 16, 1987, appellant had contacted several modeling agencies in Reno in person and by telephone, sometimes using the name Mark Bloomfield, and stated that he was interested in finding teenage models for the video. The caller, in a May 14, 1987 call to the Barbizon Modeling School and Agency in Reno, used that name and said he was from Barrett or Parrot Communications in Georgia. The person who appeared at the Barbizon agency on May 15, identifying himself as Mark Bloomfield, had a business card bearing the word Parrot. He appeared nervous and in disguise. His hair was very black and was slicked back with a hair preparation, he wore a mustache, and had horn-rimmed glasses. The owner of the agency decided that she would not supply any models for him. The person who contacted Aviance Modeling Agency on May 13, 1987, had dark brown hair, a mustache, and wore glasses. He asked if the agent there knew where Avalon Modeling Agency was located. A man who identified himself as Mark Bloomfield had called the Avalon Agency on May 13, 1987, inquiring about teenage models for an antidrug campaign he was filming at Lake Tahoe.

24
25
26
27
28
> In May 1987 appellant had also contacted Candice Smith, a woman employed as a blackjack dealer in Stateline, Nevada, who knew him as Gary Sarno, a daily player at the blackjack table. Evidence was presented that before he called Smith, appellant told another blackjack dealer that he understood that Smith had a "pretty cute little daughter." Appellant telephoned Smith at 3:00 a.m. using the name John Parrot. He affected a Southern accent and said he was calling from Atlanta, Georgia. The caller said he had obtained her name from Avalon Modeling Agency and wanted to use her in a beer commercial. During the call he mentioned Smith's daughter. Smith

said she was not interested and questioned the hour of the call. He said he had played at her table quite a bit. He knew quite a bit about her. She hung up. He called back at 9:00 a.m., again identifying himself as John Parrot, and explained that he just wanted her to know the call was legitimate. He offered to let her speak to his partner. A voice which she thought was the same person then said "hello." Using the prior voice, he said he wanted to meet her for lunch. She hung up.

On Thursday evening, May 14, 1987, Mabs Martin, the owner of Showcase Models, set up an audition for appellant at her agency in Reno. Appellant, using the name Mark Bloomfield, conducted the audition. Witnesses described him as having really dark black hair that appeared to be dyed. He wore glasses and a dark pinstripe suit. Alecia, Monica, and eight to 10 other girls auditioned. They read from cue cards about drug abuse and walked around the studio. Ostensibly this audition was for a commercial to be shot at Lake Tahoe the following Saturday.

On Friday afternoon appellant auditioned girls at the Barbizon Modeling School. That evening appellant auditioned Jennifer K., another student at Showcase Models. When Jennifer parked she noticed a large, expensive car with a license that she believed read "TVTEEN." After discussing the drug problem and looking at Jennifer's portfolio, appellant said they would be going to Regan Beach. He talked about the commercial and said he wanted her to bring very short shorts and a bathing suit. Jennifer knew that Martin planned to drive other girls to the site, but wanted to drive separately as she had to go to Sacramento on Saturday with her family. Martin and appellant opposed this. He wanted everyone to drive to Tahoe together and to meet at the Nugget casino. Martin arranged for Jennifer to meet Martin on Saturday morning and drive with Martin to the meeting. Martin called Jennifer later that evening and told Jennifer that appellant did not need Jennifer. His photographer said she was too old. Martin called Alecia and Monica, and told them that they had won the parts and would be paid $50 per hour.

Other circumstantial evidence that appellant planned both the murders of the chaperones and sexual molestation of the girls was offered. David Hacker testified that, in 1983, appellant had read aloud to David and his brother Allen from a booklet about assassinations which described various methods of killing people. One of the methods was using a clear nylon baggage tie, pulling it tight and walking off. Appellant said at the time, "[O]nce you have it on, you can't get it off." Evidence was presented that in February 1987, at the time appellant became the sublessee of the trailer, a person using the name Gary Sarno advertised in a local newspaper for used carpeting or mattress material needed for soundproofing. The telephone number of one person who had responded to the ad was found among appellant's possessions. Also, early in 1987 a South Lake Tahoe lumber company delivered plywood and studs to the trailer. In May 1987 a repairman entered the trailer and saw plywood, drywall, and insulation laid flat in the living room. A neighbor and the manager of the trailer park observed old and end pieces of carpet outside the trailer. An invoice revealed that the

1  FLEX–CUF[2] ligatures that could not be released once cinched up,
which appellant knew could be used to strangle Martin and Walsh,
2  had been ordered on March 13, 1987. The People also offered
exhibits consisting of various scraps of writing by appellant found in
3  his trailer. Exhibit No. 186 included writings taken from other
exhibits which asked how to call "them," "how will they come,"
4  "where will they meet," how to get "them" to the trailer, and how to
get "them" inside. To the last two, the response was "force."

5
        FN 2. FLEX-CUF is a proprietary name for a self-locking
6      plastic restraint to be used on human subjects. It must be cut
       to be removed.
7

8  Although most of the evidence of preplanning related to luring and
confining teenage girls, these documents also bore words that could
9  reflect appellant's concern that the chaperones would have to be
killed. On one response appellant had added "tarp," which the
10  prosecution argued was something in which a body could be
wrapped. The prosecutor also argued to the jury that various
11  disjointed words found on those papers reflected planning the
murders and how to dispose of the bodies. Those words included
12  "bag," "sacks," "case," "burn," "Rot," "shallow", "deep," "won't eat
through," "chop," and "where store" followed by "trunk," "van,"
13  "M.D," "trailer," and "motel." Another series of words, which the
prosecutor argued reflected preplanning of the murders, asked "what
14  to do once inside" and responded "throat," "zap," "stomach,"
"straps," "cuffs," and "backup 45." Other notations suggested that
15  appellant had also planned to leave distracting clues when he left and
had planned what he would say if apprehended.

16  On Saturday, May 16, 1987, Martin told her son that she was going
to drive to South Lake Tahoe with two girls to shoot an antidrug
17  commercial and that her friend "Dottie" Walsh would accompany
them. Martin owned a 1984 Chrysler Fifth Avenue automobile.
18  Martin met Alecia and Monica and then picked up Dottie Walsh.
They drove to the Nugget where Martin parked and the group waited
19  in the restaurant. When appellant arrived, all five drove to appellant's
trailer in Martin's car. The girls were told to go inside so they could
20  change into shorts and freshen their makeup.

21  The two girls went in with Martin and Walsh. Appellant directed
them to a room with wood walls on which were pictures of models.
22  There was a bed in the room, but there were no mirrors. As the girls
entered the room appellant rammed Martin and Walsh and threw
23  them into the room, closing the door behind him. He ran to Alecia
and hit her on the jaw with a rectangular black object about five
24  inches wide and two inches thick. He then began hitting and pushing
Martin and Walsh on the chest and face. He told all four to shut up
25  and told Martin and Walsh to lie on the floor so he could tie them up.
Before Martin got down, appellant threatened to kill one of the girls
26  if she did not get down. He then used FLEX–CUFs to tie the
women's hands behind their backs and to bind their feet. Walsh
27  begged not to be killed. Martin told appellant "[T]ake us. Don't hurt
the girls." One of them told appellant she would give him all the
28  money he wanted, to which appellant replied, "I know you will."

4

1    Alecia gave appellant money she had in her pocket. Appellant put a
     pillowcase over Martin's head and a FLEX–CUF around her neck.
2    She asked him to loosen it, saying she could not breathe. She started
     to gag, and fell over to the side from a sitting position.
3
     Appellant then ordered Alecia and Monica to lie over the legs of the
4    older women. He used FLEX–CUFs to tie their hands behind their
     backs and their feet together. He then put Alecia on the bed and
5    Monica on the floor beside the bed. He put a jacket over Alecia's
     face and a pair of shorts over Monica's head. Alecia could see only
6    the carpet. She heard a "throwing up" sound from Walsh. Monica
     heard gargling noises. Alecia then heard a dragging sound like bodies
7    being dragged. About 15 minutes later she heard the sound of plastic
     bags. Monica also heard the noise of dragging of the plastic bags and
8    thought Martin and Walsh were no longer in the room.

9    Appellant then returned to the room. He took the FLEX–CUFs off
     the girls and retied their hands in the front with belts. He put a ski
10   mask over Alecia's eyes and a pillowcase over her head, securing it
     with a rope around her neck. Alecia was able to see a red substance
11   on the carpet to the right of the door, however. Asked about what he
     was doing at that spot, appellant replied that he had spilled Kool–Aid
12   and was going to clean it up. Monica was able to see him scrubbing
     something dark brown on the carpet.[FN 3] Appellant was wearing a
13   plastic bag over his head. His hair was black and wet.

14           FN 3.  Carpet pad from that location bore blood identified as
             coming   from   a   person   with   the   same   PGM
15           (phosphoglucomotase, an enzyme) classification as Dorothy
             Walsh.
16
     Appellant told Alecia and Monica that he did not want them, saying,
17   "[W]e wanted Mabs, and I was paid to get her, and I'll have to be
     paid extra for Dottie." Appellant allowed the girls to take off the wrist
18   restraints and blindfolds. He said he might hold the girls for ransom.
     When Monica asked him if he was going to kill them, he displayed a
19   pistol with a silencer on it, and said that if he planned to kill them he
     could already have done it. Alecia saw that the door into the room
20   had eyeholes in it. Appellant gave them water, and, after making
     them turn around and put the pillowcases over their heads, brought
21   in some fruit. Later, appellant brought magazines. Alecia removed
     an address label for "Herb Coddington" from one and put it in her
22   suitcase. She later gave it to the FBI.

23   The next morning when the girls awoke, appellant brought eggs and
     strawberries and made the girls take vitamins. He allowed them to go
24   into the living room of the trailer. Appellant was wearing what Alecia
     thought was a turtleneck with the arms over his mouth and part of his
25   ears and a ski hat over his hair. The hair that she could see was
     orange. Monica thought he was wearing a knit cap and ski mask. She
26   also saw orange hair sticking out. After the girls watched television,
     appellant said he was going to work out. He put them back in the
27   other room and told them to change clothes so they could work out
     also. They heard heavy breathing as if he were working out. He said
28   he was going to shower and they heard a shower. He then let the girls

1
2
3

come back into the living room and had them exercise to a videotape. They were returned to the other room. They refused appellant's offer of a shower, but when Alecia used the bathroom to brush her teeth she saw brown hair, about the size of a moustache, all over the sink.

4
5
6
7
8
9
10
11
12

Appellant told the girls that they were going to make a videotape to be sold in Europe, with an 18–year–old boy his friends had kidnapped. He told them they would have to take off their clothes. He blindfolded them, but Alecia could see out under the blindfold. She asked appellant if he was going to rape them. He replied "no," and added that if the boy hurt them he would hurt the boy. The girls were then put on the bed where they held hands. Appellant then climbed onto the bed and began whispering to Monica. In his normal voice, holding a microphone, appellant pretended to tell the nonexistent boy to be gentle and make the girls feel relaxed. Affecting the voice of a young boy he then whispered to Monica that he was also scared and that, while he did not think they were going to be killed, the people had guns. Appellant undressed Monica and kissed her all over her body including her "private parts." Alecia could hear, but could not understand, the whispering. When she asked Monica if she was all right, Monica replied "yes." After about half an hour Monica said "stop" and asked to get dressed. Appellant agreed.

13
14
15
16

Appellant then took off Alecia's clothes and whispered in a young boy's voice that he was sorry, he did not want to do this, and he hoped they would not kill them. He massaged Alecia all over her body and kissed her on her lips, breasts, and genitals. After 20 minutes she said "stop." She heard appellant's voice coming from some distance, but there was still weight on the bed. It felt like a foot.

17
18
19
20
21

The girls were allowed to dress and go into the living room. Only appellant was there. Appellant said the video would have to be repeated as it was "not worth two cents" and no one would buy it. He promised to let the girls go home if they did another five or 10 minutes. He put them back in the room and again blindfolded them. Alecia was put on the floor, Monica on the bed, but they could still hold hands. Monica heard a voice with a European or British accent say the tape was no good, and heard appellant respond that he had tried. The other voice said he would have to do another one.

22
23
24
25
26

Appellant removed Monica's clothes and put a finger in her vagina. She felt pain and repeatedly asked him to stop. The voice pretending to be a boy called out to appellant and appellant said to stop. He asked Monica if she wanted her mouth on him and, when she said no, he told her that she would have to keep doing "it." Next, pretending to be the boy, he took her finger and sucked on it, saying that was how to do it. Appellant then put his penis in her mouth. She said she was going to throw up to which he replied: "Why did you say that? Now, you've ruined the whole thing." He told her she would have to do more. She said she could not and he allowed her to dress.

27
28

Appellant then put Alecia on the bed and told her that since Monica did not do very well she would have to do better. She repeatedly said "no," but he removed her clothes and put his finger in her vagina.

6

She screamed to stop it. Appellant then said: "Well don't use the finger, you're going to have to fuck her." She screamed that he had promised he would not rape her, but appellant got back on the bed, put Alecia's legs over his shoulders and inserted his penis into her vagina. It was very painful and she told him that "it doesn't fit," again asking him to stop. He got off and said: "Well it doesn't fit. You're going to have to use the finger again." Appellant then inserted his finger into her vagina, causing her great pain and some bleeding. Alecia could see a red light in the corner of the room and believed it was a camera that was videotaping.

The girls were allowed to watch television later. When they asked permission to call their parents, appellant told them they could tape their voices and he would play the tape over a pay phone. He let them go to bed where they eventually fell asleep. On Monday morning, May 18, appellant told the girls that he was going to release them someplace and call the police so they could be taken to Reno. He instructed them to say they had been kidnapped and taken to a blue two-story house in Sacramento, warning them that if they did not follow those instructions the girls' families would be in danger. He did not release them, however. They were rescued that night by FBI agents and South Lake Tahoe police who had identified appellant as the suspect from composite sketches based on witness descriptions of the man who had been interviewing teenage models.

The law enforcement agents had been alerted to Alecia's disappearance by her stepfather. Alecia's stepfather broke into Martin's studio and used her Rolodex phone directory to contact persons from whom he was able to identify Martin's automobile, which his brother-in-law then located on a parking lot at South Lake Tahoe. FBI agents determined that the "TVTEEN" license plate was connected to a Tveten automobile dealership in South Lake Tahoe,[FN 4] and learned from Tveten that the composite sketch was of a person Tveten knew as Gary Sarno, whose address was supplied. That address was for the trailer park where appellant lived in a trailer next to Tveten's mother. The trailer park manager confirmed that appellant's car had a TVETEN license plate on it before he acquired a Nevada plate.

> FN 4. The "license plate" was actually the auto dealer's promotional card in the form of a license plate.

In March 1987, Tveten had seen old carpeting outside appellant's trailer. Appellant told Tveten he was making a soundproof room for playing the guitar. Appellant had purchased a Porsche from Tveten because appellant's BMW, purchased in Europe, could not be registered in California. Appellant then told Tveten he was going to have the BMW licensed in Nevada and would not need the Porsche. Tveten took the Porsche on consignment to sell for appellant. About two weeks before the crimes with which appellant was charged, Tveten had given appellant paper license plates from his dealership so appellant could drive the BMW to Nevada for registration.

The trailer was placed under surveillance. The manager told agents that a paper dealer's license reading TVETEN formerly had been on

7

appellant's car which now bore a Nevada license. Tveten telephoned appellant, told him that appellant's Porsche had been sold and Tveten had the money for him. Tveten also told appellant that the FBI was looking for him and that he should call them. When Tveten asked appellant if he was involved in the kidnapping that the newspapers had reported, appellant replied that he had done "much worse."

Alecia heard the telephone ring and appellant say: "What? My picture's in the post office?" They then heard a car leave. Shortly thereafter appellant telephoned David Hacker asking for directions to Allen Hacker's home in Happy Camp. Appellant said that "[t]hings were getting a little hot." FBI agents followed appellant when he left the trailer in the early evening and saw him enter the post office and look at the bulletin board. His hair was a glowing orange-yellow. Appellant returned to the trailer at 9:00 p.m. Three minutes later an FBI agent received a telephone call from a man who identified himself as Herb Coddington and said he understood the FBI was looking for him, that a friend had seen his photo in the post office and said that he was wanted. Asked for what, the caller replied: "The kidnapping in Reno." The agent told the caller that he was not sure whom they were looking for and would have one of the agents who had that information call. The caller gave the agent the phone number and address of the trailer occupied by appellant.

On Sunday whenever the two girls asked appellant if they could leave, he responded only, "[L]et me think." He once said he would drop them off and call the police so they could be taken to Reno, and that he would try to get a plane to Europe. Later, Alecia heard appellant ask someone on the telephone, "[M]y picture is on the wall?" Appellant then told Alecia and Monica that they did not have to worry because "they found me." He told them to give him their clothing so he could wash off his fingerprints. By then the trailer, which had been under surveillance, was surrounded by law enforcement personnel. Two FBI agents who had been assigned to interview appellant knocked, identified themselves as agents and asked to talk to appellant, who replied that he did not want to speak in person and would rather talk to them on the telephone. The lights had gone out and immediately an FBI agent made a call to the trailer. Appellant asked the agents outside what he was to do and was told the call was from the FBI and he was to answer the phone and do exactly as told. Appellant answered the phone and said there were people at the door. He was told the people were FBI agents and he should open the door. He told the agent on the telephone that the girls were there and said he needed to go to a hospital.

Law enforcement personnel then assaulted and broke into the trailer. As they did so another agent had broken a window in the trailer, looked in and saw appellant. He ordered appellant to "go down" and held him at gunpoint until the other agents who had by then entered the trailer took appellant into custody. While held at gunpoint, handcuffed and searched, appellant stated again that he was sick, and the girls were all right. He also said that the women were in a back bedroom and that he had placed them in plastic bags because he did not want any "messies." The FBI agents found Alecia and Monica in a room built within another room, its door secured by a two-by-four

8

that was used as a bar. South Lake Tahoe officers, who then assumed control of the investigation, found the bodies of Martin and Walsh in plastic bags in a bedroom of the mobile home.

Appellant was advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694) at the time he was placed in an automobile for transportation to jail. While being transported appellant admitted that he had killed Martin and Walsh. He said again that he was sick and needed help. Under questioning, appellant admitted that he had strangled the two women. He killed them almost immediately after they entered the mobile home on Saturday morning because they had fought him and were too hard to control. He denied sexual molestation of the girls. He explained his conduct by saying there were too many bad things in the world, too much smoking in the casinos, and too many drunk drivers.

Appellant was then taken to, and interviewed at, the South Lake Tahoe Police Department after again being advised of and waiving his constitutional rights. When asked how he killed the two women, appellant told the officers that he had strangled Martin and Walsh and they could find the cord he used inside the residence. He said he had killed the women almost immediately on Saturday morning when he brought them into the trailer. When asked how he controlled the two girls he said that he had built a soundproof room that the agents would find inside. He denied any sexual contact with the girls. He again explained his conduct by saying that there was too much smoking in the casinos and too many drunk drivers. He told the agents that police officers had a difficult job and that was why he had bagged up the women the way they were bagged up so the police would not have to see the "messies."

During the time the girls were being held in the trailer appellant had called Michael Szeremeta, an acquaintance then living in Minnesota whom he had called several times before these incidents. Szeremeta testified that he and appellant met in Las Vegas in 1982. Appellant was then a gambler by profession and had authored two books on gambling. Szeremeta, who had an advanced degree in mathematics, had discussed the mathematical possibilities related to gambling with appellant and thought appellant had a very sophisticated understanding of the subject. Appellant was accomplished at card counting, which improved the odds in his favor. In 1985 appellant had moved to South Lake Tahoe, but he still visited Szeremeta. Appellant once mentioned that he was practicing clairvoyance techniques and believed he could predict the outcome of the cards in baccarat.

Szeremeta moved to Minnesota in 1986. Appellant had called him on the telephone about five times after that. In either January or March 1987, appellant referred to "the man in Philadelphia" who had captured a woman and held her captive. Szeremeta received the fifth call from appellant during the time Alecia and Monica were being held captive. Appellant told Szeremeta that "I have something going here ... something like the guy in Philadelphia." Asked if it was voluntary, appellant replied "no." Appellant was not worried that he might be discovered because, he said, the landlord never came

around. Appellant also said that he was close to 30 years old, his life was going nowhere, and the man in Philadelphia had gotten away with it. He told Szeremeta that Szeremeta might want to stop by if he was in the area as "it" was "better than [he] could imagine."

When found, Martin's body, which had been inside a garbage bag, had a portion of a FLEX–CUF around her neck. Her hands were then tied with rope. Walsh, whose body was wrapped in clear plastic and placed inside three garbage bags, had a FLEX–CUF around her neck. Her hands were then tied in front of her body with rope. Autopsies confirmed that ligature neck compression was the cause of death of both Martin and Walsh. Each victim had suffered additional, very similar injuries, including lacerations and abrasions. There was bruising in Walsh's vaginal area outside the hymeneal ring, and a tear of Martin's vaginal area just outside the hymeneal ring. Walsh also suffered a hemorrhage inside her brain from a blow to the head. A FLEX–CUF container was found in the master bedroom of the mobilehome.

A physical examination revealed a recent bruise on Alecia's thigh and one on her cheek, erythema (redness), engorgement, and bluish bruising in the vaginal area, and torn necrotic tissue hanging from the hymen. The examining physician could not identify the instrumentality that caused the injuries, but they were consistent with insertion of a finger. Monica also had reddened tissue in the vaginal area.

**B. Defense Guilt Phase Evidence/Prosecution Rebuttal.**

During voir dire of the jurors the defense conceded that defendant was responsible for the deaths of Martin and Walsh, and that he had molested the two girls. During closing argument counsel again conceded appellant's guilt of the sex offenses and that he had killed Martin and Walsh. He disputed only the degree of homicide of which appellant was guilty and argued that the killing was an unplanned reaction to the victims' screaming and resisting when forced into the plywood room, an attempt to quiet the victims. Although the FLEX–CUFs were on the women's necks, only when that failed to quiet them did appellant pull them tight and kill them.

Only one defense witness was called during the guilt phase of the trial. The prosecutor had said in his opening statement that a Mr. Hacker would testify that appellant had a fascination with FLEX–CUFs. In response to that statement, Allen Hacker testified that he had met appellant in 1981 or 1982 while working in Las Vegas casinos exploring the potential of card counting. Appellant was one of several persons he knew in Las Vegas who counted cards. He and appellant also shared an interest in target shooting.

Allen Hacker testified that he would not testify in accordance with the prosecutor's opening statement that appellant was obsessed with use of FLEX–CUFs as a method of killing. In 1982, in a Las Vegas gun shop, Allen Hacker and appellant had discussed "ziplocks," which he described as locking nylon strips like those used to tie garbage bags, when Allen read from a booklet, supposedly written

10

by an ex-CIA agent, that described ways to kill people. He and appellant agreed that the methods were outrageous and unrealistic. Appellant expressed no particular interest in nylon ties then or in their subsequent contacts. Hacker denied telling FBI Agent McKevitt that appellant read The Anarchist Cookbook and seemed interested in ways of killing people, particularly women.

Allen Hacker also described appellant's inability to function under stress and "inappropriate" behavior while part of a gambling team of card counters. Appellant's behavior drew attention to himself when it appeared that the house was catching on. Allen Hacker denied telling FBI agents that appellant was cunning, sly, and expert at disguises. He believed he had told the agents that appellant was a bumbler who did unusual things. Appellant was extremely bright about mathematics, but did not act the way other people did and most people were uncomfortable around appellant. Socially, appellant was like a 12- or 13-year-old.

In rebuttal, McKevitt, the FBI agent who had interviewed Allen Hacker, testified that when she interviewed Allen Hacker, he had described appellant as sly, cunning and an expert at disguises. On cross-examination she conceded she could not recall whether Hacker might have said appellant believed he was an expert at disguises. The agent testified that Hacker was surprised that appellant was the subject of the investigation and thought appellant was too intelligent to get caught. Hacker had also told the agent that appellant was interested in methods of killing people, particularly women.

**C. Sanity Phase Evidence.**

Three defense experts testified that, in their opinion, appellant was legally insane at the time of the offense.

Mark J. Mills, M.D., a psychiatrist and professor of psychiatry at the University of California at Los Angeles Medical School, was the director of the Program in Psychiatry and Law for the UCLA Neuropsychiatric Institute and Hospital, and director of the Forensic Science Medical Group. He was board certified in psychiatry, neurology, and forensic psychiatry. Prior to attending medical school, Dr. Mills had graduated from Harvard Law School. He had interviewed appellant on two occasions for a total of 10 or 11 hours and had discussed the case with appellant's counsel and reviewed some documents to understand what had happened.

Dr. Mills offered his opinion that appellant did not suffer from any organic brain damage or illness, although there was a "negativity" in the temporal lobe that would be consistent with a delusionary disease. Dr. Mills concluded that for several months before and continuing through several months after the crimes appellant suffered from a delusional or paranoid disorder of the grandiose type described in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev.) (DSM–III–R). Appellant believed he had a special relationship with a deity. A delusion is a systemic belief not shared by most other persons. Dr. Mills believed that appellant believed he was receiving messages

11

from God in very unusual forms. Green traffic lights meant that whatever he was thinking he should do, red that whatever he was thinking or fantasizing about should be stopped. Yellow was a warning. Certain numbers heard on the radio or seen on clocks also communicated messages from God: 46 or 45 were "go" numbers. Twenty-six was a "stop" number. Indicative of his disorder, about a year and a half before the crimes appellant switched from rational thinking to "crazy" or "magical" thinking in his gambling. He believed at this time that if he did not obey the messages he received things would turn out very badly.

Dr. Mills was satisfied that appellant was not malingering. He found that many of the beliefs appellant described to him were also reflected in entries appellant made in his diary and on other papers contemporaneously with the events he described. Appellant knew what he was doing when he killed Martin and Walsh. He knew they would die when he applied the ligatures and he knew that was against the law. However, appellant believed that since he was obeying personal messages from God who would punish him if he did not comply, appellant did not believe or understand that he was violating any moral law. On that basis, Dr. Mills opined that appellant was insane at the time of the criminal acts.

Tests given to appellant several months after the crimes did not indicate he was psychotic or crazy, possibly because of the delay in testing. The delusional disorder had gotten better in the structured setting of the jail, where appellant received support from his attorneys and understood the reality of the pending charges.

Fred Rosenthal, M.D., a psychiatrist with experience as a biologist and neurophysiologist, interviewed appellant for about 12 hours total and interviewed his mother, father and sister. He also reviewed extensive writings of appellant, a 60–page autobiography appellant prepared while in jail, police and FBI reports, psychiatric reports, and psychological testing reports. He concluded that appellant was psychotic and legally insane at the time he committed the crimes. He believed that appellant's illness might be schizophrenia, although not a typical textbook case of that illness, but he did not make that a firm diagnosis. Appellant did suffer a psychotic episode, but Dr. Rosenthal did not know if this was a psychotic episode superimposed on the borderline aspects of appellant's personality, or a brief reactive psychosis to stress, or if appellant was schizophrenic and had become psychotic at the time of the offenses. The delusional disorder diagnosis of Dr. Mills was not inconsistent with Dr. Rosenthal's diagnosis, as a delusional disorder is another, more specifically paranoid, form of psychosis.

Dr. Rosenthal believed appellant had severe obsessional problems as reflected in an endless production of notes and lists, voluminous written materials, the way he thought, his actions as described by others, and his very small and meticulous writing.

Dr. Rosenthal based his conclusion that appellant was psychotic and delusional on appellant's history, his magical thinking about numbers, and appellant's belief that he had extrasensory perception

and belief that he was receiving messages from God who ordered appellant to do his bidding. Dr. Rosenthal testified that delusional thinking of this type was fairly common among schizophrenics and other persons who become psychotic. Although appellant was aware of the nature and quality of his actions and understood that what he did would cause the death of Martin and Walsh and knew that his conduct was unlawful and condemned by society, he did not understand that it was morally wrong.

Joseph Satten, M.D., a psychiatrist, interviewed appellant three times for about eight to nine hours total, spoke with appellant's parents and sister, and reviewed the FBI reports and the reports of prior psychiatric examinations, and the documents prepared by appellant at different times in his life. He also concluded that at the time of the offenses appellant suffered from a mental disease or defect, and was legally insane. Appellant suffered from a long-term mixed personality disorder with elements of several personality disorders. He also had obsessive compulsive disorder, which caused him to have obsessions and feel driven to do certain things. The obsessive-compulsive disorder had been superseded briefly by a psychotic disorder, either a paranoid (delusional) disorder or an atypical psychosis. Like Drs. Mills and Rosenthal, Dr. Satten concluded that appellant was insane at the time of the offenses. While appellant understood he was killing two women, he was incapable of distinguishing right and wrong and did not understand that what he was doing was morally wrong.

Dr. Satten found no inconsistency between appellant's statement to him that he had received no messages on the day he lured the victims to his trailer and his statement to another expert that the traffic lights were all green on the way to the trailer. Appellant simply meant that there was no message that he should not go through with his plan. He did not receive a stop message. Telling one person that he received the go-ahead sign in January and another that he received it in February 1987, was not a major or meaningful inconsistency.

Drs. Mills, Rosenthal, and Satten were aware of the contrary views of court-appointed experts and other experts who had examined appellant. They were also aware of appellant's past use of deception and lies, his gambling practices, and other factors which might suggest that he was not being truthful and was motivated to lie when interviewed by them. That information did not change their view that appellant was psychotic and legally insane at the time he committed the crimes.

The prosecution witnesses offered contrary opinions.

Bruce T. Kaldor, M.D., had been appointed by the court to determine whether appellant was insane at the time of the commission of the crimes. He reviewed all available information and interviewed appellant for six hours over two days, interviewed his relatives, friends, jail personnel, arresting officers, and others. He asked Dr. Michael Erickson to undertake psychological testing to distinguish personality disorder, neurosis and psychosis, and possible malingering. Dr. Kaldor testified about the "practice effect" in which

intelligent persons interviewed by several mental health professionals are able to tailor their responses to indicate certain symptoms. He also observed that persons who suffer from mental illness can be excellent malingerers because they have experienced the symptoms they describe. Dr. Kaldor believed that the inconsistencies in statements appellant made to the various experts could be significant in determining if he was malingering.

Dr. Kaldor concluded that appellant had a severe personality disorder with many facets, a DSM–III–R mixed personality disorder. His diagnosis was "Mixed personality disorder with anti-social, paranoid, border-line obsessive/compulsive, passive/aggressive, and narcissistic features." Appellant knew what he was doing when he killed the two women and knew that the acts were unlawful. He had not conceptualized his own religion, but had a concept of morality that was very idiosyncratic to him. He had his own ideas of what was right and wrong. He had no well-systematized, organized religious moral conception. Dr. Kaldor believed that as an aspect of his obsessive-compulsive disorder appellant did engage in conduct based on his perception of the meaning of numbers and traffic lights, but when caught, appellant exaggerated and embellished this for his own self-serving purposes to avoid responsibility for what he had done. Dr. Kaldor conceded that if he believed appellant's version of God fit within the *People v. Skinner* concept, [FN 5] he would have to conclude that appellant was legally insane at the time of the offenses.

> FN 5.  In *People v. Skinner* (1985) 39 Cal.3d 765, 217 Cal.Rptr. 685, 704 P.2d 752, this court construed the test of legal insanity adopted in June 1982, by initiative (Prop.8) as Penal Code section 25, subdivision (b), which provides: "In any criminal proceeding, ... in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." We held, with regard to application of the second prong of the insanity definition: "If the mental illness is manifested in delusions which render the individual incapable ... of understanding that [the act] is wrong, he is legally insane under the California formulation of the M'Naghten test." (*Skinner*, at p. 782, 217 Cal.Rptr. 685, 704 P.2d 752.) The defendant must know that the act was "inherently, or morally wrong." (*Ibid*.) As applied when a defendant suffers from a delusional mental illness, a person who "because of mental illness believed that God commanded and expected him to kill another human being and that therefore the killing was morally justified and was not 'wrong'" would meet that prong of the insanity test. (*Id*. at p. 783, 217 Cal.Rptr. 685, 704 P.2d 752.) A person "who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." (*Ibid*.)

14

Robert M. Bittle, M.D., a psychiatrist appointed by the court, reviewed similar material, requested psychological and neurological testing, and interviewed appellant and his relatives. He also concluded that appellant, who was very intelligent, with an IQ of 142 to 145, had a remarkable ability to rationalize his behavior and beliefs, and was able to manipulate the psychological testing. He did not believe appellant's use of numbers or stoplights had a delusional quality that would amount to a major mental illness. Appellant had an obsessive-compulsive personality. Such people go through certain rituals as a natural part of their personality. They tend to be more superstitious and have more rigid behavior patterns which they try to rationalize. This behavior went back to appellant's adolescence. Appellant was not disturbed by these behaviors and they did not seriously interrupt his daily existence. At the time of the offenses appellant was not totally controlled by making every decision with this ritual and with his obsessive thoughts and compulsive behavior. He had some independence. This distinguished appellant who had an obsessive-compulsive personality from a person suffering from a major mental illness or obsessive-compulsive disorder. The signs from God defendant experienced were a means by which appellant rationalized or justified behavior in which he wanted to engage.

Dr. Bittle diagnosed appellant as having a severe borderline personality disorder with a multitude of features including passivism, hysteroid elements, pendent elements, passive/aggressive elements, and antisocial elements. This was his lifelong functioning since midadolescence, accounting for his behavior over the preceding several years that he best represented what would be referred to as a borderline personality disorder. With a borderline personality under special circumstances in a period of high stress, the individual may have an acute psychotic episode. Dr. Bittle considered, but concluded that appellant did not suffer from, schizophrenia, a delusional paranoid disorder, or a brief reactive psychosis. Dr. Bittle concluded appellant suffered from a mental defect, a personality disorder, borderline type, that was severe, but that disease did not impair appellant's ability to understand the nature and quality of his acts or his ability to know right from wrong. Appellant did not have an organized moral system or a delusion that originated in an external source.

The parties stipulated that all of the guilt phase evidence could be considered in the sanity phase.[FN 6] They agreed that the hundreds of documents seized in appellant's trailer would be displayed to the jury to emphasize the sheer number of records and papers he retained, some of which went back to his school days, and on many of which his compulsive writing appeared. They further stipulated that appellant had over $10,000 in cash available when arrested. The jury also received evidence regarding appellant's gambling activity and investments, and heard very brief testimony by his parents about his childhood, his family, his upbringing, and his religious beliefs. It viewed two videotapes, the first a compilation of home movies and slides depicting appellant in his early years, the other being excerpts of films found in appellant's trailer, which included scenes of appellant with a former girlfriend and her children and the part of a pornographic film into which appellant had inserted a clip of himself

1   wearing makeup.

2          FN 6.  The jury was not instructed to that effect, but counsel
            agreed that should the jury request any information about the
3          guilt phase evidence, an instruction would be formulated.

4   The jury returned a verdict finding appellant sane at the time of the
    offenses.
5
    **D. Defense Penalty Phase Evidence.**
6
    Joanne Garner had known appellant well through grammar and high
7   school, but had seen him only twice since graduation. Most of her
    knowledge of appellant came from his visits to the home of his
8   grandparents who were her neighbors. She testified that appellant
    had been normal, clean-cut, neat and fastidious, and very serious. He
9   got along well with teachers and played chess with his fourth grade
    teacher during recess. She described normal childhood activities and
10  said that when appellant got involved in something he became very
    involved and really studied the matter to learn everything he could
11  about it. He was not dishonest and was never violent, but was always
    the peacemaker. He would not harm anyone's property because he
12  did not want that to happen to him. She and appellant were
    romantically involved for a brief period in high school, but when she
13  told him she did not want to become more involved he accepted it
    and they remained friends. He had no sexually perverted or bizarre
14  sexual ideas. He had a good relationship with his grandparents.
    Garner could not understand his murdering Martin and Walsh.
15
    Vladimir Grigoriew had known appellant from kindergarten through
16  high school. They lived three houses apart, played together, and were
    close friends. They saw each other infrequently after appellant joined
17  the Marine Corps, but Grigoriew had visited appellant in California.
    As a child appellant was intellectual, cultured, and civilized
18  compared with the other children. He read books and was not
    outdoorsy or physical. He was a master at any indoor board game.
19  Appellant was obsessive about health and against smoking, drinking,
    taking drugs or eating junk food, frequently commenting about how
20  bad those things were. He ordered a soft drink or water in bars or, if
    he ordered a drink, it would last for the evening. As an adult appellant
21  had criticized Grigoriew's driving because he was not maximizing
    gasoline mileage. Appellant drove excessively slowly to save gas.
22
    Appellant was not violent or even physical. He was frustrated
23  because he was not popular and some children thought he was a wise
    guy. Appellant spoke in a loud voice and spoke out of turn in class.
24  He would sometimes become depressed and felt that he was a loser
    because he and his circle of friends had not accomplished much in
25  school and he did not have a girlfriend or a car. He had a very low
    image of himself.
26
    Grigoriew described appellant's family as a typical average family,
27  almost a model family. His father was a professional, and was a
    handyman around the house. He was quiet, but was available if
28  someone had a question or wanted to know how something was done.

                                16

Appellant's mother worked part-time, but spent most of her time taking care of the household, raising the children. The family had a nice house and two cars, and they socialized. Church was important to appellant's parents, but appellant had objected to having to attend religious education classes in grammar school. In high school appellant developed an interest in the Mormon Church, and joined the Methodist Youth Fund, which was made up of girls, in order to meet girls. He got Grigoriew to join with him for that purpose. The girls elected appellant president at the first meeting.

Appellant had discussed becoming an attorney with Grigoriew, but dropped out of college, saying high school had not prepared him to study for college. Grigoriew testified that after appellant dropped out of college, appellant did unusual things that caused Grigoriew to think appellant was having a nervous breakdown. Appellant shaved his head, hung around wearing white pajamas, and acted like a kung fu character. Then appellant took all his money and left for Las Vegas to gamble and win a lot of money, but found out only when he got there that you had to be 21 to gamble. Appellant then joined the Marine Corps even though they had agreed that a military career was not right for either of them.

Grigoriew was surprised that appellant did have some success as a gambler later, and believed appellant was successful and happy. In 1985, however, when Grigoriew visited him, appellant was dissatisfied with his life and with having accomplished little. On cross-examination Grigoriew testified that he had never given appellant permission to represent to the manager of the Tahoe Verde Mobile Home Park that Grigoriew would be appellant's roommate and had not authorized appellant to obtain a telephone calling card in Grigoriew's name.

Appellant's father, G. Herbert Coddington, testified that appellant seemed like a normal child, but was a little more intelligent than average. He had a good memory and learned to play games like chess at an early age. He had no problems with the law and was no more disobedient than other boys his age. He was respectful of other people and was never cruel or violent. Kindness was one of his strong attributes. He was very gentle and the younger children liked and looked up to him. Small children liked him, and flocked around him. Appellant did have obsessive traits, however. He followed his parents around the house turning off the lights when they left the room. He chastised his mother for smoking. Raised as a Catholic because his mother was Catholic, appellant objected to having to attend services regularly while his father, a Protestant, did not do so. He annoyed his father by questioning him and asking "why" repeatedly. The family was close-knit and lived close to both sets of grandparents.

Appellant did not understand or accept the family rule that because a gentleman does not hit a girl he could not retaliate when hit by his sister or another girl. Appellant suffered from Osgood–Schatter's disease and was dissatisfied that he could not participate in physical activities as a result.

When appellant joined the Marine Corps he was promised he could sign up for the job he wanted and selected intelligence. He was made a clerk-typist, which fit within that category, but felt cheated and went AWOL. His father convinced him he should return. When he did he was given psychological tests, which led to an honorable discharge as unfit psychologically for service. When appellant last came home for Christmas in December 1986, his father noticed nothing unusual about his behavior other than that appellant played Santa Claus and ran back and forth handing out presents to the people there.

Appellant's father could not explain his son's conduct in committing the crimes.

Appellant's mother testified that she could recall nothing in appellant's upbringing to explain the crimes. They were a pretty close family, always together and supported each other. In Las Vegas appellant became more and more lonesome and wanted someone with whom to share his life, but he did not know how to go about it. He lived in a fantasy world. He liked science fiction and did not know what reality was anymore. At Christmas 1986 appellant seemed more nervous, but she thought it was from the stress of gambling.

Neither parent was aware that appellant had been discharged from the Marine Corps because of mental or emotional illness.

The parties stipulated that appellant had no prior criminal convictions.

**E. Prosecution Penalty Phase Evidence.**

The only evidence offered by the People at the penalty phase was rebuttal evidence in the form of a stipulation that appellant had represented to a rental agent that Grigoriew would be a cotenant of the space at the Tahoe Verde Mobile Home Park and that appellant had secured phone service in Grigoriew's name, and had received an international telephone credit card in that name.

After argument and instructions, the jury returned a verdict of death.[FN 7] The court denied appellant's automatic motion for modification of the penalty and his motion for new trial, after which judgment imposing the penalty of death was pronounced. Before imposing judgment the court found that appellant had been "well and fully represented by counsel" and ruled that the murder counts and special circumstances had been proved beyond a reasonable doubt, and that the aggravating factors outweighed the mitigating factors.[FN 8]

> FN 7.  Only one verdict of death was returned and this was read in open court. It did not specify the count or counts for which the jury determined death was the appropriate penalty. We have held that this is not error or a defective verdict. (*People v. Hines* (1997) 15 Cal.4th 997, 1070–1071, 64 Cal.Rptr.2d 594, 938 P.2d 388; *People v. Crittenden* (1994) 9 Cal.4th 83, 159, 36 Cal.Rptr.2d 474, 885 P.2d 887.)

18

1
2
3
4

However, in practice this rule could be troublesome in a case in which conviction on one of several murder counts is reversed as judgment is not pronounced on each count of which defendant is convicted. For this reason, the better practice is to provide the jury with verdict forms for each count on which the penalty must be imposed and to impose a penalty on each count.

5
6
7
8
9

FN 8.  As to the noncapital counts, probation was denied, and full consecutive eight-year upper terms imposed for each count on the basis that each involved great violence, the offenses were premeditated, the victims were particularly vulnerable, and there were multiple victims. The court specified that should the death sentence be reduced or commuted, the 32–year term was to be served prior to any reduced or commuted murder terms. Credit for 650 days time served and conduct credits was awarded.

10

## PROCEDURAL HISTORY

11      This case commenced in 1987 in El Dorado County, California. A preliminary hearing

12  was held June 22, 23 and 24, 1987, in the South Lake Tahoe division of the El Dorado County

13  Superior Court, after which Petitioner was held to answer on six of the seven counts alleged in the

14  complaint. (2 CT 75-294; 3 CT 299-552, 555.)[2] On July 2, 1987, the prosecution filed an

15  Information charging petitioner with the following counts: the murder of Mabs Martin (Pen.

16  Code,[3] § 187; count one); the murder of Dorothy Walsh (Pen. Code, § 187; count two); the rape

17  of Alecia T. (Pen. Code, § 261(2) [4]; count three); sexual penetration by force of Alecia T. (Pen.

18  Code, § 289(a); count four); oral copulation by force of Monica B. (Pen. Code, § 288a(c)[5]; count

19  five); and sexual penetration by force of Monica B. (Pen. Code, § 289(a); count six). (1 CT 68-

20  71.) The Information also alleged as a special circumstance, under Penal Code section

21  190.2(a)(3), that petitioner had murdered more than one person. (1 CT 68-69.)

22
23
24
25

[2] "CT" refers to the Clerk's Transcript on Appeal; "ACT" refers to the Augmented Clerk's Transcript on Appeal; "SACT" refers to the Supplement to the Augmented Clerk's Transcript on Appeal; "RT" refers to the Reporter's Transcript on Appeal; "ART" refers to the Reporter's Transcript on Appeal designated "Volume aI" and "Volume aII," lodged on July 17, 2002. (ECF No. 25.) Each title is preceded by volume number and followed by a page number.

26      [3] Herein, all statutory references are to the California codes, unless otherwise indicated.

27      [4] As amended by Stats.1986, ch.1299, § 1, pp. 4592-4593.

28      [5] Renumbered § 287 and amended by Stats.2018, c. 423 (S.B.1494), § 49, eff. Jan. 1, 2019.

1    On July 8, 1987, before Judge Terrence M. Finney in the South Lake Tahoe division,

2  petitioner entered pleas of not guilty to all counts alleged in the information and denied the

3  special circumstance. (4 CT 559-560.) On this same date, counsel for petitioner sought

4  appointment of a psychotherapist to examine petitioner pursuant to Evidence Code section 1017,

5  which permits the court to appoint a psychotherapist to provide defense counsel "with

6  information needed so that he or she may advise the defendant whether to enter or withdraw a

7  plea based on insanity or to present a defense based on his or her mental or emotional condition."

8  (4 CT 560.)

9    Subsequently, Petitioner moved to suppress evidence, which the trial court heard and

10  denied. (4 CT 598-600, 602; 5 CT 787; 17 SACT 4498-4667.)

11    On January 7, 1988, Petitioner entered pleas of not guilty by reason of insanity to all

12  charges. (1 ART a251-a253.) The next day, pursuant to Penal Code section 1026, the trial court

13  appointed Robert Bittle, M.D., and Bruce T. Kaldor, M.D., and to examine Petitioner.[6] (5 CT

14  787-88.)

15    On January 8, 1988, the court heard argument on the propriety of transferring the case to a

16  different venue. (5 CT 789.) On March 4, 1988, El Dorado County Superior Court Presiding

17  Judge Charles F. Fogerty ordered the matter transferred within the county, from the South Lake

18  Tahoe division to the Placerville division, for all further proceedings. (5 CT 815.) Petitioner

19  objected to the transfer and, subsequently, moved the court to reconsider the transfer, which the

20  prosecution opposed. (5 CT 818, 830-66.) After hearing argument, the court denied the motion

21  for reconsideration and set the matter for trial in the Placerville division, although it also ordered

22  that the jury panel be drawn from the entire county. (5 CT 869, 875.)

23    On May 5, 1988, Petitioner sought to sever the murder charges from the remaining counts.

24  (5 CT 901-909.) The prosecution opposed severance (5 CT 886-900) and, after hearing argument,

25  the court denied the motion. (5 CT 944, 961.)

26    Jury selection began on June 20, 1988. (5 CT 970-974.) Shortly thereafter, Petitioner

27

28  [6] The order was amended on January 12, 1987, to correct the language in question number one posed to the psychiatrists. (5 CT 795.)

20

1    moved to quash the jury venire on the basis that it was not drawn from a random cross-section of

2    the community. (5 CT 976.) The prosecution opposed and the court denied the motion after

3    argument. (5 CT 982-996, 999, 1009.) On July 14, 1988, the jury was sworn. (5 CT 1030.)

4            The guilt phase commenced on July 19, 1988. (6 CT 1037.) The prosecution presented the

5    testimony of 44 witnesses over seven days. (6 CT 1037-42, 1046-50, 1054-58, 1061-64.) On

6    August 3, 1988, the defense presented the testimony of one witness, Allen Hacker, before resting.

7    (6 CT 1072.) The prosecution presented the testimony of a rebuttal witness and rested. (6 CT

8    1079.) Closing arguments in the guilt phase were given on August 10, 1988, and the jury was

9    instructed the following morning. (6 CT 1084-1085, 1087.) Later that afternoon, the jury returned

10   verdicts of guilt on all counts. (6 CT 1087-1094.)

11           On August 17, 1988, the jury heard argument concerning the multiple-murder special

12   circumstance and, later, returned a verdict finding the allegation true. (6 CT 1167, 1171.)

13           That same date, the sanity phase began, with an opening statement by counsel and the

14   presentation of testimony from defense witnesses. (6 CT 1168; 14 SACT 3843.) The defense

15   rested on August 30, 1988; that same date, the prosecutor gave an opening statement. (6 CT

16   1185.) The prosecution's presentation of evidence in the sanity phase began on August 31, 1988,

17   and concluded on September 8, 1988. (6 CT 1186-1190, 1192.) The defense then presented

18   rebuttal evidence (6 CT 1192-1193, 1196; 14 SACT 3851) and closing arguments were heard on

19   September 13, 1988. (6 CT 1197.) The jury was instructed and began sanity-phase deliberations

20   the same day. (6 CT 1197.) Almost immediately upon commencing deliberations, the jury

21   requested to review documents that had been referenced during witnesses' testimonies, which the

22   court denied, over no objection, because none of the requested materials had been entered into

23   evidence. (6 CT 1197; 14 SACT 3853-54; 19 SACT 5061-63; 38 RT 6500-01.) The next day, on

24   September 14, 1988, the jury found Petitioner to be sane at the time of the offenses. (6 CT 1201,

25   1203.)

26           Later that same day, on September 14, 1988, the penalty phase commenced. (6 CT 1201;

27   39 RT 6509, 6518.) The defense presented the testimony of four witnesses that day and rested. (6

28   CT 1201-02, 1246.) The prosecution presented no evidence save the entry of certain stipulations

1   and rested. (6 CT 1246; 40 RT 6635-36.) The court instructed the jury and, after approximately

2   four hours of deliberation, the jury returned a death verdict. (6 CT 1247-48, 1270; 3 SACT 634.)[7]

3          On January 20, 1989, the trial court denied Petitioner's motion for new trial and to modify

4   the verdict and sentenced Petitioner to death. (7 CT 1356-1364, 1367, 1370-1374.)  On the non-

5   homicide counts, the court sentenced Petitioner to the maximum terms of eight years each on

6   Counts Three, Four, Five, and Six, to be served consecutively. (7 CT 1364-1367, 1370-1374,

7   1380-1436.)

8          Pursuant to state statute, Petitioner's convictions and sentences were automatically

9   appealed to the California Supreme Court. (LD 25-B.1; LD 25-B.2; LD 25-B.3.)[8] On July 3,

10   2000, the California Supreme Court affirmed the judgment in its entirety. (LD 25-B.4.)

11   Coddington, 23 Cal.4th 529. Respondent moved to modify the opinion (LD 220-A.1) and

12   Petitioner moved for rehearing (LD 220-A.2). The California Supreme Court denied rehearing

13   and modified the opinion without altering the judgment on September 27, 2000. Coddington, 23

14   Cal.4th 529. Petitioner then sought a writ of certiorari to the United States Supreme Court, which

15   was denied. (LD 25-D.1; LD 25-D.2; LD 25-D.3.)

16          While Petitioner's appeal was pending, on February 16, 2000, he filed a petition for writ

17   of habeas corpus with the California Supreme Court. (LD 25-C.1; LD 25-C.3.) Respondent filed

18   an informal response (LD 25-C.4) and Petitioner filed a reply to only the timeliness arguments

19

20   [7] As noted above, although the prosecution had sought the death penalty on both Counts One and
      Two, "[o]nly one verdict of death was returned and this was read in open court. It did not specify
21   the count or counts for which the jury determined death was the appropriate penalty."
      Coddington, 23 Cal.4th at 566 n.7 (see 6 CT 1248). The California Supreme Court held that this
22   does not constitute "error or a defective verdict," Coddington, 23 Cal.4th at 566 n.7, which
23   Petitioner does not challenge in the instant proceeding.

24   [8] "LD" refers to the documents lodged, in paper, with this court. Petitioner and Respondent have
      lodged documents on July 17, 2002 (ECF No. 25); October 15, 2002 (ECF No. 41); October 21,
25   2002 (ECF No. 43); July 24, 2003 (ECF No. 51); February 9, 2015 (ECF No. 212); January 11,
      2016 (ECF No. 220); January 27, 2016 (ECF No. 221); and December 9, 2022 (ECF No. 224).
26   On December 9, 2022, Respondent filed in this court an index that accounts for all lodged
      materials and, herein, the undersigned references lodged documents by the numbering provided in
27   that index, with the exception of the Reporter's and Clerk's Transcripts, which are referenced in
28   the manner described in footnote 2, ante.

1    raised in the informal response. (LD 224-2.) On May 16, 2001, the California Supreme Court

2    denied this petition in full, in a summary order:

3              The petition for writ of habeas corpus is denied. All claims are denied
               on the merits. Except to the extent petitioner claims ineffective
4              assistance of counsel, claims B-7, C-8, C-9, C-14, C-22, D-13, D-14,
               D-15, D-16, D-17, D-18, D-19, D-20, D-21, D-22, D-25, D-33 and
5              D-34 are denied for the additional reason that they were raised and
               rejected on appeal. (*See In re Waltreus* (1965) 62 Cal.2d 218, 225.)
6              Except to the extent petitioner claims ineffective assistance of
               counsel, claims B-2 and C-13 are also denied pursuant to *In re*
7              *Waltreus*, *supra*, 62 Cal.2d at page 225, and *In re Dixon* (1953) 41
               Cal.2d 756, 759, to the extent that they were raised and rejected on
8              appeal or could have been raised on appeal. Mosk, J., is of the
               opinion an order to show cause should issue. Brown, J., would deny
9              the petition solely on the merits.

10   (LD 25-C.5.)

11           Proceedings in this Court commenced on July 3, 2001. That day, Petitioner filed an

12   application to proceed in forma pauperis, a request for the appointment of counsel, and for a stay

13   of execution. (ECF Nos. 1-3.) On July 9, 2001, this Court granted the in forma pauperis

14   application, appointed counsel, and set the matter for a hearing concerning the request for a stay

15   of execution, given that Petitioner had no pending execution date. (ECF No. 4.) Following a

16   status conference held November 9, 2001, the then-assigned magistrate judge ordered that a fully

17   briefed petition, containing only unexhausted claims, be filed no later than June 14, 2002. (ECF

18   Nos. 12-13.)

19           On June 11, 2002, Petitioner filed a second petition for writ of habeas corpus with the

20   California Supreme Court, in case number S107502. (LD 41-1; LD 41-2.)

21           On June 14, 2002, Petitioner filed a petition for writ of habeas corpus in this Court. (ECF

22   No. 16.) Five days later, he moved to hold the petition in abeyance to permit exhaustion. (ECF

23   No. 19.) After briefing, the then-assigned magistrate judge issued an order striking certain claims

24   without prejudice to renewal after exhaustion and issued findings and recommendations that the

25   motion to hold proceedings in abeyance be denied. (ECF No. 37; see ECF Nos. 22, 24, 29, 31.)

26           Respondent filed its informal response to the second state habeas petition on October 15,

27   2002, in the California Supreme Court. (LD 43-A.)

28           On that same date, in these proceedings, Petitioner sought reconsideration of the

1    magistrate judge's order striking certain claims and filed objections to the findings and

2    recommendations concerning his request for abeyance. (ECF No. 40.) Respondent replied to the

3    objections on October 21, 2002, and lodged in this Court its informal response to Petitioner's

4    second state habeas petition. (ECF Nos. 42-43.) On November 20, 2002, District Judge Morrison

5    C. England ordered paragraph 1293 of claim 59 of the petition be struck as unexhausted and

6    stayed the proceedings in this court pending resolution of the second state habeas petition by the

7    California Supreme Court. (ECF No. 45.)

8          On July 24, 2003, Petitioner filed in the California Supreme Court his reply to

9    respondent's informal response to his second state habeas petition, including several additional

10   exhibits in support thereof. (LD 51-1.)

11         On May 27, 2005, in this Court, Petitioner filed an Amended Petition for Writ of Habeas

12   Corpus, which asserted 158 claims. (ECF No. 59.) At the time, the California Supreme Court had

13   not yet ruled on the second state habeas petition and Petitioner advised this Court he had sought a

14   stay of the state habeas corpus proceedings pending resolution of certain discovery requests in

15   state court. (ECF No. 61.) Thereafter, the proceedings in this Court remained stayed for several

16   years while the second state habeas petition remained pending in the California Supreme Court.

17   (ECF Nos. 65-87.) On May 20, 2010, the California Supreme Court denied the second petition for

18   writ of habeas corpus in its entirety, on the merits, in a summary order. (See ECF No. 88-1; In re

19   Coddington, No. S107502 (Cal. Sup. Ct. May 20, 2010).)

20         On November 15, 2010, Respondent filed a brief addressing issues of exhaustion and

21   procedural default. (ECF Nos. 99, 101, 102.) On April 1, 2011, Petitioner filed an opposition

22   (ECF No. 131.) On May 16, 2011, Respondent filed a reply brief. (ECF No. 148). Resolution of

23   this briefing is currently pending before the Court. (See ECF Nos. 189 at 21, 209 at 33

24   (acknowledging same).)

25         On December 21, 2010, Petitioner filed a motion for discovery and filed a supplemental

26   motion the following day. (ECF Nos. 107, 110.) On February 17, 2011, Respondent opposed both

27   discovery motions. (ECF Nos. 120-121.) In March 2011, petitioner filed a supplemental brief in

28   support of his December 21, 2010, motion for discovery. (ECF No. 130.) The following month,

1   the then-assigned magistrate judge ordered the parties to brief the effect of the United States

2   Supreme Court's decision in <u>Cullen v. Pinholster</u>, 563 U.S. 170 (2011), on these proceedings, and

3   particularly, on the discovery motions then-pending. (ECF No. 133.) The parties filed their

4   briefing on May 4, 2011. (ECF Nos. 138-139.) On May 27, 2011, the magistrate judge denied

5   Petitioner's motions for discovery, without prejudice. (ECF No. 150.) Petitioner timely moved for

6   reconsideration of the magistrate judge's order by the district judge (ECF Nos. 154, 157, 159),

7   which Respondent opposed. (ECF Nos. 163, 164.) On October 11, 2011, a hearing was held

8   before District Judge Kimberly J. Mueller on Petitioner's motion for reconsideration and the

9   matter was submitted at the conclusion of the hearing. (ECF Nos. 174 & 176.) Petitioner

10  thereafter filed supplemental authorities. (ECF No. 182.) On September 20, 2013, the district

11  court denied the motion for reconsideration. (ECF No. 199.)

12        On September 15, 2011, Respondent filed an Answer to the First Amended Petition for

13  Writ of Habeas Corpus. (ECF No. 173.) On October 14, 2011, Petitioner moved to strike

14  Respondent's answer and for a more definite statement (ECF No. 175), which Respondent

15  opposed. (ECF No. 177.) Petitioner replied to the opposition and thereafter filed supplemental

16  authority. (ECF Nos. 178-179.) Following a hearing on December 1, 2011, the then-assigned

17  magistrate judge granted the motion to strike and directed Respondent to file an amended answer.

18  (ECF No. 181.)

19        On June 27, 2012, Respondent filed an amended Answer to the Petition for Writ Of

20  Habeas Corpus. (ECF No. 189.) The undersigned was reassigned to this action on November 20,

21  2012. (ECF No. 192.) Petitioner filed a Traverse on October 20, 2014. (ECF No. 209.)

22        On October 27, 2014, the undersigned issued an order requiring the filing of a joint

23  statement addressing "whether the section 2254(d) issues" had been adequately briefed, and if

24  not, the parties were to propose a briefing schedule. (ECF No. 210.) On November 17, 2014, the

25  parties filed a joint statement, agreeing no further briefing was necessary. (ECF No. 211.)

26        Respondent lodged additional materials in this Court on January 11, 2016, with addenda

27  thereto on January 27 and March 22, 2016; and on December 9, 2022 (ECF Nos. 220-222, 224).

28  ////

1

**PRELIMINARY MATTERS**

2          In the Amended Petition, Petitioner raised 147 claims for relief. (ECF No. 59; <u>see</u> ECF

3    No. 209 at 116 & n.43 [explaining that the claims are erroneously numbered through 160].)[9] In

4    his Traverse, Petitioner expressly conceded the claims numbered 1, 2, 4, 16, 17, 18, 19, 20, 24,

5    25, 26, 27, 28, 30, 33, 39, 42, 51, 61, 62, 64, 65, 67, 70, 72, 73, 74, 75, 78, 80, 81, 83, 84, 88, 90,

6    91, 94, 95, 107, 108, 115, 116, 117, 123, 124, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138,

7    139, 141, 144, 145, 146, 152, 153, 154, 155, 160 (b)&(c). (ECF No. 209 at 760.) Petitioner also

8    apparently abandoned in the Traverse an additional fifteen claims by making no argument in their

9    support; these are claims numbers 52, 53, 96, 97, 98, 113, 114, 121, 122, 127, 128, 142, 143, 148,

10   and 151. (<u>See</u> ECF No. 209; <u>see also</u> ECF No. 209 at 1, ECF No. 211 at 1-2 (indicating that the

11   Traverse reflected Petitioner's briefing of the applicability of § 2254(d) and merits briefing for all

12   operative claims).) In Respondent's briefs concerning procedural default, Respondent had

13   asserted that claims 7, 43, 52, 58, 62, 67, 70, 78, 90, 96, 99, 101, 103, 105, 107, 109, 111, 113,

14   115, 121, 135, and 160(b) and (c) are procedurally defaulted (ECF No. 102 at 2; <u>see also</u> ECF No.

15   189 at 21); because of Petitioner's concessions and abandonments in the Traverse, however, the

16   only operative claims for which Respondent has asserted procedural defaults are claims 7, 43, 58,

17   99, 101, 103, 105, 109 and 111. Therefore, in the instant Findings and Recommendations, the

18   undersigned considers the application of the asserted procedural defaults to those claims and

19   considers the application of 28 U.S.C. § 2254(d) to the operative claims that were denied on the

20   merits by the state court. (<u>See generally</u> ECF Nos. 210, 211.)

21

**APPLICATION OF 28 U.S.C. § 2254(d)**

22   I.    <u>Legal Standards</u>

23          Title 28 U.S.C. § 2254 confers upon a federal district court the jurisdiction to consider a

24   petition for writ of habeas corpus challenging a state court conviction. A writ of habeas corpus is

25   available under section 2254 only on the basis of some transgression of federal law binding on the

26   state courts. <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1994); <u>Middleton v. Cupp</u>, 768 F.2d

27   _____

[9] There are no claims numbered 5, 21, 23, 36, 38, 41, 57, 63, 66, 68, 71 or 76. Claim 156 has
28   previously been stricken. (ECF No. 37; <u>see</u> ECF Nos. 40, 45.)

1083, 1085 (9th Cir. 1985). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

Where a state court resolves a federal constitutional claim on the merits, the petitioner in federal court may not succeed on that claim absent a showing that the state court resolution of the claim was contrary to law or unreasonable. 28 U.S.C. § 2254(d). Congress adopted this standard when it revised the habeas statutes in 1996 as part of the Anti-terrorism and Effective Death Penalty Act ("AEDPA"). To meet the standards, a petitioner must establish that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Section 2254(d) is a gateway. If a petitioner satisfies either subsection (1) or (2) for a claim, then the federal court considers that claim de novo. See Panetti v. Quarterman, 551 U.S. 930, 953 (2007); Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008).

Under AEDPA, the state court's determination is given a high degree of deference and, in considering whether either subsection of 2254(d) is met, the focus of the federal court's inquiry is only the record that had been before the state court at the time of its adjudication. Cullen v. Pinholster, 563 U.S. 170, 180-82 (2011). In order to satisfy section 2254(d), a petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011); see also Amado v. Gonzalez, 758 F.3d 1119, 1131-32 (9th Cir. 2014). Thus, federal habeas relief is precluded if "'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). This objective standard of reasonableness applies to review under both subsections of 28 U.S.C. § 2254(d). See Hibbler v. Benedetti, 693 F.3d 1140, 1146-47 (9th Cir. 2012). The federal court

must engage in the deferential review even where the state court has not provided a reasoned

decision. Richter, 562 U.S. at 99-100.

In the present case, some of Petitioner's claims were raised, and rejected, in the California

Supreme Court's reasoned decision on appeal and some were raised in his state habeas petitions,

which the California Supreme Court summarily denied. A summary denial is presumed to be a

denial on the merits of the petitioner's claims and, in assessing those claims summarily denied by

the state court, the federal court must defer to the state court's denial if review of the state court

record shows any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98.

The federal court "must determine what arguments or theories . . . could have supported . . . the

state court's decision; and then it must ask whether it is possible fairminded jurists could disagree

that those arguments or theories are inconsistent with the holding in a prior decision of [the

Supreme] Court." Id. at 102. The petitioner bears "the burden to demonstrate that 'there was no

reasonable basis for the state court to deny relief.'" Walker v. Martel, 709 F.3d 925, 939 (9th Cir.

2013) (quoting Richter, 562 U.S. at 98).

When reviewing the California Supreme Court's summary denial of a petition for writ of

habeas corpus that had been brought in state court, this court must consider that

> the California Supreme Court's summary denial of a habeas petition
> on the merits reflects that court's determination that "the claims
> made in th[e] petition do not state a prima facie case entitling the
> petitioner to relief." It appears that the court generally assumes the
> allegations in the petition to be true, but does not accept wholly
> conclusory allegations, and will also "review the record of the trial
> ... to assess the merits of the petitioner's claims."

Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal.4th 750, 770 (1993), and citing

People v. Duvall, 9 Cal.4th 464, 474 (1995)). Accordingly, in these instances, the absence of a

prima facie case is the state-court determination that this court reviews under section 2254(d) and

that determination is considered a denial "on the merits" for the purposes of AEDPA. See

Pinholster, 563 U.S. at 190; Ochoa v. Davis, 50 F.4th 865, 888 (9th Cir. 2022); Nunes v. Mueller,

350 F.3d 1045, 1054-55 (9th Cir. 2003). A petitioner establishes a prima facie case of a

constitutional violation if he made allegations sufficient to support the claim and demonstrated

that "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he has proved his

28

1   claim. <u>Nunes</u>, 350 F.3d at 1054-55. If this court finds petitioner had unarguably presented a prima

2   facie case for relief on a claim to the state court, the state court's summary rejection of that claim

3   was unreasonable. <u>Id.</u>

4         Under section 2254(d), the state court decision is not entitled to deference if either

5   subsection (d)(1) or (d)(2) is met. <u>See</u> 28 U.S.C. § 2254(d) (listing subsections in the disjunctive).

6   Subsection (d)(1) states that no deference is owed if the state court decision reflects "a decision

7   that was contrary to, or involved an unreasonable application of, clearly established Federal law."

8   28 U.S.C. § 2254(d)(1). "Clearly established Federal law" is that which was set forth in the

9   United States Supreme Court's "applicable holdings," <u>Carey v. Musladin</u>, 549 U.S. 70, 74 (2006),

10  rather than dicta, at the time the state court decided the issue. <u>Cannedy v. Adams</u>, 706 F.3d 1148,

11  1157 (9th Cir. 2013); <u>see also</u> <u>Stanley v. Schriro</u>, 598 F.3d 612, 617 (9th Cir. 2010), <u>amended on</u>

12  <u>other grounds</u>, 733 F.3d 794 (9th Cir. 2013). While "circuit court precedent may be persuasive in

13  determining what law is clearly established and whether a state court applied that law

14  unreasonably," <u>Maxwell v. Roe</u>, 606 F.3d 561, 567 (9th Cir. 2010), circuit precedent may not be

15  "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal

16  rule that th[e] [Supreme] Court has not announced." <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013)

17  (citing <u>Parker v. Matthews</u>, 567 U.S. 37, 48-49 (2012) (per curiam)). Additionally, where courts

18  of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly

19  established Federal law" governing that issue. <u>Carey</u>, 549 U.S. at 77.

20        A state court decision is "contrary to . . . clearly established Federal law" under subsection

21  (d)(1) if it applies a rule contradicting a holding of the Supreme Court or reaches a result different

22  from Supreme Court precedent on "materially indistinguishable" facts. <u>Price v. Vincent</u>, 538 U.S.

23  634, 640 (2003). A state court decision is an "unreasonable application" of clearly established

24  federal law if "the state court correctly identifies the governing legal principle . . . but

25  unreasonably applies it to the facts of the particular case." <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002)

26  (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 407-08 (2000)). When the federal court reviews the

27  summary denial of a habeas corpus petition by the state court—where, by virtue of it having been

28  a summary denial, the state court made no factual findings—the federal court analyzes the state-

1    court decision under 2254(d)(1), because the state court's determination that petitioner's

2    allegations if true did not state a prima facie case for relief is a legal determination, rather than a

3    factual one. Prescott v. Santoro, 53 F.4th 470, 479 (9th Cir. 2022).

4          Subsection 2254(d)(2) provides that an unreasonable factual determination by the state

5    court is not entitled to deference. See 28 U.S.C. § 2254(d)(2). There are two ways a petitioner

6    may satisfy subsection (d)(2): he may show the state court's findings of fact "were not supported

7    by substantial evidence in the state court record" or he may "challenge the fact-finding process

8    itself on the ground it was deficient in some material way." Hibbler, 693 F.3d at 1146 (citing

9    Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), abrogated on other grounds by

10   Murray v. Schriro, 745 F.3d 984, 1000 (9th Cir. 2014)); see also Hurles v. Ryan, 752 F.3d 768,

11   790-91 (9th Cir. 2014) (if a state court makes factual findings without an opportunity for the

12   petitioner to present evidence, the fact-finding process is deficient and the state court opinion is

13   not entitled to deference), cert. denied, 574 U.S. 1071 (2014). The standard for determining

14   whether the state court's fact-finding process is insufficient requires the federal court to "be

15   satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is

16   pointed out would be unreasonable in holding that the state court's fact-finding process was

17   adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th

18   Cir. 2004)). This standard is satisfied, for example, where the state court denied the petitioner an

19   evidentiary hearing when the petitioner's proffered evidence satisfied the state-law standard for

20   granting one. Brumfield v. Cain, 576 U.S. 305, 320-22 (2015). In contrast, the state court's failure

21   to have held an evidentiary hearing is not unreasonable if the state court may have reasonably

22   concluded that the evidence already on the record sufficed to resolve the relevant factual question.

23   Hibbler, 693 F.3d at 1147; Earp, 431 F.3d at 1167-70. Thus, a state court may make factual

24   findings without an evidentiary hearing if "the record conclusively establishes a fact or where

25   petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943,

26   951 (9th Cir. 2006) (citing Nunes, 350 F.3d at 1055); cf. Landrigan v. Schriro, 550 U.S. 465, 474

27   (2007) (in federal habeas corpus proceedings, a district court may decline to hold an evidentiary

28   hearing "if the record refutes the applicant's factual allegations or otherwise precludes habeas

30

1    relief").

2          If a petitioner shows that section 2254(d)(1) or (d)(2) is satisfied, this court may review

3    the merits of the claim de novo. 28 U.S.C. § 2254(d); see Panetti, 551 U.S. at 953; Frantz, 533

4    F.3d at 737. For the claims upon which Petitioner seeks to present evidence, Petitioner must meet

5    the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual

6    basis of [the] claim in State court proceedings" and by meeting the federal case law standards for

7    the presentation of evidence in a federal habeas corpus proceeding. See Pinholster, 563 U.S. at

8    185-86.

9    II.    Petitioner's Challenges to the Applicability of 28 U.S.C. § 2254(d)

10         Petitioner makes several broad challenges to the application of § 2254(d),[10] none of which

11   have merit. First, Petitioner argues that none of the claims that the California Supreme Court

12   denied summarily, in state habeas corpus proceedings, were denials "on the merits" within the

13   meaning of section 2254(d) because the denial reflected, as a matter of state procedural law,

14   merely that Petitioner had failed to state a prima facie case for relief. (ECF No. 209 at 12-30, 74-

15   76.) This argument was squarely foreclosed by Pinholster, where the Supreme Court examined

16   California's state habeas pleading and adjudication procedures specifically and held that the

17   California Supreme Court's summary denial of a habeas corpus claim constituted a merits denial

18   within the meaning of section 2254(d). Pinholster, 563 U.S. at 187-88; see also Montiel v.

19   Chappell, 43 F.4th 942, 957 (9th Cir. 2022) (rejecting same argument, citing Pinholster).

20         Second, Petitioner argues that the California Supreme Court's treatment of federal

21   constitutional claims in other published decisions indicates that it holds petitioners to higher

22   pleading standards than constitutional law requires, thus indicating that the California Supreme

23   _____

24   [10] In the parties' joint statement filed November 17, 2014, Respondent noted he did not have "an
     opportunity to specifically address Petitioner's interpretation of California's habeas corpus
25   procedures, his general attacks on the applicability of section 2254(d) to this case, or his specific
     application of section 2254(d) to individual claims." Nevertheless, to avoid additional delay,
26   Respondent was "willing to submit the section 2254(d) matters on the briefing as it now stands,"
     and referred to the previous findings made by the undersigned in Frye v. Warden, 2:99-cv-0628,
27   on December 3, 2013. (See ECF No. 211 [now vacated via Amended Findings and
     Recommendations dated 1/22/15].) The undersigned therefore considers those arguments as if
28   fully set forth in Respondent's briefing in the instant case.

                                                      31

1  Court applies federal constitutional law unreasonably or contrary to Supreme Court precedent.

2  (ECF No. 209 at 78-79; see also id. at 111-16 (arguing that the California Supreme Court holds

3  petitioner to an erroneously high burden to demonstrate prejudice for ineffective assistance of

4  counsel claims).) This is meritless. Under Pinholster, 563 U.S. at 188, and Richter, 562 U.S. at

5  98, 102, this Court must defer to the state court's denial if there is any reasonable basis for it,

6  consistent with governing law; this is not rebutted by evidence of what the state court did in other

7  cases, but instead the federal court's only inquiry is "'what arguments or theories . . . *could have*

8  supporte[d] the state court's decision [in petitioner's case]; and . . . whether it is possible

9  fairminded jurists could disagree that those arguments or theories are inconsistent with the

10  holding in a prior decision of'" the Supreme Court. Pinholster, 563 U.S. at 188 (quoting Richter,

11  562 U.S. at 102) (italics added)); see also Visciotti, 537 U.S. at 24 ("§ 2254(d)'s 'highly

12  deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be

13  given the benefit of the doubt" (quoting Lindh v. Murphy, 521 U.S. 320, 333, n.7 (1997))). To the

14  extent this argument posits that California's presumption of correctness of a criminal judgment in

15  habeas review reflects a higher burden for a habeas petitioner than he would face in federal court

16  or is otherwise inconsistent with governing constitutional law (see ECF No. 209 at 56-61), he is

17  incorrect. See, e.g., Richter, 562 U.S. at 98; Brecht v. Abrahamson, 507 U.S. 619, 633 (1993); see

18  also Duckworth v. Eagan, 492 U.S. 195, 210 (1989); United States v. Frady, 456 U.S. 152, 164-

19  66 (1982). To the extent that he argues that the California Supreme Court's procedures for

20  adjudicating habeas corpus petitions violate the Supremacy Clause or reflect suspensions of the

21  writ of habeas corpus (see ECF No. 209 at 77-79, 95), these arguments are also foreclosed by

22  binding precedent. Felker v. Turpin, 518 U.S. 651, 664 (1996); Crater v. Galaza, 491 F.3d 1119,

23  1124 (9th Cir. 2007).

24         Third, Petitioner argues that the California Supreme Court's denial of the opportunity for

25  adequate factual development in state habeas proceedings, absent the issuance of an order to show

26  cause, reflects a denial of his due process rights. (ECF No. 209 at 79-96.) The defects that

27  Petitioner identifies do not appear to rise to level of offending fundamental principles of justice or

28  fairness, but rather permissible limitations on access to discovery mechanisms in post-conviction

1  proceedings, given the lesser liberty interests recognized in that stage of proceedings. See Dist.

2  Attorney's Office for the Third Judicial District v. Osborne, 557 U.S. 52, 69-72 (2009); Chapman

3  v. Sacramento Cnty. Dist. Attorney's Off., 812 F. App'x 641 (9th Cir. 2020).

4                                          **PROCEDURAL BARS**

5         As noted, Respondent raises the argument that certain of Petitioner's claims were denied

6  by the California Supreme Court as procedurally barred and, as such, the federal court must defer

7  to those denials. (ECF No. 102 at 2; ECF No. 189 at 21.) As a matter of comity, the federal courts

8  "will not review a question of federal law decided by a state court if the decision of that court

9  rests on a state law ground that is independent of the federal question and adequate to support the

10  judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991), superseded on other grounds by 28

11  U.S.C. § 2254(b) and overruled on other grounds by Martinez v. Ryan, 566 U.S. 1 (2012). For a

12  claim to be procedurally barred, the petitioner must have actually violated a state procedural rule,

13  see Wells v. Maass, 28 F.3d 1005, 1008 (9th Cir. 1994), and the highest state court to consider the

14  claim must have actually relied on the procedural default to deny the claim. See Harris v. Reed,

15  489 U.S. 255, 261-62 (1989); Zapata v. Vasquez, 788 F.3d 1106, 1112 (9th Cir. 2015). To be

16  "adequate to support the judgment," Coleman, 501 U.S. at 729, the rule must be "firmly

17  established and regularly followed" at the time of the purported default. Beard v. Kindler, 558

18  U.S. 53, 60 (2009) (quoting Lee v. Kemna, 534 U.S. 362, 376 (2002)).

19         The State bears the initial burden of pleading the existence of a state procedural

20  ground. Williams v. Filson, 908 F.3d 546, 577 (9th Cir. 2018); Bennett v. Mueller, 322 F.3d 573,

21  585-86 (9th Cir. 2003). If the State makes this initial showing, the burden shifts to the petitioner

22  to demonstrate that the procedural ground is not adequate because, for example, it was not

23  consistently applied at the time of the state court adjudication. Williams, 908 F.3d at 577. If the

24  petitioner makes such a showing, the burden then shifts back to the State to make a showing in

25  rebuttal. Id.

26         A federal court may elect not to apply an otherwise-valid procedural bar in two narrow

27  circumstances: if the petitioner can demonstrate cause for the default and prejudice as a result of

28  the alleged violation of federal law, or if the petitioner can show that failure to consider the claim

                                                    33

1    will result in a fundamental miscarriage of justice. See Martinez, 566 U.S. at 9-10; see also

2    Maples v. Thomas, 565 U.S. 266, 280 (2012); Hurles v. Ryan, 752 F.3d 768, 780 (9th Cir. 2014).

3    The Petitioner having received ineffective assistance of counsel, in violation of his Sixth

4    Amendment rights, in his state direct appeal or habeas corpus litigation may constitute cause for

5    the federal court excusing an otherwise valid procedural default. See Martinez, 566 U.S. 1.

6          For all of the operative claims for which Respondent has asserted a procedural bar,

7    Petitioner has argued that his trial counsels' ineffectiveness served as cause and prejudice for this

8    court to decline to apply the procedural bar. (ECF No. 131 at 23-25, 31, 36, 37-38, 40-41, 44, 50,

9    53, 56, 58, 65, 66, 68, 69, 70, 71-72, 72-73, 74, 76, 77-78.) Petitioner therefore requests that,

10   should the undersigned determine a procedural bar invoked by the state court is facially entitled to

11   deference, then the undersigned should defer ruling on whether cause and prejudice exists until

12   the court proceeds to a merits determination on the ineffectiveness allegations. (Ibid.; ECF No.

13   209 at 33.) Respondent agrees with this approach. (ECF No. 148 at 15.) This procedure is

14   generally proper, see Martinez, 566 U.S. 1, with the caveat that because "a federal habeas court

15   may *never* 'needlessly prolong' a habeas case" Shinn v. Ramirez, __ U.S. __ 212 L. Ed. 2d 713,

16   142 S. Ct. 1718, 1739 (2022) (quoting Pinholster, 563 U.S. at 209 (Sotomayor, J., dissenting)

17   (italics in original)), the federal court may not allow evidentiary development to support the non-

18   application of a procedural bar under the cause-and-prejudice doctrine "if the newly developed

19   evidence never would 'entitle [the prisoner] to federal habeas relief,'" ibid. (quoting Shriro v.

20   Landrigan, 550 U.S. 465, 474 (2007)), whether because the ineffective assistance of counsel

21   allegations forming petitioner's cause and prejudice argument do not state a prima facie case

22   under Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984), or because the underlying

23   habeas corpus claim itself is meritless. Shinn, 142 S. Ct. at 1737, 1739; see also Coleman v.

24   Thompson, 501 U.S. 722, 755 (1991).

25         If the federal court finds a state's procedural default inapplicable, then the federal court

26   reviews the claim de novo. Cone v. Bell, 556 U.S. 449, 472 (2009); Pirtle v. Morgan, 313 F.3d

27   1160, 1167 (9th Cir. 2002). Correspondingly, where a claim is meritless, the federal court may

28   deny it on that basis without first determining the adequacy, independence, and applicability of

1  any procedural bars asserted for the claim. See, e.g., Franklin v. Johnson, 290 F.3d 1223, 1232

2  (9th Cir. 2002) ("appeals courts are empowered to, and in some cases should, reach the merits of

3  habeas petitions if they are, on their face and without regard to any facts that could be developed

4  below, clearly not meritorious despite an asserted procedural bar"); see also Bell v. Cone, 543

5  U.S. 447, 451 n.3 (2005) (an application for habeas corpus may be denied on the merits even if

6  unexhausted in state court).

7        The doctrine of procedural bars and the deference to state courts' merits determinations

8  codified at 28 U.S.C. section 2254(d)(1) and (2) operate in tandem for the same purpose: "to

9  confirm that state courts are the principal forum for asserting constitutional challenges to state

10  convictions." Richter, 562 U.S. at 103. Ergo,

11          [i]f the state court rejects the claim on procedural grounds, the claim
            is barred in federal court unless one of the exceptions to the doctrine
12          . . . applies. And if the state court denies the claim on the merits, the
            claim is barred in federal court unless one of the exceptions to §
13          2254(d) set out in §§ 2254(d)(1) and (2) applies.

14  Ibid. Thus, this court must first determine on what basis the state court denied the claim: through

15  the application of a procedural bar or on the merits. See ibid.; 28 U.S.C. § 2254(d). If this court

16  concludes that the state court denied relief through the application of a procedural bar, and then

17  determines that that procedural bar should not be given deference (because, for instance, the court

18  concludes that the procedural bar is not independent and adequate), the court would then review

19  the claim de novo, rather than engaging in the analyses described at subsections 2254(d)(1) and

20  (2), as those only apply to claims "adjudicated *on the merits* in State court proceedings." 28

21  U.S.C. § 2254(d) (italics added). Similarly, the court would only undertake analysis under 28

22  U.S.C. subsections 2254(d)(1) or (2) if it first concluded that the claim had been adjudicated on

23  the merits; it would be analytically backwards for the court to analyze the claim under subsections

24  2254(d)(1) and (2) and then decide whether, in fact, the state court had denied the claim on

25  procedural grounds instead. Thus, for those claims for which Respondent has asserted a

26  procedural bar and for which the parties also have briefed the applicability of 2254(d), the court

27  typically first determines on what basis the state court denied relief and proceeds accordingly. See

28  Richter, 562 U.S. at 103.

1     This analysis is rendered, in some instances, simpler because, as noted above, if the court

2     concludes that a procedural bar invoked by the state court should not be given deference, or, for

3     those claims adjudicated on the merits, if the court concludes that 28 U.S.C. subsections

4     2254(d)(1) or (2) are satisfied, the result is the same: the claim is reviewed de novo by the federal

5     court. See Cone, 556 U.S. at 472; Panetti, 551 U.S. at 953. Therefore, if a claim is ultimately

6     meritless, the federal court may deny it on this basis without resolving the intermediate questions

7     of on what basis the state court denied the claim, whether circumstances exist to decline to defer

8     to any invoked procedural bars, or whether circumstances exist to decline to defer to the state

9     court's merits determination. See Berghuis v. Thompkins, 560 U.S. 370, 389-90 (2010) (where it

10    is unclear whether the AEDPA standard applies, a state court's adjudication that is correct under a

11    de novo standard would necessarily be reasonable under the more deferential AEDPA standard of

12    review); see also Brown v. Davenport, __ U.S. __, 212 L. Ed. 2d 463, 142 S. Ct. 1510, 1524

13    (2022) ("a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either this

14    Court's equitable precedents [for habeas relief on the merits] or AEDPA. But to *grant* relief, a

15    court must find that the petitioner has cleared both tests." (italics in original)).

16

17                                       **CLAIMS FOR RELIEF**

18    **CLAIM 3**

19           In Claim 3, Petitioner alleges that his rights to due process of law were violated when

20    Judge Fogerty transferred the trial to another division within the county based, at least in part, on

21    Judge Fogerty's own interests and by Judge Fogerty's failure to disclose the conflict to the

22    defense. Petitioner has not shown that the state court's denial of this claim was contrary to or an

23    unreasonable application of clearly established federal law under section 2254(d).

24           1.   Proceedings in State Court

25           Petitioner timely raised this claim in his first petition for writ of habeas corpus.[11] In it, he

26    alleged that when the criminal proceeding was initiated against him, it was located in the South

27    _____
      [11] This was raised as Claim A-1(b)&(c) in that pleading. (See LD 25-C.1 at 8-10.) An allegation

28    that the prosecution improperly failed to disclose the basis of the judicial bias was struck as
      untimely (see ECF No. 37 at 3), and Petitioner proceeds with that allegation stricken. (See ECF

1   Lake Tahoe division of the Superior Court of El Dorado County but, before trial and without

2   notice to the parties, the presiding judge moved the case to the Placerville division. (ECF No. 59

3   at 8, 46.) According to Petitioner, although Judge Fogerty's stated purpose for the transfer was

4   facilitation of obtaining jurors untainted by pretrial publicity, he was also motivated by personal

5   biases. Petitioner alleged and presented some documentary evidence tending to show that Judge

6   Fogerty was under investigation by the F.B.I. at the time of his decision and that prosecution

7   witness Joe Eric Tveten may have also been involved in the drug activities for which Judge

8   Fogerty was under investigation; according to Petitioner, by transferring the case to his own

9   division, Judge Fogerty could "keep an eye on the proceedings" (ECF No. 209 at 621) and

10  thereby "enhance[] his ability to determine the nature and extent of Tveten's communications

11  with the F.B.I., and/or to see to it that information damaging to himself did not surface." (ECF

12  No. 59 at 90.) Petitioner also alleged that Judge Fogerty personally disliked the judge to whom

13  the matter had been assigned and ordered the transfer out of personal spite. (ECF No. 59 at 91.)[12]

14          Petitioner alleged that these facts indicated that "the transfer order was motivated in whole

15  or in part by the judge's self-interest," thereby violating Petitioner's rights to "due process, fair

16  trial, impartiality, and trustworthiness guarantee[d] [by] the Fifth, Sixth, Eighth, and Fourteenth

17  Amendments," including his right to be free from "arbitrary" judicial orders. (LD 25-C.1 at 9,

18  10.) The California Supreme Court denied the claim summarily, on the merits. (LD 25-C.5.)

19          2.  Legal Standard

20          A defendant has a due process right to a fundamentally fair trial, which includes a judge

21  "who has no direct personal interest in the outcome of a proceeding." Paradis v. Arave, 20 F.3d

22  _____

23  No. 59 at 90, n.84.)
    [12] In his Traverse, Petitioner also offers an alternative basis for relief: that the trial judge, Judge
24  Finney, was biased in denying Petitioner's motion for reconsideration of the transfer order,
    because the denial was based on Judge Finney's personal desire to maintain a harmonious
25  relationship with Judge Fogerty. (See ECF No. 209 at 626.) The Court declines to consider
    allegations and theories of relief raised for the first time in the Traverse. See Delgadillo v.
26  Woodford, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in [a
    habeas] petitioner's reply brief are deemed waived."); Cacoperdo v. Demosthenes, 37 F.3d 504,
27  507 (9th Cir. 1994) ("A Traverse is not the proper pleading to raise additional grounds for
    [federal habeas] relief."), cert. denied, 514 U.S. 1026 (1995).
28

1    950, 958 (9th Cir. 1994); see In re Murchison, 349 U.S. 133, 136 (1955) (a "fair trial in a fair

2    tribunal is a basic requirement of due process"). Reversal is required where a petitioner shows

3    that the judge harbored an actual bias against him or that "there existed an unconstitutional

4    potential for bias." Hurles v. Ryan, 752 F.3d 768, 789 (9th Cir. 2014), citing Caperton v.

5    A.T. Massey Coal Co., 556 U.S. 868, 881 (2009); see also Mayberry v. Pennsylvania, 400 U.S.

6    455, 465-66 (1971); Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986). To succeed on a

7    judicial bias claim, a petitioner must "overcome a presumption of honesty and integrity in those

8    serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47 (1975).

9            3.   The California Supreme Court's Summary Denial of this Claim Was Neither Contrary

10                to Nor an Unreasonable Application of Clearly Established Federal Law

11           In summarily denying this claim on the merits, the California Supreme Court did not act

12   contrary to nor unreasonably apply clearly established federal law. At the time of the

13   adjudication, clearly established federal law set forth a "broad rule that a biased judge may well

14   give rise to a due process violation." Presley v. Premo, 701 F. App'x 619, 621 (9th Cir. 2017)

15   (citing Bracy v. Gramley, 520 U.S. 899, 904-05 (1997)); see Bracy, 520 U.S. at 904-05 ("the

16   floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,'

17   [citation] before a judge with no actual bias against the defendant or interest in the outcome of his

18   particular case"). "Biased" in this sense encompasses situations where the judge possessed an

19   actual bias against the defendant, as well as situations where there is not evidence of actual bias,

20   but where the factual circumstances give rise to a "'probability of unfairness'" in light of "'a

21   realistic appraisal of psychological tendencies and human weakness.'" Hurles v. Ryan, 752 F.3d

22   768, 788-90 (9th Cir. 2014) (quoting Caperton, 556 U.S. at 883-84, and Murchison, 349 U.S. at

23   136). The latter, often referred to as apparent bias, is an objective test that considers whether,

24   given the totality of the circumstances, "the average judge in [the judge at issue's] position is

25   likely to be neutral, or whether there is an unconstitutional potential for bias." Caperton, 556 U.S.

26   at 881 (internal citations omitted); see also Williams v. Pennsylvania, 579 U.S. 1, 8 (2016)

27   (same); Herrington v. Sonoma County, 834 F.2d 1488, 1502 (9th Cir. 1987) ("The test for ...

28   apparent bias sufficient to require [recusal] ... is an objective one: 'whether a reasonable person

1    with knowledge of all the facts would conclude that the judge's impartiality might reasonably be

2    questioned,'" quoting United States v. Nelson, 718 F.2d 315, 321 (9th Cir. 1983)).

3          The Supreme Court has acknowledged that the types of circumstances that give rise to

4    apparent bias "cannot be defined with precision," Murchison, 349 U.S. at 136, but "'[o]nly in the

5    most extreme of cases would disqualification on the basis of judge bias be constitutionally

6    required.'" Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (quoting Aetna Life Ins. Co. v.

7    Lavoie, 475 U.S. 813, 821 (1986)). At the time of the state court's denial of the claim in this case,

8    the Supreme Court had only found this standard met in three types of apparent-bias cases, where

9    "the judge had a direct pecuniary interest in the case, was involved in a controversy with a

10   litigant, or was part of the accusatory process." Martinez v. Ryan, 926 F.3d 1215, 1226-27 (9th

11   Cir. 2019) (collecting cases). The first form of apparent bias—the judge's pecuniary interest in

12   the case—was demonstrated in Tumey v. Ohio, 273 U.S. 510, 532 (1927), where the Court found

13   that bias should be presumed where the trial judge profited from every defendant he convicted, as

14   the process "would offer a possible temptation to the average man as a judge to forget the burden

15   of proof required to convict the defendant . . . ."  See also Ward v. Vill. of Monroeville, Ohio, 409

16   U.S. 57 (1972) (unconstitutional judicial conflict present where judicial officer served as mayor

17   and the fines imposed in his court financed a large portion of the village's budget). The second

18   form of apparent bias encompasses situations where there has been personal acrimony between a

19   litigant and the court. In Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971), for example, the

20   Supreme Court held that a judge who had been crassly insulted by a litigant, and then held the

21   litigant in contempt, could not also preside over that litigant's contempt trial because "[n]o one so

22   cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." See

23   also Taylor v. Hayes, 418 U.S. 488 (1974) (acrimonious personal relationship between judge and

24   lawyer required judge's recusal from lawyer's contempt trial). Finally, a third form of apparent

25   bias exists where the judge is responsible for multiple, possibly incompatible duties in a single

26   proceeding. For instance, in In re Murchison, 349 U.S. 133, 137 (1955), the Supreme Court found

27   a presumption of bias where the State employed a practice of permitting a judge to order a

28   witness to appear before them, hold the witness in contempt, and then preside over the contempt

1    trial; this "judge-grand jury" arrangement, the Supreme Court held, created the possibility of bias

2    by making the judge both the adjudicator and part of the accusatory process.

3          Given the nature of Petitioner's allegations and in light of the Supreme Court

4    jurisprudence at the time of the state court's decision, the state court did not act contrary to nor

5    unreasonably apply clearly established federal law in concluding that Petitioner had not set forth a

6    prima facie showing of relief. The Supreme Court had repeatedly emphasized that it is only in

7    extreme, rare circumstances that a judge's apparent bias would violate a defendant's due process

8    rights (see Bracy v. Gramley, 520 U.S. 899, 904-05 (1997); Aetna Life Ins. Co. v. Lavoie, 475

9    U.S. 813, 821 (1986)) and this bar had been met in "only three circumstances" (Crater v.

10   Galaza, 491 F.3d 1119, 1131 (9th Cir. 2007)): where the judge "ha[d] a direct, personal,

11   substantial pecuniary interest in reaching a conclusion against [one of the litigants]," Tumey, 273

12   U.S. at 523; where the judge had a personal controversy with one of the litigants or counsel, such

13   as the slanderous party held in contempt in Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971);

14   or where the judge was tasked with multiple, incompatible roles in the judicial process, such as

15   the hybrid grand juror-judge role found unconstitutional in Murchison, 349 U.S. at 135-37. See

16   Sivak v. Hardison, 658 F.3d 898, 924 (9th Cir. 2011); Crater v. Galaza, 491 F.3d 1119, 1131 (9th

17   Cir. 2007).

18         Here, the judicial interest alleged here is not of those types. Instead, Petitioner alleges that

19   bias could be inferred from Judge Fogerty's alleged interest in obtaining information about a

20   prosecution witness, from which he might deduce information about the progress of an

21   investigation into his own conduct, and from his alleged interest in maintaining a petty personal

22   feud with Petitioner's assigned trial judge. This is an allegation of apparent, rather than actual,

23   bias, but no clearly established federal law has recognized that the judicial interests identified are

24   of the nature that create an inference of unfairness in the average observer. See generally

25   Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (state court decision is contrary to clearly

26   established federal law when it reaches an opposite conclusion on facts that are "materially

27   indistinguishable from a relevant Supreme Court precedent"); Crater, 491 F.3d at 1131 (United

28   States Supreme Court has only clearly established that three types of circumstances give rise to

                                                      40

1  apparent bias). Moreover, in light of the Supreme Court's repeated insistence that the standard for

2  judicial bias is exceptionally narrow and that there exists a strong legal presumption against a

3  finding of bias (see Bracy, 520 U.S. at 904-05; Withrow v. Larkin, 421 U.S. 35, 47 (1975)), the

4  state court cannot be said to have "fail[ed] to extend a clearly established legal principle to"

5  Petitioner's claim "in a way that is objectively unreasonable" by concluding that those precedents

6  recognizing apparent bias in three narrow circumstances should not be applied more broadly to

7  also encompass Petitioner's allegations. See DeWeaver v. Runnels, 556 F.3d 995, 997 (9th Cir.

8  2009). It is therefore recommended that this claim be dismissed. See 28 U.S.C. § 2254(d).

9  **CLAIM 6**

10      In Claim 6, Petitioner alleges that defense counsel performed ineffectively at the guilt

11  phase by failing to present available psychiatric expert testimony in support of his defense that he

12  did not deliberate prior to the homicides. (ECF No. 59 at 108, 115-16.) Specifically, Petitioner

13  alleges that trial counsel unreasonably failed to timely ask sanity-phase experts Drs. Bittle, Mills,

14  Rosenthal, and Satten their opinions of whether Petitioner deliberated prior to the homicides, and

15  unreasonably failed to present the experts' available, admissible testimony at the guilt phase,

16  despite electing a mental state defense at that phase. (ECF No. 59 at 109-11.) Petitioner presented

17  this claim in his first petition for writ of habeas corpus (LD 25-C.1 at 18-30), which the California

18  Supreme Court denied summarily, on the merits. (LD 25-C.5.) That determination was not

19  contrary to, or an unreasonable application of, clearly established federal law, nor was it an

20  unreasonable factual determination. See 28 U.S.C. § 2254(d).

21      1.   Proceedings In State Court

22      During the guilt phase, the trial court made several rulings concerning the scope of

23  admissible psychiatric expert testimony. The trial court

24          ruled that the defense could offer any relevant evidence on mental
            defect or disease. However, no questions could be asked of the expert
25          by either appellant or the People about whether or how such defect
            or disease would affect the defendant's mental state or actuality, or
26          if it would impair his ability to form an intent, deliberate, or
            premeditate, unless the psychiatrist would testify, out of the presence
27          of the jury, that he believed that appellant did not premeditate and
            deliberate the killings. The court extended that ruling to preclude any
28          hypothetical questions regarding the effect of mental defect or illness

41

1     on a person's ability to deliberate or premeditate.

2   Coddington, 23 Cal.4th at 582.

3         At the guilt phase, the defense pursued a mental state defense to both first-degree murder

4   counts, conceding Petitioner's guilt—including that he had possessed the requisite mental

5   states—on the non-homicide counts. The defense did not present any psychiatric expert

6   testimony. Coddington, 23 Cal.4th at 582. In closing argument, defense counsel urged the jury to

7   conclude that, although Petitioner had premeditated, deliberated about, and intended his assaults

8   of Ms. Martin and Ms. Walsh, he had become overwhelmed when he could not silence them and

9   killed them spontaneously, due to his overwrought emotional state. (24 RT 4642-43, 4645, 4650-

10  52.) The defense had presented some evidence, through the testimony of Allen Hacker, that

11  Petitioner had a history of acting oddly when under stress, including one incident wherein he

12  behaved dramatically and loudly when signaling members of his "gambling team" at a casino in

13  Nevada. (22 RT 4333-47.) See Coddington, 23 Cal.4th at 556-58. In closing argument, defense

14  counsel addressed Petitioner's possible mental illness only briefly and in response to the

15  prosecutor's argument, contending that it was "for [the jury] to decide" whether the prosecutor

16  had been correct that "there's no evidence of mental defense or defect," encouraging the jury to

17  "read each and every one of those documents" that had been entered into evidence, including

18  Petitioner's writings, and "then . . .decide." (24 RT 4652.)

19        In his first petition for a writ of habeas corpus, Petitioner raised this claim and supported it

20  with declarations from trial counsel Richard Meyer; court-appointed sanity phase expert Dr.

21  Robert Bittle; defense sanity-phase expert Dr. Mark Mills; defense sanity-phase expert Dr. Fred

22  Rosenthal; and defense sanity-phase expert Dr. Joseph Satten. (LD 25-C.1 at 18-19; LD 25-C.3

23  Exs. A (Meyer declaration), H (Bittle declaration), T (Mills declaration), U (Rosenthal

24  declaration), V (Satten declaration).)[13] The California Supreme Court denied relief summarily, on

25  the merits. (LD 25-C.5.)

26  _____

27  [13] Petitioner's allegations in this claim lack some clarity and seem, in some respects, to overlap
    with the allegations raised in Claim 8. The undersigned understands Claim 6 as principally

28  alleging that trial counsel performed deficiently by failing to investigate and present available
    psychiatric expert testimony, which would have been admissible even under the trial court's

1          2.  Legal Standard

2          Under clearly established federal law, to prevail on a claim of ineffective assistance of

3   counsel, a petitioner must show that his trial counsel's performance "fell below an objective

4   standard of reasonableness" and that "there is a reasonable probability that, but for counsel's

5   unprofessional errors, the result of the proceeding would have been different." Strickland v.

6   Washington, 466 U.S. 668, 687-88, 694 (1984).

7          Under the first prong of the Strickland test, a petitioner must show that counsel's conduct

8   failed to meet an objective standard of reasonableness. Strickland, 466 U.S. at 687. There is "a

9   'strong presumption' that counsel's representation was within the 'wide range' of reasonable

10  professional assistance." Richter, 562 U.S. at 104 (quoting Strickland, 466 U.S. at 689). Petitioner

11  must rebut this presumption by demonstrating that his counsels' performance was unreasonable

12  under prevailing professional norms and was not the product of "sound trial strategy." Strickland,

13  466 U.S. at 688-89. Where a petitioner alleges that counsel unreasonably failed to investigate, the

14  court must consider whether the limited investigation was itself reasonable under objective

15  standards, as "strategic choices made after thorough investigation of law and facts relevant to

16  plausible options are virtually unchallengeable," but "strategic choices made after less than

17  complete investigation are reasonable precisely to the extent that reasonable professional

18  judgment supports limitations on investigation." Id. at 690-91; see also Wiggins v. Smith, 539

19  U.S. 510, 522-23 (2003) (where trial counsel is alleged to have failed to introduce favorable

20  evidence due to his failure to uncover it through reasonable investigation, the operative inquiry

21  into deficient performance under Strickland is "not whether counsel should have presented" the

22  evidence they could have found, but rather "whether the investigation supporting counsel's

23  decision not to introduce [the] evidence [at issue] *was itself reasonable*" (italics in original).)

24

25  _____

    erroneous ruling (requiring a threshold showing that the expert personally believed Petitioner had
26  not deliberated prior to the homicides, in order for that expert's testimony to be admitted at the
    guilt phase), and understands Claim 8 as alleging that trial counsel performed deficiently by
27  failing to adequately litigate the issue of the scope and limits of psychiatric expert testimony at
    the guilt phase, thereby resulting in the trial court's erroneous ruling. (See ECF No. 59 at 116-18,
28  146-48; ECF No. 209 at 125-29, 150-51; LD 25-C.1 at 20-27, 38-39.)

1          The second prong of the Strickland test requires a petitioner to show that counsel's

2    conduct prejudiced him. Strickland, 466 U.S. at 691-92. Prejudice is found where "there is a

3    reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

4    would have been different." Id. at 694. A reasonable probability is one "sufficient to undermine

5    confidence in the outcome." Id. at 693. "This does not require a showing that counsel's actions

6    'more likely than not altered the outcome,' but the difference between Strickland's prejudice

7    standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'"

8    Richter, 562 U.S. at 112 (quoting Strickland, 466 U.S. at 693). "The likelihood of a different

9    result must be substantial, not just conceivable." Id.

10         Under clearly established federal law, in considering whether counsel's deficient

11   performance was reasonably probable to have affected the jury's verdict, the prejudice from

12   individual instances of deficient performance should be considered cumulatively. Strickland, 466

13   U.S. at 695-96 ("Taking the unaffected findings as a given, and taking due account of the effect

14   of the errors on the remaining findings, a court making the prejudice inquiry must ask if the

15   defendant has met the burden of showing that the decision reached would reasonably likely have

16   been different absent the errors."). (See ECF No. 209 at 101-02.) Thus, the court "must analyze

17   each of [petitioner's] claims separately to determine whether his counsel was deficient, but

18   'prejudice may result from the cumulative impact of multiple deficiencies.'" Boyde v.

19   Brown, 404 F.3d 1159, 1175 (9th Cir. 2005) (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333

20   (9th Cir. 1978) (en banc)); see also Michaels v. Davis, 51 F.4th 904, 930 (9th Cir. 2022); Lang v.

21   Cullen, 725 F. Supp. 2d 925, 970-71 (C.D. Cal. 2010).

22         When a court is considering a claim of ineffective assistance of counsel through the

23   AEDPA lens, the court's analysis is "doubly . . . deferential," Richter, 562 U.S. at 105, because,

24   in order to grant relief, the court must consider not only whether Strickland's substantive standard

25   has been met, but whether each prong has been met so unequivocally that no reasonable jurist

26   could conclude otherwise. Id. Where, as here, the state court has denied relief without a reasoned

27   opinion, the habeas court must determine whether there was any reasonable basis for the denial,

28   consistent with clearly established federal law. Richter, 562 U.S. at 98; Kipp, 971 F.3d at 948.

44

Thus, if the state court could have reasonably found there was a lack of a prima facie showing of

relief on either the deficiency or prejudice prong of the <u>Strickland</u> inquiry, the denial is entitled to

deference. <u>Shinn</u>, 141 S. Ct. at 524; <u>cf</u>. <u>Strickland</u>, 466 U.S. at 697 (because petitioner bears the

burden on both prongs, "a court need not determine whether counsel's performance was deficient

before examining the prejudice suffered by the defendant as a result of the alleged deficiencies ....

If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,

which we expect will often be so, that course should be followed.")

      3.   The California Supreme Court's Denial of This Claim Was Not Contrary to, or an
           Unreasonable Application of, Clearly Established Federal Law Nor an Unreasonable
           Factual Determination

      Given the record before the state court, the state court reasonably could have found that no

clearly established federal law supported the argument that trial counsels' decisions with regards

to the investigation and presentation of psychiatric expert testimony at the guilt phase were

objectively unreasonable. In other words, the state court could have reasonably found that the

record failed to make a prima facie showing of deficient performance, such that Petitioner was

not entitled to relief.

      At the time of the state court adjudication, Supreme Court precedent had held that an

attorney has a duty to conduct reasonable investigations and may reasonably limit the scope of

their investigations. In <u>Strickland</u>, the Court held, "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations unnecessary.

In any ineffectiveness case, a particular decision not to investigate must be directly assessed for

reasonableness in all the circumstances, applying a heavy measure of deference to counsel's

judgments." 466 U.S. at 691. In <u>Strickland</u>, in preparation for his client's capital sentencing

hearing, defense counsel conducted some investigation: he interviewed his client about the latter's

background and conducted a telephone interview of his client's wife and mother. <u>Id</u>. at 672-73.

He did not, however, follow through on his plans to interview the client's wife and mother in

person; did not seek out any other character witnesses for his client; and did not request a

psychiatric examination for his client, as he saw no signs of mental illness. <u>Id</u>. at 673. He

"decided not to present and hence not to look further for evidence concerning respondent's character and emotional state." Ibid. One of his reasons for making this decision was to prevent the prosecution from cross-examining the defendant and "from putting on psychiatric evidence of its own." Ibid. At the sentencing hearing, defense counsel put on no evidence, but argued that the defendant should not be sentenced to death due to his remorse, lack of criminal history, and extreme emotional disturbance at the time of the crime. Id. at 673-74.

The Court held that it was "not difficult" to conclude counsel's performance was reasonable under prevailing professional norms. Id. at 698-99. His choice to forego presentation of mitigation evidence was based on his reasonable expectations of damaging rebuttal evidence and cross-examination that would result. Id. at 699. Additionally, the record had provided counsel some basis for his arguments at sentencing, as his client had engaged in a plea colloquy at the guilt phase that had referenced some mitigating factors. Ibid. "On these facts," the Court concluded, "there can be little question, even without application of the presumption of adequate performance, that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment." Ibid.

Shortly after Strickland, and before the state court's adjudication in this case, the Supreme Court twice again held that trial counsel did not perform deficiently by electing a trial strategy that limited the ability for the prosecution to adduce harmful rebuttal evidence, even where such strategy was based on an abbreviated defense investigation. In Darden v. Wainwright, 477 U.S. 168 (1986), the Court held that defense counsel had not performed deficiently for failing to present mitigation evidence at the sentencing phase of his client's capital trial, even if he had not thoroughly investigated the defendant's background. The Court observed that trial counsel's decisions had been influenced by concern that "[a]ny attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions" that had not otherwise been admitted and, similarly, that evidence of lingering doubt based on the defendant's mental functioning would have been rebutted with harmful testimony from a prosecution psychiatric expert. Darden, 477 U.S. at 186.

////

1    The Court reached a similar result the following year in <u>Burger v. Kemp</u>, 483 U.S. 776

2    (1987). Again, defense counsel had presented no evidence at the penalty phase of a capital trial

3    and had conducted only a minimal investigation into his client's background prior to electing the

4    penalty-phase strategy. <u>Id.</u> at 789-91. Defense counsel elected not to present the testimony of

5    available family members and other lay witnesses, concerned that damaging information about

6    the defendant would be elicited on cross-examination. <u>Id.</u> at 791-94. Counsel also chose not to

7    call the defendant to testify, lest his testimony contain unhelpful indications of lack of remorse.

8    <u>Id.</u> at 791.  In assessing deficient performance, the Court acknowledged that "[t]he record at the

9    habeas corpus hearing does suggest that [trial counsel] could well have made a more thorough

10   investigation than he did" into the defendant's personal history, which contained many mitigating

11   elements. <u>Id.</u> at 794. Nonetheless, <u>Strickland</u> recognized that there may be situations where

12   defense counsel's "'reasonable professional judgments support the limitations on investigation.'"

13   <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 690-91.) The Court held that such reasonable professional

14   judgment existed there, given that counsel had reasonably determined that presenting a mitigating

15   social history would expose the jury to evidence of the defendant's past misconduct, such that the

16   danger of presenting such evidence outweighed the likely benefit. The Court explained,

17
18           counsel's decision not to mount an all-out investigation into
             petitioner's background in search of mitigating circumstances was
             supported by reasonable professional judgment. It appears that he did
19           interview all potential witnesses who had been called to his attention
             and that there was a reasonable basis for his strategic decision that an
20           explanation of petitioner's history would not have minimized the risk
             of the death penalty. Having made this judgment, he reasonably
21           determined that he need not undertake further investigation to locate
             witnesses who would make statements about [the defendant's] past.

22   <u>Id.</u> at 794-95.

23           Given this state of Supreme Court jurisprudence at the time of the state court's

24   adjudication of Petitioner's first petition for writ of habeas corpus in 2001, the undersigned

25   concludes that it would not have been unreasonable for the California Supreme Court to have

26   determined that the facts alleged did not demonstrate deficient performance under clearly

27   established federal law. In support of his allegation in state court, Petitioner had proffered the

28   declaration of defense counsel Meyer, who described the defense's approach to investigating and

47

1   weighing the possibility of presenting expert testimony on the issue of mental state at the guilt

2   phase. He declared that he and his co-counsel had believed that a mental state defense had had

3   factual merit, because they believed that Petitioner had not deliberated prior to the homicides and

4   that he had committed them as a result of his mental illness. (LD 25-C.3 Ex. A ¶ 73(a).) Prior to

5   the commencement of the guilt phase, counsel had discussed the mental state defense with

6   defense expert Dr. Rosenthal and understood the latter to believe Petitioner had not deliberated

7   prior to the homicides. (Id. ¶ 73(b).) Counsel did not recall having discussed the issue with Drs.

8   Mills or Satten, but "assumed that they would have had favorable opinions on the question of

9   deliberation as well" based on their respective conclusions that Petitioner had been insane at the

10  time of the homicides. (Id. ¶ 73(c).)

11       Defense counsel, however, was concerned about the jury's receptiveness to psychiatric

12  evidence at the guilt phase. (Id. ¶ 73(a).) Counsel believed "a psychiatric defense had a better

13  chance of succeeding in the sanity phase than in the guilt phase" and, for that reason, "did not

14  want to present psychiatric testimony in a losing effort in the guilt phase, and then have to ask

15  jurors to accept similar testimony in the sanity phase." (Ibid.) Counsel decided to "sav[e] [their]

16  psychiatric experts for the sanity phase." (Id. ¶ 73(c).)

17       Despite this decision, defense counsel considered calling court-appointed expert Dr. Bittle

18  at the guilt phase. In the midst of the guilt phase, defense counsel spoke to Dr. Bittle and learned

19  the latter believed that Petitioner had not acted with deliberation during the homicides. (Id. ¶¶

20  73(f), 73(h).) Although the trial court had ruled that such opinion testimony was not admissible

21  under California statute, it indicated it would permit Dr. Bittle to testify that Petitioner had a

22  mental disease or defect and the basis for that opinion. (Id. ¶ 73(g).) Defense counsel considered

23  calling Dr. Bittle as a witness to present this testimony (id. ¶ 73(h); see also id. ¶ 73(d)), but

24  ultimately determined it would dangerously open the door to contrary opinion testimony from an

25  expert witness whom the prosecution would call:

26           Based on [the prosecutor's] in-court statements, it appeared that, if
             we called Dr. Bittle, [the prosecutor] intended to call Dr. Kaldor, the
27           other court-appointed psychiatrist, and, with both Bittle and Kaldor,
             get into matters that we were prepared to address in the sanity phase
28           through the defense psychiatrists but were not prepared to discuss in

1
2

the guilt phase. Mr. Tapson and I discussed the matter and decided
not to call Dr. Bittle after all.

3

(Id. ¶ 73(h).)[14]

4          Thus, the uncontroverted record before the state court was that, like the trial counsel in

5   Strickland, Darden, and Burger, counsel in this case did conduct investigation relevant to

6   Petitioner's guilt-phase defense, but, in the course of doing so, learned that presenting a particular

7   form of evidence or testimony from a particular witness in support of this defense would open the

8   door for adverse rebuttal evidence that the prosecutor was prepared to present. See Burger, 483

9   U.S. at 789-94; Darden, 477 U.S. at 186; Strickland, 466 U.S. at 672-74. (LD 25-C.3 Ex. A ¶¶

10  73(a)-(h).) Planning backwards from this possibility, counsel made the decision that it would not

11  be fruitful to continue pressing that line of investigation (by specifically asking the experts their

12  opinions on the deliberation element), foreseeing that the harm from presenting the possible

13  evidence at issue would outweigh any benefit. See Burger, 483 U.S. at 791-95; Darden, 477 U.S.

14  at 186; Strickland, 466 U.S. at 698-99. (LD 25-C.3 Ex. A ¶ 73(h).) The Supreme Court in

15  Strickland, Darden, and Burger endorsed this as "reasonable professional judgment" "even

16  without application of the presumption of adequate performance." Strickland, 466 U.S. at 699;

17  see also Darden, 477 U.S. at 186-87; Burger, 483 U.S. at 794-95; see also Hendricks v. Calderon,

18  70 F.3d 1032, 1038 (9th Cir. 1995) ("This Court has also held that even where there is a strong

19  basis for a mental defense, an attorney may forego that defense where the attorney's experts

20  would be subject to cross-examination based on equally persuasive psychiatric opinions that

21  reach a different conclusion," citing Harris v. Vasquez, 949 F.2d 1497, 1525 (9th Cir. 1990)).

22  Notably, as here, in both Strickland and Darden, the evidence at issue included competing

23  psychiatric expert testimony. Darden, 477 U.S. at 186; Strickland, 466 U.S. at 673. Finally, like

24  trial counsel in Strickland, the conclusion that trial counsel was employing strategic judgment is

25

26  [14] As defense counsel's declaration alludes to, court-appointed psychiatrist Dr. Bruce Kaldor's
    later testimony at the sanity phase would seem to indicate plainly that he believed Petitioner did
27  deliberate prior to the homicides. (See 32 RT 5780-84, 5809-13, 5852-57, 5870-72.) See
    generally People v. Bobo, 229 Cal. App. 3d 1417, 1433-36 (1991) (describing meaning and
28  sufficient evidence under California law of "premeditation and deliberation").

1  underscored by his efforts to urge the jury to find that Petitioner had not deliberated without

2  resorting to introduction of potentially-problematic psychiatric expert testimony, but instead

3  relying on other evidence in the record: testimony from Allen Hacker describing Petitioner's past

4  conduct, evidence of Petitioner's erratic and odd behaviors before and during the crimes, and

5  exhibits of Petitioner's writings. See Strickland, 466 U.S. at 673, 699. (See 24 RT 4642-43, 4645,

6  4650-52 (defense guilt-phase closing argument).)

7         Petitioner also alleged that defense counsels' failure to present expert testimony at the

8  guilt phase in addition to the sanity phase must have reflected a misunderstanding of the law

9  governing the defendant's respective burdens at each phase, thereby constituting deficient

10  performance. (ECF No. 59 at 115-16.) These allegations appear to lack evidentiary support and,

11  in fact, appear contradicted by the evidence Petitioner tendered in support of his state habeas

12  corpus petition. In his declaration describing his preparations for the guilt and sanity phases, Mr.

13  Meyer indicates no such misunderstandings, nor is such a misunderstanding implied elsewhere in

14  the record. See generally LD 25-C.3 Ex A. Rather, as described above, he declared that, after the

15  trial court had issued its ruling restricting the scope of psychiatric expert testimony that either

16  party could present, defense counsel decided against introducing psychiatric expert testimony

17  from Dr. Bittle at the guilt phase because they had learned that the prosecutor was prepared to call

18  an adverse psychiatric expert as a witness in rebuttal. (LD 25-C.3 Ex A ¶ 73(g)-(h).) Petitioner's

19  speculative and unsupported allegations that counsel was proceeding under a misapprehension of

20  the law, therefore, neither give rise to habeas relief nor demonstrate that the state court's denial of

21  such relief was unreasonable. See Zapien v. Davis, 849 F.3d 787, 800 (9th Cir. 2015); see also

22  Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5 Cal.4th 750, 770 (1993)).

23         Therefore, if the state court denied this claim on the basis of failure to state a prima facie

24  case of deficient performance, that denial was not an unreasonable application of or contrary to

25  clearly established federal law. See Shinn, 141 S. Ct. at 524; Richter, 562 U.S. at 98. The

26  undersigned therefore recommends it be dismissed.

27  ////

28  ////

50

1      **CLAIMS 7 and 8**

2              In Claim 7, Petitioner alleges that the trial court violated his rights to due process and

3      compulsory process and to a non-arbitrary death sentence by erroneously limiting the scope of the

4      expert testimony evidence that could be admitted on the question of Petitioner's mental state at

5      the time of the homicides. (ECF No. 59 at 121-24.) In Claim 8, Petitioner alleges that trial counsel

6      performed ineffectively in their litigation of this issue at trial. (ECF No. 59 at 146-47.) Petitioner

7      raised Claim 7 on direct appeal, which the California Supreme Court denied in a written opinion.

8      Coddington, 23 Cal.4th at 581-84. He raised Claim 8 in his first petition for writ of habeas corpus

9      (LD 25-C.1 at 30-39), which the California Supreme Court denied summarily. (LD 25-C.5.)

10             Pending before the court are the issues of whether Claim 7 is procedurally defaulted (ECF

11     Nos. 102, 131, 148) and whether either claim must be dismissed under 28 U.S.C. section 2254(d).

12     (ECF No. 59, 189, 209, 211.) The undersigned concludes that Claim 7 is not procedurally

13     defaulted but that, regardless of whether the state court's denial of this claim on the merits was an

14     unreasonable application of clearly established federal law, the claim should be dismissed as

15     meritless. See 28 U.S.C. § 2254(d)(1). The undersigned concludes that the state court's denial of

16     Claim 8 is entitled to deference under section 2254(d).

17             1.   Proceedings In State Court

18             During the guilt phase, the trial court ruled that psychiatric expert testimony could be

19     presented on the issue of Petitioner's mental state, with limitations. Neither the defense nor

20     prosecution could ask the expert whether or how any mental "defect or disease would affect the

21     defendant's mental state or actuality, or if it would impair his ability to form an intent, deliberate,

22     or premeditate, unless the psychiatrist would testify, out of the presence of the jury, that he

23     believed that appellant did not premeditate and deliberate the killings." Coddington, 23 Cal.4th at

24     581-82. (22 RT 4299-4304.) The expert also could not be asked any hypothetical questions

25     concerning the effect of the defect or illness on a person's abilities to deliberate or premeditate.

26     Ibid.  On direct appeal, Petitioner argued that the trial court's ruling on the admissibility of

27     psychiatric expert testimony at the guilt phase was error under state law and federal constitutional

28     law. (LD 25-B.1 at 112-30.) The California Supreme Court held that the trial court had erred

1    under state law, but that this error had not constituted a due process violation and that Petitioner

2    had failed to show prejudice from the state-law error:

3              The ruling was an overly restrictive reading of the statutory
       limitations on admission of evidence of mental illness. Expert
4      opinion on whether a defendant had the capacity to form a mental
       state that is an element of a charged offense or actually did form such
5      intent is not admissible at the guilt phase of a trial. (*People v.
       Smithey* (1999) 20 Cal.4th 936, 960-961 [86 Cal.Rptr.2d 243, 978
6      P.2d 1171].) Sections 28 and 29 permit introduction of evidence of
       mental illness when relevant to whether a defendant actually formed
7      a mental state that is an element of a charged offense, but do not
       permit an expert to offer an opinion on whether a defendant had the
8      mental capacity to form a specific mental state or whether the
       defendant actually harbored such a mental state. An expert's opinion
9      that a form of mental illness can lead to impulsive behavior is
       relevant to the existence *vel non* of the mental states of premeditation
10     and deliberation regardless of whether the expert believed appellant
       actually harbored those mental states at the time of the killing.
11
              We reject, however, appellant's claim that exclusion of expert
12     testimony on the ultimate question of fact as to whether appellant did
       form those mental states denied him the right to present a defense
13     and thereby deprived him of rights under the Fifth, Sixth, Eighth and
       Fourteenth Amendments to the United States Constitution. All
14     authority is to the contrary. (See, e.g., *People v. Nunn* (1996) 50
       Cal.App.4th 1357 [58 Cal.Rptr.2d 294]; *People v. Young* (1987) 189
15     Cal.App.3d 891, 905 [234 Cal.Rptr. 819]; *People v.
       McCowan* (1986) 182 Cal.App.3d 1, 12-15 [227 Cal.Rptr.
16     23]; *People v. Whitler* (1985) 171 Cal.App.3d 337 [214 Cal.Rptr.
       610].) Sections 28 and 29 do not preclude offering as a defense the
17     absence of a mental state that is an element of a charged offense or
       presenting evidence in support of that defense. They preclude only
18     expert opinion that the element was not present.

19            Although we agree that the court erred in ruling that the experts could
       not testify unless they believed defendant did not premeditate and
20     deliberate the murders, that error is not a basis for reversal of the
       judgment. The record does not confirm appellant's implied claim that
21     his failure to offer expert testimony regarding mental illness or defect
       was attributable to the trial court's restriction of expert testimony. At
22     the hearing, defense counsel conceded that section 29 precludes
       expert opinion on whether a defendant had the capacity to entertain
23     or actually had a particular mental state when the crime was
       committed and submitted the matter only on the issue of whether
24     hypothetical questions could be asked of the experts. The court ruled
       that expert opinion on the ultimate issue could not be introduced by
25     means of asking the expert a hypothetical question such as what a
       person who had a bipolar disorder or was a paranoid schizophrenic
26     could or could not do. The expert could not tie the disease to
       appellant's conduct in that manner. That discussion and a subsequent
27     discussion of what evidence the prosecution would be permitted to
       offer to impeach defense evidence of mental illness clearly assumed
28     that the defense would be offering psychiatric testimony.

52

1
2
3
4
5
6
7
8
9
10

> Thus, appellant was free to offer evidence that he suffered from a mental disease or defect as well as evidence about that disease or defect. Had the evidence he introduced at the sanity phase about his mental illness offered a basis from which the jury could infer that he did not premeditate or deliberate the murders, that evidence could have been introduced at the guilt phase. Inasmuch as he failed to offer any such evidence at the guilt phase and the record does not reflect that this failure was due to the court's ruling, the issue is not properly preserved or presented. (*People v. Samayoa* (1997) 15 Cal.4th 795, 837 [64 Cal.Rptr.2d 400, 938 P.2d 2].) Even assuming the court erred in precluding hypothetical questions, however, the error was not prejudicial. None of the experts, either court-appointed or defense-retained, all of whom testified that appellant was mentally ill, suggested that his illness precluded or would affect the ability to premeditate and deliberate. At least to the extent that it was relevant to the plan to seize the girls and their chaperones, the guilt phase evidence demonstrated extensive premeditation and deliberation. There was also sufficient evidence that the murders were premeditated and deliberate.

11   Coddington, 23 Cal.4th at 582-84.

12   In his first petition for writ of habeas corpus, petitioner alleged that trial counsel

13   performed ineffectively by failing to adequately object to the trial court's interpretation of Penal

14   Code sections 28 and 29 and failing to adequately preserve this issue for review. (LD 25-C.1 at

15   30-39.) He argued that trial counsel should have objected to the trial court's ruling on all of the

16   grounds set forth in Claim 7, both to persuade the trial court and to preserve the issue adequately

17   for appeal. (Id. at 37-38.) Had trial counsel made these arguments and the trial court accepted

18   them, per Petitioner, "it is reasonably probable that trial counsel would have presented psychiatric

19   testimony in the guilt phase," including, specifically, calling Dr. Bittle as a witness in the guilt

20   phase. (Id. at 39.) Had trial counsel called any or all available psychiatric witnesses in the guilt

21   phase, Petitioner alleged, it is reasonably probable the jury would have returned lesser verdicts on

22   Counts One and Two. (Ibid.) The California Supreme Court denied this claim summarily, on the

23   merits. (LD 25-C.5.)

24   2.   Claim Seven Is Not Procedurally Barred

25   Respondent argues that Claim 7 is procedurally barred from consideration on the merits in

26   this proceeding because the California Supreme Court defaulted the claim for not having been

27   "properly preserved or presented." (ECF No. 102 at 4.) Respondent describes this ruling as an

28

53

1   application of California's contemporary objection rule. (ECF No. 102 at 2; ECF No. 148 at 16-

2   17.) The undersigned does not agree that this claim was procedurally defaulted on direct appeal.

3         a.   The Record Does Not Show That the State Court Clearly and Expressly Applied a

4           State-Law Procedural Bar to Claim Seven

5         The California Supreme Court's denial of this claim on direct appeal is ambiguous as to

6   the basis of its denial and, most specifically, the import of its assertion that "[i]nasmuch as

7   [Petitioner] failed to offer any such evidence at the guilt phase and the record does not reflect that

8   this failure was due to the court's ruling, the issue is not properly preserved or presented," and its

9   supporting citation to <u>People v. Samayoa</u>, 15 Cal.4th 795, 837 (1997). Respondent argues that

10  this language reflects that the California Supreme Court applied the procedural default that the

11  claim was not properly preserved at trial, because Petitioner "abandon[ed]" it by failing to present

12  "any evidence on this issue, though permitted by the trial court to do so," which Respondent

13  characterizes as an application of California's contemporary objection rule. (ECF No. 148 at 16-

14  17.) Petitioner argues that the totality of the California Supreme Court's discussion indicates that

15  it denied the claim on the merits and that language at issue communicates that the record did not

16  support a prejudice finding because the record did not contain indication of what evidence the

17  jury would have heard absent the trial court's error. (ECF No. 131 at 22.)

18        The Supreme Court has given guidance in situations such as these. In <u>Coleman</u>, 501 U.S.

19  at 732, it recognized that "[s]tate court opinions will, at times, discuss federal questions at length

20  and mention a state law basis for decision only briefly. In such cases, it is often difficult to

21  determine if the state law discussion is truly an independent basis for decision or merely a passing

22  reference." Thus, the Court created a presumption that, where "'a state court decision fairly

23  appears to rest primarily on federal law, or to be interwoven with the federal law, and when the

24  adequacy and independence of any possible state law ground is not clear from the face of the

25  opinion, we will accept as the most reasonable explanation that the state court decided the case

26  the way it did because it believed that federal law required it to do so.'" <u>Id.</u> at 733 (quoting

27  <u>Michigan v. Long</u>, 463 U.S. 1032, 1040-41 (1983)). Therefore, "a state court that wishes to look

28

1    to federal law for guidance or as an alternative holding while still relying on an independent and

2    adequate state ground can avoid the presumption by stating 'clearly and expressly that [its

3    decision] is . . . based on bona fide separate, adequate, and independent grounds.'" Id. (quoting

4    Long, 463 U.S. at 1041).

5             Applying this rule, the Court has repeatedly held that particular claims were not

6    procedurally barred where the state court discussed at length the merits of the federal

7    constitutional claim, but also mentioned the fact that, under state procedural rules, the issue had

8    not been properly preserved. See, e.g., Harris v. Reed, 489 U.S. 255 (1989) (holding ineffective

9    assistance of counsel claim not procedurally barred where state court denied it on the merits but

10   also referred to a state rule deeming waived claims that had not, but could have, been raised in an

11   earlier proceeding); Caldwell v. Mississippi, 472 U.S. 320, 327 (1985) (holding claim not

12   procedurally barred where state court both discussed the merits of the federal claim at length and

13   also made reference to a state procedural rule that issues not raised on appeal are deemed

14   waived); see also Florida v. Powell, 559 U.S. 50, 56 (2010) (holding federal constitutional claim

15   would be presumed denied on the merits where state court discussed both Supreme Court and

16   state court jurisprudence and the state constitution, but treated the federal and state law questions

17   as "interchangeable and interwoven" and never "indicated clearly and expressly" that state law

18   provided distinct grounds for denying the claim); Long, 463 U.S. at 1040-42 (holding federal

19   constitutional claim had been decided on the merits under federal law, where state court discussed

20   federal jurisprudence at length but also twice referenced the state constitution).

21            Here, the state court decision denying relief on Petitioner's federal constitutional claim

22   "fairly appear[s] to rest primarily on federal law," Coleman, 501 U.S. at 740, and the California

23   Supreme Court did not "stat[e] clearly and expressly that its decision [was] based on bona fide

24   separate, adequate, and independent grounds" of rules of state appellate procedure.  Id. at 733

25   (internal citations and punctuation omitted). On direct appeal, Petitioner had argued that the trial

26   court erred in its interpretation of Penal Code sections 28 and 29 under California state law,

27   including under state-law principles of statutory construction, (LD 25-B.1 at 113-26) and that the

28   trial court's restrictive application of these code sections also violated Petitioner's federal

1    constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (LD 25-B.1 at

2    126-30) He argued that these errors were reversible per se or, alternatively, harmless, although

3    did not indicate whether harmlessness should be addressed under the standard for state-law error

4    or federal constitutional error. (See LD 25-B.1 at 130-34.)

5           The California Supreme Court's discussion of this claim tracks the structure utilized by

6    Petitioner in his argument on appeal. The court began its analysis by agreeing with Petitioner that

7    the trial court erred in employing an "overly restrictive reading" of Penal Code sections 28 and

8    29, citing only state-law authority for this conclusion. Coddington, 23 Cal.4th at 582. The court

9    then turned to the constitutional allegations of the claim, holding,

10                  We reject, however, appellant's claim that exclusion of expert
                    testimony on the ultimate question of fact as to whether appellant did
11                  form those mental states denied him the right to present a defense
                    and thereby deprived him of rights under the Fifth, Sixth, Eighth and
12                  Fourteenth Amendments to the United States Constitution. All
                    authority is to the contrary. [Citations] Sections 28 and 29 do not
13                  preclude offering as a defense the absence of a mental state that is an
                    element of a charged offense or presenting evidence in support of
14                  that defense. They preclude only expert opinion that the element was
                    not present.
15

16   Id. at 583. From this, it is clear that the California Supreme Court's ruling was that Petitioner had

17   not shown that the trial court's error had reflected a violation of his federal constitutional rights

18   because, per the California Supreme Court, Petitioner had not shown that the statutes themselves

19   "preclude offering . . . a defense . . . or presenting evidence in support of that defense." See ibid.

20   Then, the court turned to the question of the prejudice from the error that it had found—i.e., the

21   error under state law—and explained that the record did not support a finding that Petitioner had

22   suffered any prejudice from the trial court's erroneous ruling, because it did not appear that the

23   court's ruling was the but-for cause of the defense's failure to present psychiatric expert

24   testimony in the guilt phase. Id. at 583-84. Because Petitioner could have presented some such

25   evidence, even within the parameters of the trial court's restrictions, his failure to do so defeated

26   his claim: "Inasmuch as [Petitioner] failed to offer any such evidence at the guilt phase and the

27   record does not reflect that this failure was due to the court's ruling, the issue is not properly

28   preserved or presented. (People v. Samayoa (1997) 15 Cal.4th 795, 837 [64 Cal.Rptr.2d 400, 938

                                                     56

1    P.2d 2].)" <u>Id</u>. at 584.

2          Apparent in this ruling are the two factors giving rise to the presumption described in

3    <u>Coleman</u>, <u>Long</u>, and related cases. First, the denial of the federal constitutional aspect of the claim

4    appears to have rested primarily on federal law. <u>See</u> <u>Coleman</u>, 501 U.S. at 740; <u>Long</u>, 463 U.S. at

5    1040. By its plain language, the California Supreme Court held that Petitioner had not shown any

6    violation of federal constitutional law because the statutes at issue did not wholesale foreclose the

7    presentation of an available defense or the presentation of evidence in support of this defense; in

8    other words, there was no federal constitutional error. <u>See</u> <u>Coddington</u>, 23 Cal.4th at 583. This

9    interpretation of the ruling is supported by the fact that, in making this ruling, the California

10   Supreme Court cited as authority other California cases that had, themselves, held that Penal

11   Code sections 28 and 29 did not violate a defendant's federal constitutional right to present a

12   defense nor related constitutional rights. <u>See</u> <u>ibid</u>.; <u>People v. Nunn</u>, 50 Cal. App. 4th 1357, 1364

13   (1996) ("Both <u>McCowan</u> and <u>Jackson</u> were dealing with the fundamental question of whether the

14   evidentiary restrictions imposed by section 29 denied due process. The answer was no since the

15   section allows the defense to present extensive psychological testimony relevant to the mental

16   state in issue."); <u>People v. Young</u>, 189 Cal. App. 3d 891, 905 (1987) ("Appellant's arguments that

17   Penal Code sections 25, 28 and 29 violate the right to present a defense have been consistently

18   rejected. [Citations] We agree with the persuasive reasoning in the above-cited authorities and

19   decline to consider the issue anew."); <u>People v. McCowan</u>, 182 Cal. App. 3d 1, 14-15 (1986)

20   ("These [statutory] limitations did not prevent defendant from presenting his defense. We hold

21   that [Penal Code] sections 25, subdivision (a), 28, and 29 do not contravene defendant's

22   constitutional rights to due process, use of witnesses, or equal protection, nor do they relieve the

23   prosecution of its proof burden."); <u>People v. Whitler</u>, 171 Cal. App. 3d 337, 340 (1985)

24   ("Defendant contends sections 25, 28, and 29 violate her constitutional right to effectively present

25   a defense, as those sections prevented her from introducing evidence she lacked the capacity to

26   formulate malice aforethought and also prevented her from introducing testimony by an expert

27   that as the result of a mental disorder she did not possess the requisite mental state at the time of

28   the killing. We do not agree."). Thus, in denying Petitioner relief on the constitutional aspect, the

1    California Supreme Court appeared to primarily—if not exclusively—base this denial on

2    Petitioner failing to have shown, as a matter of law, that the complained-of error was cognizable

3    as a violation of federal constitutional rights, which reflects a merits denial, irrespective of the

4    court's later, additional citation to <u>People v. Samayoa</u> 15 Cal.4th 795, 837 (1997), and statement

5    that Petitioner had not properly preserved or presented evidence necessary to resolve the question

6    of harmlessness. In this way, this case is indistinguishable from <u>Harris</u>, 463 U.S. at 1043, which

7    commands the conclusion that the state's court's denial, on this record, was "rested . . . primarily

8    on federal law" rather than the application of a state-law procedural bar.

9         Second, the California Supreme Court did not "stat[e] clearly and expressly that its

10   decision [was] based on bona fide separate, adequate, and independent grounds" of the

11   application of a state procedural bar. <u>See</u> <u>Coleman</u>, 501 U.S. at 733. Instead, like the state courts

12   in <u>Harris</u>, 489 U.S. at 263, and <u>Caldwell</u>, 472 U.S. at 327, the California Supreme Court here

13   discussed at length its reasons for denying the claim on the merits, then made comparatively brief

14   reference to a state-law procedural rule requiring issues to be properly preserved and presented.

15   <u>See</u> <u>Coddington</u>, 23 Cal.4th at 584. Under the plain directives of the United States Supreme

16   Court, this does not suffice—and did not suffice at the time of the state court adjudication—to

17   rebut the presumption that the denial was on the merits rather than on the basis of application of

18   an independent state procedural rule. <u>See</u> <u>Coleman</u>, 501 U.S. at 733; <u>Harris</u>, 489 U.S. at 263;

19   <u>Caldwell</u>, 472 U.S. at 327; <u>Long</u>, 463 U.S. at 1040; <u>see also</u> <u>Chambers v. McDaniel</u>, 549 F.3d

20   1191, 1197 (9th Cir. 2008) ("unless a court expressly (not implicitly) states that it is relying upon

21   a procedural bar, [the federal court] must construe an ambiguous state court response as acting on

22   the merits of a claim, if such a construction is plausible").

23        For these reasons, even if the California Supreme Court intended to invoke the state-law

24   contemporary objection rule in denying Petitioner relief for this claim, the record does not rebut

25   the presumption that the state court primarily denied the federal constitutional allegations on the

26   merits, rather than on independent, state-law procedural grounds. <u>See</u> <u>Coleman</u>, 501 U.S. at 733;

27   <u>Long</u>, 463 U.S. at 1040. Accordingly, this Court is not barred from reaching the merits of Claim

28   Seven in the instant proceeding. <u>See</u> <u>Coleman</u>, 501 U.S. at 733; 28 U.S.C. § 2254(c)-(d).

b.   Alternatively, Claim Seven Was Not Procedurally Barred On Appeal Because

Petitioner Complied With California's Contemporary Objection Rule

An alternative reason supports the non-application of the procedural default rule to Claim

Seven. If the California Supreme Court did, in fact, intend to deny relief on the constitutional

allegations of this claim through application of a version of the state's contemporary objection

rule, that denial would have been erroneous under California state law and therefore is not a basis

to deprive this Court of jurisdiction to consider the merits of the claim in the instant proceeding.

See, e.g., James v. Kentucky, 466 U.S. 341, 351 (1984) (holding habeas corpus claim not barred

from federal court review on the basis of the state court's application of a procedural bar, where

record revealed that petitioner had not violated the relevant state procedural rule); Sivak v.

Hardison, 658 F.3d 898, 907 (9th Cir. 2011) ("Here, the state court applied the state's procedural

rule to [petitioner's] case in an erroneous and arbitrary manner. Thus, we follow the Supreme

Court and our sister circuits in holding that an erroneously applied procedural rule does not bar

federal habeas review.")

Here, the language employed by the California Supreme Court and its citation to page 837

of People v. Samayoa 15 Cal.4th 795 (1997), suggest a reference to California's contemporary

objection rule. (See ECF No. 102 at 2; ECF No. 148 at 1, 15-17 (Respondent representing same).)

In Samayoa, 15 Cal.4th at 837, the California Supreme Court had held that the defendant had not

properly preserved a challenge to the exclusion of defense expert testimony, because he had not

sought nor obtained a ruling from the trial court on the issue:

> defendant never sought to introduce evidence that assertedly would
> have been excluded under the prosecution's [motion in limine]
> memorandum, and hence the trial court was never required to rule
> upon the scope of admissible expert testimony relating to defendant's
> state of mind. Instead, defendant complained of the prosecution's
> cross-examination and argument (which emphasized the defense
> experts' failure to correlate their results with the evidence of the
> crimes) as being inconsistent with the prosecution's memorandum.
> Again, as noted above, the absence of an adverse ruling precludes
> any appellate challenge.

Samayoa, 15 Cal.4th at 837 (internal quotation omitted). In making this ruling, the court in

Samayoa relied on cases that had similarly held that a defendant could not raise on appeal an

59

1    issue on which the trial court had not ruled. See People v. Rowland, 4 Cal.4th 238, 259 (1992)

2    ("No ruling was made below. Accordingly, no review can be conducted here. '[T]he absence of

3    an adverse ruling precludes any appellate challenge.'"); People v. McPeters, 2 Cal.4th 1148, 1179

4    (1992), as modified on denial of reh'g (Sept. 23, 1992) ("the court did not sustain any objection

5    or specifically preclude any line of inquiry. Its mere inquiry was not a definite ruling against

6    defendant's proposed examination; the absence of an adverse ruling precludes any appellate

7    challenge").

8           This is not what occurred in Petitioner's case. Here, the trial court did make a ruling, in

9    response to the prosecutor's and defense counsels' in limine arguments concerning the scope of

10   admissibility of psychiatric expert testimony, which the trial court expressly understood as

11   reflecting a defense request to admit the contested testimony. See generally Coddington, 23

12   Cal.4th at 582 (describing that Petitioner had "sought a ruling" on this issue from the trial court

13   and that the court "ruled" then "extended its ruling" in response). In the proceedings in the trial

14   court, defense counsel and the prosecutor made opposing arguments as to the admissibility of

15   psychiatric expert testimony at the guilt phase under the newly-revised Penal Code, after the

16   prosecutor raised the question in relation to another pending in limine motion. (See 21 RT 4288-

17   93.) The trial court offered its tentative opinion but stated it would read the authorities counsel

18   had cited at the hearing before making a ruling. (21 RT 4293-94.) At the next hearing date, the

19   trial court broached the issue again, indicating that it understood the issue to reflect a motion by

20   defense counsel for which defense counsel sought a ruling. (22 RT 4298 ("COURT: . . . It's my

21   understanding that counsel have asked this motion be heard today, is that correct? [DEFENSE

22   COUNSEL] MEYER: That is correct.").) When prompted by the court for argument, defense

23   counsel stated their position that diminished actuality evidence was admissible at the guilt phase,

24   even under Penal Code sections 28 and 29, and cited case law supporting their position. (22 RT

25   4298-99.) The court explained its contrary understanding of the law and defense counsel replied,

26   "We would submit the matter on that issue, your honor." (22 RT 4300.) The court then

27   expounded on its understanding of the law and defense counsel again argued that case law

28   contradicted the trial court's understanding; the court dismissed this, stating he believed the Court

                                                    60

1  of Appeals cases had been wrongly decided. (22 RT 4301.) The trial court then ruled that a

2  psychiatric expert witness could not testify to his or her opinions on whether the defendant had

3  diminished actuality at the time of the charged crimes; could not testify to opinions of the

4  defendant's mental condition at the time of the crime; could not be asked hypotheticals by either

5  party; but could testify to statements made by the defendant in the course of his mental

6  examination, unless those admissions were so prejudicial as to be inadmissible under Evidence

7  Code section 352. (22 RT 4301-05.) On this final point, defense counsel specifically objected and

8  submitted. (22 RT 4305.)

9       Thus, unlike the appellants in Samayoa, Rowland, McPeters, and related authority, here

10  Petitioner did not fail to present his arguments to the trial court, did not fail to interpose an

11  objection, and did not fail to obtain a ruling from the trial court. See Samayoa, 15 Cal.4th at 837;

12  Rowland, 4 Cal.4th at 259; McPeters, 2 Cal.4th at 1179. The California Supreme Court, therefore,

13  was mistaken if it concluded that the cited portion of Samayoa was apposite to, let alone

14  determinative of, the issue contained in the record before the court in Petitioner's appeal. See

15  Coddington, 23 Cal.4th at 583-84.

16       Defense counsels' actions were adequate to preserve the issue for appeal under California

17  law.[15] Under California Evidence Code section 354, subdivision (a), in order to preserve for

18  appeal an objection to the trial court's exclusion of particular evidence, the record must reflect

19  that "[t]he substance, purpose, and relevance of the excluded evidence was made known to the

20  court by the questions asked, an offer of proof, or by any other means." By its plain language, it is

21  not necessary that the objecting party make a specific proffer in order to perfect the objection.

22  See, e.g., Montez v. Superior Ct., 10 Cal. App. 3d 343, 352 (1970) ("It is evident that the making

23  of an offer of proof is only one of several means by which the evident purposes of section 354

24  may be satisfied."). In applying this rule to the exclusion of expert testimony, for example, the

25  _____

26  [15] The Ninth Circuit has rejected the argument that California's contemporary objection rule is, as
a general matter, an inadequate state law grounds for denial of a federal constitutional claim. See,
27  e.g., Melendez v. Pliler, 288 F.3d 1120 (9th Cir. 2002) (holding California's contemporaneous
objection rule is clear and consistently applied where a party fails to make any objection to the
28  admission of evidence, citing Garrison v. McCarthy, 653 F.2d 374, 377 (9th Cir. 1981)).

61

1   California courts have held that the statute only requires that, when a party is seeking to object to

2   the exclusion of proposed expert testimony, the trial court have notice of the ultimate opinions to

3   which the expert could testify, if permitted. See, e.g., Bowman v. Wyatt, 186 Cal. App. 4th 286,

4   329 (2010); Gordon v. Nissan Motor Co., 170 Cal. App. 4th 1103, 1113-14 (2009).

5          Here, the record reflects that, in the limine hearing, the trial court was aware of the

6   "substance, purpose, and relevance of the excluded evidence." See Evid. Code § 354. The court

7   and counsel discussed at length and with specificity the scope of admissibility of proposed

8   psychiatric expert testimony. In the course of these two hearings, the court demonstrated its

9   understanding of the substance of that proposed testimony, its purposes if introduced by the

10  defense or by the prosecution—including a gamut of possible opinions to which the defense-

11  retained or court-appointed experts might testify—and the proposed testimony's relevance to the

12  material issue of whether Petitioner actually possessed the mental state charged in Counts One

13  and Two. (21 RT 4288-94; 22 RT 4298-4305.) This sufficed to preserve the issue for appellate

14  review under California law. See, e.g., People v. Thompson, 1 Cal.5th 1043, 1108-09 (2016)

15  (unsuccessful in limine motion preserves issue for appeal where the motion concerned a specific

16  body of evidence and was made at a time where the trial court had enough contextual information

17  to enable it to determine the evidentiary question, and where the same grounds for admission or

18  exclusion were reiterated on appeal); People v. Morris, 53 Cal.3d 152, 190 (1991) (same).

19         Even if, however, the California Supreme Court perceived that defense counsel had not

20  done enough to specifically proffer the contents of the excluded expert testimony, that would not

21  render the issue not preserved because, under California law, no specific proffer is required where

22  the trial court has excluded "an entire class of evidence" or indicated "it will receive no evidence

23  of a particular type or class, or upon a particular issue." Lawless v. Calaway, 24 Cal.2d 81, 91

24  (1944). The California Supreme Court held almost a half-century prior to Petitioner's trial:

25              Defendant contends that plaintiff cannot complain of the trial court's
                rulings on evidence since she did not make an offer of proof. Where,
26              however, an entire class of evidence has been declared inadmissible
                or the trial court has clearly intimated that it will receive no evidence
27              of a particular type or class, or upon a particular issue, an offer of
                proof is not a prerequisite to arguing on appeal the prejudicial nature
28              of the exclusion of such evidence. [Citations] In the present case the

                                                62

1
2

> trial court stated that defendant could not be interrogated as an expert
> and thereby foreclosed examination on issues which could be proved
> solely be expert testimony.

3   Ibid.; see also Montez, 10 Cal. App. 3d at 350-51 (applying this exception where the trial court

4   "made it abundantly clear that it simply was not going to receive" the evidence appellant had

5   sought to introduce, because trial court believed it inadmissible as a matter of law); Beneficial

6   Fire & Cas. Ins. Co. v. Kurt Hitke & Co., 46 Cal.2d 517, 522 (1956) (same, where trial court had

7   believed none of the evidence at issue could be admitted under governing law). The effect of this

8   rule may mean that the appellate record does not contain sufficient information to assess the

9   prejudice of the trial court's ruling, if its ruling is later determined to have been error. This

10  absence, however, is not ascribed to the appellant and is not deemed indicating that the objection

11  has been imperfectly lodged; rather, the California courts appear to consider this additional reason

12  to justify reversal and remand to the trial court for further proceedings in which the wrongly-

13  excluded evidence may be properly ruled upon. See, e.g., Beneficial Fire & Cas. Ins. Co., 46

14  Cal.2d at 527 ("Whether all that defendant offered to prove will be relevant and admissible

15  cannot, of course, be now determined. That will depend upon the nature and character of the

16  proof sought to be made. The judgment is reversed."); see also Montez, 10 Cal. App. 3d at 352

17  ("The peremptory writ of prohibition must be granted because of the respondent court's refusal to

18  permit petitioner to" introduce the evidence that the trial court had refused to admit due to its

19  error of law); Lawless, 24 Cal.2d at 89, 92 (reversing judgment for the erroneous exclusion of

20  expert testimony because, "While it may be true that favorable answers to the questions

21  propounded would not have supplied the deficiency in proof in this case, plaintiff was precluded,

22  by virtue of the trial court's ruling, from continuing with the examination of the witness and

23  developing further the line of inquiry which might have elicited the essential expert testimony").

24      This corollary to Evidence Code section 354 squarely applies. Here, the trial court's ruling

25  was that entire categories of evidence were inadmissible as a matter of California statute,

26  irrespective of the court's own determinations of the relevance, materiality, probity, or reliability

27  of the specific evidence at issue. The trial court held that California statute flatly prohibited all

28  evidence constituting (1) any testimony from any expert who did not personally, subjectively

1   believe the defendant did not deliberate or form intent at the time of the charged crimes (21 RT

2   4288-92); (2) any expert's opinion testimony in response to any hypothetical questions (22 RT

3   4300, 4302); (3) any expert's opinion as to whether the defendant likely did deliberate or did

4   premeditate prior to committing a homicide (22 RT 4300-04); and (4) any expert's opinion as to

5   how the defendant's mental disease or defect presented symptomatically and may have been

6   consistent or inconsistent with undertaking planning and deliberative tasks at the time of the

7   charged crimes (22 RT 4299-4302). (See 22 RT 4299-4300 (trial court describing these rulings as

8   reflecting its understanding of "the state of the law"); 4300 (trial court explaining that its rulings

9   are compelled by law, per the trial court's understanding, although "the law doesn't make sense in

10  my humble opinion"), 4301 (trial court again explaining that its rulings were required under

11  governing law, but "the law is in a bad way on that. When they did away with diminished

12  capacity, they didn't think through what they were substituting in place of that."), 4302 (trial

13  court explaining that its wholesale exclusion of expert response to hypothetical questions was

14  "the state of the law"), 4302 (trial court explaining its belief that diminished actuality expert

15  testimony was "forbidden" under the Penal Code).) Because the trial court excluded entire

16  categories of evidence, as it believed they were prohibited as a matter of law, any proffer either

17  party would have made was immaterial to the trial court's ruling and, thus, was unnecessary to

18  preserve the ruling for appellate review. See Beneficial Fire & Cas. Ins. Co., 46 Cal.2d at 522;

19  Lawless, 24 Cal.2d at 91; Montez, 10 Cal. App. 3d at 350-51. Although this resulted in the record

20  on appeal lacking information to enable the state appellate court to assess the prejudice of the trial

21  court's erroneous ruling, under California law this result did not mean that Petitioner did not

22  perfect the objection, but rather constituted justification for reversal as a remedy. See Lawless, 24

23  Cal.2d at 89, 92; Beneficial Fire & Cas. Ins. Co., 46 Cal.2d at 527. Therefore, if the California

24  Supreme Court intended to apply a form of the state's contemporary objection rule to bar its

25  consideration of the merits of the constitutional claim reflected in Claim Seven, that

26  determination was error under California law and, as such, provides no basis for this Court to

27  refuse to reach the merits of this claim in the instant proceedings. See James, 466 U.S. at 351.

28  ////

1       3.   Claim Seven Should Be Dismissed As Meritless

2              Because the state court denied the federal constitutional allegations on the merits,

3       deference to that denial is proper unless Petitioner meets the alternative standards set forth in

4       2254(d)(1) or (2). The federal court, however, "may never needlessly prolong a habeas case"

5       Shinn, 142 S. Ct. at 1739 (internal citation and italics omitted), and may deny relief on a claim if

6       the record shows petitioner cannot succeed on the merits, irrespective of the correctness of the

7       state court's analysis of the petitioner's federal constitutional allegations. See Brown, 142 S. Ct.

8       at 1524; see also Berghuis, 560 U.S. at 389-90. Here, review of Claim 7 makes plain that it is

9       meritless on the issue of harmlessness and therefore the undersigned recommends it be denied.

10             a.   Governing Legal Standard

11             The Constitution guarantees criminal defendants the right to a meaningful opportunity to

12      present a complete defense, and it forbids the states from applying arbitrary rules of evidence

13      that exclude important defense evidence. Holmes v. South Carolina, 547 U.S. 319, 324 (2006);

14      Chambers v. Mississippi, 410 U.S. 284, 302 (1973); Washington v. Texas, 388 U.S. 14 (1967).

15      This right stems from both the Compulsory Process Clause of the Sixth Amendment and the Due

16      Process Clause of the Fourteenth Amendment. See Holmes, 547 U.S. at 324; Crane v. Kentucky,

17      476 U.S. 683, 690 (1986); California v. Trombetta, 467 U.S. 479, 485 (1984)

18             A "defendant's right to present relevant evidence is not unlimited," United States v.

19      Scheffer, 523 U.S. 303, 308 (1998), however, and must "bow to accommodate other legitimate

20      interests in the criminal trial process." Chambers, 410 U.S. at 295. These interests are principally

21      defined by the relevant legislative body, as "state and federal rulemakers have broad latitude

22      under the Constitution to establish rules excluding evidence from criminal trials. Such rules do

23      not abridge an accused's right to present a defense so long as they are not "'arbitrary' or

24      'disproportionate to the purposes they are designed to serve.'" Scheffer, 523 U.S. at 308 (quoting

25      Rock v. Arkansas, 483 U.S. 44, 56 (1987)). For example, the Supreme Court has recognized that

26      "well-established rules of evidence permit trial judges to exclude evidence if its probative value

27      is outweighed by certain other facts such as unfair prejudice, confusion of the issues, or potential

28      to mislead the jury." Holmes, 547 U.S. at 326. On the other hand, the State does violate a

1    defendant's rights to due process and compulsory process when it prevents the presentation of

2    relevant, material defense evidence for reasons that are arbitrary or that serve no rational state

3    purpose. See, e.g., Holmes, 547 U.S. at 331 (rule invalid where it did not rationally serve any

4    discernible purpose); Rock, 483 U.S. 44, 61 (holding rules excluding material defense evidence

5    were arbitrary and thus violative of due process); Crane, 476 U.S. 683 (blanket exclusion of

6    defense evidence concerning the circumstances surrounding defendant's confession violated

7    right to present a defense where his sole defense was that his confession was unreliable and

8    where there was no other evidence otherwise linking him to crime); Chambers, 410 U.S. at 302-

9    303 (rule invalid where it foreclosed evidence of third-party culpability and State could offer no

10    legitimate explanation for the rule); Washington, 388 U.S. at 22 (defendant's right to present a

11    defense violated by state statute preventing co-defendants or co-participants from testifying for

12    one another, where there was no indication such testimony would be unreliable and thus rule was

13    not a rational limitation on defendant's rights).

14         The Supreme Court has specifically approved state statutes that restrict, non-arbitrarily

15    and for a legitimate state reason, the defense's presentation of evidence of mental impairment at

16    the guilt phase of a criminal trial. In Clark v. Arizona, 548 U.S. 735 (2006), the Supreme Court

17    upheld the constitutionality of an Arizona state rule that limited consideration of mental illness

18    and incapacity evidence to the affirmative defense of insanity and eliminated consideration of

19    such evidence on the element of mens rea, observing that such evidence often took the form of

20    testimony from "psychologists or psychiatrists qualified to give opinions as expert witnesses."

21    Clark, 548 U.S. at 760. The Court noted that the Arizona legislature had created such restrictions

22    to place the burden of persuasion on the defendant who sought to raise incapacity as a defense;

23    to minimize the opportunity for the jury to misapply the expert testimony; and to lessen

24    possibility of the jury confusing issues put before them to resolve at the guilt phase. Clark, 548

25    U.S. at 770-71, 774. These restrictions had been created by the legislature to "channel[] or

26    restrict[]" the defense's "mental-disease and capacity evidence" to only the question of legal

27    insanity at the time of the charged crime and did not result in the relevant defense evidence being

28    excluded entirely. Id. at 770. As such, the Court concluded, the reasons for and effect of the

1   limitations in the Arizona statute were "good enough to satisfy the standard of fundamental

2   fairness that due process requires." Id. at 770-71.

3        These same principles apply where the issue is not whether a statute or rule itself violates

4   the rights to due process and compulsory process, but where the question is whether the state

5   court erred under state evidentiary rules in a manner that also reflected a violation of the

6   defendant's constitutional rights. See Estelle v. McGuire, 502 U.S. 62, 70 (1991); Pulley v.

7   Harris, 465 U.S. 37, 41 (1984); Cudjo v. Ayers, 698 F.3d 752, 767 (9th Cir. 2012); see also

8   Swarthout v. Cooke, 562 U.S. 216, 220 (2011) ("When, however, a State creates a liberty

9   interest, the Due Process Clause requires fair procedures for its vindication—and federal courts

10  will review the application of those constitutionally required procedures."); Larson v. Palmateer,

11  515 F.3d 1057, 1065 (9th Cir. 2008) ("The correctness of the trial court's evidentiary ruling as a

12  matter of state law is irrelevant to our review" of whether the ruling violated the constitutional

13  right to present a defense); Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995) ("A state

14  court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling

15  violates federal law, either by infringing upon a specific federal constitutional or statutory

16  provision or by depriving the defendant of the fundamentally fair trial guaranteed by due

17  process."). Thus, when confronted with an as-applied challenge, the reviewing court must

18  determine, as it would with a facial challenge, whether the trial court's exclusion of defense

19  evidence violated the defendant's rights to due process and compulsory process, i.e., whether the

20  exclusion was arbitrary or whether it served a legitimate state purpose, whether its effect was

21  disproportionate to the state's interest, and whether the defense evidence at issue was competent

22  and material to the defense. See Crane, 476 U.S. at 689-91; Chambers, 410 U.S. at 294-97; see,

23  e.g., Parle v. Runnels, 505 F.3d 922, 932-33 (9th Cir. 2007); DePetris v. Kuykendall, 239 F.3d

24  1057, 1061-63 (9th Cir. 2001); see generally Chia v. Cambra, 360 F.3d 997, 1004-05 (9th Cir.

25  2004) (setting forth a five-part balancing test to determine whether a trial court's exclusion of

26  defense evidence violated the defendant's due process rights).

27        If the reviewing court determines defense evidence was wrongfully excluded from trial,

28  relief is only warranted where such exclusion had a "substantial and injurious effect or

67

1    influence" on the jury's verdict. <u>Brecht</u>, 507 U.S. at 637; <u>see</u> <u>Parle</u>, 505 F.3d at 928. Prejudice

2    can be shown by demonstrating that the exclusion resulted in the defense case being "'far less

3    persuasive'" than it would have been absent the error, <u>Parle</u>, 505 F.3d at 928 (quoting <u>Chambers</u>,

4    410 U.S. at 294), or that the prosecution's case was particularly weak on the material issue to

5    which the excluded evidence was relevant. <u>Parle</u>, 505 F.3d at 927-28.

6            b.   Petitioner Cannot Show That The Trial Court's Error Was Prejudicial

7            Petitioner alleges that he was prejudiced by the wrongful exclusion of mental health

8    expert testimony at the guilt phase because such evidence could have shown that he did not

9    premediate and deliberate prior to the homicides, thus precluding verdicts on guilt of first-degree

10   murder on Counts One and Two. (ECF Nos. 59 at 142-44, 209 at 145-48.) To substantiate this,

11   Petitioner argues that the record indicated the homicides "were not planned" (ECF No. 209 at

12   145); had occurred because the victims had "fought with him and were too hard to control"

13   (<u>ibid</u>.); and had occurred as Petitioner was in a delusional state, awaiting messages he believed

14   were from God. (ECF Nos. 59 at 144-45, 209 at 145-47.) On the record before the state court,

15   however, Petitioner cannot show that the trial court's limitations on mental health expert

16   testimony at the guilt phase resulted in the defense case being "far less persuasive" than it could

17   have been had such testimony been presented, <u>Chambers</u>, 410 U.S. at 294, nor that the ruling had

18   a substantial and injurious effect or influence on the jury's verdict. <u>Brecht</u>, 507 U.S. 637, given

19   the exceedingly narrow nature of the defense's theory of lack of premeditation and deliberation,

20   the evidence available in rebuttal, and California juries' rejection of similar arguments in

21   comparable cases.

22           The possible prejudice from any constitutional error committed by the trial court in

23   limiting mental health expert testimony at the guilt phase must be understood within the context

24   of the other evidence of premeditation and deliberation that the jury heard at that phase. <u>See</u>

25   <u>Brecht</u>, 507 U.S. at 637; <u>Chambers</u>, 410 U.S. at 294; <u>Parle</u>, 505 F.3d at 928. On one hand, the

26   jury heard an abundance of evidence—all unrefuted—depicting Petitioner's elaborate, detailed,

27   single-minded plan to commit the non-capital crimes, and the numerous steps he took to

28   effectuate that plan. The jury heard that, several months before the crimes and in service of his

dream of forcing girls into romantic relationships with him, Petitioner rented a trailer, sought out soundproof materials, and built an antechamber inside one of the bedrooms. (16 RT 3370-3403; 18 RT 3627-39.) He obtained disguises, dyed his hair, and practiced false voices. (See 17 RT 3426-3520; 21 RT 4221-63.) He acquired temporary license plates to use on his car. (18 RT 3627-39.) He apparently called an acquaintance and pretended to be a modeling agent interested in hiring her teenaged daughter. (17 RT 3417-25.) He concocted a plan of pretending to be a film producer to deceive girls into coming to his trailer, and spent days carrying out this plan. (See 17 RT 3426-3520.) He wrote and had printed an ersatz script for his nonexistent television commercial and had fake business cards printed. (See 17 RT 3449-76, 3484-93.) He called and then went to several modeling agencies and held sham auditions. (See 17 RT 3426-3520.) After he selected Ms. Berg and Ms. Thoma from the "auditions," he advised them where to meet him the next day and eventually led them into his trailer, dissembling as a film producer up until the moment he had trapped them in the modified bedroom. (See 19 RT 3735-3923.) Truly, the evidence revealed an exceptional amount of planning and deliberation for the kidnappings, detentions, and eventual sexual assaults of the child victims.

On the other hand, however, the evidence that homicide was part and parcel of this plan was much more speculative. The prosecution presented evidence that, as Petitioner conducted his phony auditions, he learned that any minor he selected would most likely be accompanied by a chaperone to the location of the purported job site. (See 17 RT 3426, 3430-31, 3436 [testimony of Gaynel Wadsworth]; 17 RT 3437, 3439 [testimony of Sharon Monroe]; 17 RT 3457-58 [testimony of Jeanette Knight]; 17 RT 3490 [testimony of Jennifer Karrisch]; 17 RT 3498, 3502 [testimony of Joy Miller]; 17 RT 3511-14 [testimony of Jennifer Kelly].) On the day of the crimes, the minor victims arrived at their meeting with Petitioner accompanied by Ms. Martin and Ms. Walsh, who insisted on chaperoning the girls throughout the purported acting job. (18 RT 3598-3603; 19 RT 3735-3923.) From these facts, the jury could deduce that killing Ms. Martin and Ms. Walsh became part of Petitioner's plan upon his realizing that he could not be alone with the minor girls otherwise. (24 RT 4591-94, 4605-08.)

////

1    Other facts also supported this deduction, per the prosecution. The prosecution presented

2    evidence that years before the crimes, Petitioner had become aware of the use of flexible ties as a

3    means of strangulation (16 RT 3360-64), although the defense disputed whether Petitioner had

4    considered this seriously or as a joke. (16 RT 3367-69.) The prosecutor also directed the jury to

5    Petitioner's writings, which contained notations like "force," "bag," and "tarp." (24 RT 4570-71,

6    4591-94; see 1 SACT 216, 222, 235, 239; 2 SACT 248; 19 SACT 5150; 20 SACT 5257, 5264,

7    5265, 5270, 5294, 5308.) The prosecutor argued that, from this, the jury could deduce that killing

8    the girls' chaperones became, at some point, part of Petitioner's "sweet hostage" plan. (24 RT

9    4571, 4591-94, 4605-08.) This deduction, however, was not the only, or even most likely,

10    deduction from that evidence and therefore, as a matter of state law, provided little evidentiary

11    support for the prosecutor's theory. (See 32 RT 5862-64 [Dr. Kaldor rejects any particular

12    interpretation of these notations as wholly speculative, as no one could know their meaning to

13    Petitioner]; see generally 24 RT 4689 [jury instructed that, when circumstantial evidence is

14    presented that could be interpreted as supporting the existence of a mental state, the jury must

15    adopt the interpretation that points to the absence of the mental state].)

16    The defense countered that, although Petitioner did have an elaborate "sweet hostage"

17    plan for the minor victims and although he knew adults would be present during his kidnappings

18    of the girls, he did not have any particular plan for handling the adults, did not plan to kill them,

19    and only wished to detain and quiet them while he carried out his sexual assaults of the minors.

20    (24 RT 4639-42, 4646-47, 4649-50; see also 27 RT 5241 [eliciting same from defense expert Dr.

21    Mills during sanity phase].) Defense counsel argued that Petitioner only put flexible ties around

22    the adults' necks in order to silence them. (24 RT 4642-45, 4647-50.) He argued that Petitioner

23    only strangled the victims in a fit of overwhelmed emotion, rashly tightening the ligatures as the

24    victims made noise, but without any careful thought, weighing of choices, or consideration of

25    consequences. (24 RT 4638-39, 4642-45, 4647-53; see also ECF No. 59 at 108, 119-20, 144-45.)

26    As such, per Petitioner, he would only be culpable of second-degree murder. (24 RT 4638-39,

27    4652-53.)

28    ////

70

This defense theory, however, was tenuous at best, given the meaning of "premeditation and deliberation" under California law. In order for the jury to find that the homicides were the product of premeditation and deliberation, the jury need not have found that they were part of any particular plan at all, let alone that they were intrinsic to Petitioner's elaborate "sweet hostage" plan. "Premeditation and deliberation," within the meaning of California first-degree murder definition, requires far less. The California Supreme Court has explained, in its seminal case on the issue:

> The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing— what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People v. Thomas, supra,* 25 Cal.2d 880, at pp. 898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).
>
> Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).

People v. Anderson, 70 Cal.2d 15, 26-27 (1968). Moreover, this standard can be satisfied by acts that occur within moments of the homicide; the defendant's planning need not be extensive or protracted to satisfy prongs one or three of the Anderson test. People v. Stitely, 35 Cal.4th 514, 543 (2005) ("the requisite reflection [to show premeditation and deliberation] need not span a specific or extended period of time. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly,'" quoting People v. Bolin, 18 Cal.4th 297, 332 (1998)).

////

71

1    Looking through this lens, the evidence of Petitioner's premeditation and deliberation was

2    substantial and unrefuted. Even if, as Petitioner posits, the killing of the chaperones had not been

3    part of Petitioner's original plan, at the time he strangled them, he had a very clear motive for

4    their deaths: to silence them so that they would not ruin his opportunity to sexually assault Ms.

5    Thoma and Ms. Berg and form romantic relationships with them. (See 24 RT 4639-42, 4646-47,

6    4649-50.) The manner of death, too, was "particular and exacting," see Anderson, 70 Cal.2d at

7    27, as Petitioner applied a ligature around the victims' necks and tightened them until the women

8    could not breathe. See, e.g., People v. Hovarter, 44 Cal.4th 983, 1020 (2008) (holding homicide

9    by strangulation "requires an offender to apply constant force to the neck of the victim, [and thus]

10   affords ample time for the offender to consider the nature of his deadly act," thereby constituting

11   strong evidence of deliberation); People v. Bonillas, 48 Cal.3d 757, 792 (1989) (en banc)

12   ("Ligature strangulation is in its nature a deliberate act."); People v. Lucero, 44 Cal.3d 1006,

13   1020 (1988) (holding the jury could have found "strangulation as a deliberate manner of killing

14   sufficient to indicate a 'preconceived design'" showing premeditation and deliberation). One

15   victim's ligature was found to have been pulled so tightly that her neck was "compress[ed] . . . to

16   an extraordinary degree." Coddington, 23 Cal.4th at 633 (describing autopsy photographs).

17   Under California law, a jury could have relied on these facts alone to reach the conclusion

18   that Petitioner's conduct indicated premeditation and deliberation sufficient to meet the standard

19   of first-degree murder. See Anderson, 70 Cal.2d at 26-27; see, e.g., Bonillas, 48 Cal.3d at 792

20   (sufficient evidence of deliberation where victim had been strangled and could have identified

21   defendant as her burglar, thereby providing his motive to kill her); Lucero, 44 Cal.3d at 1119-20

22   (where defendant had killed victims by strangulation and had a motive to kill them because they

23   were witnesses to other crimes, there was sufficient evidence of deliberation to sustain a first-

24   degree murder verdict); People v. Shamblin, 236 Cal. App. 4th 1, 10-14 (2015) (same). Thus,

25   even if mental health experts had testified that they believed that Petitioner had not included

26   homicide in his "sweet hostage" plan or that he had killed Ms. Martin and Ms. Walsh because

27   they "were too hard to control" (see ECF No. 209 at 145), the jury nevertheless could find that his

28   acts sufficed to demonstrate that he had acted with premeditation and deliberation, within the

72

1   meaning of California law, when he chose to strangle them. On this basis, therefore, Petitioner

2   fails to demonstrate that the exclusion of such expert testimony had a substantial and injurious

3   effect on the jury's consideration of his culpability on Counts One and Two, or that the defense

4   case would have been "far [more] persuasive," Chambers, 410 U.S. at 294, on the issue of

5   premeditation and deliberation had the identified expert testimony been presented. See

6   Brecht, 507 U.S. at 637.

7          Equally unpersuasive is Petitioner's theory that, if the jury had heard expert testimony that

8   Petitioner committed the homicides while awaiting what he believed were divine

9   communications, the jury would have concluded he did not premeditate and deliberate. (See ECF

10  Nos. 59 at 144-45, 209 at 145-47.) The premise of this theory is incompatible with California law,

11  because, even if Petitioner was experiencing such mental health symptoms, a jury nonetheless

12  could reasonably conclude that Petitioner acted with premeditation and deliberation within the

13  context of his delusional, psychotic, anxious, and/or depressed state. Under California law at the

14  time of Petitioner's trial, premeditation and deliberation were shown with evidence that the

15  defendant's homicidal "intent was the result of forethought and reflection, . . . [i.e.,] careful

16  thought and a weighing of considerations," but this finding was "not negated by evidence a

17  defendant's mental condition was abnormal or his perception of reality delusional unless those

18  conditions resulted in the failure to plan or weigh considerations for and against the proposed

19  course of action." People v. Stress, 205 Cal. App. 3d 1259, 1270 (1988), reh'g denied and opinion

20  modified (Dec. 5, 1988). Premeditation and deliberation can be shown even where the assailant

21  had no rational motive for the murder, see People v. Lunafelix, 168 Cal. App. 3d 97, 102 (1985),

22  or where the "considerations reflected on by the defendant [when undertaking the homicide] were

23  the product of mental disease or defect." Stress, 205 Cal. App. 3d at 1271.

24         Thus, both California juries and courts have found sufficient evidence of premeditation

25  and deliberation where the defendant killed the victim pursuant to his delusional or psychotic

26  beliefs. In Stress, for example, the jury convicted the defendant of first-degree murder, where the

27  evidence showed that the defendant had killed his wife during a period of paranoid delusional

28  psychosis wherein the defendant believed in a conspiracy concerning the Vietnam War. Stress,

1    205 Cal. App. 3d at 1263-64, 1270-71. Increasingly agitated about the public's ignorance of

2    purported conspiracy, he killed his wife to bring attention to the issue. Id. at 1263-64. The Court

3    of Appeals held the evidence of premeditation and deliberation was sufficient because, "while

4    appellant's motive for the killing was bizarre and delusional," there was strong evidence that he

5    "killed his wife after careful reflection and after a weighing of considerations" within the context

6    of his delusions. Id. at 1268, 1271. Likewise, in People v. Bobo, 229 Cal. App. 3d 1417, 1433-

7    36, review granted and opinion superseded, 798 P.2d 1213 (Cal. 1990), and publication

8    ordered, 822 P.2d 385 (Cal. 1991), the Court of Appeals found sufficient evidence of deliberation

9    where the defendant had been convicted for first-degree murder of her children whom she killed

10    pursuant to her paranoid delusions that her family was under threat. Although there was guilt-

11    phase expert testimony opining that the defendant's "crimes were the product of a paranoid

12    delusion, there was substantial evidence that defendant, like the defendant in Stress, was

13    purposefully planning and acting in the context of that delusion." Id. at 1435. The evidence

14    indicated advanced planning of the homicides, the manner of killing, and the fact that the deaths

15    served her own motive, albeit an irrational one. Id. at 1435-36.

16         The evidence in Petitioner's case seems to support a similar conclusion: that, even if

17    Petitioner was in a psychotic or delusional state during the crimes, his conduct specifically as it

18    related to his killing of Ms. Martin and Ms. Walsh bore clear hallmarks of deliberation by virtue

19    of the method of killing and his motives for the killings. Hence even if the overall scheme was the

20    product of delusional, psychotic, or otherwise disordered thinking; or if aspects of Petitioner's

21    execution of the plan were irrational as a result of his mental impairments; or if his underlying

22    motive for all of the crimes was bizarre, the jury nonetheless could find, based on the unrefuted

23    evidence before it, that Petitioner's homicidal acts themselves were premeditated and deliberate

24    within the meaning of California law. See Bobo, 229 Cal. App. 3d 1417, 1433-36; Stress, 205

25    Cal. App. 3d 1259, 1270.

26         An additional reason vitiates Petitioner's theory of prejudice on this claim. Given the

27    record that was later developed at the sanity phase, it appears that, if Petitioner had propounded

28    testimony at the guilt phase that mental health experts believed Petitioner had not premeditated

74

and deliberated prior to the homicides, it would have opened the door to impeachment evidence that tended to undermine this argument entirely. At the sanity phase, all five of the testifying experts testified that Petitioner had admitted to thoughts, decisions, and actions that implied premeditation and deliberation under <u>Anderson</u>. In the sanity phase, court-appointed expert Dr. Kaldor testified that Petitioner had reported having contemplated the homicides in advance, stating, "I had planned that I might have to kill someone. It was something I'd do if I had to," should there be impediments to his "sweet hostage" objective. (32 RT 5780-83; <u>see also</u> 32 RT 5870 [same].) Other experts testified that Petitioner reported he had strangled the victims to keep them quiet, knowing that his actions would kill them. Defense expert Dr. Mills testified in the sanity phase that, per his conversations with Petitioner, Petitioner "knew that by throttling [Ms. Martin and Ms. Walsh], they would be asphyxiated and they would die." (25 RT 4876.) Dr. Mills further testified that Petitioner had told him that he initially put the flexible tie around Ms. Martin's neck to quiet her, but then strangled her so she wouldn't suffer. (27 RT 5172.) Dr. Rosenthal similarly testified at the sanity phase that Petitioner had told him that killing the chaperones had not been initially part of his plan, but he realized he would have to kill them once they became noisy in his trailer. (28 RT 5427.) Dr. Bittle testified at length of Petitioner's descriptions of the homicides, including reporting to him that, upon forcing the four victims into the soundproof bedroom, Ms. Martin and Ms. Walsh yelled and he sought to subdue them. (33 RT 5920-21.) In the course of doing so, he put the flexible ties around their necks and, then,

> I had the plastic tie around Mabs's neck and she said, I can't breathe and I said to her, you must be able to breathe or you couldn't be talking to me. She was still yelling and saying, "I can't breathe," which I thought was a little ridiculous. . . . The FLEX-CUF was to restrain . . . just tie them up. Mabs was still making noises . . . I tightened it up because I could not have her screaming and yelling. . . . I had been told to get away with this at all cost, try to keep things quiet. . . .so I tightened it up . . . then she started making choking noises – or choking sounds and now she really couldn't breathe really well and she said something like . . . I think she did say (whispers) "I can't breathe." . . . didn't want her to suffer . . , so I just tightened up as tight as I could tighten it up so she would be unconscious very quickly. . . . I immediately went to the other lady and tried to tie her up . . . Dorothy . . . did the same thing to her . . . again I was in an extreme hurry . . . had to get out . . . get the car . . . move it . . . everything had to be quiet and I had to get the car out of there.

1   (33 RT 5920-24.)

2          In sum, the totality of the record does not support the conclusion that the defense case was

3   "far less persuasive" on the question of whether Petitioner premeditated and deliberated prior to

4   the homicides than it would have been if Petitioner had been permitted to adduce mental health

5   expert testimony to the extent required by the Constitution. See Chambers, 410 U.S. at 294.

6   Rather, had such testimony been presented, the jury nevertheless would have heard extensive,

7   compelling, and unrefuted evidence that Petitioner had expressly decided to kill Ms. Martin and

8   Ms. Walsh for a particular motive and in a particularly exacting manner, even if he reached that

9   decision quickly, angrily, and/or while in a delusional state. Under California law, there would

10  have been more than ample evidence to permit the jury to find that premeditation and deliberation

11  had been proven on Counts One and Two, even with the additional expert testimony. In these

12  circumstances, Petitioner cannot show that exclusion of this testimony had a substantial, injurious

13  effect on the verdicts rendered on the homicide counts. See Brecht, 507 U.S. at 637.

14         For these reasons, the undersigned recommends Claim 7 be dismissed. See Shinn, 142 S.

15  Ct. at 1739; Brown, 142 S. Ct. at 1524; Berghuis, 560 U.S. at 389-90.

16         4.   The California Supreme Court's Denial of Claim Eight Was Not Contrary to, Nor an

17              Unreasonably Application of, Clearly Established Federal Law Nor An Unreasonable

18              Fact Determination

19         In his first petition for writ of habeas corpus, Petitioner alleged that his trial counsel

20  performed deficiently by "failing to adequately object" to the trial court's ruling on the

21  admissibility of expert psychiatric testimony at the guilt phase (LD 25-C.1 at 30) and failing to

22  state on the record that, but for the trial court's ruling, the defense would have called Dr. Bittle to

23  testify at the guilt phase. (LD 25-C.1 at 38). Petitioner alleged that these failures prejudiced him

24  at the guilt phase. (LD 25-C.1 at 39.) The California Supreme Court denied the claim summarily,

25  on the merits (LD 25-C.5.)

26         Because the California Supreme Court denied relief without a reasoned decision, its denial

27  is entitled to deference if there could have been any reasonable basis for the denial consistent with

28  clearly established federal law. Richter, 562 U.S. at 98; Kipp, 971 F.3d at 948. Here, based on the

1    record before it, the California Supreme Court reasonably could have found that Petitioner had

2    failed to make a prima facie showing of defense counsels' deficient performance under clearly

3    established federal law, thus foreclosing federal habeas corpus relief. See Shinn, 141 S. Ct. at

4    524.

5              a.   Petitioner Did Not Make a Prima Facie Showing that Defense Counsel

6                   Performed Deficiently In The Litigation of the Question of Admissibility of

7                   Psychiatric Expert Testimony at the Guilt Phase

8         The Sixth Amendment's guarantee of the right to counsel implies the right to counsel who

9    demonstrates "at least a minimal standard of competence," Hinton v. Alabama, 571 U.S. 263, 272

10   (2014), in adversarially challenging the state's case against the defendant. Strickland, 466 U.S. at

11   685. Counsel's duty of reasonably competent performance embraces the litigation of trial issues

12   and preparation therefor. Maryland v. Kulbicki, 577 U.S. 1, 3-5 (2015); Hinton, 571 U.S. at 274.

13   Thus, defense counsel performs deficiently by, for example, failing to learn that a state statute

14   authorized expert funding, see Hinton, 571 U.S. at 274-75, or authorized access to records

15   relevant to the defendant's mitigation case, see Williams, 529 U.S. at 395, or failing to learn the

16   state rules governing pretrial discovery. See Kimmelman v. Morrison, 477 U.S. 365, 385 (1986);

17   see also Iaea v. Sunn, 800 F.2d 861, 864-65 (9th Cir. 1986) (trial counsel deficient for advising

18   defendant based on counsel's misreading of sentencing statute). Because, however, the

19   reasonableness of defense counsel's performance is not defined by hindsight but by

20   contemporaneous norms, Lockhart v. Fretwell, 506 U.S. 364, 372 (1993), an attorney does not

21   perform deficiently by failing to anticipate changes in the law or judicial decisions settling

22   ambiguous areas of law. United States v. Juliano, 12 F.4th 937, 940-41 (9th Cir. 2021); Pinkston

23   v. Foster, 506 F. App'x 539, 542 (9th Cir. 2013); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir.

24   1994); cf. Kulbicki, 577 U.S. at 4-5, (trial counsel not deficient for failing to anticipate scientific

25   advancements that would have impeached the prosecution's ballistics evidence). Counsel is also

26   not deficient for failing to make futile arguments, motions, or objections. See, e.g., Ochoa v.

27   Davis, 50 F.4th 865, 889 (9th Cir. 2022); Pinkston, 506 F. App'x at 542-43; Rupe v. Wood, 93

28   F.3d 1434, 1445 (9th Cir. 1996).

1    In the state court, Petitioner alleged that trial counsel performed deficiently by failing to

2  "have objected to the [trial] court's ruling" on the admissibility of psychiatric expert testimony at

3  the guilt phase, on all of the grounds that were later raised on appeal in challenging that ruling,

4  (LD 25-C.1 at 37) and failing to interpose any "substantive argument to . . . persuade the court to

5  change its mind" on that admissibility question. (Id. at 38.) The record, however, before the state

6  court supported the finding that Petitioner had not made a prima facie showing of deficient

7  performance.

8    Preliminarily, to the extent that Petitioner's allegations on habeas corpus conflicted with

9  the record, the state court was entitled to rely on the record. See Pinholster, 563 U.S. at 190-94;

10  Landrigan, 550 U.S. at 475-77. The record demonstrated that defense counsel did argue for the

11  admissibility of psychiatric expert testimony at the guilt phase and did dispute the trial court's and

12  prosecutor's restrictive interpretation of Penal Code sections 28 and 29. Defense counsel argued

13  that state law permitted a psychiatric expert to testify about Petitioner's mental disease or defect,

14  but could not testify as to his opinion of the ultimate issue of whether or not Petitioner had

15  deliberated or premeditated at the time of the homicides. (21 RT 4289-91.) Counsel continued to

16  press this interpretation even when faced with disagreement from the prosecutor and the trial

17  court. (21 RT 4291-92.) Counsel argued that "diminished actuality" evidence was admissible at

18  the guilt phase under Penal Code sections 28 and 29, aptly citing People v. Jackson, 152 Cal.

19  App. 3d 961 (1984), and People v. Whitler, 171 Cal. App. 3d 337 (1985). (22 RT 4298-99.) After

20  the court persisted in its rejection of this argument, defense counsel submitted. (22 RT 4300,

21  4305.)

22    In light of this record, the state court was entitled to reject Petitioner's allegations that trial

23  counsel failed to litigate the issue entirely or failed to interpose any substantive arguments during

24  litigation of the issue. (See LD 25-C.1 at 37-38.) See Pinholster, 563 U.S. at 190-94; Landrigan,

25  550 U.S. at 475-77. Similarly, the state court was entitled to give little weight to defense

26  counsel's declaration in habeas corpus that counsel had shared the trial court's interpretation of

27  Penal Code sections 28 and 29 and had believed the trial court's ruling was correct (see LD 25-

28  C.3 Ex. A at ¶ 73(i)), given that these averments were directly undermined by the record, which

78

1     showed defense counsel having disagreed with the trial court and arguing for a more expansive

2     interpretation of the statutes. See generally Richter, 562 U.S. at 109 ("courts may not indulge

3     '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of

4     counsel's actions, [because] [a]fter an adverse verdict at trial even the most experienced counsel

5     may find it difficult to resist asking whether a different strategy might have been better, and, in

6     the course of that reflection, to magnify their own responsibility for an unfavorable outcome"

7     (internal citation omitted)); Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993) (court may

8     give little weight to a declaration containing statements contradicted by the record); Hayden v.

9     Nat'l Sec. Agency/Cent. Sec. Serv., 608 F.2d 1381, 1387 (D.C. Cir. 1979) (court may choose not

10     to credit an affidavit whose contents are contradicted by the record).

11         To the extent trial counsel could have pressed his point more vociferously or tendered

12     even more arguments in support of it (see ECF No. 59 at 146-47), his failure to do so was not so

13     unreasonable as to render it a deficient performance under clearly established federal law upon

14     which no reasonable jurist could disagree. At the time of Petitioner's trial, several relevant

15     aspects of the application of Penal Code sections 28 and 29 had yet to be settled by the courts.

16     Most notably, it was not until after Petitioner's trial that the California Supreme Court held that

17     Penal Code sections 28 and 29 permitted "expert testimony relating to defendant's mental

18     disorders at the time of the commission of the crimes, or a correlation of the evidence of the

19     crimes to the experts' test results" and only excluded testimony of an expert's "opinion that as a

20     result of defendant's mental disorders he lacked the capacity to form the intent to kill, or did not

21     in fact have the intent to kill, when committing the crime." Samayoa, 15 Cal.4th at 837 (citing

22     People v. Breaux, 1 Cal.4th 281, 303 (1991)). Indeed, courts have repeatedly treated the

23     California Supreme Court's holding in Petitioner's direct appeal opinion as having set forth, for

24     the first time definitively, the rule on this issue. See People v. Cortes, 192 Cal. App. 4th 873, 902

25     (2011) ("Eleven years ago, in *People v. Coddington* (2000) 23 Cal.4th 529, 97 Cal.Rptr.2d 528, 2

26     P.3d 1081 (*Coddington*), our Supreme Court summarized permissible and impermissible expert

27     testimony on mental state evidence in criminal trials."); see, e.g., People v. Nieves, 11 Cal.5th

28     404, 441 (2021); People v. DeHoyos, 57 Cal.4th 79, 117 (2013); People v. Vieira, 35 Cal.4th 264,

1   292 (2005), as modified (May 26, 2005); People v. Herrera, 247 Cal. App. 4th 467, 476 (2016);

2   People v. Larsen, 205 Cal. App. 4th 810, 826 (2012); Roybal v. Davis, 148 F. Supp. 3d 958, 1070

3   (S.D. Cal. 2015). In his direct appeal brief, Petitioner acknowledged this reality, explaining that,

4   at that time, "[n]o California appellate opinion ha[d] yet to address the problem squarely" of what

5   scope of diminished actuality evidence was admissible under the newly-revised statutes,

6   describing that "[i]n the few appellate cases to consider the constitutionality of sections 28 and

7   29, the trial courts did not seriously restrict the kind of mental-health evidence the defendants

8   could present. The courts of appeal, therefore, were not called on to engage in a rigorous analysis

9   of the scope of the statutory scheme." (LD 25-B.1 at 119 & n.114.) The California Supreme Court

10  thus would not have been unreasonable in concluding that the record did not show that defense

11  counsel failed to know governing law when litigating this issue (see Hinton, 571 U.S. at 274-75;

12  Williams, 529 U.S. at 395; Kimmelman, 477 U.S. at 385), but rather supported the conclusion

13  that counsel merely failed to anticipate how the California Supreme Court would eventually

14  resolve a yet-unsettled legal question, which is not deficient performance under clearly

15  established federal law. See Juliano, 12 F.4th at 940-41; Pinkston, 506 F. App'x at 542; Lowry,

16  21 F.3d at 3406.

17          Finally, the state court reasonably could have concluded that defense counsel did not

18  perform deficiently because the record indicated that any further argument on the question would

19  have been futile, given the position of the trial court. In its in limine hearings, the trial court

20  repeatedly made clear that it believed that its admissibility ruling was mandated by state statute

21  and that it possessed no discretion to admit a broader scope of psychiatric expert testimony at the

22  guilt phase, even if such testimony was reliable and probative. (See 22 RT 4299-4302.) The trial

23  court repeatedly rejected arguments that the court itself found compelling, but that it concluded

24  were foreclosed under the recently-revised statute. (See 22 RT 4300-01 (rejecting defense

25  counsel's arguments by stating that the California statute "doesn't make sense" and "is in a bad

26  way" on the admissibility of diminished actuality evidence).) Throughout the hearings, the trial

27  court was resolute in its ruling and its belief that it was bound by statute to rule in the manner it

28  did. (See 22 RT 4299 (describing its ruling as "the state of the law), 4302 (same), ibid. (stating it

80

1    was "forbidden" under state statute to admit diminished actuality expert testimony).) In light of

2    this, reasonable defense counsel could have concluded that any further argument would have been

3    futile. See, e.g., Pinkston, 506 F. App'x at 542-43 (counsel not deficient for failing to move for

4    rehearing of an adverse decision, where court had previously indicated its belief that the claim at

5    issue was meritless); Rupe, 93 F.3d at 1445 (counsel not deficient for failing to seek admission at

6    retrial evidence that had been excluded at trial, where retrial court had indicated it would follow

7    the ruling of the first trial court).[16]

8          Accordingly, the California Supreme Court was reasonable if it denied relief on this claim

9    upon the conclusion that Petitioner had failed to make a prima facie showing that his trial

10   counsels' performance was deficient under clearly established federal law. See Richter, 562 U.S.

11   at 98.

12   **CLAIM 9**

13         In Claim 9, Petitioner alleges that "all allegations regarding ineffective assistance of

14   counsel in the sanity phase," as "set forth more completely . . . in Claims 45 – 49," also

15   prejudiced him at the guilt phase, because had those instances of deficient performance not

16   occurred, the jury was reasonably likely to have returned favorable verdicts on Counts One and

17   Two on the basis of the available testimonies of "Drs. Bittle, Mills, Rosenthal, and Satten . . . that

18   Petitioner had not acted with deliberation." (ECF No. 59 at 149; see also ECF No. 209 at 151-53.)

19   Petitioner presented this claim in part in his first petition for writ of habeas corpus (LD 25-C.1 at

20   39-40)[17], which the California Supreme Court denied on the merits. (LD 25-C.5.) The

21   undersigned concludes that the denial is entitled to deference. See 28 U.S.C. § 2254(d).

22   _____

23   [16] Petitioner's additional allegation in state court that defense counsel "fail[ed] to leave adequate record for review" (LD 25-C.1 at 30) may have been reasonably denied as conclusory, given that Petitioner made no further allegations in support of this argument, including most notably how

24   such a deficiency would have prejudiced him in the guilt phase of his trial, which is the form of prejudice he alleged. (See LD 25-C.1 at 30-39.) See Pinholster, 563 U.S. at 188 n.12; Duvall, 9

25   Cal.4th at 474; Clark, 5 Cal.4th at 770.

26   [17] In his first petition for writ of habeas corpus in state court, Petitioner only incorporated into this

27   claim those allegations set forth in Claims C-1 and C-2 of that petition, which correspond only to Claims 45 and 46 of the Amended Petition in the instant proceeding. (See LD 25-C.1 at 39-40;

28   ECF No. 59 at 322-40, nn. 247-52.) Respondent has not argued that this claim has not been

1   Preliminarily, to the extent that this claim incorporates the allegations of Claim 48 and 49,

2   those allegations fail as conclusory. "Conclusory allegations which are not supported by a

3   statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 29 (9th Cir.

4   1994); see, e.g., Jones v. Gomez, 66 F.3d 199, 204-05 (9th Cir. 1995) (conclusory allegations

5   made with no reference to the record or any document do not merit habeas relief); Campbell v.

6   Wood, 18 F.3d 662, 679 (9th Cir. 1994) ("An evidentiary hearing is not required on allegations

7   that are 'conclusory and wholly devoid of specifics.'"); O'Bremski v. Maass, 915 F.2d 418, 420

8   (9th Cir. 1990) (habeas corpus petition should be dismissed if it fails to "state facts that point to 'a

9   real possibility of constitutional error'"). Here, in Claim 48, Petitioner alleges that trial counsel

10   performed deficiently at the sanity phase by failing to seek to have a positron emission

11   tomography scan performed on him (ECF No. 59 at 336-38) and, in Claim 49, alleges that trial

12   counsel performed deficiently by failing to provide Dr. Rosenthal's report to Dr. Bittle. (ECF No.

13   59 at 339-41.) In Claim 9, however, he makes no allegations whatsoever as to how either of these

14   deficiencies may have prejudiced him in the guilt phase. (See ECF No. 59 at 149-50; see also

15   ECF No. 209 at 151-53.) Petitioner therefore fails to show any entitlement to guilt-phase relief on

16   the basis of these allegations. See James, 24 F.3d at 29; Jones, 66 F.3d at 204-05; O'Bremski, 915

17   

18   exhausted. (See ECF Nos. 29, 37, 99 at 1-2, 102 at 1-2, 189 at 1.) Generally, in order to exhaust a
    claim under AEDPA, the petitioner must explicitly present to the state court his legal theory

19   setting forth the federal constitutional provision that he alleges was violated, as well as the factual
    basis for his claim. See Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam); Castillo v.

20   McFadden, 399 F.3d 993, 998-99 (9th Cir. 2005); Lyons v. Crawford, 232 F.3d 666, 668 (9th Cir.
    2000), as modified by 247 F.3d 904 (9th Cir. 2001). While a federal habeas corpus petitioner has

21   some leeway to raise additional theories and factual allegations in federal court without running
    afoul of AEDPA's exhaustion requirement, a petitioner may only provide further facts or theories

22   to support a claim in federal district court, so long as they "do not 'fundamentally alter the legal
    claim already considered by the state courts.'" Lopez v. Schriro, 491 F.3d 1029, 1040 (9th Cir.

23   2007) (quoting Vasquez v. Hillery, 474 U.S. 254, 260 (1986)). For instance, the exhaustion
    requirement does not allow for "a petitioner who presented any ineffective assistance of counsel

24   claim below [to] later add unrelated alleged instances of counsel's ineffectiveness to his claim."
    Moormann v. Schriro, 426 F.3d 1044, 1056 (9th Cir. 2005), citing Carriger v. Lewis, 971 F.2d

25   329, 333 (9th Cir. 1992) (en banc)); see also Poyson v. Ryan, 879 F.3d 875, 894-95 (9th Cir.
    2018) (citing same).  Here, however, Respondent has waived an exhaustion defense to any

26   

27   portion of this claim (see ECF Nos. 99 at 1-2, 102 at 1-2, 189 at 1) and therefore the undersigned
    analyzes it as though it had been exhausted. See Banks v. Dretke, 540 U.S. 668, 705 (2004); 28

28   U.S.C. § 2254(b)(3).

82

1   F.2d at 420; see generally Brown, 142 S. Ct. at 1520, 1531 (petitioner must show substantive

2   entitlement to relief, as well as satisfaction of AEDPA, for federal court to grant writ of habeas

3   corpus).

4          Second, the state court may have reasonably found that several of the identified instances

5   do not reflect a prima facie showing of deficient performance, namely, those alleged in Claims

6   45, 48, and 49, for the reasons discussed post. Petitioner makes no additional allegations in Claim

7   9 to show that counsels' performance, while it may have been adequate for preparation for the

8   sanity phase, nonetheless fell below the standard of care for the presentation of a defense at the

9   guilt phase. (See ECF No. 59 at 149; see also ECF No. 209 at 151-53.) Thus, because there was

10  no prima facie showing of deficient performance on these claims, there could be no showing of

11  prejudice at the guilt phase from them. See generally Strickland, 466 U.S. at 695-96; see Shinn,

12  141 S. Ct. at 524. Similarly, to the extent Claim 9 alleges that the Brady claim set forth in Claim

13  46 is incorporated into Claim 9, Petitioner cannot show prejudice or materiality at the guilt phase,

14  given that he failed to make a prima facie showing that any Brady violation occurred, as

15  explained post.

16         All that remains, therefore, is an allegation that defense counsels' failure to discover the

17  Branton report and provide it to the defense-retained and court-appointed experts (Claim 47)

18  prejudiced him in the guilt phase. As described below, Petitioner made a prima facie showing that

19  defense counsel performed deficiently by failing to seek his jail mental health records in the

20  course of investigating the sanity defense and, particularly, upon learning Petitioner had received

21  some form of mental health assessment shortly after his arrest. (See Claim 47, post.) Had counsel

22  undertaken such investigation, the undisputed record was that they would have received a report

23  generated by Sandra Branton of the El Dorado County Mental Health Department, which

24  reflected her assessment of Petitioner's mental functioning at the El Dorado County Jail the

25  morning after his arrest. (ECF Nos. 59 at 330-33, 209 at 557-58.) This report memorialized Ms.

26  Branton's observations that Petitioner appeared suicidal and was possibly psychotic, delusional,

27  paranoid and/or possessed a personality disorder. (Ibid.; LD 25-C.3 Exs. F ¶ 7, P.) Relative to his

28  allegations of guilt-phase prejudice, Petitioner tendered to the state court a declaration from Dr.

1  Bittle that, had he possessed the Branton report, he "would have had serious doubts whether Mr.

2  Coddington's mental state at the time of the homicides constituted 'deliberation' within the

3  meaning of CALJIC No. 8.20," as Dr. Bittle "would have been inclined to say that [Petitioner's]

4  actions were not the result of 'careful thought,' that he did not 'weigh and consider the question

5  of killing and the reasons for and against such a choice,' and that he did not kill 'having in mind

6  the consequence' of such a choice." (LD 25-C.3 Ex. I ¶ 5.) Dr. Rosenthal also declared that the

7  information in the Branton report would have "strengthened" his opinion that Petitioner

8  committed the homicides "in the throes of a psychosis (delusional disorder) in which he believed

9  that any actions necessary to effectuate the kidnap plan were authorized, and in fact compelled,

10  by God," and therefore were not the result of careful thought, weighing of alternatives, and

11  consideration of consequences as implied by "deliberation" under CALJIC No. 8.20. (LD 25-C.3

12  Ex. U ¶¶ 3, 7, 8.) Dr. Mills provided an almost identical opinion (LD 25-C.3 Ex. T ¶¶ 3, 7, 8), as

13  did Dr. Satten (LD 25-C.3 Ex. V ¶¶ 7, 8).

14          To demonstrate whether counsels' deficiencies alleged in Claim 47 prejudiced Petitioner

15  at the guilt phase, the reviewing court "must consider the totality of the evidence before the judge

16  or jury." Strickland, 466 U.S. at 695. This includes both those factual findings that would have

17  been unaffected by the claimed deficiency, as well as the likely nature of the effects of the

18  deficiency, as "some errors will have had a pervasive effect on the inferences to be drawn from

19  the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial

20  effect." Id. at 695-96. The import of the error must also be considered in light of the evidence in

21  the record that was adverse to the defendant, because "a verdict or conclusion only weakly

22  supported by the record is more likely to have been affected by errors than one with

23  overwhelming record support." Id. at 696. As the Ninth Circuit has explained, this standard

24  necessarily implies that, "in a case in which counsel's error was a failure adequately to

25  investigate, demonstrating Strickland prejudice requires showing both a reasonable probability

26  that counsel would have made a different decision had he investigated, and a reasonable

27  probability that the different decision would have altered the outcome." Bemore v. Chappell, 788

28  F.3d 1151, 1169 (9th Cir. 2015) (citing Wiggins, 539 U.S. at 535-36); see also Wong v.

1  Belmontes, 558 U.S. 15, 19-20 (2009) (per curiam) (to show prejudice for failure to investigate,

2  petitioner must "establish 'a reasonable probability that a competent attorney, aware of [the

3  available mitigating evidence], would have introduced it at sentencing,' and "that had the jury

4  been confronted with this . . . mitigating evidence, there is a reasonable probability that it would

5  have returned with a different sentence'").

6          Here, given the record before the state court, the state court reasonably could have

7  concluded that Petitioner had not shown prejudice at the guilt phase for the deficient performance

8  identified in Claim 47. For the reasons described in the undersigned's discussion of Claim 7, *ante*,

9  defense counsel could have reasonably opted not to present expert testimony which relied on the

10  Branton report and opined that Petitioner had not deliberated prior to the homicides, and it is not

11  reasonably likely the jury would have returned lesser verdicts on Counts One and Two had such

12  testimony been presented. See Bemore, 788 F.3d at 1169. In support of this claim, Petitioner

13  tendered to the state court declarations from Drs. Bittle, Mills, Rosenthal, and Satten, in which

14  they indicate that, if Petitioner was psychotic and/or displaying symptoms of a delusional disorder

15  during the homicides, then that mental state would have been incompatible with—or at least

16  inconsistent with—the features of premeditation and deliberation. (See LD 25-C.3 Ex. I ¶ 5; Ex.

17  T ¶¶ 3, 7, 8; Ex. U ¶¶ 3, 7, 8; Ex. V ¶¶ 7, 8.) None of these materials—nor any other argument

18  made in support of this claim—address, however, that under California law, a person may be

19  found to have premeditated and deliberated even within the context of his delusional, irrational,

20  or otherwise impaired beliefs. The state court reasonably could have found, therefore, that

21  reasonable defense counsel could have opted not to present such testimony or, if presented, that it

22  was not reasonably likely the jury would have returned lesser verdicts on Counts One and Two.

23  See Strickland, 466 U.S. at 698-99.

24          Further, neither Petitioner's argument nor declarations offered in support of this claim

25  address the disclosures these experts testified, in the sanity phase, that they had received from

26  Petitioner, in which he admitted to mental processes that would seem to demonstrate

27  premeditation and deliberation. As with Claim 7, such impeachment or rebuttal evidence would

28

1   seem to have been plainly admissible at the guilt phase had the defense propounded expert

2   testimony that Petitioner had not premeditated or deliberated prior to the homicides.

3   Given this readily-available impeachment evidence, a reasonable defense counsel may have

4   decided that it was strategically unsound to propound testimony that posited that Petitioner had

5   killed unthinkingly, in a burst of extreme emotion, without awareness of the consequences of his

6   acts. See Strickland, 466 U.S. at 698-99 (trial counsel exercises "reasonable professional

7   judgment" in not presenting evidence that could be impeached in very damaging way); Richter,

8   562 U.S. at 108 (same, where defense counsel had not presented available expert testimony); see

9   also Darden, 477 U.S. at 186; Hendricks, 70 F.3d at 1038; Bonin v. Calderon, 59 F.3d 815, 836

10  (9th Cir. 1995); see generally Bemore, 788 F.3d at 1169 (to show prejudice from failure to

11  investigate, petitioner must show "a reasonable probability that counsel would have made a

12  different decision had he investigated"). This is particularly true, given that Petitioner would go

13  on to rely on these same experts to support his defense at the sanity phase, where defense counsel

14  believed there was a better chance for a favorable verdict based on the evidence. (LD 25-C.3 Ex.

15  A ¶ 73(a)-(c).) It was strategically reasonable, therefore, for counsel to avoid having these experts

16  decisively impeached at the guilt phase and risk the jury giving their opinions little weight in

17  subsequent phases. See Richter, 562 U.S. at 108-09; see generally Dunn v. Reeves, __ U.S. __,

18  210 L. Ed. 2d 812, 141 S. Ct. 2405, 2410 (2021) (defense counsel is reasonable when he avoids

19  presenting evidence that risks "'harm[ing] the defense' by undermining credibility with the jury,"

20  quoting Richter, 562 U.S. at 108); McCoy v. Louisiana, __ U.S. __, 200 L. Ed. 2d 821, 138 S. Ct.

21  1500, 1509 (2018) (in a multi-phase trial, counsel may make strategic decisions in one phase with

22  the goal of maximizing the chance of success in a subsequent phase); People v. Weaver, 26

23  Cal.4th 876, 925-29 (2001) (not unreasonable for defense counsel to present available evidence at

24  the sanity phase and forego its presentation at the guilt phase, where the evidence was relevant

25  and admissible in either phase).

26          Accordingly, the defense would appear to have had little to gain—but much to lose, in

27  terms of the credibility of the psychiatric experts and the defense generally—by adducing the

28  testimony Petitioner now urges. Consequently, it is not reasonably likely that reasonable defense

1   counsel would have elected to present this evidence and, if presented, it was not reasonably likely

2   to have resulted in a second-degree murder verdict on Counts One and Two. See Bemore, 788

3   F.3d at 1169 ("in a case in which counsel's error was a failure adequately to investigate,

4   demonstrating Strickland prejudice requires showing both a reasonable probability that counsel

5   would have made a different decision had he investigated, and a reasonable probability that the

6   different decision would have altered the outcome").

7       For this reason, therefore, the state court's denial of Claim 9 is entitled to deference and

8   the undersigned recommends it be dismissed.

9   **CLAIMS 10 AND 11**

10      In Claim 10, Petitioner alleges that the trial court committed prejudicial constitutional

11   error in instructing the jurors during voir dire that, at the guilt phase of the trial, the defendant was

12   presumed to have been sane at the time of the crimes. (ECF No. 59 at 151-56.) In Claim 11,

13   Petitioner alleges that trial counsel was ineffective for having agreed to this instruction. (ECF No.

14   59 at 157.) Petitioner raised Claim 10 on direct appeal, which the California Supreme Court

15   denied. Coddington, 23 Cal.4th at 584-85. He raised Claim 11 in his first petition for writ of

16   habeas corpus (LD 25-C.1 at 54-56), which the state court denied summarily. (LD 25-C.5.) The

17   undersigned concludes that the denials of both claims are entitled to deference under section

18   2254(d).

19      A.  Relevant Proceedings Below

20      At the outset of jury selection, the trial court read the Information to the jury panel and

21   stated that Petitioner had pled not guilty and not guilty by reason of insanity to each count. (1 RT

22   20.) The court then instructed that Petitioner was presumed innocent and was entitled to acquittal

23   unless the State proved his guilt beyond a reasonable doubt. (1 RT 84.)

24      During individual voir dire, the court explained to each prospective juror that the trial

25   might proceed in multiple phases, with the first phase being the guilt phase in which "the jury will

26   be required to determine whether or not beyond a reasonable doubt Mr. Coddington is guilty of

27   the crimes" in the Information. (2 RT 312.) If the jury returned guilty verdicts on the murder

28   counts, the case would proceed to a special circumstances phase. (2 RT 312.) After that, the case

might proceed to a sanity phase, because, as the court had informed the prospective jurors

previously, Petitioner had entered a dual plea of not guilty and not guilty by reason of insanity; at

the sanity phase, "the jury would have to make a determination whether or not [the defendant]

was sane at the time the alleged offenses were committed." (2 RT 312.) The court then explained

that the verdicts at the guilt and special circumstances phases would determine whether there

would be a penalty phase. (2 RT 312-13.) Finally, the court explained how the guilt and sanity

phases related to each other:

> As I've indicated, the defendant has entered a dual plea of not guilty
> and not guilty by reason of insanity. During the guilt phase of the
> trial, the defendant shall be conclusively presumed to be sane at the
> time the crimes were alleged to have been committed.
>
> If the jury finds the defendant guilty, then the jury will try the issue
> of the defendant's sanity. During that phase of the trial, and only
> during the sanity phase of the trial, the defendant has the burden of
> proof to a preponderance of the evidence to prove he was insane at
> the time of the alleged commitment of the crimes charged.

(2 RT 313; see also 2 RT 312-15; 3 RT 415-19; 4 RT 675-79; 7RT 1246-49; 8 RT 1663-66; 9 RT

1725-29; 10 RT 2147-51; 13 RT 2671-75, 2697-2701; 14 RT 2945-49; 15 RT 3171-76 [providing

similar instructions to eleven of the twelve seated jurors]; see generally 5 CT 1027 [identifying

jurors]).[18] Defense counsel did not object to this instruction. (See 1 RT 8-9.)

At the close of the guilt phase, the jury was instructed that the defendant was presumed

innocent unless the State proved his guilt beyond a reasonable doubt. (24 RT 4695.) To find the

defendant guilty of first-degree murder on Counts One or Two, the jury was instructed that they

had to find, inter alia, that "a certain mental state" of "premeditation, deliberation, and malice

aforethought" had existed "in the mind of the perpetrator and unless such mental state exist[ed]

the crime to which it relates [was] not committed." (24 RT 4696.) The jury was then instructed:

> It is a matter for the jury to determine whether or not there is any
> evidence that the defendant suffered from a mental disease or defect
> at the time of the alleged offenses as charged in Counts I and II of
> the information. Should the jury determine that there is such evidence
> or an inference of such evidence, you may consider such evidence

---

[18] In voir dire of the twelfth juror, the court provided a similar explanation of the trial procedure
but omitted mention of the presumption of sanity. (2 RT 210-17.)

1
2
solely for the purpose of determining whether or not the defendant actually formed the mental states which are the elements of the crimes charged in Counts I and II of the information, to wit, murder.

3
4
5
6
7
In the crime of murder a necessary element is the existence in the mind of the defendant of malice aforethought. Your conclusions as to whether or not there is any evidence that the defendant suffered from a mental disease or defect may be used in determining whether or not the defendant had the mental states of malice aforethought and an intent to kill, and whether or not he premeditated or deliberated in connection with the offenses charged in Counts I and II of the information.

8   (24 RT 4697.) The jury was instructed that, "there is no malice aforethought if the jury concludes

9   that the defendant suffered from a mental disease or defect which actually precluded him from

10  performing such malice aforethought." (24 RT 4700.)

11      The jury was also instructed specifically that they could rely on circumstantial evidence in

12  determining whether or not the mental states required for Counts One and Two existed, including

13  that if the evidence was susceptible to two or more reasonable interpretations, they must adopt

14  that interpretation that "points to the absence of the specific intent or mental state." (24 RT 4689.)

15  The court instructed the jury as to the meanings of aforethought, willful, deliberate, and

16  premeditated, and that malice was an essential element of the crime of murder. (24 RT 4697-99.)

17  The jury received a copy of these instructions to bring into deliberations. (24 RT 4710, 4712.)

18      On direct appeal, Petitioner argued that the preliminary instruction that he was presumed

19  sane at the guilt phase violated his federal constitutional rights to a reliable death sentence, to

20  compulsory process, and to due process. (LD 25-B.1 at 138.) He posited multiple theories of his

21  due process violation: that the instruction undermined his theory of defense, reduced the

22  prosecution's burden, and relieved the jury of a portion of its fact-finding duties, citing Sandstrom

23  v. Montana, 442 U.S. 510 (1979), Yates v. Evatt, 500 U.S. 391 (1991), Ake v. Oklahoma, 470

24  U.S. 68 (1985), and other Supreme Court authority. (Ibid.) The California Supreme Court denied

25  the constitutional allegations, only expressly mentioning Petitioner's allegations that the

26  instruction undermined his defense. Coddington, 23 Cal.4th at 584-85. The court held that there

27  was no possibility that the instruction confused jurors because "the prosecutor and defense

28  counsel argued the presence or absence of mental disease during guilt phase closing argument,

89

1   with defendant reminding the jury that whether appellant was mentally ill was for the jury to

2   decide" and because the "guilt phase instructions given shortly thereafter expressly advised the

3   jury that premeditation and deliberation were elements of first degree murder and that evidence

4   that the defendant suffered from a mental illness or defect could be considered in determining if

5   those mental states were present." Ibid.

6       In his first petition for writ of habeas corpus, Petitioner alleged that trial counsel was

7   ineffective in failing to object to the instruction, supporting this allegation with a declaration from

8   defense counsel in which he averred that there was no strategic reason for counsels' failure to

9   object to the instruction, as he believed it accurately stated the law. (LD 25-C.1 at 54-56; LD 25-

10  C.3 Ex. A ¶ 6.) The California Supreme Court denied relief summarily. (LD 25-C.5.)

11      B.  The California Supreme Court's Denial of Relief on Claims Ten and Eleven Was

12          Reasonable

13      Due process requires that, in a criminal trial, the State must prove every element of the

14  offense and the jury must be so instructed. See Sandstrom, 442 U.S. at 520-521; Francis v.

15  Franklin, 471 U.S. 307 (1985). A defendant's due process rights are violated where, when

16  considering the entire jury instructions, there is a "'reasonable likelihood that the jury has applied

17  [an] instruction in a way' that violates the Constitution." Estelle v. McGuire, 502 U.S. 62, 72

18  (1991) (quoting Boyde v. California, 494 U.S. 370, 380 (1990)); see also Middleton v. McNeil,

19  541 U.S. 433, 437 (2004) (per curiam).

20      Under these principles, the Ninth Circuit has recognized that a presumption-of-sanity

21  instruction may violate the defendant's constitutional due process rights at the guilt phase of a

22  trial by relieving the prosecution of its burden on the element of mental state:

23          The problem with the instruction . . . is that it tells the jury to presume
            a mental condition that—depending on its definition—is crucial to
24          the state's proof beyond a reasonable doubt of an essential element
            of the crime. Under California law, a criminal defendant is allowed
25          to introduce evidence of the existence of a mental disease, defect, or
            disorder as a way of showing that he did not have the specific intent
26          for the crime. In a first-degree murder case, the evidence would be
            used to show that he did not willfully deliberate and premeditate the
27          killing. If the jury is required to presume the non-existence of the
            very mental disease, defect, or disorder that prevented the defendant
28          from forming the required mental state for first degree murder, that

                                        90

1
2
3

> presumption impermissibly shifts the burden of proof for a crucial element of the case from the state to the defendant. Whether the jury was required to presume the non-existence of a mental disease, defect, or disorder depends on the definition of sanity that a reasonable juror could have had in mind. . . .

4
5
6
7
8
9
10

> Where, as here, evidence is introduced at trial that a defendant was suffering from a mental disease, defect, or disorder, the jury is entitled to consider evidence of such disease, defect, or disorder in determining whether the defendant actually had the mental state necessary for first degree murder. But if a jury is instructed that a defendant must be presumed "sane"—that is, "rational" and "mentally sound," and "able to anticipate and appraise the effect of [his] actions,"—a reasonable juror could well conclude that he or she must presume that the defendant had no such mental disease, defect, or disorder. If a juror so concludes, he or she presumes a crucial element of the state's proof that the defendant was guilty of willfulness, premeditation, and deliberation.

11   Patterson v. Gomez, 223 F.3d 959, 965-66 (9th Cir. 2000). This conclusion was compelled by the

12   clearly established federal law set forth in Sandstrom, 442 U.S. 510, and Francis, 471 U.S. 307,

13   which both held that a jury instruction that reduces or shifts the prosecution's burden of proof

14   violates due process. Id. at 962-64, 966-67; see also Stark v. Hickman, 455 F.3d 1070, 1078 (9th

15   Cir. 2006) (holding same, regarding California's presumption-of-sanity instruction).

16         To determine whether the defendant's due process rights were violated, the reviewing

17   court must consider the burden-reducing or -shifting instruction "in the context of the charge as a

18   whole." Francis, 471 U.S. at 315; see Patterson, 223 F.3d at 966 (quoting same). In Patterson, the

19   Ninth Circuit held that such an instruction had violated the defendant's due process rights where,

20   prior to the commencement of the guilt phase, the court explained that there might be a sanity

21   phase at which the defendant would bear the burden of proof. 223 F.3d at 966. At the close of the

22   guilt phase, the court then instructed:

23
24
25
26

> Evidence has been received regarding a mental disease or mental disorder of the defendant at the time of the crime in the Information. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in the Information, and are [sic] found in the definitions of murder.

27
28

> If from all the evidence you determine to be credible you have a reasonable doubt whether the defendant formed any required mental state or had the necessary specific intent, you must find that he did not have such mental state or specific intent.

91

> At the time of the alleged offense charged in the Information, you were [sic] instructed to presume that the defendant was sane.

Id. at 964. The court's instructions prior to the guilt deliberations, however, never defined "sane" per the California statutory definition or otherwise informed the jury that the term "was being used in something other than the conventional lay sense that the jurors were likely to have had in mind," nor did the instructions inform the jury that the presumption of sanity was simply the "analytical basis" for bifurcation. Id. at 966. For these reasons, the Ninth Circuit concluded that, as a whole, the instructions the jury received could have caused a reasonable juror to relieve the prosecution of its burden of proving mental state at the guilt phase, thereby violating due process. Id. at 962, 966; see also Stark, 455 F.3d at 1078 (holding same, where jury was similar instructed at close of guilt phase). The court concluded this error was not harmless given that disputing mental state was the principal defense theory at trial, the prosecutor repeatedly relied on the presumption in guilt-phase closing argument, and the jury later could not reach a unanimous verdict at the sanity phase. Patterson, 223 F.3d at 967-68.

When considering the reasonable likelihood of the jury's confusion from a particular instruction, the Supreme Court has emphasized that the confusing effect of one instruction may be cured by other instructions. Middleton v. McNeil, 541 U.S. 433, 437 (2004); Victor v. Nebraska, 511 U.S. 1, 22 (1994); Boyde v. California, 494 U.S. 370, 378 (1990); Francis, 471 U.S. at 322; Sandstrom, 442 U.S. at 517; United States v. Hayes, 794 F.2d 1348, 1352 (9th Cir. 1986). Where, for example, the jury was instructed as to the existence of a legal presumption, but also instructed as to the definition and limits of that presumption, a reviewing court may conclude that the instructions, taken as a whole, were not reasonably likely to have misled the jury. Francis, 471 U.S. at 322; Sandstrom, 442 U.S. at 517. Applying this rule, the Ninth Circuit presumes the jury has followed the correct instruction if the jury was given an erroneous instruction at the beginning of trial, but then that instruction was corrected in the final charge. People of Territory of Guam v. Ignacio, 852 F.2d 549, 561 (1988). Similarly, if the jury has been instructed correctly multiple times, but incorrectly once and the incorrect instruction creates a logical ambiguity that would only be apparent from "extremely refined . . . parsing" of the instructions, it "makes no

1   conceivable sense" that a reasonable juror would parse the instructions that way and would ignore

2   the other, correct and straightforward instructions they had received. <u>Middleton</u>, 541 U.S. at 438.

3   Where, however, the jury has been given two instructions that directly contradict one another and

4   neither instruction "makes clear to the jury that one of these contradictory instructions carries

5   more weight than the other," the prejudice flowing from the misleading instruction cannot be said

6   to have been cured. <u>Francis</u>, 471 U.S. at 322.

7          Under these rules, the California Supreme Court was reasonable for denying relief on

8   Petitioner's Claim 10. The state court held that, to the extent Petitioner alleged the presumption-

9   of-sanity instruction undermined his right to present a defense, there was no possibility the

10  instruction confused the jurors, because the instructions at the end of the guilt phase properly

11  informed the jury of the relevance of evidence of mental disease or defect on the mental state

12  elements for first-degree murder and because counsels' closing arguments similarly so advised

13  the jury. <u>Coddington</u>, 23 Cal.4th at 584-85. This holding is a reasonable application of clearly

14  established federal law. <u>See</u> 28 U.S.C. § 2254(d). The state court's sub silento denial of the

15  remaining bases for relief on this claim, including that the instruction served to lessen the

16  prosecution's burden of proof at the guilt phase thereby violating due process, was also not

17  unreasonable and is therefore entitled to deference. <u>See</u> <u>Johnson v. Williams</u>, 568 U.S. 289, 298-

18  301 (2013).

19         Considering the jury's instructions as a whole, a reviewing court could reasonably

20  conclude that there was no reasonable likelihood that a juror, when deliberating at the end of the

21  guilt phase, would have understood the court's preliminary instruction describing the presumption

22  of sanity as indication that the juror should treat it as conclusively proven that Petitioner had had

23  no mental disease or defect at the time of the crimes. Here, the trial court only instructed the jury

24  about the presumption of sanity at the beginning of voir dire, when explaining the four phases of

25  the trial that could occur, what happened at each, and why any one of them would be triggered to

26  occur. (<u>See</u>, <u>e.g.</u>, 2 RT 312-15.) In these preliminary instructions, the court also explained that the

27  Petitioner had entered pleas of not guilty and not guilty of reason of insanity and that he was

28  presumed innocent at the guilt phase. (<u>See</u>, <u>e.g.</u>, 1 RT 20, 85; 2 RT 312.) At the close of the guilt

1    phase, the court reiterated the presumption of innocence and correctly instructed the jury as to the

2    State's burden of proof, the elements of first-degree murder, the meanings of premeditation and

3    deliberation, and the effect they could give to the circumstantial evidence of mental disease and

4    defect that they had heard. (24 RT 4689, 4695-4700.) The court did not, in the course of those

5    instructions, again reference the presumption of sanity. (See ibid.) Thus, the presumption of

6    sanity instruction was only provided within the context of explaining the "analytical basis for the

7    bifurcated trial," see Patterson, 223 F.3d at 466, and the concluding instructions specifically

8    informed jurors of the State's burden on the element of mental state, as well as the legal effect

9    they could give evidence of mental disease or defect, without further reference to the presumption

10   of sanity. As a whole, therefore, it would be reasonable for a court to conclude that there was no

11   reasonable likelihood that a juror would have understood the preliminary instruction to have

12   forbidden or circumscribed their consideration of mental defect or disease evidence at the guilt

13   phase, given the entirety of the instructions they received.

14          The facts here stand in contrast to those cases where a due process violation was found. In

15   Sandstrom, for example, the final jury charge included the instruction that the defendant was

16   presumed to have intended the consequences of his actions, as well as the instruction that the

17   prosecution had the burden to prove that the defendant had acted purposely or knowingly. 442

18   U.S. at 513-19. Taken together, therefore, it would be reasonable for a jury to conclude that the

19   presumption meant that element was conclusively proven unless the defendant had presented

20   evidence rebutting the presumption. Id. at 519; see also Francis, 471 U.S. 307 (holding same,

21   where jury had received a similar instruction, which, as in Sandstrom, was integrated into the

22   final instruction the jury received on the element of intent). Similarly, in both Patterson and Stark,

23   the Ninth Circuit held a reasonable juror could have been confused by the court's instructions, at

24   the end of the guilt phase, both that mental state was an element that had to be proven beyond a

25   reasonable doubt and also that the defendant was presumed "sane" at the time of the crimes. See

26   Stark, 455 F.3d at 1078; Patterson, 223 F.3d at 962-66. In contrast, here, the court's final

27   instructions to the jury elaborately and correctly described the prosecution's burden on all

28   elements of Counts One and Two, including mental state, as well as the weight the jury could

1    give to the circumstantial evidence of mental disease and defect that they had heard, with no

2    reference to sanity nor the presumption of sanity. (24 RT 4689-4700.) That reference only arose

3    in the court's very first instructions to prospective jurors in voir dire, when describing the

4    byzantine legal procedures governing a four-phase trial; even in those preliminary instructions,

5    the court's reference to the presumption of sanity was accompanied with instructions that the

6    defendant was presumed innocent and the State bore the burden at the guilt phase. (See, e.g., 1

7    RT 20, 85; 2 RT 312.) Under clearly established federal law, these are collectively strong

8    indications that the jury was not likely confused. See Sandstrom, 442 U.S. at 513-19; Francis, 471

9    U.S. 307; see also Patterson, 223 F.3d at 966; Ignacio, 852 F.2d at 561.

10        Moreover, the arguments of counsel at the end of the guilt phase did not reference the

11    presumption of sanity at that phase; rather, both the prosecution and defense argued that any

12    circumstantial evidence the jury had heard concerning Petitioner's mental functioning could be

13    considered by the jury in determining whether the mental state element had been proven for

14    Counts One and Two. (24 RT 4589-91, 4642-43, 4645, 4650-52; 4654-4662.) This too stands in

15    contrast to cases where courts have held the jury was likely confused by the instruction because

16    counsel's closing argument had emphasized, and urged the jury to rely on, the presumption at

17    issue. See, e.g., Patterson, 223 F.3d at 967-68.

18        For these reasons, the California Supreme Court was not unreasonable in holding that

19    some of Petitioner's allegations did not demonstrate a due process violation, due to the contents

20    of the final instructions and the closing arguments the jury received at the end of the guilt phase.

21    See Coddington, 23 Cal.4th at 584-85. For these same reasons, the state court would not have

22    been unreasonable for denying relief on all of Petitioner's remaining federal constitutional

23    allegations on Claim Ten, as well.[19] See Richter, 562 U.S. at 98-99, 102.

24    _____

25    [19] Petitioner makes in the Amended Petition, and made in state court, no specific allegations as to
      how the instruction at issue rendered his death sentence unreliable, nor any authority for this

26    particular action by a trial court to implicate the Eighth Amendment under clearly established
      federal law. The state court was entitled to deny relief on conclusory allegations (see Pinholster,

27    563 U.S. at 188 n.12) and, in this proceeding, Petitioner bears the burden to demonstrate that the
      exceptions codified in 28 U.S.C. section 2254(d) apply, including that there exists clearly

28    established federal law governing his claim. Walker, 709 F.3d at 939. Petitioner's Eighth

1        Given this determination, the state court was also reasonable for denying relief on

2    Petitioner's Claim Eleven. Because there was no reasonable likelihood that the trial court's

3    instruction describing the presumption of sanity in the context of the structure of a four-phase

4    trial, at the beginning of voir dire, confused the jury as to the prosecution's burden of proof on

5    Counts One and Two, defense counsel was not deficient for failing to object to the instruction nor

6    could Petitioner demonstrate any prejudice resulting from the failure to object. See, e.g., Leavitt

7    v. Arave, 682 F.3d 1138, 1140 (9th Cir. 2012) (defense counsel did not perform deficiently by

8    failing to object to an instruction that was not reasonably likely to confuse the jury); Hall v.

9    Whitley, 935 F.2d 164, 165-66 (9th Cir. 1991) (rejecting a Strickland claim premised on the

10    counsel's failure to object to the prosecutor's closing argument, reasoning that where there was

11    no due process violation, the petitioner could not show prejudice from his counsel's

12    performance). The state court's summary dismissal of Claim Eleven, therefore, was reasonable.

13    See Richter, 562 U.S. at 98.

14        For these reasons, the state court's denial of relief on Claims Ten and Eleven is entitled to

15    deference and the undersigned recommends they be dismissed. See 28 U.S.C. § 2254(d).

16    **CLAIMS 12, 13, 69, AND 119**

17        Petitioner alleges four claims arising from his having been shackled with leg restraints

18    during the trial. In Claim 12, Petitioner alleges that the trial court violated his rights under the

19    Sixth and Fourteenth Amendments by permitting him to be restrained without an adequate

20    showing of necessity, over his counsels' objections, which prejudiced him in the guilt phase. In

21    Claim 69, Petitioner alleges that the error set forth in Claim 12 prejudiced him in the sanity phase

22    and, in Claim 119, alleges that the same error violated his rights under the Eighth and Fourteenth

23    Amendments and prejudiced him in the penalty phase. In Claim 13, Petitioner alleges that his

24    counsel performed ineffectively by failing to specifically object to the fact that his restraints were

25    visible to the jury and by failing to request a less visible form of restraint, prejudicing the guilt,

26    sanity, and penalty phase verdicts.

27

28    Amendment allegations, therefore, must be dismissed on this basis.

1    Because the record before the state court did not provide a prima facie showing of

2    Petitioner's entitlement to relief, i.e., "sufficient evidence for a reasonable fact finder to

3    conclude" that he could prove his allegations, the state court's rejections of these claims is

4    entitled to deference under section 2254(d). See Nunes, 350 F.3d at 1054-55.

5        1.  Legal Standard

6        The Fifth and Fourteenth Amendments bar the use of shackles visible to the jury unless a

7    trial court determines the physical restraints are justified by a state interest. Deck v. Missouri, 544

8    U.S. 622, 622 (2005); Rhoden v. Rowland, 172 F.3d 633, 636 (9th Cir. 1999) ("Because visible

9    shackling during trial is so likely to cause a defendant prejudice, it is permitted only when

10   justified by an essential state interest specific to each trial."). To establish his entitlement to relief

11   on this claim, petitioner must show he was shackled in the presence of the jury, the jury saw him

12   shackled, and the shackles were not justified by state interests. Ghent v. Woodford, 279 F.3d

13   1121, 1132 (9th Cir. 2002). If so, the court must then determine whether the error had a

14   "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S.

15   at 623 (quotations omitted). In assessing prejudice, the Ninth Circuit considers "[1] the

16   appearance and visibility of the restraining device, [2] the nature of the crime with which the

17   defendant was charged and [3] the strength of the state's evidence against the defendant." Larson,

18   515 F.3d at 1064 (citing Dyas, 317 F.3d at 937). While prejudice may result from "even one

19   juror" being affected "by the sight of the shackles," Dyas, 317 F.3d at 937, prejudice is unlikely

20   where the jury had only a "brief," "infrequent," or "inadvertent" glimpse of the defendant

21   shackled. Ghent, 279 F.3d at 1133.

22       2.  Claims 12, 69, and 119

23           a.  Proceedings In State Court

24       Petitioner raised Claims 12, 69, and 119 on direct appeal.[20] He argued that the record had

25   shown that the trial court ordered Petitioner be restrained in the courtroom during trial not based

26   _____

27   [20] Claim 12 was raised as Claim VI, Claim 69 was raised as Claim XXXII, and Claim 119 was
     raised as Claim XLII in Appellant's Opening Brief. (See LD 25-B.1; ECF No. 189 at 74, 168, 229

28   [Respondent acknowledging same].) In his Amended Petition, Petitioner asserted that Claim 12
     was raised both on direct appeal and in his first state habeas corpus petition (see ECF No. 59 at

                                              97

on a showing of manifest need nor consideration of less restrictive alternatives, but rather out of deference to the preferences of the courtroom bailiff. (LD 25-B.1 at 142-144.) According to Petitioner, the record showed that he had been retrained with leg restraints throughout all phases of the trial and jury selection. (Ibid.) Petitioner argued that these restraints had been visible to the jury as evidenced by defense counsel's comment, in penalty phase closing argument, that the jury had "seen [Petitioner] every day come into court here . . . chained up." (LD 25-B.1 at 142, n.136; 40 RT 6678.) Petitioner argued that the jury having seen him in leg restraints prejudiced the guilt, sanity, and penalty phase verdicts. (LD 25-B.1 at 142-148, 376-378, 437-439.)

The California Supreme Court rejected all three claims on the basis that the trial record failed to establish that the jurors actually observed the restraints on Petitioner. The court held:

> Assuming that the restraint was unjustified, the record does not support the claim that the jury was aware of the restraints. Absent evidence that the jury was aware that appellant was restrained any error is harmless. (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583-584 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) We will not assume solely on the basis of a statement by counsel made during penalty phase argument after months of trial and in the absence of any complaint by counsel during trial that the precautions taken to avoid prejudice to appellant were ineffective and that the jury was aware of, or influenced by, the restraint.

> When the subject was raised at the beginning of jury selection, the court authorized leg irons, but not handcuffs. He also directed that if handcuffs were used in transporting appellant, he should be brought into the courtroom before the jurors arrived and removed after they

---

158, n.123), but in the Traverse acknowledges that only the claim that is reflected as Claim 13 of the Amended Petition was raised in the first state habeas corpus petition. (ECF No. 209 at 630; see LD 25-C.1 at 11-14 (alleging that trial counsel performed deficiently in three respects related to petitioner's shackling, prejudicing him).) Petitioner argues that the California Supreme Court should have considered the declarations tendered in support of his first petition for habeas corpus when adjudicating this claim on direct appeal, as the two matters were pending before the court simultaneously. (ECF No. 209 at 638, 645, 647-49, 660.) The California Supreme Court did not act unreasonably, within the meaning of either 2254(d)(1) or (d)(2), by failing to consider extra-record allegations and proffers in deciding the issues raised on direct appeal. See, e.g., Harrington v. Richter, 562 U.S. 86, 100 (2011) (state court not unreasonable under 2254(d)(1) where its determinations were supported by "the record" before it); Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004) (same); People By & Through Dep't of Pub. Works v. Keligian, 182 Cal. App. 2d 771, 774 (1960) ("In reviewing the cause we are confined to the record of the proceedings which took place in the court below and are brought up for review in a properly prepared record on appeal . . . It is improper to set forth in briefs facts, events, or other matters not included in the record on appeal.")

1    left. The bailiff assured the court that the practice had been to use
     handcuffs during transport and in the elevator but not in court, and
2    that "[w]e make sure he's out of the view of the jurors first before we
     take him out." There is no indication that this practice was not
3    followed throughout the trial, and counsel made no further complaint
     or objection to the manner in which the restraints were used.
4
     Moreover, prejudicial error is not established simply on the basis of
5    one or more jurors having seen the defendant in shackles. (*People v.
     Tuilaepa*, *supra*, 4 Cal.4th at p. 584.)
6

7    Coddington, 23 Cal.4th at 651.

8            b.   The State Court's Denial of Claims 12, 69, and 119 Is Entitled to Deference

9            Based on the record before the state court on direct appeal, its rejection of these claims

10   was not improper under either 2254(d)(1) or (d)(2). As set forth above, both the constitutional

11   error itself and any prejudice flowing therefrom require, as an essential element, that a member of

12   the jury actually observed or otherwise perceived the existence of the restraints. Dixon v. Ryan,

13   932 F.3d 789, 809-10 (9th Cir. 2019); see, e.g., People v. Slaughter, 27 Cal.4th 1187, 1212-13

14   (2002) (acknowledging that the jury may infer from the defendant's hobbled gait that he was

15   shackled); United States v. Wilson, 634 F. App'x 718, 733-34 (11th Cir. 2015) (acknowledging

16   that the jury members' hearing the restraints moving may give rise to a claim of prejudicial,

17   unconstitutional shackling). Here, the record on appeal did not support that inference, even

18   circumstantially. Instead, the record showed that, during jury selection but out of the presence of

19   the jury, the court acquiesced to the courtroom's bailiff's preference that Petitioner be restrained

20   with leg chains while seated in the courtroom. (1 RT 77-79.) The court agreed that the bailiff

21   could transport Petitioner into and out of the courtroom in handcuffs and a leg chain, but that the

22   handcuffs would have to be removed in the presence of the jury. (1 RT 78-79.) The court

23   explained that this could be effectuated by "bring[ing] [Petitioner] in early before the jurors are

24   here, and tak[ing] him out after the jurors are gone;" the bailiff agreed to "make sure he's out of

25   view of the jurors first before we take him out." (1 RT 79.) In other words, per the trial court's

26   directive, Petitioner would be seated in the courtroom while the jury was present and, while there,

27   he was to be only restrained with a leg chain.

28   ////

                                                99

1    From these facts, it cannot be inferred that the restraints were visible to the jury. As the

2    California Supreme Court noted, the trial court's and bailiff's statements on the record indicate

3    that Petitioner was transported into the courtroom in a manner so as to minimize the possibility of

4    the jurors seeing his restraints. There is no indication on the record, in the form of objections by

5    counsel or statements or findings by the trial court, that these efforts were not adhered to, later

6    abandoned, or became ineffectual. In order to hold the contrary, this Court would have to

7    conclude that, despite the trial court's and bailiff's efforts, the restraints were necessarily visible

8    when the defendant was seated in the courtroom. There is no factual basis for this conclusion,

9    however, either on this specific record nor deducible from case law generally. (See 16 RT 3387-

10   3388; 17 RT 3419, 3522; 18 RT 3597, 3622; 19 RT 3816, 3854; 20 RT 3979, 4078; 21 RT 4141,

11   4147, 4153, 4196; 24 RT 4594, 4656, 4722, 4727; 27 RT 5080; 28 RT 5443; 29 RT 5482, 5534;

12   30 RT 5680; 33 RT 6011; 34 RT 6044, 6092, 6164, 6190; 37 RT 6346; 40 RT 6628 (Petitioner

13   remained at counsel's table during bench conferences); 21 RT 4148; 24 RT 4663-64, 4737-38; 39

14   RT 6507 (Petitioner removed from courtroom after jury had departed).) See Dixon v. Ryan, 932

15   F.3d 789, 809-11 (9th Cir. 2019) (absent evidence that the members of the jury actually observed

16   the restraints at issue, the court cannot presume that they did); see generally Walker v. Martel,

17   709 F.3d 925, 942 (9th Cir. 2013) (observing, "Not all restraints are created equal," and noting a

18   variety of forms of restraints employed in courtrooms, with varying degrees of perceptibility);

19   see, e.g., Castillo v. Stainer, 983 F.2d 145, 149 (9th Cir. 1992) (defendant's waist chain not

20   visible when seated in the courtroom, because his clothing covered it); People v. Cleveland, 32

21   Cal.4th 704, 739-40 (2004) (trial court stated that, in several previous trials, it had employed leg

22   braces that were not visible to the jury when shackling was ordered); People v. Slaughter, 27

23   Cal.4th 1187, 1212-13 (2002) (record detailed the nature of the leg brace with which defendant

24   was shackled, including that it was barely visible beneath his pant leg); People v. Livaditis, 2

25   Cal.4th 759, 773 (1992) (noting that capital defendant had been shackled with a leg brace that

26   was not visible over his clothes); People v. Stankewitz, 51 Cal.3d 72, 96 (1990) (defendant

27   restrained with leg brace worn under his pants).

28   ////

100

The court is not persuaded that defense counsel's comment referencing the restraint during penalty phase closing argument constituted, essentially, a factual finding in the record that Petitioner had indeed been shackled in a manner that the jury could view during the trial. As a matter of law, Petitioner's position is unavailing. Counsel's arguments are not considered evidence (see, e.g., United States v. Hurtado, 838 F. App'x 258, 261 (9th Cir. 2020)), nor do California courts treat statements or argument by counsel as the functional equivalent of an objection for the purpose of creating a record. See, e.g., People v. Guillen, 37 Cal. App. 3d 976, 980 (1974); In re Harold M., 78 Cal. App. 3d 380, 386 (1978); People v. O'Brien, 71 Cal.2d 394, 403-404 (1969); People v. Johnson, 205 Cal. App. 2d 831, 837 (1962). Moreover, the California appellate courts, typically, cannot impute to the trial court fact-finding that the latter did not actually perform. See, e.g., Luce v. Sutton, 115 Cal. App. 2d 428, 434 (1953). Such reluctance was particularly apt here, because in a defense penalty phase closing argument in a capital case, California law permitted the defense rhetorical leeway to impress upon the jury the seriousness of a sentence of life without the possibility of parole (see, e.g., People v. Thompson, 45 Cal.3d 86, 130-31 (1988)), which would accord with an argument by defense counsel that Petitioner was and would continue to be figuratively enchained for the rest of his life should he be sentenced to life imprisonment. (40 RT 6678 ("Now, you've seen Herb Coddington every day come into court here, he's chained up . . . . And we say to you he should be chained up. He should be chained up for the rest of his natural life. He should not be allowed to roam in society ever again.").) Finally, the Court cannot conclude that the California Supreme Court was unreasonable in determining that it stretched credulity to infer that "after months of trial and in the absence of any complaint by counsel during trial," defense counsel opted to address the visibility of Petitioner's shackles via a complaint to the jury during penalty phase closing argument in lieu of an objection, sidebar, or other mechanism for raising and resolving the issue with the trial court. See Coddington, 23 Cal.4th at 651; see, e.g., People v. Homick, 55 Cal.4th 816, 883 (2012) (emphasizing necessity of counsel to object and set forth the basis for the objection in order to address errors as they occur). For all of these reasons, the California Supreme Court did not make an unreasonable factual determination under section 2254(d)(2) in concluding that a factual finding could not be imputed

1   to defense counsel's statement made in closing argument that Petitioner's restraints had been

2   visible to the jury throughout the trial, nor was the state court unreasonable in applying governing

3   law under section 2254(d)(1) in concluding that an essential element of this claim had not been

4   shown. Petitioner therefore is barred from proceeding on Claims 12, 69, and 119 of the Amended

5   Petition.

6         3.   Claim 13

7              a.   Proceedings In State Court

8         In Claim 13, Petitioner alleges that trial counsel performed ineffectively by failing to

9   object specifically to the fact that his leg restraints were visible to the jury, failing to request that

10  measures be taken to lessen the restraints' visibility to the jury, and failing to request a jury

11  instruction that the use of restraints should have no effect on their verdicts. He alleges that these

12  instances of deficient performance prejudiced the guilt, sanity, and penalty phase verdicts. (ECF

13  No. 59 at 165-66.) This claim was presented to the California Supreme Court in his first state

14  habeas corpus petition as Claim A-2. (LD 25-C.1 at 11-14.)

15        In support of his allegation that the restraints had been visible to the jury throughout the

16  trial, Petitioner relied on two declarations by trial counsel; declarations by each of Petitioner's

17  parents, who had been present in the courtroom as spectators; and two news reports of the trial.

18  (LD 25-C.1 at 12, citing LD 25-C.3 Ex. A ¶4, Ex. E ¶2, Ex. L ¶2, Ex. M ¶2, Ex. J-1, Ex. J-2.)

19  Both of the spectators' declarations describe having seen Petitioner shackled as he was brought

20  into the courtroom, prior to the jury's arrival. (LD 25-C.3 Ex. L ¶2; Ex. M ¶2; cf. LD 25-C.3 Ex.

21  J-1 (describing journalist's view from gallery); Ex. J-2 (same).) Supporting the inference that the

22  jurors saw the restraints, both of Petitioner's counsel declared that the table at which Petitioner sat

23  lacked skirting (LD 25-C.3 Ex. A ¶4; Ex. E ¶2) and two spectators declared that they believed the

24  jurors would have seen the shackles when Petitioner was seated, due to the layout of the

25  courtroom. (LD 25-C.3 Ex. L ¶2; Ex. M ¶2.) The California Supreme Court denied the claim

26  summarily, on the merits. (LD 25-C.5.)

27  ////

28  ////

102

1                          b.  The State Court's Denial of Claim 13 Is Entitled to Deference

2              In summarily denying Petitioner's Claim 13, the California Supreme Court neither acted

3     contrary to nor unreasonably applied clearly established federal law. As on direct appeal, because

4     it was uncontroverted that Petitioner had been restrained during the trial without a showing of

5     necessity (see Coddington, 23 Cal.4th at 651), the dispositive questions before the court were

6     whether the jurors actually observed the restraints and, if so, whether Petitioner was prejudiced.

7     Although Petitioner tendered in support of his allegations several items of evidence on the former

8     question, that evidence left gaps in the chain of factual inferences such that it was not

9     unreasonable for the state court to conclude that Petitioner had not made a prima facie showing of

10    relief on this claim. See Nunes, 350 F.3d at 1054-55.

11             As noted, in support of Claim 13 in state court, Petitioner did not tender direct evidence

12    that any juror saw his restraints at any point in the trial, in the form of declarations or other

13    statements from any juror. (See LD 25-C.1 at 12, citing LD 25-C.3 Ex. A ¶4, Ex. E ¶2, Ex. L ¶2,

14    Ex. M ¶2, Ex. J-1, Ex. J-2.) Instead, Petitioner supported his allegations with evidence from

15    which a factfinder might infer that jurors saw the restraints. Two declarants described seeing

16    Petitioner's restraints as he was brought into the courtroom before the jury. (LD 25-C.3 Ex. L ¶2;

17    Ex. M ¶2.) Newspaper reports of jury selection also indicated that journalists could perceive from

18    the courtroom gallery the restraints at Petitioner's ankles. (See LD 25-C.3 Ex. J-1 (newspaper

19    report describing Petitioner as having "sat shackled" during jury selection); Ex. J-2 (newspaper

20    report describing Petitioner's "appearance marred only by the shackles on his ankles" during jury

21    selection).) This evidence, however, was minimally probative to the question of what the jurors

22    would have seen when they were present in the courtroom with Petitioner, given that the record

23    reflected that Petitioner entered and departed the courtroom outside the presence of the jury (see 1

24    RT 77-80; see, e.g., 21 RT 4148; 24 RT 4663-64; see also 15 RT 3307 (press remained in gallery

25    when jury was not present); 24 RT 4583 (same); 25 RT 4737 (same), 4754-55 (same)) and that

26    there was nothing on the record nor among the evidence tendered by Petitioner that indicated

27    where the jury box was oriented relative to the gallery and to counsel's table.

28    ////

103

1          Some of the declarations addressed whether it could be inferred that the jurors could see

2     Petitioner's restraints while he was seated at counsel's table during the trial. Both defense counsel

3     declared that the table at which they were seated lacked skirting and two spectators declared that,

4     because of the layout of the courtroom, it seemed that the jurors would be able to view

5     Petitioner's shackles when he was seated. (LD 25-C.3 Ex. A ¶4, Ex. E ¶2, Ex. L ¶2, Ex. M ¶2.)

6     Although it is a close call, the court must conclude that the state court was not necessarily

7     unreasonable in concluding that this evidence did not suffice to show that Petitioner could

8     demonstrate at an evidentiary hearing that any juror actually saw his restraints during the trial.

9     The declarations addressing Petitioner's presentation while at counsel's table lacked detail and

10    were conclusory: although G. Herbert Coddington declared that the layout of the courtroom

11    would enable the jury to see Petitioner's restraints while seated (LD 25-C.3 Ex. M ¶2), neither

12    this witness nor any other described what that layout was, to justify such a conclusion. (See LD

13    25-C.3 Ex. A ¶4, Ex. E ¶2, Ex. L ¶2, Ex. M ¶2.) Similarly, although witnesses declared that the

14    table at which Petitioner was seated during the trial lacked skirting, no witness addressed whether

15    or the degree to which the restraints were obscured under Petitioner's pants while he was seated.

16    (See LD 25-C.3 Ex. A ¶4, Ex. E ¶2, Ex. L ¶2, Ex. M ¶2.)

17          These omissions are not merely academic, but rather reflect the lack of critical factual

18    information that has been dispositive to similar claims in other cases. See, e.g., Walker v. Martel,

19    709 F.3d 925, 942 (9th Cir. 2013) (dispositive to court's prejudice analysis was evidence that the

20    restraint was "underneath [defendant's] clothing" and, as such, was "relatively unobtrusive");

21    Dixon v. Ryan, 932 F.3d 789, 809-11 (9th Cir. 2019) (affirming denial of relief where restraint

22    was worn under defendant's pant leg, leading the state court to conclude the restraint had not been

23    "visible in the absence of evidence to the contrary"); Parrish v. Small, 315 F.3d 1131, 1133-35

24    (9th Cir. 2003) (because the record indicated, uncontrovertedly, that Petitioner had been

25    restrained in "handcuffs . . . visible to the jury," an evidentiary hearing was warranted to develop

26    "additional information about what was visible in the court-room, what jurors could actually see,

27    and what the trial participants recall"); Castillo v. Stainer, 983 F.2d 145, 149 (9th Cir.

28    1992), opinion amended on denial of reh'g, 997 F.2d 669 (9th Cir. 1993) (denying relief on

1   shackling claim because the record indicated that "[t]he restraint in the courtroom was so worn by

2   [defendant] that the jury could not see it"); see also United States v. Wilson, 634 F. App'x 718,

3   733-34 (11th Cir. 2015) (holding prejudice could not be shown where "Appellants' clothing and

4   the table skirts covered the shackles and tasers, and the shackle chains were taped to the

5   Appellants' legs, [so] the jury could neither see nor hear the restraints"); Roche v. Davis, 291

6   F.3d 473, 483 (7th Cir. 2002) (holding counsel ineffective in failing to object to use of restraints

7   where "a witness recounted that during her testimony at trial, she could see [defendant's] shackles

8   from the witness box. Most importantly, the jury box was directly next to the witness box, and

9   therefore, [defendant's] shackles were 'readily visible' to the jury"); Fountain v. United States,

10   211 F.3d 429, 434-35 & n.8 (7th Cir. 2000) (rejecting claim on basis that no showing had been

11   made that defendant's ankle shackles had been visible to the jury, where there was evidence that

12   "due to the arrangement of the tables, counsel, individuals at the tables, as well as the raised

13   position of the witness chair in front of the jury box, it was unlikely that the jury even saw

14   [defendant's] legs during trial"); People v. Cleveland, 32 Cal.4th 704, 739-40 (2004) (in ordering

15   defendant restrained during trial, the trial court observed that, consistent with other trials, the

16   restraint would consist of "a leg brace underneath the pants . . . [that] was not visible to the jury,"

17   which was "unlocked at the knee so that they can bend but they cannot run"); People v. Slaughter,

18   27 Cal.4th 1187, 1214 (2002), abrogated by People v. Diaz, 60 Cal.4th 1176 (2015) (holding no

19   constitutional violation where defendant's leg restraint "was 'covered by his pant leg'" except for

20   "'a very small portion of the device which [came] over the shoe'"). Because Petitioner's claim

21   relied on factual inferences to demonstrate that the jurors actually saw the restraints on his legs,

22   the claim fails if a link in that chain of inferences is missing. Here, Petitioner tendered no

23   evidence to the state court to show that, unlike other shackled defendants, his shackles were

24   visible outside of his pant legs when he was seated, nor evidence – beyond conclusory statements

25   – of the orientation of counsel's table vis-à-vis the jury box that would have provided a factual

26   basis for the inference that the jurors could see under the unskirted table. With these factual links

27   absent, the state court may have reasonably determined that Petitioner had not made a prima facie

28   showing that he could succeed on the merits of this claim, i.e., that he could produce "sufficient

1  evidence for a reasonable fact finder to conclude" that he could prove all of the essential elements

2  of the claim. See Nunes, 350 F.3d at 1054-55. Accordingly, the state court's denial of Claim 13 is

3  entitled to deference under section 2254(d)(1). See ibid.

4  **CLAIM 14**

5  In Claim 14, Petitioner alleges that his due process rights were violated by the

6  prosecution's failure to disclose to the defense prior to the commencement of trial that one of its

7  witnesses, David Hacker, disputed the veracity of an FBI report that stated that he told the FBI

8  agent that Petitioner had been "obsessed" with flexible ties as a means of killing. (ECF No. 59 at

9  176.) Petitioner further alleges that the trial court violated his due process rights by admitting the

10  rebuttal testimony of prosecution witness McKevitt, which exceeded the scope of the evidence it

11  was admitted to rebut.[21] (ECF No. 59 at 184-187). Petitioner alleges that each error individually

12  and cumulatively prejudiced him in all phases of the trial. The undersigned concludes that the

13  state court's denial of this claim was not contrary to nor an unreasonable application of federal

14  law, nor reflected an unreasonable factual determination, and therefore is entitled to deference.

15  See 28 U.S.C. § 2254(d).

16      1.  Alleged *Brady* Violation

17          a.  Proceedings In State Court

18  Petitioner raised both grounds for this claim on direct appeal, as Claim VII. (LD 25-B.1 at

19  148-77.) On the first ground, Petitioner argued that the record had shown that the prosecution had

20  unlawfully suppressed statements by prosecution witness David Hacker that tended to impeach

21  him. The record indicated that, several months before trial, David Hacker had been interviewed

22  by an FBI agent and, later, by an investigator with the El Dorado County District Attorney's

23  Office. In the latter interview, David reviewed a copy of the FBI's report of his statement to the

24  _____

25  [21] Per the testimony at trial, David and Allen Hacker were brothers and were both friends of
Petitioner. At the guilt phase, the prosecution called David Hacker as a witness in its case-in-

26  chief, and the defense called Allen Hacker as a witness. Special Agent McKevitt had interviewed
both Allen and David Hacker when investigating the crimes. (See 16 RT 3360-69; 22 RT 4333-

27  47; 23 RT 4444-67, 4504-16.) The undersigned here refers to Messrs. Hacker by their first names
in order to minimize confusion; no disrespect is intended.

28

1  FBI agent and he reported to the District Attorney investigator that parts of it were inaccurate. (23

2  RT 4406, 4471.) The investigator apparently did not report this partial disavowal to the

3  prosecutor. (See 16 RT 3352; 23 RT 4469-71.)

4         In his opening statement at the guilt phase, the prosecutor stated that "Mr. Hacker" would

5  testify that Petitioner had been "obsessed" with using a flexible handcuff as a "method . . . of

6  inducing the death of another human being." (16 RT 3295-96.) Later that day, the prosecutor

7  called David Hacker as a witness. (16 RT 3360-69.) The defense objected to Mr. Hacker's

8  testimony in its entirety, arguing that defense counsel had learned from another witness that Mr.

9  Hacker had disavowed portions of the statements attributed to him in the FBI report of his

10  interview and therefore he was an unreliable witness. (16 RT 3352.) The prosecutor responded by

11  stating that he had "talked to Mr. Hacker for the first time this morning"[22] and showed him the

12  FBI report of his interview; David then "pointed out discrepancies in areas where he believed not

13  to reflect his present state of knowledge" but that he confirmed other aspects of the interview,

14  including an event in which he, his brother Allen, and Petitioner had read a book about methods

15  to kill that included strangulation with a flexible plastic tie. (16 RT 3352-53.) The court overruled

16  the defense objections to David Hacker's testimony. (16 RT 3358.) On direct examination, David

17  Hacker testified about the event wherein Petitioner read and discussed a portion of a book

18  describing ligature strangulation by flexible plastic tie, but, despite his representation in his

19  opening statement, the prosecutor did not elicit any testimony that Petitioner had seemed

20  "obsessed with" this manner of killing. (16 RT 3360-69.)

21         Toward the end of the guilt phase, defense counsel reported to the court that he had

22  spoken to David Hacker only the night before – i.e., after David's testimony and the court's ruling

23  on its admissibility – and, in this conversation, David told defense counsel that, when he had

24  spoken with the prosecutor before his testimony, he had told the prosecutor that the "obsession"

25  statement in the FBI report was inaccurate. (23 RT 4406-07, 4425.) On this basis, defense counsel

26  argued, it was essential to hold a hearing in which the relevant witnesses could be examined about

27  _____

28  [22] Later, the prosecutor clarified that his conversation with David Hacker had occurred after he
    had given his opening statement. (23 RT 4422-23.)

1    David Hacker's purported past disavowal of the "obsession" statement. (23 RT 4418.) The court

2    agreed. (23 RT 4418.) Although the court indicated that the defense could call the prosecutor as a

3    witness (23 RT 4418), defense counsel clarified that the defense's "contention [was] that at the

4    time that [the prosecutor] made his opening statement that he didn't have any reason to believe at

5    that point, to our knowledge, that Mr. David Hacker would testify in any way different that was

6    reflected in the [FBI] report," but that, prior to David testifying, he had told the prosecutor that

7    "there were inconsistencies in the [FBI] report." (23 RT 4434.)

8           In a hearing outside the presence of the jury, prosecution witnesses FBI Special Agent

9    McKevitt and prosecution investigator Hawkins testified about their conversations with David

10   Hacker. Agent McKevitt testified that her report reflected her recollections of her conversation

11   with David. (23 RT 4444-65.) District Attorney Office Investigator Hawkins testified that David

12   Hacker had alerted him that he did not agree with "particular words" that had been utilized in the

13   FBI report, which investigator Hawkins believed were "insignificant" and "did not change the

14   report." (23 RT 4470-71.)

15          Allen Hacker then testified for the defense, and the prosecution called Special Agent

16   McKevitt as rebuttal to Allen's testimony. In her testimony, Special Agent McKevitt discussed

17   her interview of Allen Hacker, but did not testify about her interview with David Hacker and,

18   specifically, did not testify that David Hacker made the "obsession" statement at issue in the

19   instant claim. (See 23 4504-4516.)

20          On direct appeal, Petitioner argued that the prosecutor had violated his obligations under

21   Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose to the defense, prior to the

22   commencement of trial, that David Hacker had disavowed specifically the portion of the FBI

23   report of his interview that he had stated that Petitioner had been "obsessed" with flexible plastic

24   ties as a manner of killing. (LD 25-B.1 at 149-160.) The California Supreme Court rejected this

25   claim for several reasons. It held that the record had not established that David Hacker had

26   specifically disavowed the obsession statement to the prosecution team; that, because David

27   Hacker did not testify that Petitioner seemed "obsessed" with flexible ties as a manner of killing,

28   any prior disavowal of such a statement was not material under Brady; and that any error was not

1   reasonably probable to have affected the verdict, given that the jury was instructed that arguments

2   of counsel, including opening statements, were not evidence. Coddington, 23 Cal.4th at 589-590.

3             b.  Legal Standard

4        Under Brady v. Maryland, 373 U.S. 83 (1963), the prosecutor is required to disclose to a

5   criminal defendant all evidence favorable to the accused, material to guilt or penalty. "To

6   establish a Brady violation, a defendant must show that: (1) the evidence at issue is favorable to

7   the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was

8   suppressed by the government, regardless of whether the suppression was willful or inadvertent;

9   and (3) the evidence is material to the guilt or innocence of the defendant." United States v.

10  Sedaghaty, 728 F.3d 885, 899 (9th Cir. 2013) (citing Brady, 373 U.S. at 87).

11            c.  The California Supreme Court's Denial of this Claim Was Neither Contrary to

12                Nor an Unreasonable Application of Clearly Established Federal Law

13       The California Supreme Court did not act contrary to nor unreasonably apply clearly

14  established federal law in denying this claim on the basis that the record had not shown that

15  David Hacker had specifically disavowed the statement attributed to him that Petitioner was

16  "obsessed" with flexible plastic ties as a manner of killing people. Both the prosecutor's proffer

17  and prosecution investigator's testimony established merely that David Hacker had alerted them

18  to some inconsistencies between his recollection and the FBI report; the investigator described, in

19  his testimony, that these were minor discrepancies concerning word choice, a characterization

20  consistent with that of the prosecutor's representation in his proffer. (See 16 RT 3352; 23 RT

21  4470-71.) No witness testified that Mr. Hacker had disavowed the "obsession" comment

22  specifically, although the defense was given an opportunity to call witnesses, including the

23  prosecutor to whom this statement was ostensibly made, at a hearing outside the presence of the

24  jury. (See 23 RT 4418.) Instead, the sole evidence before the state court in support of Petitioner's

25  position were defense counsel's representations to the court that Mr. Hacker had told him he had

26  made the specific disavowal to the prosecutor on the day of his testimony. (23 RT 4406-4407.)

27       At the time of the state court adjudication, clearly established federal law imposed a

28  burden on the defendant "of producing some evidence to support an inference that the

1  government possessed or knew about material favorable to the defense and failed to disclose it."

2  United States v. Price, 566 F.3d 900, 910 (9th Cir. 2009); see Kyles, 514 U.S. at 432-35 (under

3  Brady and its progeny, "a defendant" bears the burden to "demonstrate" that the elements of the

4  Brady standard must be met). Here, the state court could have reasonably concluded that

5  Petitioner had not met his burden to "demonstrate," see Kyles, 514 U.S. at 432, that the

6  prosecution team actually possessed, specifically, David Hacker's disavowal of his statement that

7  Petitioner had been "obsessed" with a particular manner of killing. Rather, despite the defense

8  being given the opportunity to examine relevant witnesses on this issue – including the

9  prosecuting attorney to whom the statement was reportedly made – the testimony only established

10  that Mr. Hacker disagreed with the FBI report on inconsequential matters of word choice, but

11  agreed with its material substance. None of the witnesses who testified at the hearing testified that

12  Mr. Hacker had specifically disavowed the "obsession" comment. On this record, the state court

13  was not unreasonable in concluding that this did not suffice to meet Petitioner's burden to show

14  that the prosecution team had, in fact, possessed the specific disavowal attributed by defense

15  counsel to David Hacker.[23]  Because this reflects a reasonable basis for the state court's denial,

16  that denial is entitled to deference. See Shinn, 141 S. Ct. at 524.

17       2.  Wrongful Admission of Rebuttal Testimony

18            a.  Proceedings in State Court

19  As noted, at the guilt phase, the defense called David Hacker's brother Allen Hacker as a

20  witness. Allen testified that he recalled an instance in 1982 in which he and Petitioner had read

21  through and laughed about a book describing methods of killing, including strangulation by

22  flexible tie. (22 RT 4337-4338.) Defense counsel then read to Allen that portion of the

23  prosecutor's opening statement in which the prosecutor stated that "Mr. Hacker" would testify

24  that, after having read a book describing homicide using a flexible tie as a ligature, he became

25  "obsessed with this particular method." (22 RT 4335.) Allen Hacker testified that he did not agree

26

27  [23] Petitioner does not allege that any of the other purported inconsistencies between David
    Hacker's recollection of his interview with the FBI and the report memorializing it constituted
    material, favorable evidence, the suppression of which violated his due process rights under
28  Brady. (See ECF No. 59 at 176-179.)

1   with that characterization and recalled that Petitioner exhibited no particular interest in flexible

2   ties after this event. (22 RT 4336, 4338.) Finally, he testified that he recalled having been

3   interviewed by the FBI about Petitioner. (22 RT 4341.) He recalled the FBI having "attribute[ed]

4   a statement to [him] that Mr. Coddington is cunning, sly and an expert at disguises and at fooling

5   people." (22 RT 4341.) He testified that he did not make that statement and such a description

6   would be inaccurate. (22 RT 4342.)

7       On cross-examination, the prosecutor probed Allen Hacker about the details of his

8   conversation with an FBI agent. Mr. Hacker identified the agent who interviewed him as Jody

9   McKevitt. (22 RT 4345.) He testified that he did not tell Special Agent McKevitt that Petitioner

10  "possessed the Anarchist Cookbook, which he often read. Coddington seemed to be especially

11  interested in various methods of killing people, particularly women." (22 RT 4345-46.)

12      Defense counsel moved to strike the portion of Allen Hacker's testimony elicited on

13  cross-examination in which he denied having told Agent McKevitt that Petitioner had been

14  interested in various methods of killing people, particularly women, as beyond the scope of direct

15  examination, and also moved for a mistrial on this basis. (23 RT 4404-4408, 4426, 4493-4494.)

16  The court denied the motions, ruling that the defense had elicited on direct examination testimony

17  from Allen Hacker that Petitioner did not have a particular interest in killing after having read the

18  book about homicide methods, thereby opening the door to him being impeached with a prior

19  inconsistent statement in which Allen had described Petitioner as interested in methods of killing

20  people. (23 RT 4414-15, 4426-27, 4429, 4436, 4441, 4499.) After an in limine hearing in which

21  Agent McKevitt testified as to her recollections of her interview with Allen Hacker, the court

22  confirmed its ruling. (23 RT 4497-99.)

23      Agent McKevitt then testified as a prosecution rebuttal witness. (23 RT 4504-16.) The

24  prosecutor elicited testimony that she recalled Allen Hacker having told her that Petitioner "was

25  interested in various methods of killing people, particularly women." (23 RT 4511.)

26      On direct appeal, Petitioner argued that the trial court erred in admitting Agent McKevitt's

27  rebuttal testimony that Allen Hacker had told her that Petitioner was interested in various

28  methods of killing people, especially women, because this testimony was beyond the scope of the

1    evidence it was admitted to rebut, and that this error was so grave as to have rendered the trial

2    fundamentally unfair, in violation of Petitioner's federal due process rights. (LD 25-B.1 at 164-

3    77.) The California Supreme Court rejected this, holding that the admission of the testimony at

4    issue was not an abuse of discretion under state or federal law and, even if it were, any error was

5    harmless due to the "overwhelming" evidence that Petitioner had planned for the eventuality of

6    killing whoever had accompanied the girls he sought to detain and assault. Coddington, 23

7    Cal.4th at 587-88 (citing People v. Jones, 17 Cal.4th 279, 304 (1998)).

8              b.   Legal Standard

9         According to clearly established federal law, when evidence "is so extremely unfair that

10   its admission violates fundamental conceptions of justice," Dowling v. United States, 493 U.S.

11   342, 352 (1990) (internal quotation marks omitted), the due process clause of the Constitution

12   prohibits its admission. Perry v. New Hampshire, 565 U.S. 228, 237 (2012) (citing Napue v.

13   Illinois, 360 U.S. 264, 269 (1959) (prosecution's knowing reliance on false evidence violates due

14   process). This standard has been rarely met under Supreme Court case law, as "state and federal

15   statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task

16   of determining the reliability of the evidence presented at trial."  Perry, 565 U.S. at 237 (citing

17   Kansas v. Ventris, 556 U.S. 586, 594, n.* (2009) ("Our legal system . . . is built on the premise

18   that it is the province of the jury to weigh the credibility of competing witnesses.")); Liscenba v.

19   California, 314 U.S. 219, 227-28 (1941) ("The Fourteenth Amendment leaves California free to

20   adopt a rule of relevance . . . .").

21             c.   The California Supreme Court's Denial of this Claim Was Neither Contrary to

22                  Nor an Unreasonable Application of Clearly Established Federal Law

23        The California Supreme Court did not act contrary to nor unreasonably apply clearly

24   established federal law in denying relief on this claim. Under federal constitutional law, the

25   record does not support a finding that Petitioner's due process rights were violated by the

26   introduction of Special Agent McKevitt's testimony that Allen Hacker had told her that Petitioner

27   "was interested in various methods of killing people, particularly women." (23 RT 4511.) This

28   rebuttal testimony was offered in response to Allen Hacker's prior testimony, on cross-

                                              112

1  examination, that he "did not say" to Special Agent McKevitt that Petitioner had seemed

2  especially interested in various methods of killing people, particularly women. (22 RT 4345.)[24] In

3  light of this dispute introduced through Allen Hacker's testimony, the prosecution's rebuttal

4  evidence appears proper; indeed, Allen Hacker's testimony and the contrary testimony of Special

5  Agent McKevitt disputing his recollection appear to be precisely the type of credibility dispute

6  that the Supreme Court has deferred to state evidentiary rules for resolution. See Kansas, 556 U.S.

7  at 594; Liscenba, 314 U.S. at 227-28. There appears no support for the notion that the admission

8  of such evidence violated due process rules that have been clearly established by the Supreme

9  Court or rendered the trial fundamentally unfair in a manner comparable to analogous claims

10 considered by the Supreme Court. See Dowling, 493 U.S. at 352; Liscenba, 314 U.S. at 227-28;

11 see generally Perry, 565 U.S. at 237 (observing this standard has been met only by outrageous

12 prosecutorial misconduct, such as the knowing introduction of false evidence); Marshall v.

13 Walker, 464 U.S. 951, 952 (1983) (dis. opn. of Rehnquist, J., noting that this standard has rarely

14 been met per Supreme Court jurisprudence). This claim is therefore barred under section 2254(d)

15 and the undersigned recommends its dismissal.

16 **CLAIM 15**

17        In Claim 15, Petitioner alleges that defense counsel rendered ineffective assistance by

18 failing to interview David Hacker prior to trial; by failing to adequately present to the trial court

19 the defense's argument that the prosecution violated Brady by failing to disclose David Hacker's

20 disavowal of the comment attributed to him that Petitioner was obsessed with flexible ties as a

21 manner of killing; and by failing to object to the admission of FBI Special Agent McKevitt's

22 report memorializing her interview with defense witness Allen Hacker. (ECF No. 59 at 189-92.)

23 Petitioner presented this claim, including its subclaims, to the California Supreme Court in his

24 first petition for habeas corpus. (LD 25-C.1 at 56-58.) The California Supreme Court denied relief

25 on the merits summarily. (LD 25-C.5.) That ruling was not contrary to nor an unreasonable

26

27 _____

28 [24] Petitioner does not allege that the scope of cross-examination was improper. (See ECF No. 59 at 182-87.)

1    application of clearly established federal law, nor reflected an unreasonable factual determination.

2    See 28 U.S.C. § 2254(d).

3                    1.   Failure to Interview David Hacker Prior to Trial

4            Related to the allegations in the previous section, Petitioner alleges that trial counsel

5    performed ineffectively for failing to interview David Hacker prior to trial, although he had been

6    identified as prosecution witness, and, had they timely interviewed him, counsel would have

7    learned that he had specifically disavowed the "obsession" comment memorialized in the FBI

8    report of his interview. (ECF No. 59 at 189-90; LD 25-C.1 at 56-57.) Had this occurred,

9    Petitioner alleges, defense counsel would have had a basis to object to and move to strike that

10   portion of the prosecutor's opening statement referencing the "obsession" comment, which

11   reasonably probably would have led to favorable guilt-phase verdicts. (Ibid.)

12           The California Supreme Court's summary rejection of this claim was not contrary to nor

13   an unreasonable application of clearly established federal law. As described in the previous

14   section, the appellate record did not establish that David Hacker had, in fact, disavowed the

15   "obsession" comment that the FBI interviewer attributed to him. In state habeas corpus

16   proceedings, Petitioner tendered no additional factual materials nor allegations to the state court

17   that would tend to show that David Hacker, in fact, had disavowed the "obsession" comment to

18   the prosecution team. (See LD 25-C.1 at 56-57; see generally LD 25-C.3.)

19           Based on this omission, the California Supreme Court could reasonably have concluded

20   that Petitioner failed to set forth a prima facie showing of relief on a theory of ineffective

21   assistance of counsel. When counsel's deficient performance is premised on his alleged failure to

22   undertake some form of investigation, a habeas petitioner must show that the object of the

23   investigation had been available to trial counsel had he sought it. For example, in Rompilla v.

24   Beard, 545 U.S. 374, 383-84 (2005), the Supreme Court held that defense counsel performed

25   ineffectively by failing to investigate the records of their client's prior convictions, on which

26   counsel knew the prosecution would rely as aggravation in the penalty phase. In assessing

27   prejudice, the Supreme Court began by describing the materials that had been available to defense

28

                                                  114

1    counsel, had they undertaken the proper investigation – materials which had been uncovered by

2    post-conviction counsel and made part of the record in state habeas corpus proceedings:

> If the defense lawyers had looked in the file on Rompilla's prior
> conviction, it is uncontested they would have found a range of
> mitigation leads that no other source had opened up. In the same file
> with the transcript of the prior trial were the records of Rompilla's
> imprisonment on the earlier conviction, App. 508, 571, 631, which
> defense counsel testified she had never seen, *id.,* at 508. The prison
> files pictured Rompilla's childhood and mental health very
> differently from anything defense counsel had seen or heard. An
> evaluation by a corrections counselor states that Rompilla was
> "reared in the slum environment of Allentown, Pa. vicinity. He early
> came to [the] attention of juvenile authorities, quit school at 16, [and]
> started a series of incarcerations in and out Penna. often of assaultive
> nature and commonly related to over-indulgence in alcoholic
> beverages." Lodging 40. The same file discloses test results that the
> defense's mental health experts would have viewed as pointing to
> schizophrenia and other disorders, and test scores showing a third
> grade level of cognition after nine years of schooling. *Id.,* at 32–35.

12   Rompilla, 545 U.S. at 390–91; see also Wiggins v. Smith, 539 U.S. 510, 534 (2003)

13   (beginning prejudice analysis with a description of the "evidence counsel failed to

14   discover," which had been made part of the record in state post-conviction proceedings);

15   Williams v. Taylor, 529 U.S. 362, 395 (2000) (detailing the contents of the juvenile court,

16   social service, and prison records that petitioner alleged trial counsel unreasonably failed

17   to discover before trial, which were later made part of the state habeas corpus record).

18         Here, in contrast, Petitioner never made a similar showing: that, had trial counsel

19   interviewed David Hacker before trial, he would have told defense counsel that he had

20   specifically disavowed the statement that Petitioner was "obsessed" with the manner of

21   killing that Petitioner later employed. Instead, that allegation was premised solely on

22   defense counsel's representation to the court during trial, which was contradicted by the

23   prosecution investigator's sworn testimony and the prosecutor's proffer. No additional

24   factual support for this allegation was offered in state habeas corpus proceedings. (See LD

25   25-C.1 at 56-57.) On this record, therefore, the California Supreme Court acted in

26   accordance with Supreme Court precedent by concluding that Petitioner had failed to meet

27   his burden of showing what trial counsel would have actually uncovered had they

28

115

1    undertaken the investigation urged. See Rompilla, 545 U.S. at 390-91; Wiggins, 539 U.S.

2    at 534; Williams, 529 U.S. at 395.

3                    2.    Failure to Effectively Present the Defense's Brady Objection

4           In this subclaim, Petitioner alleges that trial counsel performed deficiently by

5    failing to argue to the trial court that the prosecution's duty to disclose under Brady David

6    Hacker's specific disavowal of the "obsessed" statement had arisen "when David had

7    denied making the 'obsessed' statement to [District Attorney] Investigator Hawkins six

8    weeks prior to trial." (ECF No. 59 at 191.) According to Petitioner, had the defense made

9    this argument, it is reasonably likely that the trial court would have barred the rebuttal

10   testimony of Special Agent McKevitt, as such testimony reflected "unfair exploitation of a

11   situation for which the prosecution was to blame," namely, the prosecutor's reference to

12   the "obsession" statement in his opening statement. (ECF No. 59 at 191.) Had the court

13   barred this rebuttal testimony, Petitioner argues, it is reasonably likely the verdicts in all

14   phases of the trial would have been more favorable. (ECF No. 59 at 191.)

15          The California Supreme Court's summary denial of this subclaim was not contrary

16   to nor an unreasonable application of clearly established federal law. Under Supreme

17   Court precedent, the state court's summary denial reflects its determination that

18   "'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to

19   relief,'" including, for example, that the allegations were "wholly conclusory" or were

20   unsupported by the trial record. Pinholster, 563 U.S. at 188 n.12 (quoting In re Clark, 5

21   Cal.4th 750, 770 (1993)). In Pinholster, for instance, the Supreme Court held that

22   Petitioner had failed to make a prima facie showing of relief on the basis of

23   ineffectiveness of counsel where the trial record belied his allegations of counsel's

24   deficient performance. There, in habeas corpus proceedings, petitioner alleged that his

25   trial counsel performed ineffectively by failing to investigate and present available,

26   compelling evidence of mitigation. Pinholster, 563 U.S. at 190-91. The Supreme Court

27   observed that these allegations, however, were at odds with the trial record: statements by

28   defense counsel made during the trial, the billing records generated by counsel during the

116

1    trial, and petitioner's own behavior during the trial. Id. at 194. As such, the Supreme

2    Court held that petitioner had not met 2254(d)'s standard, as the California Supreme Court

3    could have reasonably concluded that these important discrepancies between the habeas

4    corpus allegations and trial record indicated that petitioner could not prove his entitlement

5    to habeas corpus relief. Id. at 195-97. Similarly, in Schriro v. Landrigan, 550 U.S. 465

6    (2007), the Supreme Court held that a habeas corpus petitioner was entitled to no

7    evidentiary hearing under section 2254(e) – i.e., he had failed to make a prima facie

8    showing that he could prove his entitlement to relief – where his allegations of ineffective

9    assistance of counsel were undermined by the trial record. There, petitioner alleged that

10   trial counsel had performed ineffectively by failing to present mitigation evidence; the

11   trial record showed, however, that petitioner had instructed his counsel to present no

12   mitigation evidence, which had been confirmed by the trial court in a colloquy with him.

13   Landrigan, 550 U.S. at 469-76. In light of this, the federal district court had properly

14   concluded that "even with the benefit of an evidentiary hearing, [petitioner] could not

15   develop a factual record that would entitle him to habeas relief." Id. at 475.

16         The same result is compelled here. Petitioner's subclaim is premised on the

17   allegation that, when David Hacker spoke to District Attorney investigator Hawkins

18   several weeks prior to trial, David "denied making the 'obsessed' statement" to the FBI

19   agent who had interviewed him. (ECF No. 59 at 191.) Petitioner cites to the record as

20   factual support for this allegation, but the record offers no such support. Rather, the record

21   indicates that, after David's testimony, defense counsel told the trial court that David had

22   told him that David had told investigator Hawkins that the FBI report was "filled with

23   inaccuracies," but the investigator had deferred discussing it further. (23 RT 4406-07.)

24   Later, in a hearing outside the presence of the jury, investigator Hawkins testified that,

25   when he met with David, he had reviewed David's statement with him and David had

26   confirmed "that it was his statement" but he disputed "particular words" as not reflecting

27   "the exact word that he may have used." (23 RT 4469.) He further testified that David said

28   nothing "that had suggested . . . that he had not made" the statements Special Agent

117

1   McKevitt had attributed to him concerning Petitioner's familiarity with and interest in

2   methods of homicide. (23 RT 4471.) Finally, investigator Hawkins testified that when

3   "David Hacker . . . started to point out things about the [FBI] report that weren't

4   accurate," Investigator Hawkins "indicated that could be taken up at a later point." (23 RT

5   4471.)

6          The record, therefore, does not offer any factual support to Petitioner's allegation

7   that David Hacker had specifically disavowed the "obsession" statement to investigator

8   Hawkins, so as to trigger the prosecutor's <u>Brady</u> obligation at that time. As such, the state

9   court reasonably could have determined that Petitioner had not shown entitlement to relief

10  on this claim, because a central factual premise for the subclaim was unsupported by the

11  record before the state court. Consistent with <u>Pinholster</u>, 563 U.S. at 190-91, and

12  <u>Landrigan</u>, 550 U.S. at 469-76, summary denial of relief on this subclaim was proper and

13  was not contrary to or an unreasonable application of clearly established federal law.

14              3.   Failure to Object on Hearsay Grounds to the Admission of Special

15                   Agent McKevitt's Report

16         Petitioner alleges that trial counsel performed deficiently and prejudicially by

17  failing to support their objection to the admission of Special Agent McKevitt's report of

18  her interview with Allen Hacker on the grounds that "the contents of the report contained

19  double and sometimes triple hearsay and were inadmissible on that ground." (ECF No. 59

20  at 192.) Had trial counsel supported their objection on this additional basis – having

21  already objected under Evidence Code section 352 and the Constitution's due process

22  clause – the trial court would have excluded the report and it is reasonably likely the

23  results of all phases of the trial would have been more favorable, per Petitioner. (ECF No.

24  59 at 192.)

25         Petitioner's allegations before the state court were "wholly conclusory," <u>see</u>

26  <u>Pinholster</u>, 563 U.S. at 188 n.12, failing to identify any particular instance of hearsay in

27  the FBI report, let alone set forth an argument addressing how any such instance violated

28  state or federal restrictions on the admission of hearsay evidence in this context. Under

                                                118

1   clearly established federal law, the state court was not unreasonable for concluding that

2   Petitioner's allegations on this subclaim failed to set forth a prima facie showing of

3   entitlement to relief. See Pinholster, 563 U.S. at 188-92.

4   **CLAIM 22**

5         In Claim 22, Petitioner alleges that the prosecutor committed prejudicial misconduct by

6   quoting from two writings attributed to the Petitioner during his guilt-phase opening statement,

7   and that defense counsel performed ineffectively by failing to object pre-trial to the admission of

8   one of the statements at issue and failing object to the prosecution's referencing of both

9   statements in his opening statement. (ECF No. 59 at 214-19.) The California Supreme Court

10  denied relief on this claim on direct appeal and on habeas corpus and both denials reflect

11  reasonable applications of clearly established federal law. See 28 U.S.C. § 2254(d).

12        1.  Proceedings In State Court

13        In his opening statement at the guilt phase, the prosecutor began with a brief statement of

14  the charges against Petitioner and then explained, "The People will demonstrate through

15  testimony and evidence that these crimes had their inception . . . months and perhaps even years

16  prior to that weekend of May 16th and May 17th, 1987." (16 RT 3290.) He described that

17  Petitioner had "kept a diary," in which "months, perhaps even years prior to [the charged] crime

18  Mr. Coddington made the entry, 'Evil must exist to prevent boredom.'" (16 RT 3291.) After

19  quoting from and describing several diary entries, the prosecutor stated:

20  
21          And, finally, Mr. Coddington committed to paper his own version of the law. Mr. Coddington wrote down that which he, Herbert James
22          Coddington, perceived as the law. And, ladies and gentlemen of the jury, I will read it for you.

23          "If you aren't given a choice whether or not to kill but can choose who or when or how or the number to die or live, it's not murder.
24          Death is a given in some situations." "If you aren't given a choice whether or not to kill but can choose who or when or how or the
25          number to die or live, it's not murder. Death is a given in some situations."

26  (16 RT 3295.) At no point during the opening statement did the defense object. (See 16 RT 3290-

27  3335.) Immediately after the jury was empaneled, the trial court had instructed them that opening

28  statements were not evidence (15 RT 3263), an instruction that the court repeated just before the

1    prosecutor began his guilt-phase opening statement, during the course of the prosecutor's guilt-

2    phase closing argument, and again at the close of the guilt phase. (16 RT 3288; 24 RT 4605,

3    4687.)

4            Upon the completion of the prosecution's case-in-chief at the guilt phase, the prosecutor

5    moved to admit as exhibits the diary containing the comment concerning "evil" and the paper

6    containing the comment that "death is a given." (21 RT 4277; 22 RT 4332.) The diary was

7    admitted with no objection, but the defense counsel objected to the admission of the paper

8    containing the "death is a given" statement, as lacking foundation and as more prejudicial than

9    probative. (21 RT 4277; 22 RT 4332-33; 23 RT 4375-4399.) Defense counsel represented that the

10   statements contained on the paper had been part of a philosophical discussion Petitioner had with

11   another person, several years prior. (23 RT 4375.) Before the court could rule on the exhibit's

12   admissibility, the prosecutor withdrew it pursuant to an agreement with the defense. (24 RT 4527

13   [Defense counsel: ". . . we agreed that if [the prosecutor] would withdraw that exhibit, we would

14   not comment on the fact that he failed to prove up the reference that he made in his opening

15   statement to that particular exhibit"].)

16           On direct appeal, Petitioner argued that the prosecutor committed misconduct in making

17   each of the statements at issue during his guilt-phase opening statement and that defense counsel

18   performed ineffectively by failing to object to them. (LD 25-B.1 at 196-201; LD 25-B.3 at 49.)

19   The California Supreme Court denied relief on the merits. To the extent the claim alleged

20   prosecutorial misconduct, the Court held that both comments were proper descriptions of "the

21   evidence to be presented and [the prosecutor's] theory of its relevance," namely, that Petitioner

22   "had contemplated seizing young girls for sexual gratification and was not troubled by the

23   possible need to kill to achieve his aim." Coddington, 23 Cal.4th at 596.

24           In his first state petition for state habeas corpus relief, Petitioner raised a version of this

25   claim again, alleging that trial counsel performed deficiently by failing to object pretrial to the

26   admission of the paper containing the "death is a given" statement. (LD 25-C.1 at 66-68.)

27   Petitioner additionally alleged that trial counsel performed deficiently by not objecting to the

28   prosecutor quoting, in his opening statement, the portion of Petitioner's diary (which later would

120

1    be admitted without objection) containing the statement, "evil must exist to prevent boredom."

2    (LD 25-C.1 at 66-67.) According to Petitioner, by quoting this portion of the diary, the prosecutor

3    encouraged the jury to engage in "character and propensity reasoning forbidden by . . . due

4    process." (LD 25-C.1 at 66.) Petitioner supported both allegations with a declaration from trial

5    counsel that he had no tactical purpose in failing to lodge either objection. (LD 25-C.3 Ex. A, ¶

6    11.) The California Supreme Court denied the claim on the merits summarily. (LD 25-C.5.)

7            2.   Prosecutorial Misconduct

8            a.   Legal Standard

9            Under clearly established federal law, prosecutorial misconduct merits reversal of a

10   criminal conviction only if it "so infected the trial with unfairness as to make the resulting

11   conviction a denial of due process," Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal

12   quotation marks and citation omitted). Where the misconduct takes the form of improper

13   comments by the prosecutor, the jury is also presumed to follow a curative instruction unless

14   there is an "overwhelming probability that [it] will be unable" to do so and "a strong likelihood

15   that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S.

16   756, 767 n.8 (1987). In Darden, for example, in closing argument the prosecutor described the

17   defendant as an "animal," opined that the defendant should only be allowed out of a jail cell if he

18   were on a leash, and shared his wish that the defendant was "sitting here with no face, blown

19   away by a shotgun." 477 U.S. at 181-83 nn.11 & 12. The Court held that these statements –

20   although improper – did not deprive the defendant of a fair trial, in light of the instruction by the

21   court that the arguments made by counsel were not evidence and in light of the substantial

22   evidence of the defendant's culpability. Id. at 181–83; see also Donnelly v. DeChristoforo, 416

23   U.S. 637, 647 (1974) (holding no due process violation by prosecutor's improper closing

24   argument, because court instructed the jury that the remark was not evidence and in light of the

25   substantial evidence of guilt).

26   ////

27   ////

28   ////

1        b.  The California Supreme Court's Denial Was Not Contrary to Nor an Unreasonable

2            Application of Federal Law

3        To the extent this claim alleges Petitioner is entitled to a new trial due to the violation of

4 his due process rights in the prosecutor's comments in opening statement,[25] the California

5 Supreme Court did not act contrary to nor unreasonably apply clearly established federal law in

6 denying relief. In his state appellate pleadings, Petitioner alleged that the prosecutor committed

7 misconduct by quoting the excerpts at issue with the explanation that they demonstrated that the

8 charged crimes "had their inception . . . months and perhaps even years prior to the" events

9 comprising the charged crimes. (LD 25-B.1 at 196, quoting RT 3291.) This "gloss" on the

10 evidence, per Petitioner, violated his due process rights by encouraging the jurors to engage in

11 speculation and to treat the writings as character and propensity evidence. (LD 25-B.1 at 197-99.)

12        Petitioner failed to show that the comments were improper, let alone that they were so

13 egregious as to have rendered his trial fundamentally unfair per Supreme Court precedent. In

14 rejecting this claim, the California Supreme Court correctly observed that the "function of an

15 opening statement is not only to inform the jury of the expected evidence, but also to prepare the

16 jurors to follow the evidence and more readily discern its materiality, force, and meaning,'"

---

18 [25] In some respects, Petitioner appears to allege both that the prosecutor committed misconduct in
19 his opening statement and that counsel performed ineffectively in failing to object, and that these
are distinct legal theories that, in the alternative, entitle him to a new trial. (See ECF No. 59 at
20 214 ["Prosecutorial Misconduct and Ineffective Assistance of Counsel Occurred in the
Prosecutor's Guilt / Innocence Phase Opening Statement . . ."], 215 [alleging that prosecutor's
21 statement required the jury to speculate, which "violates due process"], 218 ["The Prosecutor's
Comments Require Reversal of Mr. Coddington's Murder Convictions"].) On direct appeal,
22 Petitioner appeared to frame this claim in this manner (see LD 25-B.1 at 196-201) and the
California Supreme Court understood it that way. Coddington, 23 Cal.4th at 595-96. In state
23 habeas corpus, Petitioner re-alleged the ineffective assistance of counsel allegations comprising
this claim (LD 25-C.1 at 66-68), which the California Supreme Court summarily denied. (LD 25-
24 C.5.) As noted, in the Amended Petition pending in the instant proceeding, Petitioner appeared to
allege both theories of relief (prosecutorial misconduct and ineffective assistance of counsel); in
25 the Traverse, however, Petitioner only advances one part of one of these theories: that trial
counsel performed ineffectively by failing to object, pretrial, to the admission of the paper
26 containing the "death is a given" statement. (ECF No. 209 at 360-364.) Because of the factual
overlap among the various allegations, and in an abundance of caution as to the Court's
27 understanding of Petitioner's actual theories of relief, the Court herein considers all theories that
28 were advanced in state court.

1    Coddington, 23 Cal.4th at 596, which accords with the High Court's pronouncement that the

2    purpose of an opening statement "'is to state what evidence will be presented, to make it easier

3    for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to

4    the whole.'" Arizona v. Washington, 434 U.S. 497, 513 n.32 (1978) (quoting United States v.

5    Dinitz, 404 U.S. 600, 612 (1976) (concurring opn. of Berger, C.J.)) Here, the prosecutor did not

6    improperly ask the jury to speculate as to the meaning of the evidence he described in his opening

7    statement, nor did he encourage the jury to treat Petitioner's writings as character or propensity

8    evidence. Rather, he quoted accurately passages of Petitioner's writings that he expected would

9    be admitted as evidence, expressly noted they had been written prior to the events comprising the

10   charged crimes, and explained the prosecution's theory of their relevance: that the writings

11   demonstrated that Petitioner had planned some form of these crimes well in advance of

12   undertaking them and that they were committed pursuant to Petitioner's personal moral code. (16

13   RT 3291-95.) The jury was free to reject these theories upon hearing the evidence, but the

14   prosecutor did not act improperly by "relat[ing] [these] parts of the evidence" to the whole of the

15   prosecution's theory of the case, i.e., why and how it came to be that Petitioner was discovered

16   with two girls detained in his home and two deceased women in his bedroom. See Arizona, 434

17   U.S. at 513 n.32. Because the prosecutor's comments were not improper, they necessarily also did

18   not reach the high bar of having rendered the trial fundamentally unfair. See Darden, 477 U.S. at

19   181 (holding that even a penalty phase closing argument in which the prosecutor repeatedly,

20   emotionally dehumanized defendant with florid language did not violate his federal due process

21   rights); cf. Donnelly, 416 U.S. at 647 (no due process violation from prosecutor's reference, in

22   closing argument, to inadmissible evidence, where jury had been properly instructed). The

23   California Supreme Court did not fail to apply federal precedent reasonably when it rejected this

24   claim on direct appeal.

25           3.   Ineffective Assistance of Counsel

26           The California Supreme Court's rejection of the ineffective assistance of counsel

27   allegations of this claim also was not an unreasonable application of nor a determination contrary

28   to clearly established federal law. Under clearly established federal law, a claim of ineffective

123

1    assistance of counsel cannot lie where Petitioner alleges that defense counsel should have

2    undertaken some action that, per the record, "stood almost no chance of success." Knowles v.

3    Mirzayance, 556 U.S. 111, 123 (2009). In these situations, the Petitioner cannot show trial

4    counsel performed deficiently under prevailing professional norms nor that Petitioner was

5    prejudiced by his counsel failing to undertake an act that would have been futile. Id. at 124-28;

6    see also Jones v. Barnes, 463 U.S. 745 (1983) (holding that the Sixth Amendment's guarantee of

7    effective assistance of counsel does not encompass a requirement that counsel raise frivolous

8    arguments).

9          Here, the California Supreme Court could have reasonably concluded that Petitioner failed

10   to make a prima facie showing of ineffective assistance of counsel, because the actions Petitioner

11   alleges should have undertaken would have been futile. First, to the extent that Petitioner alleges

12   that trial counsel was ineffective in failing to object to those portions of the prosecutor's opening

13   statement noted above (see LD 25-C.1 at 66, 68), those allegations must fail because, as

14   described, the prosecutor's statements were not improper; thus, defense counsel did not perform

15   below professional norms by failing to object to those statements and Petitioner cannot show that,

16   had he made the objection, it is likely that the trial court would have sustained it. See Knowles,

17   556 U.S. at 123-28.

18         Second, to the extent that Petitioner's allegation is that defense counsel should have

19   moved before trial to exclude the paper that contained the "death is a given" statement (LD 25-

20   C.1 at 67-68, ECF No. 209 at 360-64), these allegations too failed as the record indicated such an

21   act would have been futile. The trial record showed that, at the close of the prosecution's case-in-

22   chief, defense counsel did object to the admission of the paper at issue on several grounds and

23   argued robustly that the paper should be excluded. (23 RT 4375-4400.) After hearing extensive

24   argument and probing both the prosecutor and defense counsel on the legal mandates governing

25   the admissibility question, the court indicated that it would admit the paper as evidence, ruling, "it

26   seems to me that relevancy that [the prosecutor] has alluded to is enough to get in to the jury, and

27   [defense counsel] could put . . .on" rebuttal evidence that would give a different context to the

28   writing, namely, witnesses that defense counsel had represented could testify that the writing

1    reflected nothing more than a college-age discussion about abstract moral philosophy. (23 RT

2    4399.) In his state pleadings, Petitioner did not allege that defense counsel should have raised

3    additional, meritorious arguments to demonstrate the writings' inadmissibility, but rather that the

4    arguments he did raise should have been raised earlier. (See LD 25-B.1 at 196-201; LD 25-C.1 at

5    66-68; see generally ECF No. 209 at 360-364.) Given the trial court's eventual ruling and

6    reasoning for it, it is unclear how – if at all – defense counsel raising the issue pretrial rather than

7    at the close of the guilt phase would have altered the trial court's ruling; it appears, instead, that

8    Petitioner's allegations rest on a contention that defense counsel should have done something

9    that, ultimately, would have proven to be futile. As such, clearly established federal law accords

10   with the state court's determination that such allegations did not give rise to a colorable claim of

11   ineffective assistance of counsel. See Knowles, 556 U.S. at 123-28. This claim, therefore, is

12   recommended to be dismissed.

13   **CLAIM 29**

14        In Claim 29, Petitioner alleges that trial counsel performed ineffectively in failing to

15   develop and present available expert testimony refuting that conclusion that the decedents'

16   injuries appeared similar to each other. Petitioner alleges that, had such testimony been presented,

17   it is reasonably probable that "one or more jurors would not have concluded that the killings were

18   premeditated." (ECF No. 59 at 242.) The California Supreme Court's summary denial of this

19   claim was not contrary to nor an unreasonable application of clearly established federal law nor

20   an unreasonable factual determination and, therefore, pursuant to section 2254(d) the undersigned

21   recommends it be dismissed.

22        1.   Proceedings In State Court

23        At the guilt phase, the prosecution presented the testimony of forensic pathologist Dr.

24   Richard Sander, who had performed the autopsies of decedents Martin and Walsh. In his

25   testimony, he detailed the numerous injuries to the decedents, describing multiple contusions,

26   abrasions, lacerations, and furrowed indentations visible on the women's faces, scalps, necks,

27   chests, arms, shoulders, genitals, thighs, shins, and ankles. (18 RT 3684-99.) He opined that it

28   appeared that both women had been beaten before being killed. (18 RT 3703.) Based on the

1   unusual position of some of the injuries and the "remarkable" similarities between the injuries on

2   both victims, he did not believe the injuries' similarities to be "coincidental." (18 RT 3704.)

3          In closing argument, the prosecutor urged that Dr. Sander's testimony was evidence that

4   Petitioner had killed Ms. Martin and Ms. Walsh with specific intent, pursuant to a plan that had

5   reflected premeditation and deliberation. (24 RT 4626.) He described that Dr. Sander had testified

6   that "both women had suffered the same kind of injuries," including having been beaten on the

7   face and upper torso, with a large abrasion on their backs and hymenal tearing. (Ibid.) He then

8   posited, "How could it be that the two women would have those distribution of injuries unless

9   Mr. Coddington approached in demise with a consistent plan, and one that contemplated that each

10  would be killed in the exact same method?" (Ibid.)

11         Defense counsel, in closing argument, countered that Petitioner had not premeditated or

12  deliberated about a plan to kill Ms. Martin or Ms. Walsh. (24 RT 4639.) Instead, per counsel,

13  Petitioner had long premeditated and deliberated about kidnapping underage girls (24 RT 4638,

14  4640) and, once he learned the girls would be accompanied by a chaperone, his "plan" included

15  "keep[ing] [the older women] quiet" and "shut[ting] them up." (24 RT 4642-43.) Counsel urged

16  this theory repeatedly throughout his argument. (24 RT 4645, 4650-52.) Counsel further argued

17  that Petitioner had killed Ms. Martin and Ms. Walsh impulsively when his plan to keep them

18  quiet and immobilized failed and he was overwhelmed by their frantic fear. (24 RT 4650-51.) He

19  explained: "my argument to you is that when he brought these women and he wanted to quiet

20  them down . . . and he was trying to make them quiet and they wouldn't be quite (sic) and they

21  fought it, and then and only then did he kill them," by opting to pull tightly the flexible ties that

22  he had fastened around both of their necks. (24 RT 4651.)

23         In his first petition for a writ of habeas corpus, Petitioner alleged that his trial counsel

24  performed ineffectively by failing to offer available expert testimony to counter Dr. Sander's

25  opinion that Ms. Walsh's and Ms. Martin's wounds were so similar as to imply deliberateness.

26  (LD 25-C.1 at 40-42.) He supported his allegations with a declaration from trial counsel stating

27  that he had no tactical reason to not consult with a forensic pathology expert about Dr. Sander's

28  testimony and with a declaration from Dr. Joseph Masters, a decorated Sacramento pathologist,

1    who opined that he did not believe the decedents' injuries to be particularly similar nor had any

2    other characteristics to suggest that a "preconceived design" had prompted them. (Ibid.; LD 25-

3    C.3 Ex. A ¶ 16, Ex. D ¶ 4.) The California Supreme Court denied relief summarily, on the merits.

4    (LD 25-C.5.)

5         2.   The California Supreme Court's Summary Denial of Relief Was Neither Contrary To

6              Nor An Unreasonable Application of Clearly Established Federal Law

7         Because the state court denied relief summarily, the federal court considers whether there

8    could have been any reasonable basis for the state court's decision that accorded with clearly

9    established federal law. Richter, 562 U.S. at 98; Kipp v. Davis, 971 F.3d 939, 948 (9th Cir. 2020).

10   Where the claim at issue alleged constitutional error and prejudice, the state court decision must

11   be given deference if its determination on either of those prongs may have been reasonable. Shinn

12   v. Kayer, ___ U.S. ___, 141 S. Ct. 517, 524, 208 L. Ed. 2d 353 (2020) (per curiam). Therefore, on a

13   claim of ineffective assistance of counsel, this court may forego analysis of whether trial counsel

14   performed deficiently if the state court could have reasonably denied relief on the prejudice

15   prong. Ibid.; see also Strickland, 466 U.S. at 697.

16        Here, Petitioner failed to make a prima facie showing that, even if his allegations were

17   fully credited by a factfinder, it was reasonably probable that the jury would have returned lesser

18   verdicts on Counts One and Two. As described above, at the guilt phase the defense elected a

19   strategy of conceding Petitioner's guilt on the non-homicide offenses; conceding that Petitioner

20   had planned, premeditated, and deliberated about the abductions, detentions, and sexual assaults

21   of the young victims; conceding that he intended to immobilize Ms. Martin and Ms. Walsh when

22   he attacked them; conceding that Petitioner may have eventually planned to kill Ms. Martin and

23   Ms. Walsh; but disputing that Petitioner had premeditated and deliberated about the killings as

24   they had occurred and disputing that Petitioner had formed intent to kill, given his mentally

25   overwhelmed state. In other words, the defense theory was that Petitioner had acted deliberately

26   and intentionally when beating Ms. Walsh and Ms. Martin, pursuant to his plan to incapacitate

27   them, but did not have that mental state when pulling tight the ligatures around their necks. (See

28   24 RT 4638-52.)

1    From this recitation, it is clear that there was no material dispute between the parties as to

2  whether Petitioner had planned and intended to physically attack Ms. Martin and Ms. Walsh.

3  Both parties theorized that Petitioner did have such a plan and that his beatings of the decedents

4  had been pursuant to that plan. The defense and prosecution, however, advocated for different

5  deductions relative to those facts. In the defense's view, the attacks on Ms. Martin and Ms. Walsh

6  were temporally distinct from his strangulation of the victims, such that Petitioner's plan was

7  unlikely to have encompassed strangulation by ligature (24 RT 4638-52); in the prosecution's

8  contrary view, the beatings and strangulations were part of a single homicidal plan. (24 RT 4626,

9  4654-4662.)

10    Petitioner does not now allege that trial counsel performed ineffectively for electing this

11  strategy or urging this deduction. Given that, then, there seems no purchase for Petitioner's

12  allegation that, had the jury heard testimony that the decedents' beatings appeared dissimilar, the

13  jury was reasonably likely to return lesser verdicts on Counts One and Two. See Strickland, 466

14  U.S. at 693 (to prove prejudice, petitioner must prove that counsel's errors "actually had an

15  adverse effect on the defense"). In light of the defense concessions that the beatings were

16  pursuant to Petitioner's plan to immobilize the adult women and the theory of the case that the

17  defense urged—which Petitioner does not argue was itself deficient but simply inadequately

18  supported (see ECF No. 59 at 241-42)—Dr. Master's proffered testimony would seem to have

19  little if any probative value. It was not unreasonable for the state court to conclude, therefore, that

20  Petitioner could not show counsel's ostensible deficiency was reasonably likely to have actually

21  affected the jury's verdicts on the homicide counts. See Strickland, 466 U.S. at 694 (no prejudice

22  where the complained error would have had a "trivial effect" on the verdict, given the entirety of

23  the record); see, e.g., Alcala v. Woodford, 334 F.3d 862 (9th Cir. 2003) (finding Strickland

24  prejudice where counsel's errors related to the critical material evidentiary dispute at the guilt

25  phase); Lord v. Wood, 184 F.3d 1083 (prejudice present where counsel could have presented

26  evidence that would have "undermined" the prosecution's theory of the case); see generally

27  Gentry v. Sinclair, 705 F.3d 884, 906 (9th Cir. 2013) (no prejudice where the evidence at issue

28  would have been immaterial to guilt or penalty). Because it was not contrary to nor an

128

1    unreasonable application of Supreme Court precedent, nor an unreasonable factual determination,

2    for the state court to deny this claim summarily, the state court's denial must be given deference

3    and the undersigned recommends that this claim be dismissed. See 28 U.S.C. §2254(d).

4    **CLAIMS 31 AND 32**

5        In Claim 31, Petitioner alleges that his Sixth Amendment Confrontation rights were

6    violated when the trial court permitted him to waive his presence during the presentation of one

7    prosecution exhibit without an affirmative showing that the waiver was knowing, intelligent, and

8    voluntary. In Claim 32, Petitioner alleges that trial counsel performed ineffectively for failing to

9    advise him that he was barred under state law from waiving his presence. The California Supreme

10   Court denied relief on both claims, which was not contrary to nor an unreasonably application of

11   clearly established federal law, nor an unreasonable factual determination. See 28 U.S.C. §

12   2254(d).

13       A.  Proceedings In State Court

14       During the prosecution's case in chief, the prosecutor introduced People's Exhibit 135, an

15   audio recording, that prosecution witness Richard Hartman testified had been seized by the FBI

16   from a car parked at Petitioner's home after the latter's arrest. (21 RT 4145-46, 4150-4151.) The

17   tape was three to five minutes long (21 RT 4147) and both parties agree that it was a recording of

18   Petitioner apparently practicing a variety of voices. (ECF No. 189 at 113 [describing exhibit as "a

19   brief audiotape in which Petitioner could be heard practicing voices"]; ECF No. 209 at 663

20   [describing exhibit as "a recording of what appeared to be Mr. Coddington practicing different

21   voices"].) When the prosecutor asked that the tape be played for the jury, defense counsel

22   requested a sidebar, where he explained that he and his co-counsel had "heard this tape some time

23   ago, but [were] not quite sure [of] all of the contents," so they asked for the tape be played outside

24   the presence of the jury prior to the jury being permitted to hear it. (21 RT 4146-47.) The court

25   agreed and had the jury removed, after which the tape was played for the court, counsel, and

26   Petitioner. (21 RT 4147-48.)

27       Defense counsel then informed the court that, "during the break [Petitioner] indicated that

28   he did not think he could handle being present during the playing of this tape and he would

1  request he be allowed to be removed from the courtroom during the playing of the tape." (21 RT

2  4148.) The court asked the prosecutor if he had any objections, but made no inquiry of Petitioner.

3  (See ibid.) The court then had Petitioner removed to chambers and the jury was brought back into

4  the courtroom. (21 RT 4148-49.) Pursuant to defense counsel's request, the court advised the jury

5  that Petitioner "has asked that he not be present during the playing of this tape, and I've granted

6  that request." (21 RT 4149.) The tape was then played for the jury. (Ibid.)

7          On direct appeal, Petitioner alleged that the trial court had violated his rights under the

8  Sixth Amendment's Confrontation Clause by permitting him to be absent during the playing of

9  Exhibit 135 without having first obtained a constitutionally-valid waiver from him. (LD 25-B.1 at

10  221-22.) He argued that the error was structural or, in the alternative, not harmless. (LD 25-B.1 at

11  223-224.) The California Supreme Court did not address this claim specifically, although it

12  addressed all of the other claims Petitioner had raised, including a claim that his absence from the

13  penalty phase closing argument was constitutional error. See Coddington, 23 Cal.4th 529. The

14  court "affirmed in its entirety" the judgment of the trial court, id. at 657, including finding that

15  "many [of the guilt-phase claims] did not establish error, and those that did could not possibly

16  have caused prejudice," when rejecting Petitioner's claim of cumulative prejudice at the guilt

17  phase. Id. at 601.

18          In his first petition for writ of habeas corpus in state court, Petitioner raised a claim that

19  his trial counsel performed ineffectively by failing to invoke a state statute that prohibited

20  capitally-eligible defendants from waiving their presence during trial and by failing to persuade

21  Petitioner to remain present and decorous during the playing of Exhibit 135. (LD 25-C.1 at 76.)

22  Had counsel performed reasonably, Petitioner alleged, "it is reasonably probable that remaining

23  in the courtroom would have had a positive impact on the verdict of one or more of the jurors."

24  (Ibid.) The California Supreme Court denied the claim summarily. (LC 25-C.5.)

25          B.  Legal Standard

26          The Sixth Amendment's Confrontation Clause and the Fourteenth Amendment's Due

27  Process Clause both establish the defendant's right to be present at all critical stages of a criminal

28  trial. United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam); Illinois v. Allen, 397 U.S.

1  337, 338 (1970); Gardner, 430 U.S. at 358. This right may be forfeited through misconduct or

2  waived. Snyder v. Massachusetts, 291 U.S. 97, 106 (1934). In order to be constitutionally sound,

3  any waiver must be knowing, intelligent, and voluntary, and all presumptions are drawn against

4  finding that the defendant has waived these fundamental constitutional rights. Johnson v.

5  Zerbst, 304 U.S. 458, 464 (1938) ("[C]ourts indulge every reasonable presumption against waiver

6  of fundamental constitutional rights and . . . we do not presume acquiescence in the loss of

7  fundamental rights. A waiver is ordinarily an intentional relinquishment or abandonment of

8  a known right or privilege.") (internal quotation marks and citation omitted); see also Brookhart

9  v. Janis, 384 U.S. 1, 4 (1966) (holding that a waiver of constitutional confrontation rights must be

10  knowing and voluntary, citing Zerbst).

11       C.  The State Court's Denial of Relief on Claim 31 Was a Denial on the Merits

12       As a preliminary matter, the parties dispute whether the California Supreme Court's denial

13  of relief on Claim 31 constituted a ruling on the merits within the meaning of section 2254(d).

14  The undersigned concludes that the federal courts must consider the state court's denial of Claim

15  31 to have been on the merits.

16       Under section 2254(d), in adjudicating a petition for writ of habeas corpus, a federal court

17  must defer to the judgment of the state court "with respect to any claim that was adjudicated on

18  the merits in State court proceedings" unless the exceptions set forth in subdivisions (d)(1) or

19  (d)(2) are met. The Supreme Court has given some guidance as to what constitutes an

20  "adjudicate[ion] on the merits," see 28 U.S.C. § 2254(d), in state court. In Richter, 562 U.S. at

21  99-100, the Supreme Court established a legal presumption that, "[w]hen a federal claim has been

22  presented to a state court and the state court has denied relief, it may be presumed that the state

23  court adjudicated the claim on the merits in the absence of any indication or state-law procedural

24  principles to the contrary," even where, as there, the state court was entirely silent on its reasons

25  for denial.

26       In Johnson v. Williams, 568 U.S. 289, 298-301 (2013), the Court reaffirmed this principle,

27  extending the Richter presumption to records where the state court had not been wholly silent on

28  its reasons for denial, but had nevertheless failed to expressly address the petitioner's federal

constitutional claim. There, on direct appeal in state court, petitioner had raised a claim that the trial court had wrongly dismissed a seated juror, in violation of state statute and federal constitutional law. Id. at 295. The state court of appeal rejected the claim, discussing the state law in detail while omitting discussion of federal constitutional law. Ibid. The Supreme Court held that, despite this, the presumption that the constitutional claim had been denied on the merits had not been rebutted. Id. at 298. Courts may reasonably have a practice of not "discuss[ing] separately every single claim to which a defendant makes even a passing reference" for reasons of judicial economy and may fail to specifically address a constitutional claim where, for example, the state precedent has wholly incorporated federal law on a particular issue, or the federal grounds for the claim were only fleetingly raised, or the claim was "simply . . . too insubstantial to merit discussion." Id. at 299. The presumption could be rebutted, the Court opined, by, for example, evidence that the state courts in fact did, at the time, have a practice of "separately address[ing] every single claim that is mentioned in a defendant's papers." Id. at 298. The Court concluded that the Richter presumption had not been rebutted in Mr. Johnson's case because, although the state court had only discussed state precedent in adjudicating the claim, those cases had themselves wholly relied on federal constitutional law principles, and thus both grounds for the claim had been adjudicated on the merits by the state court. Id. at 304-06.

Mindful of these principles, the undersigned cannot conclude that Petitioner has rebutted the presumption that the constitutional aspects of Claim 31 were adjudicated on the merits by the state court. Petitioner did present the federal constitutional claim squarely on direct appeal: he highlighted the constitutional basis for the claim in the heading and subheadings; discussed federal constitutional principles; and cited Supreme Court and other federal authority. These facts indicate that the merits of the federal claim were fairly presented to the state court, so as to trigger the Richter presumption. See Richter, 562 U.S. at 99-100; see also Johnson, 568 U.S. at 301-02 & n.3 (a constitutional claim fleetingly mentioned in a footnote or string cite would not be presumed to have been adjudicated on the merits).

Some facts on the record militate towards a finding that, although Petitioner's constitutional claim was fairly presented to the state court, the California Supreme Court

1   inadvertently overlooked it in adjudicating Petitioner's appeal and did not deny this claim on the

2   merits. As Petitioner notes, the California Supreme Court did discuss each of the other claims that

3   he had raised on appeal. See generally Coddington, 23 Cal.4th 529. These included claims that

4   the court considered poorly pled. Id. at 595 ("Appellant scatters claims of prosecutorial

5   misconduct throughout his brief, often failing to identify the claim as such . . ."). The court also

6   expressly addressed the merits of a similar claim Petitioner had raised, which challenged the

7   validity of the waiver of his presence during a portion of the penalty phase. Id. at 629-30.

8       On the other hand, Petitioner made no showing that there is some general practice of the

9   California Supreme Court that would render suspect a conclusion that the court may have omitted

10  its discussion of this claim for reasons of judicial economy; for instance, there has been no

11  showing, as the Court opined in Johnson, that the California Supreme Court did tend to

12  "separately address every single claim that is mentioned in a defendant's papers" in capital

13  appellate adjudications. See Johnson, 568 U.S.at 298. Moreover, the California Supreme Court's

14  discussion of cumulative error in this case suggests that, as a matter of historical fact, it

15  considered and rejected the merits of Claim 31. See Coddington, 23 Cal.4th at 601 ("Having

16  concluded that several of appellant's claims were waived, many did not establish error, and those

17  that did could not possibly have caused prejudice, we reject appellant's claim that cumulative

18  [guilt-phase] prejudice from numerous errors of an inflammatory nature mandate reversal."); id.

19  at 643 ("Appellant contends that prepenalty phase instances of misconduct and error, as well as

20  those errors and misconduct he claims were made during the penalty phase, together contributed

21  to the death verdict. Inasmuch as we have rejected his claims of error and prejudicial misconduct,

22  this claim also fails.") Finally, in light of the de minimis prejudice that could be shown by the

23  complained-of error, discussed below, there may be some possibility that the California Supreme

24  Court concluded that Claim 31 was "too insubstantial to merit discussion." See Johnson, 568 U.S.

25  at 299.

26      There are compelling facts in support of both positions, but those that support Petitioner's

27  interpretation of the record are not so compelling as to permit a finding that Richter's

28  presumption has been rebutted. To the undersigned, the evidence appears in equipoise. Because

133

1   the burden lies on Petitioner to rebut the legal presumption established in <u>Richter</u>, that burden

2   cannot be said to have been met. <u>See</u>, <u>e.g.</u>, <u>Medina v. California</u>, 505 U.S. 437, 449 (1992) (when

3   evidence in equipoise, "the allocation of the burden of proof" is dispositive). Accordingly, the

4   undersigned treats the denial of Claim 31 as a denial on the merits, for which deference is owed if

5   there was any reasonable basis for it. <u>See</u> <u>Richter</u>, 562 U.S. at 98.

6       D.   The California Supreme Court's Denial of Relief on Claim 31 Was Not Contrary to

7            Nor an Unreasonable Application of Clearly Established Federal Law

8       Petitioner posits several different theories by which the California Supreme Court's denial

9   of relief on Claim 31 reflected an unreasonable application of, or decision that was contrary to,

10  clearly established federal law. The undersigned disagrees, finding the state court's denial is

11  entitled to deference under section 2254(d).

12      1.   No Clearly Established Federal Law Holds That a Capital Defendant Cannot Waive

13           His Presence For the Partial Taking of Evidence

14      Petitioner first argues that the California Supreme Court's denial of relief on this claim

15  was contrary to clearly established federal law prohibiting a capital defendant from absenting

16  himself from any part of a capital trial.[26] (ECF No. 59 at 247; ECF No. 209 at 674-79.) Petitioner

17  principally relies on <u>Diaz v. United States</u>, 223 U.S. 442 (1912); <u>Lewis v. United States</u>, 146 U.S.

18  370 (1892); and <u>Hopt v. Utah</u>, 110 U.S. 574 (1884). The sum of Supreme Court precedent,

19  however, does not support the rule that Petitioner urges.

20      In both <u>Lewis</u> and <u>Hopt</u>, the Supreme Court considered capital trials where the trial court

21  had acted outside the defendant's presence for part of the trial; in both cases, the Supreme Court

22  indicated that, broadly, in no criminal case would this be permissible. In <u>Hopt</u>, the trial court had

23  conducted part of jury selection outside the presence of the defendant, in violation of state statute.

24

25  [26] On direct appeal in state court, Petitioner did not present this theory, instead arguing that the
    record had not shown that he had executed a knowing, intelligent, or voluntary waiver of his
26  constitutional right to be present. (<u>See</u> LD 25-B.1 at 221-225; LD 25-B.3 at 55-58.) Because,
    however, Respondent has waived the exhaustion defense to this claim (<u>see</u> ECF Nos. 99 at 1-2,
27  102 at 1-2, 189 at 1), the undersigned analyzes it as though it had been exhausted. <u>See</u> <u>Banks v.
    Dretke</u>, 540 U.S. 668, 705 (2004); 28 U.S.C. § 2254(b)(3).

28

110 U.S. at 575-77. On appeal, the State argued that the defendant had waived this statutory right by failing to contemporaneously object. Id. at 578. The Supreme Court rejected this premise, explaining, "We are of opinion that it was not within the power of the accused or his counsel to dispense with statutory requirement as to his personal presence at the trial" because, at common law and under the due process clause of the Fourteenth Amendment, intrinsic to the concept of a fair, public trial was the requirement that the accused be personally present for any felony trial that may result in his loss of "life or liberty." Id. at 579.

The Supreme Court reiterated this position a few years later, in Lewis v. United States, 146 U.S. 370 (1892). There, again, the defendant faced capital charges and the trial court conducted some portion of jury selection outside the defendant's presence. 146 U.S. at 372-76. The defendant objected to the procedure, which the trial court overruled. Id. at 378. Relying on Hopt, the Court held that the trial court had violated the defendant's "substantial rights . . . to be brought face to face with the jurors at the time when the challenges were made," which constituted reversible error. Id. at 376.

In Diaz, 223 U.S. 442, the Supreme Court considered a related question of whether a criminal defendant could affirmatively waive his right to be present during a non-capital trial. The Court held that this was permissible, expressly distinguishing the case from ones where the defendant is facing the death penalty; in a capital case, per the Court, there was a consensus among the states that a person "charged with a capital offense [is] incapable of waiving the right" to be present during trial. Id. at 455. The Court distinguished Hoyt and Lewis as reflecting situations not where the defendants had voluntarily absented themselves, but where the trial court had excluded the defendant from a proceeding to which he was entitled to be present. Id. at 458. As such, those cases were not particularly instructive to the question of whether a criminal defendant may voluntarily waive his presence at trial. Ibid.

After Diaz, the Supreme Court repeatedly has affirmed the holding in Diaz acknowledging, generally, that a criminal defendant does have the right to waive his presence at trial and the Court has expressly extended this to capital cases. In Snyder v. Massachusetts, as in Hopt and Lewis, appellant alleged that the trial court erred in excluding him from a portion of his

135

1    capital trial. 291 U.S. 97 (1934), overruled on other grounds, Malloy v. Hogan, 378 U.S. 1

2    (1964). In considering this claim, the Court noted in dicta that a capital defendant's right to be

3    present "may be lost by consent or at times even by misconduct," and held that his absence in that

4    case had not offended the Constitution. Id. at 106. Subsequently, in Illinois v. Allen, 397 U.S.

5    337, 342 (1972), the Court expressed that "the broad dicta in Hopt . . . and Lewis . . ., that a trial

6    can never continue in the defendant's absence have been expressly rejected" in Diaz. Id. at 342.

7    The Court "accept[ed] instead the statement of Mr. Justice Cardozo who, speaking for the Court

8    in Snyder . . ., said: 'No doubt the privilege (of personally confronting witnesses) may be lost

9    by consent or at times even by misconduct." Id. at 342-43.

10            Despite this rule applicable to all criminal defendants, the Court has since also indicated in

11   dicta that, perhaps, there are times when a defendant facing the death penalty may not waive his

12   presence at trial. In Drope v. Missouri, 420 U.S. 162, 182 (1975), the Court considered whether a

13   capital defendant's due process rights were violated by the trial court failing to order a

14   competency examination for him and by conducting a portion of his trial in his absence, as he

15   recovered from a self-inflicted wound. After holding in favor of petitioner on the first question,

16   the Court then noted "Our resolution of the first issue raised by petitioner makes it unnecessary to

17   decide whether, as he contends, it was constitutionally impermissible to conduct the remainder of

18   his trial on a capital offense in his enforced absence from a self-inflicted wound. See Diaz . . .

19   However, even assuming the right to be present was one that could be waived," the record was

20   inadequate to decide the question. Ibid.

21            In light of this, the undersigned cannot agree with Petitioner that "Hopt and Lewis

22   control" this question and "remain good law," establishing a rule that a capital defendant cannot

23   waive his presence at a capital trial. (See ECF No. 209 at 682.) Federal law is only "clearly

24   established" where it is "embodied in a holding" of the Supreme Court. Thaler v. Haynes, 559

25   U.S. 43, 47 (2010) (per curium); see also Carey v. Musladin, 549 U.S. 70, 74 (2006) (explaining

26   that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the

27   dicta, of this Court's decisions as of the time of the relevant state-court decision"). On the other

28   hand, a rule has not been "clearly established" by Supreme Court precedent if "[n]o decision of

                                                     136

1  th[e] Court . . . squarely addresses the issue in this case" or the case law "provide no categorical

2  answer to [petitioner's] question." Wright v. Van Patten, 552 U.S. 120, 125 (2008); Knowles v.

3  Mirzayance, 556 U.S. 111, 122, (2009) (a legal rule was not "clearly established" Supreme Court

4  precedent if it had not been "squarely established" by Court's holdings).

5        The rule that Petitioner urges this Court to employ does not appear "clearly established" in

6  the meaning of section 2254(d)(1). Although both Hopt and Lewis concerned capital cases, their

7  holdings did not rest on the capital nature of the charges, nor did they address situations in which

8  the defendant affirmatively desired to waive his presence. Rather, in both cases, the trial court had

9  unilaterally excluded the defendant from a portion of his capital trial and thus the Court was faced

10 with the cognizability of the defendant's legal interest in being present for trial. Lewis, 146 U.S.

11 at 372-76; Hopt, 110 U.S. at 575-77. As such, Hopt's broad pronouncements about the

12 waivability, generally, of one's presence at a criminal trial were, as the Supreme Court later

13 acknowledged in Allen, dicta, given the inapposite factual circumstance before it. Allen, 397 U.S.

14 at 342. Moreover, neither the Hopt nor Lewis Courts indicated that the defendant's status as

15 capitally-eligible was relevant to the analysis; in Hopt, the Court indicated that in both capital and

16 non-capital cases, a defendant's presence was not waivable and, similarly, in Lewis no distinction

17 was made on this basis. See Lewis, 146 U.S. at 372-76; Hopt, 110 U.S. at 575-77. Thus, a fair

18 reading of Hopt and Lewis does not support the conclusion that both cases' holdings embodied a

19 rule that capital defendants may not affirmatively waive their presence at trial. See Thaler, 559

20 U.S. at 47.

21        Subsequent decisions of the Supreme Court reinforce this interpretation. As noted, in

22 Diaz, 223 U.S. at 458, the Supreme Court recognized that Hopt and Lewis had limited

23 applicability to the question of whether a defendant could voluntarily absent themselves from trial

24 proceedings, given that both cases concerned inapposite facts. In Allen, 397 U.S. 337, and

25 Snyder, 291 U.S. 97, the Court expressly disavowed a broad reading of Hopt and Lewis, holding

26 instead the inverse of the rule petitioner urges here, that a capital defendant may voluntarily

27 waive his presence at trial or forfeit it through misconduct. To the extent the Court considers this

28 question unresolved after Snyder and Allen, it remains an open question, rather than "squarely

137

1   addresse[d]" by <u>Hopt</u> and <u>Lewis</u>. <u>See</u> <u>Van Patten</u>, 552 U.S. at 125; <u>Drope</u>, 420 U.S. at 182

2   (declining to reach petitioner's argument that he was not constitutionally permitted to have

3   waived his presence at his capital trial).

4          Lower courts, too, have reached the conclusion that <u>Hopt</u> and <u>Lewis</u> did not create the

5   clearly established federal law that petitioner urges. Several federal circuit courts have concluded

6   that "the issue of whether a defendant must be present at all times in a capital trial has not yet

7   been settled by the Supreme Court." <u>Moore v. Campbell</u>, 344 F.3d 1313, 1323 (11th Cir. 2003);

8   <u>see also</u> <u>Campbell v. Wood</u>, 18 F.3d 662, 671 (9th Cir. 1994) (rejecting argument that "the right

9   to be present may not be waived in a capital case," citing <u>Hopt</u>, <u>Lewis</u>, <u>Diaz</u>, <u>Allen</u>, and <u>Snyder</u>);

10  <u>L'Abbe v. DiPaolo</u>, 311 F.3d 93, 97 (1st Cir. 2002) (observing that "the Supreme Court has never

11  directly ruled on the issue of whether a criminal defendant can waive his right to presence in a

12  capital case"); <u>United States v. Tipton</u>, 90 F.3d 861, 873 n.3 (4th Cir. 1996) (reviewing Supreme

13  Court jurisprudence and concluding that "whether [a rule that a capital defendant cannot waive

14  his presence at trial] has been implicitly overruled is unsettled"). Absent such a rule, lower courts

15  repeatedly have held that there is no constitutional prohibition on a capital defendant waiving his

16  presence at a critical stage of his trial, so long as the waiver meets constitutional standards. <u>See</u>,

17  <u>e.g.</u>, <u>Campbell</u>, 18 F.3d at 672 ("There is no principled basis for limiting to noncapital offenses a

18  defendant's ability knowingly, voluntarily, and intelligently to waive the right of presence. Nor

19  do we find logic in the proposition that a right that may be waived by disruptive behavior cannot

20  be waived by an affirmative petition freely made and based on informed judgment."); <u>Brown v.</u>

21  <u>Gibson</u>, 7 F. App'x 894, 909 (10th Cir. 2001) (capital defendant "may waive his right to be

22  present, or he could lose that right through misconduct"); <u>People v. Price</u>, 1 Cal.4th 324, 405

23  (1991) ("as a matter of both federal and state constitutional law, . . . a capital defendant may

24  validly waive presence at critical stages of the trial").

25         Of course, the opinions of the lower courts do not create or define what law has been

26  clearly established by the Supreme Court. <u>See</u>, <u>e.g.</u>, <u>Marshall</u> 133 S.Ct. 1450-51. They do,

27  however, "demonstrat[e] that fairminded jurists" on the California Supreme Court "could reach

28  the same conclusion that these many courts have," that there is no clearly established United

1   States Supreme Court precedent creating a categorical bar on a capital defendant opting to absent

2   himself from some portion of his trial. See Fauber v. Davis, 43 F.4th 987, 1009 (9th Cir. 2022);

3   see also Kessee v. Mendoza-Powers, 574 F.3d 675, 679 (9th Cir. 2009) ("Because the Supreme

4   Court has not given explicit direction and because the state court's interpretation is consistent

5   with many other courts' interpretations, we cannot hold that the state court's interpretation was

6   contrary to, or involved an unreasonable application of, Supreme Court precedent.").

7        For all of these reasons, the undersigned concludes that there has been no "explicit

8   direction from the Supreme Court" setting forth the rule Petitioner urges and, therefore, the

9   undersigned cannot hold that the California Supreme Court's denial of this claim on this basis

10  was contrary to or an unreasonable application of clearly established federal law. See Boyd v.

11  Newland, 467 F.3d 1139, 1152 (9th Cir. 2006) (amended op.).

12       2.  Petitioner Had a Sixth Amendment Right to Be Present During the Presentation of the

13           Prosecution's Case-in-Chief and His Waiver of That Right Was Constitutionally

14           Infirm

15       As noted, in state court, Petitioner argued that his Sixth Amendment rights were violated

16  when the trial court permitted him to be absent during the presentation of prosecution evidence

17  against him, without having obtained a valid waiver from him. (LD 25-B.1 at 221-25; LD 25-B.3

18  at 55-58.)[27] Respondent argues that the California Supreme Court may reasonably have rejected

19  this claim by determining that Petitioner's Sixth Amendment right did not attach at this stage of

20  the proceedings or, alternatively, that the waiver on the record was constitutionally sound. (ECF

21  No. 189 at 111-12.) Both of these positions, however, are contrary to or reflect unreasonable

22  applications of clearly established federal law and, consequently, do not provide reasonable bases

23  for the state court's denial of this claim. See Richter, 562 U.S. at 98.

24

25  ─────────────

    [27] Petitioner also had alleged that the trial court's action violated state statute and, consequently,
26  Petitioner's federal due process rights. (See LD 25-B.1 at 225.) The district court ruled that this
    aspect of Petitioner's constitutional claim had not been fairly presented to the state court and
27  therefore was not exhausted. (ECF No. 37 at 4.) In his Amended Petition, Petitioner proceeds
    only on the Sixth Amendment allegations and omits the due process allegations. (ECF No. 59 at
28  246-50.)

1    The Sixth Amendment guarantees a criminal defendant "the right to be present in the

2    courtroom at every stage of his trial," Illinois v. Allen, 397 U.S. 337, 338 (1970), which

3    necessarily includes those stages that include the presentation of "witnesses or evidence against

4    him." United States v. Gagnon, 470 U.S. 522, 526 (1985). This reflects "[o]ne of the most basic

5    of the rights guaranteed by the Confrontation Clause" of the Sixth Amendment. Allen, 397 U.S. at

6    338, citing Lewis v. United States, 146 U.S. 370 (1892); see also Pointer v. Texas, 380 U.S. 400,

7    406 (1965) (holding the "Sixth Amendment's guarantee of confrontation and cross-examination .

8    . . unquestionably" attaches at the preliminary hearing stage, where prosecution witness testimony

9    is adduced against the defendant); Turner v. State of La., 379 U.S. 466, 472-73 (1965) (the Sixth

10   Amendment's guarantee of a jury trial "necessarily implies at the very least that the

11   'evidence developed' against a defendant shall come from the witness stand in a public courtroom

12   where there is full judicial protection of the defendant's right of confrontation, of cross-

13   examination, and of counsel"); Bustamante v. Eyman, 456 F.2d 269, 273 (9th Cir. 1972)

14   (interpreting Allen, 397 U.S. 337, as reflecting that because "the defendant's absence from the

15   courtroom [occurred] during a portion of the prosecution's case-in-chief, the defendant's right to

16   confront the witnesses against him was directly involved").

17        Respondent erroneously posits that Petitioner's constitutional rights only attach to those

18   "stage[s] of the criminal proceeding that is critical to its outcome [where] his presence would

19   contribute to the fairness of the procedure" or would have a "relation . . . to the fullness of his

20   opportunity to defend against the charge." (ECF No. 189 at 111, citing Kentucky v. Stincer, 482

21   U.S. 730, 745 (1987), and Snyder, 291 U.S. at 105-06.) Those standards, however, do not apply

22   to claims arising from the Sixth Amendment. Rather, the Supreme Court has recognized that there

23   exist portions of a criminal trial "where the defendant is not actually confronting witnesses or

24   evidence against him," but where, nevertheless, the defendant has an interest in being present; this

25   interest arises from the Due Process Clause of the Fourteenth Amendment. United States v.

26   Gagnon, 470 U.S. 522, 526 (1985). In those situations, the defendant's due process interests are

27   defined in the manner described in Stincer and Snyder. Stincer, 482 U.S. at 745. ("The Court has

28   assumed that, even in situations where the defendant is not actually confronting witnesses or

140

1   evidence against him, he has a due process right 'to be present in his own person whenever his

2   presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against

3   the charge,'" quoting Snyder, 291 U.S. at 105-06.) Where, however, the stage of the trial

4   proceeding at issue involves the prosecution's presentation of evidence against the defendant,

5   Gagnon and Allen clearly control and hold that the Sixth Amendment right attaches. Gagnon, 470

6   U.S. at 526 ("The constitutional right to presence is rooted to a large extent in the Confrontation

7   Clause of the Sixth Amendment, e.g., Illinois v. Allen, 397 U.S. 337, 90 S. Ct. 1057, 25 L.Ed.2d

8   353 (1970), but we have recognized that this right is protected by the Due Process Clause in some

9   situations where the defendant is not actually confronting witnesses or evidence against him ...");

10  see United States v. Cazares, 788 F.3d 956, 967 (9th Cir. 2015) (interpreting Gagnon in this

11  manner).

12          As such, when a criminal defendant seeks to waive his presence at trial, Supreme Court

13  precedent clearly establishes that such a waiver must reflect "the intentional relinquishment or

14  abandonment of a known right," United States v. Olano, 507 U.S. 725, 733 (1993); see also

15  Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (same); Campbell v. Wood, 18 F.3d 662, 672 (9th

16  Cir. 1994) ("There is no principled basis for limiting to noncapital offenses a defendant's ability

17  knowingly, voluntarily, and intelligently to waive the right of presence. . . . A rational decision to

18  waive the constitutional right is entitled to the same weight as a waiver imputed by disruptive

19  conduct."); Brewer v. Raines, 670 F.2d 117, 119 (9th Cir. 1982) (holding a "defendant's

20  knowing, intelligent and voluntary absence from his trial acts as a waiver of his Sixth

21  Amendment right to confrontation"). The reviewing court, however, "must indulge every

22  reasonable presumption against the loss of constitutional rights." Allen, 397 U.S. at 343. In

23  practical effect, this means that the State bears the burden to prove that the record shows that the

24  waiver was knowing, intelligent, and voluntary; this burden has been clearly established by long-

25  standing Supreme Court precedent. See, e.g., Brewer v. Williams, 430 U.S. 387, 404 (1977) ("the

26  proper standard to be applied in determining the question of waiver as a matter of federal

27  constitutional law [is] that it was incumbent upon the State to prove 'an intentional

28  relinquishment or abandonment of a known right or privilege.' Johnson v. Zerbst, 304 U.S., at

1   464, 58 S. Ct., at 1023. That standard has been reiterated in many cases."); see also Michigan v.

2   Harvey, 494 U.S. 344, 354 (1990) ("It is the State's burden to show that a waiver is knowing and

3   voluntary.").

4          Here, based on the record before the California Supreme Court, it would have been an

5   unreasonable application of clearly established federal law for the state court to have concluded

6   that the State met its burden to prove that Petitioner had knowingly, intelligently, and voluntarily

7   waived his right to be present during the playing of Exhibit 135. There was nothing on the record

8   indicating that Petitioner knew that he had the right to be present, that he was made aware of the

9   consequences of abandoning this right, and that he was making the waiver freely and of his own

10  volition. See Johnson, 304 U.S. at 464. The trial court engaged in no colloquy with Petitioner and

11  made no statement to Petitioner concerning his right to be present. This stands in contrast to those

12  cases where the defendant has opted to absent himself from court after having received some

13  information from the court concerning the nature of the right he was seeking to abandon and his

14  consequences for its abandonment. See, e.g., Amaya-Ruiz v. Stewart, 121 F.3d 486, 496 (9th Cir.

15  1997), overruled on other grounds by United States v. Preston, 751 F.3d 1008 (9th Cir. 2014)

16  (defendant knowingly, intelligently, and voluntarily waived his right to be present where "state

17  trial court told Amaya–Ruiz that he had a right to be present during the hearing and explained the

18  nature of the proceeding" and where defense counsel testified that "she tried to convince Amaya–

19  Ruiz to stay and she was 'sure [she] was able to tell him, in terms that he could understand, why it

20  was important to him to be [there]'"); Brewer v. Raines, 670 F.2d 117, 119 (9th Cir. 1982)

21  (personally colloquy with trial court in which court described what would occur if defendant

22  absented himself from trial sufficed to show defendant's waiver was knowing, intelligent, and

23  voluntary); see also Taylor v. United States, 414 U.S. 17, 19 n.2 (1973) (waiver was proper where

24  "an independent review of the transcripts from the trial and sentencing hearing" demonstrated that

25  "petitioner knew that he was entitled to be present in court during every stage of his trial and that

26  his absence was a product of his voluntary choice"); United States v. Houtchens, 926 F.2d 824,

27  826-27 (9th Cir. 1991) (same).

28  ////

1    Petitioner also made no statements on the record concerning his waiver, either orally or in

2    writing. This distinguishes this case from those where the defendant has executed a written

3    waiver and submitted it to the court, but the court did not engage in colloquy with the defendant;

4    in such cases, courts have often found the written waiver sufficient to show it was knowing,

5    intelligently, and voluntarily made, so long as its contents indicated such. See, e.g., Campbell, 18

6    F.3d at 673.

7    Finally, although trial counsel stated he had discussed the decision with Petitioner, there

8    was nothing conveyed to the trial court about the substance of that conversation to indicate the

9    voluntariness, intelligence, or knowingness of Petitioner's conclusion to waive his right to be

10   present. (See 21 RT 4148.) Compare Amaya-Ruiz, 121 F.3d at 496 (waiver held adequate where,

11   inter alia, outside the presence of the trial court defense counsel had explained to the defendant

12   his right to be present and her belief in the strategic value of his presence) with United States v.

13   Ortiz, 992 F.2d 1220 (9th Cir. 1993) (defendant's waiver not voluntary where his counsel had

14   told him "to go home and wait for a telephone call indicating that the jury had returned with its

15   verdict," but then never called).

16   Accordingly, on the record before the state court, the state court would have been

17   unreasonable had it concluded that the State had borne its burden to prove that Petitioner had

18   knowingly, intelligently, and voluntarily waived his right to be present at the presentation of

19   evidence against him, per clearly established federal law. See Olano, 507 U.S. at 733; Harvey,

20   494 U.S. at 354; Brewer, 430 U.S. at 404; Allen, 397 U.S. at 343; Johnson, 304 U.S. at 464. As

21   such, it is not reasonable to conclude that the California Supreme Court denied relief on this

22   basis. See Richter, 562 U.S. at 98.

23      3. The State Court Did Not Unreasonably Apply Nor Act Contrary To Clearly

24         Established Federal Law In Finding This Error Harmless

25   If the California Supreme Court denied relief on this claim upon a finding that the error

26   was harmless, that determination was neither contrary to nor an unreasonable application of

27   federal law and is entitled to deference.

28   ////

143

1          First, Petitioner posits that federal law has clearly established that an invalid waiver of a

2   defendant's personal presence at trial constitutes structural error. (ECF No. 59 at 248; ECF No.

3   209 at 687-94.) The Ninth Circuit has rejected this position. In Hegler v. Borg, 50 F.3d 1472,

4   1476-78 (9th Cir. 1995), the court explained that the Supreme Court has repeatedly indicated

5   exactly the opposite, that the absence of a criminal defendant from trial without a constitutionally

6   valid waiver should be analyzed for harmlessness. See also Shewfelt v. Alaska, 228 F.3d 1088,

7   1090-92 (9th Cir. 2000), superseded, 4 F. App'x 328 (9th Cir. 2001). Most notably, in Rushen v.

8   Spain, 464 U.S. 114, 117-18 & n.2 (1983), the Supreme Court considered the trial court's ex parte

9   communication with a juror and held that the defendant's right to be present during trial

10  proceedings was subject to a harmless-error analysis, because it was not the type of error that

11  could never be harmless. See also Fulminante, 499 U.S. at 306-07 (citing with approval this

12  aspect of Rushen); Hegler, 50 F.3d at 1476-78 (holding same, citing Rushen and Fulimante);

13  Shewfelt, 228 F.3d at 1090-92 (same). The Supreme Court has reaffirmed this principle when the

14  complained-of error was the violation of the defendant's right to confrontation under the Sixth

15  Amendment. Bullcoming v. New Mexico, 564 U.S. 647, 668 & n.11 (2011); Melendez-Diaz v.

16  Massachusetts, 557 U.S. 305, 328 & n.14 (2009); see also Williams v. Illinois, 567 U.S. 50, 108-

17  09 (concurring opn. of Thomas, J.). Ergo, the undersigned cannot conclude that the state court

18  applied clearly established Supreme Court precedent erroneously if it concluded that the violation

19  of a defendant's confrontation rights is subject to a harmless-error analysis.

20         Applying clearly established federal law, the California Supreme Court was reasonable if

21  it concluded the error here was harmless. Under Chapman, in state court, Respondent bore the

22  burden to prove that the error was harmless beyond a reasonable doubt. Chapman v. California,

23  386 U.S. 18, 24 (1967). Therefore, in order to grant relief under AEDPA, the federal court must

24  conclude that the California Supreme Court applied Chapman in a manner that was contrary to or

25  an unreasonable application of clearly established federal law, i.e., that no reasonable jurist could

26  find that the State had borne its burden to prove harmlessness. Brown v. Davenport, __ U.S. __,

27  142 S. Ct. 1510, 1517, 1520, 1525, 212 L. Ed. 2d 463 (2022); see also Davis v. Ayala, 576 U.S.

28  257, 269-70 (2015); Fry v. Pliler, 551 U.S. 112, 119 (2007); Mitchell v. Esparza, 540 U.S. 12

144

1    (2003). In considering prejudice, the state court was required to review the entire record to

2    determine what harm resulted from the complained-of error and whether, in light of all of the

3    evidence presented to the jury, there is any reasonable doubt that this harm contributed to the

4    jury's verdict; if so, the error was not harmless under Chapman. See, e.g., Arizona v. Fulminante,

5    499 U.S. 279, 295-302 (1991) (interpreting Chapman). Here, the quantum of harm engendered by

6    the error here was de minimus in light of the extensive evidence of guilt, even under Chapman's

7    stringent standard, such that no reasonable jurist could have found Chapman was not satisfied on

8    the record before the state court. See Brown, 142 S. Ct. at 1529-30.

9            The courts, generally, have identified two types of harms flowing from the denial of a

10   defendant's right to be present at trial and to confront evidence and witnesses against him.

11   Quintessentially, the purpose of the confrontation right is to permit the defendant to hear the

12   evidence adduced against him and to challenge it, via cross-examination, before the jury.

13   Crawford v. Washington, 541 U.S. 36 (2004); cf. Diaz, 223 U.S. at 453, 459. Thus, in many cases

14   in which the defendant has been absent from trial, the courts view the prejudice flowing from this

15   to encompass only the diminution in the defendant's ability to know the evidence being brought

16   against him and to challenge it; this has been true even where the portion of the trial at issue did

17   not involve the defendant's confrontation rights per se, but rather where his interest in being

18   present arose from the due process clause of the Fourteenth Amendment. For instance, in Snyder,

19   291 U.S. at 108-09, the Court considered the prejudice from a capital defendant's absence when

20   the jurors, counsel, and court personnel were brought to the scene of the crime to examine it.

21   Because it was undisputed that this location had been the scene of the crime, because photographs

22   and diagrams of the scene had been admitted into evidence, and because a transcript was made of

23   the viewing of the scene, there was "almost nothing [defendant] could gain" by being present

24   except "to make certain that the jury had been brought to the right place and had viewed the right

25   scene." Id. at 108. In other words, the only harm the Court cognized was the defendant's ability to

26   ascertain – and, if appropriate, to challenge – the evidence put forth by the prosecution via the

27   showing of the crime scene.

28   ////

1    This accords with many courts' views that the principal harm arising from the exclusion

2    of the defendant from any portion of his trial is that he would be unable to know, and therefore to

3    contemporaneously challenge, some factual information that could distort the jury's verdict

4    unfairly. Thus, the defendant is harmed when excluded from jury selection because he is

5    prevented from hearing the statements elicited from prospective jurors that may reflect their

6    biases, from challenging those possible biases in cross-examination, and from making a fully

7    informed decision about his exercise of peremptory challenges on the basis of those biases. Davis,

8    576 U.S. at 274-86; Lewis, 146 U.S. at 376; Hopt, 110 U.S. at 577-78. In contrast, a defendant

9    suffers no cognizable harm when, for example, he is excluded from a brief discussion between the

10   trial judge and a juror in response to the latter's question, because he could have done nothing at

11   the conference but sit silently and he would have learned no information material to his

12   prosecution or his defense had he been present at the conference. Gagnon, 470 U.S. at 527;

13   Rushen, 464 U.S. at 120-21 (holding same concerning ex parte conversation between judge and

14   juror); see also Hegler v. Borg, 50 F.3d 1472, 1476-78 (9th Cir. 1995) (same, where defendant

15   was excluded from the readback of trial evidence, but record showed that readback had been

16   accurate); Bustamante v. Cardwell, 497 F.2d 556, 557-58 (9th Cir. 1974) (same).

17   Cases have also recognized a secondary form of harm from the exclusion of a criminal

18   defendant from trial proceedings, which is the effect the defendant's presence has on the decision-

19   maker. For instance, a defendant facing the death penalty suffers some prejudice if he is absent

20   from the reading of the sentencing verdict, as there may be some possibility that a juror would

21   change their vote in open court upon having to "look the defendant in the eye and [announce] a

22   verdict of death." Rice v. Wood, 77 F.3d 1138, 1144 (9th Cir. 1996). In a non-capital sentencing

23   hearing, too, the defendant's presence may "affect the participants (witnesses, the judge, the

24   government, or his attorney)," Hays v. Arave, 977 F.2d 475, 480 (9th Cir. 1992), overruled on

25   other grounds by Rice, 77 F.3d. 1138, given that the sentencer may consider factors like the

26   defendant's demeanor as an indicator of remorse when fixing sentence. See, e.g., United States v.

27   Spangle, 626 F.3d 488, 497 (9th Cir. 2010); see generally Williams v. New York, 337 U.S. 241,

28   247 (1949) ("punishment should fit the offender and not merely the crime"). Relatedly, the courts

146

1   have acknowledged that, if a mentally ill defendant is involuntarily medicated, that may prejudice

2   him because the medication may change his demeanor and presentation during trial in a manner

3   that would bear on the jury's determination of the existence and symptomology of his claimed

4   mental illness, which may be relevant, for example, to a sanity verdict. See, e.g., Riggins v.

5   Nevada, 504 U.S. 127 (1992).

6          Here, the record reveals little, if any, actual harm suffered by Petitioner from his absence

7   from the courtroom during the playing of Exhibit 135. As Respondent observes, Petitioner's

8   absence did not curtail his ability to know of and appropriately challenge the contents of the

9   exhibit. The undisputed facts of the record indicate that Exhibit 135 had been discovered to the

10  defense before trial and that counsel had reviewed it before trial. (21 RT 4146-47.) Immediately

11  prior to it being played for the jury, Petitioner and his counsel listened to it in the courtroom.

12  (Ibid.) During this time, the defense made no objection to its contents. (21 RT 4146-49.) At no

13  time during trial or since has Petitioner alleged that any portion of the tape was inaccurate. It

14  seems, therefore, that this case is indistinguishable from Snyder and, as there, Petitioner had

15  "almost nothing . . . [to] gain," in terms of challenging the State's evidence or propounding his

16  defense, by being present during the playing of the tape. See 291 U.S. at 108.

17         Moreover, the record indicated that the reason Petitioner voluntarily absented himself

18  from the playing of the tape was that he believed he could not maintain his composure in court if

19  he remained present during the tape's playing. (21 RT 4148.) Had Petitioner become disruptive,

20  the trial court would have acted well within its discretion to require Petitioner to be removed. See,

21  e.g., Snyder, 291 U.S. at 108; Campbell, 18 F.3d at 672. Thus, the California Supreme Court may

22  reasonably have concluded that, even if Petitioner's affirmative waiver had been inadequate, the

23  error was harmless, in part, because the record indicated Petitioner would likely have been

24  removed for a different reason regardless. See, e.g., Davis, 576 U.S. at 270-86 (holding improper

25  exclusion of defendant and defense counsel from jury selection was harmless because the trial

26  court would have reached the same rulings had counsel been present); see generally People v.

27  Henning, 178 Cal. App. 4th 388 (2009), as modified (Oct. 27, 2009) (a trial court's error is

28  harmless if it may have reached the same ruling on a different legal or factual basis).

147

1     In his appellate pleadings, Petitioner theorized that he suffered prejudice because his

2   "absence would have been construed by the jury in negative terms – e.g., as a refusal to

3   acknowledge his deeds, or as an admission that what he did was bestial," which may have "tipped

4   the balance" of the jury's guilt-phase determination of his "state of mind" at the time of the

5   homicides. (LD 25-B.1 at 224; see also ECF No. 59 at 249 (alleging same).) This, per Petitioner,

6   required reversal of the guilt verdict. (LD 25-B.1 at 225; ECF No. 59 at 249.) In his Traverse in

7   this Court, Petitioner further theorized that his absence prevented the jury from "observ[ing] any

8   emotional or remorseful reaction that Mr. Coddington had to the tape," prejudicing the jury's

9   consideration of his mental-state defense. (ECF No. 209 at 698.)

10     The California Supreme Court was entitled to give little weight to Petitioner's speculative

11   allegations. See, e.g., Zapien v. Davis, 849 F.3d 787, 800 (9th Cir. 2015); see also Pinholster, 563

12   U.S. at 188 n.12 (quoting Clark, 5 Cal.4th at 770). In state court proceedings, Petitioner made no

13   theory as to what demeanor he would have displayed during the playing of the evidence; how his

14   demeanor would have led to the jury giving little weight to the evidentiary value of the tape; and

15   how the tape related, if at all, to the jury's finding of Petitioner's guilt of two counts of first-

16   degree murder. The state court, therefore, was not unreasonable in failing to conjure such reasons

17   from whole cloth. See Pinholster, 563 U.S. at 188 n.12. Even in the instant proceeding,

18   Petitioner's most definite allegations of prejudice in this regard are that the jury was deprived of

19   seeing his remorseful demeanor while the tape was played. (ECF No. 209 at 698.) Petitioner

20   offers no explanation, however, as to how such remorse bore on the guilt-phase homicide

21   verdicts, which is the ultimate prejudice alleged (see LD 25-B.1 at 225; ECF No. 59 at 249), and

22   the undersigned is aware of no authority supporting the notion that a defendant's feelings of

23   remorse at the time of trial are relevant to the question of what mental state he possessed at the

24   time of his alleged crimes. See, e.g., People v. Jones, 17 Cal.4th 279, 307 (1998) (defendant's

25   contemporaneous feelings of remorse are generally irrelevant at the guilt phase of a criminal

26   trial); see generally 24 RT 4686 (instructing jury that guilt-phase verdicts should not be based on

27   pity, sentiment, conjecture, sympathy, or passion). Finally, because the allegation that Petitioner

28   would have displayed a remorseful countenance during the playing of the tape was directly

1    contradicted by the record, where Petitioner's counsel stated Petitioner would be indecorous

2    during the tape's playing, it would have been unreasonable for the California Supreme Court to

3    reach the opposite factual conclusion urged now by Petitioner. See Richter, 562 U.S. at 109 (in

4    habeas review, court must adhere to the factual record before the state court and may not grant

5    relief based on speculation unsupported by the record).

6          Further facts compel the conclusion that a court would not be unreasonable in finding no

7    colorable evidence of prejudice of the claimed error. As noted, Exhibit 135 was a recording of

8    Petitioner apparently practicing a variety of voices (see ECF No. 189 at 113; ECF No. 209 at

9    663), which seemingly corresponded to the various voices he later affected while sexually

10   assaulting the girls he had kidnapped. See Coddington, 23 Cal.4th at 551-53. The defense,

11   however, did not dispute that Petitioner committed the kidnappings and sexual assaults nor that he

12   had planned how he would commit those crimes. In closing, defense counsel professed that

13   Petitioner did, in fact, "wilfully [sic] premediate" and "plan" for the "taking of the girls," a plan

14   that Petitioner, per defense counsel, "had in mind for years." (24 RT 4639.) According to the

15   defense, since at least 1977, Petitioner had "had this fantasy, this idea he wanted to take girls and

16   put them in this room and have sex with them . . . ." (Ibid.) The only dispute the defense raised

17   was whether the homicides were also premeditated and deliberate or whether, instead, Petitioner

18   had been surprised by the presence of the two chaperones when he endeavored to carry out his

19   elaborate plan to keep children as sexual slaves. (See 24 RT 4639-43.) In light of this, a court

20   would not be unreasonable in finding that the error here caused no prejudice to the homicide

21   verdicts, as Exhibit 135 was not probative to the homicide charges, but rather was simply

22   additional evidence of Petitioner's plan of kidnapping and sexual assault. See Yates v. Evatt, 500

23   U.S. 391, 404-05 (1991), disapproved of on other grounds by Estelle v. McGuire, 502 U.S. 62

24   (1991) (in conducting Chapman analysis, court considers entire body of evidence on which jury

25   rested its verdict).

26         Finally, the effect of this de minimus harm must be considered in the context of the

27   evidence of Petitioner's guilt. As described in the discussion of Claim 9, Petitioner did not dispute

28   his guilt of the non-homicide counts and, relating Counts One and Two, the only area of dispute

149

1    was the very narrow question of the precise nature of Petitioner's mental impairment during the

2    killings. On this issue, the defense propounded a theory of what constitutes "premeditation and

3    deliberation" that other California juries and courts have rejected and that seemed, in several

4    respects, inconsistent with the evidence of Petitioner's actions. In light of this, no reasonable

5    jurist could find <u>Chapman</u> satisfied on the record before the state court. <u>See</u> <u>Brown</u>, 142 S. Ct. at

6    1520.

7         Accordingly, the state court's denial of this claim is entitled to deference and the

8    undersigned recommends it be dismissed.

9         E.   The California Supreme Court's Denial of Relief on Claim 32 Was Not Contrary to

10             Nor an Unreasonable Application of Clearly Established Federal Law

11        For similar reasons, the California Supreme Court did not act contrary to nor unreasonably

12   apply clearly established federal law in finding that Petitioner had not made a prima facie

13   showing of entitlement to relief on Claim 32. Assuming arguendo that defense counsel performed

14   deficiently in permitting Petitioner to absent himself and, even if a factfinder fully credited

15   defense counsel's assertion on habeas that he believed he would have convinced Petitioner to

16   conduct himself appropriately during the playing of the exhibit, it was not unreasonable for the

17   state court to conclude that Petitioner had not made a prima facie showing that his absence

18   reasonably probably affected the homicide verdicts. <u>See</u> <u>Shinn</u>, 141 S. Ct. at 524. As with Claim

19   31 on direct appeal, Petitioner advanced – and continues to advance in this proceeding – no

20   theory as to what specific benefit would have accrued to him from his presence, beyond the

21   speculations that the jury would have attributed remorse or some other sympathetic emotion to

22   Petitioner, which would not have been relevant to the questions the jury was charged with

23   resolving in rendering their verdicts on Counts One and Two. (<u>See</u> ECF No. 59 at 252; LD 25-C.1

24   at 76; <u>see generally</u> 24 RT 4686.) And, as with Claim 31, the error appears irrelevant to the

25   homicide verdicts, specifically, given the defense concessions that Petitioner had planned for

26   many years his elaborate strategy for targeting, kidnapping, restraining, and forcibly sexually

27   assaulting children and that Exhibit 135 was relevant as evidence of that plan. (<u>See</u> 16 RT 3320-

28   23; 24 RT 4639-43.) Given, therefore, that Exhibit 135 was not probative to the homicide charges

and given the lack of legally cognizable benefit from Petitioner's presence during the playing of the exhibit, on this record, the California Supreme Court was not unreasonable if it concluded that there was no reasonable probability that the jury's verdicts on Counts One and Two were affected by defense counsel's deficient performance on this issue, even if considered cumulatively with other instances of deficient performance. See Shinn, 141 S. Ct. at 524; Strickland, 466 U.S. at 695-96. The undersigned therefore recommends Claim 32 be dismissed.

**CLAIM 34**

In Claim 34, Petitioner alleges that trial counsel performed ineffectively by failing to consult with and present the testimony of a forensic pathology expert concerning whether marks observed on the decedents' necks may have been caused by scissors. (ECF No. 59 at 256-57.) The California Supreme Court denied relief on this claim summarily, on the merits, which was not an unreasonable application of nor contrary to clearly established federal law. See 28 U.S.C. § 2254(d).

1.   Proceedings In State Court

Prosecution witness Dr. Richard Sander testified to injuries to both decedents' necks that he observed during their autopsies. He opined that, although Ms. Martin did not have a ligature around her neck at the time of the autopsy, she nonetheless had been strangled by ligature. (18 RT 3683, 3685, 3689-90, 3719.) She had contusions and abrasions on her neck, including superficial abrasions that Dr. Sander opined were fingernail marks from Ms. Martin having scratched herself while attempting to pull free the ligature. (18 RT 3690.) He testified that Ms. Walsh also had been strangled by ligature; unlike Ms. Martin, she had a plastic flexible tie fastened around her neck at the time of autopsy. (18 RT 3694-95, 3700, 3704.) Her neck also had abrasions that Dr. Sander believed appeared to be fingernail scratches as Ms. Walsh attempted to free herself during her strangulation. (18 RT 3700.)

In the prosecutor's guilt-phase closing argument, he addressed Dr. Sander's testimony by admitting that there were inconsistencies in the prosecution's own case for which the evidence provided no clear answers. He argued,

Alecia Thoma and Monica Berge testified that they observed Mr.

151

1

2

3

Coddington to place the Flex-cufs so as to tie the hands of the two elderly women behind them and to tie their feet. So the youngsters testified that each of the elderly women had their hands and their feet bound, and that thereafter the defendant was observed to place the Flex-cuf around the neck of one of the elderly women.

4

5

6

7

Dr. Sander told you that, when he performed the autopsy, that he observed these kinds of marks on the necks of each of the elderly women, which would suggest that the elderly women were clawing at the device that was around their neck trying to free themselves from that device, and that it was not uncommon, in his experience, where somebody was strangled, to see those kinds of fingerprints on the neck. . . .

8

9

10

The question then would come about: where the – were the women removed from the room with the Flex-cufs that were on their hands cut and their hands retied somehow, or untied so that they could lay there and work on that contrivance around their neck? How did that happen?

11

Did they die in a different room?

12

Were the girls mistaken in there (sic) testimony?

13

14

Did Mr. Coddington untie the women and then tighten the Flex-cuf around their necks?

15

16

There are certain things in the sequence of events that I cannot tell you. . . . I am not in a position to tell you precisely when those injuries took place, or what the defendant did.

17

18

And I would want it to be very clear to you, ladies and gentlemen, that at best I can do is to argue a case with you and to share with you thoughts and theories about the deaths of these two ladies . . . .

19

20

But there are obviously some unknowns in the evidence that I cannot wrap up and give to you in a tidy form. . . . That kind of exactitude cannot be given to this jury.

21

(24 RT 4606-08.) He then argued that the jury could deduce that Petitioner acted with intent and

22

premeditation and deliberation on Counts One and Two from other circumstantial evidence. (24

23

RT 4608-30.)

24

   In the defense closing argument, defense counsel argued that the best deduction was that

25

the abrasions were caused by Petitioner when he removed the ligature with scissors after she had

26

died:

27

28

I submit to you those [injuries] look to me like scissor marks. . . . Now, why didn't Mr. Coddington cut [the ligature] off, you say. Well, because, you see, his business about fingerprints. And what

1
2

> was over her head? His pillowcase. Now, he wasn't going to leave a pillow case on there because that's evidence and he might have fingerprints on it, so he cuts it off solely to keep the pillow case.

3
4

> And I submit to you that those marks were made when he was cutting off the ligature from the lady.

5   (24 RT 4646.) He argued that Petitioner had not intended to kill either victim, but "he got caught

6   up in something he started and he couldn't stop. And only then did he pull the ligatures around

7   these ladies' necks and kill them, only then." (24 RT 4651.) In rebuttal, the prosecutor reminded

8   the jury that Dr. Sander had opined the neck abrasions had been caused pre-mortem and that the

9   wounds were not consistent with scissor marks, but fingernails. (24 RT 4655-56.)

10        In his first petition for writ of habeas corpus in state court, Petitioner alleged that trial

11   counsel performed deficiently by failing to consult with a forensic pathologist concerning the

12   abrasions on the victims' necks and failing to present expert testimony that the marks may have

13   been made by scissors. (LD 25-C.1 at 44.) In support of his allegations, Petitioner tendered the

14   declaration of Dr. Masters, who disputed that scissors could be ruled out as the source of the

15   injuries and who opined that there were more reliable methods, such as taking fingernail

16   scrapings, to determine whether the abrasions were fingernail scratches. (LD 25-C.3 Ex. D ¶ 5.)

17   Petitioner alleged that, had an expert so testified, this was reasonably likely to have resulted in

18   more favorable verdicts on Counts One and Two at the guilt phase by "undermin[ing] the

19   credibility of both Dr. Sander and the fingernails-theory so heavily relied on by the prosecutor."

20   (LD 25-C.1 at 44-45.)

21        2.   The California Supreme Court's Denial Was Not Contrary To Nor an Unreasonable

22             Application of Clearly Established Federal Law

23        Because the state court denied relief without a reasoned opinion, federal habeas corpus

24   relief is barred if there was any reasonable basis for the denial, consistent with clearly established

25   federal law. Richter, 562 U.S. at 98; Kipp, 971 F.3d at 948. Thus, if the state court could have

26   reasonably found there was a lack of a prima facie showing of relief on either the deficiency or

27   prejudice prong of the Strickland inquiry, the denial is entitled to deference. Shinn, 141 S. Ct. at

28   524. Here, the state court could have reasonably found that Petitioner had not made a prima facie

1   showing of either prong, such that its denial was not an unreasonable application of <u>Strickland</u> or

2   its progeny.

3        To prove trial counsel performed deficiently, Petitioner was required to show that his

4   counsel's performance fell below an objective standard of reasonableness, i.e., that reasonably

5   competent counsel at the time would have performed differently. <u>Padilla v. Kentucky</u>, 559 U.S.

6   356, 366 (2010), citing <u>Strickland</u>, 559 U.S. at 688. This standard is "highly deferential" to the

7   strategic choices of counsel, as "[t]here are countless ways to provide effective assistance in any

8   given case [and] [e]ven the best criminal defense attorneys would not defend a particular client in

9   the same way." <u>Strickland</u>, 559 U.S. at 689-90, citing Goodpaster, The Trial for Life: Effective

10  Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983). Thus, this court

11  must apply "a strong presumption" that counsel's conduct "'might be considered sound trial

12  strategy.'" <u>Id</u>. at 689, quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955).

13       Here, the state court was not unreasonable to the extent it concluded that Petitioner had

14  not made a prima facie showing that the failures alleged constituted deficient performance, i.e.,

15  that no reasonable defense counsel would have failed to consult with and present Dr. Masters'

16  proffered opinion. Petitioner posited that this testimony would have buttressed the defense's

17  theory that he "impulsively attempt[ed] to silence the women," by placing and tightening

18  ligatures around their necks, and "then, when he saw what he had wrought, trying to stop the

19  suffering" by cutting the ligatures. (LD 25-C.1 at 43.) This, per Petitioner, would have supported

20  his defenses to Counts One and Two that he did not act with premeditation. (<u>Ibid</u>.)

21       The problem with this theory is that only Ms. Martin's body was found with the ligature

22  removed, so Dr. Masters' proffered opinion would only appear to support the mental state defense

23  for that count; otherwise, the idea that Petitioner frantically attempted to save his victims' lives by

24  cutting the ligature would seem to imply that Petitioner specifically did not attempt to save Ms.

25  Walsh's life, given that he left her ligature intact. This, then, would suggest that Petitioner may

26  have had different mental states during the respective homicides of Ms. Walsh and Ms. Martin.

27  The defense's trial strategy, however, was the inverse: rather than parse Petitioner's mental states

28  for the homicides separately, the defense repeatedly urged the jury to view both homicides as

154

1    having occurred with the same mental state. (See 24 RT 4641-43, 4645-50, 4651-52.) Petitioner

2    fails to allege that this strategy itself was unreasonable and offered no argument as to why

3    reasonable trial counsel would have adduced evidence that would have only supported the

4    defense theory for one count, but would have apparently subverted it for another. The state court

5    was not unreasonable if it concluded that, given this, Petitioner had not made a prima facie

6    showing that he had overcome the "strong presumption" that trial counsel's strategic choices were

7    reasonable. See Strickland, 559 U.S. at 689-90.

8           The state court also could have reasonably concluded that Petitioner had failed to make a

9    prima facie showing of prejudice. The Ninth Circuit has explained that, "[i]n a case in which

10   counsel's error was a failure adequately to investigate, demonstrating Strickland prejudice

11   requires showing both a reasonable probability that counsel would have made a different decision

12   had he investigated, and a reasonable probability that the different decision would have altered

13   the outcome." Bemore v. Chappell, 788 F.3d 1151, 1169 (9th Cir. 2015) (citing Wiggins, 539

14   U.S. at 535-36). Here, Petitioner alleged to the state court that trial counsel "would have made a

15   different decision had he investigated," see Bemore, 788 F.3d at 1169, because, had trial counsel

16   learned of Dr. Masters' opinion that the victims' neck abrasions may have been caused by

17   scissors, he necessarily would have utilized that information – and ultimately, the testimony of

18   Dr. Masters or a similar expert – to posit to the jury that Petitioner's cutting of the ligatures with

19   scissors reflected his frantic concern for the victims. (LD 25-C.1 at 43.) The record, however,

20   belies this inference. In closing argument, defense counsel urged the jury to presume that

21   Petitioner had used scissors to cut the ligature off Ms. Martin's neck, but then argued the likely

22   reason Petitioner did so was not that he was "trying to stop the suffering" once he realized "what

23   he had wrought," (LD 25-C.1 at 43), but because he wanted to retrieve the pillowcase around Ms.

24   Martin's head that may have inculpated him with his fingerprints. (24 RT 4646.) Thus, it appears

25   that Petitioner's prejudice argument relies on a premise for which there is not only no factual

26   support, but which seems affirmatively contradicted by the record. As with Claim 15, the state

27   court was not unreasonable if it concluded that Petitioner failed to make a prima facie showing of

28

                                                 155

1   his entitlement to relief on this basis. See Pinholster, 563 U.S. at 190-94; Landrigan, 550 U.S. at

2   475-77.

3          The state court's summary denial of relief on this claim was not contrary to or an

4   unreasonable application of clearly established federal law. The undersigned therefore

5   recommends it be dismissed.

6   **CLAIM 35**

7          In Claim 35, Petitioner alleges that his due process rights were violated in several ways in

8   the prosecution's presentation of the testimony of Dr. Sander. First, Petitioner alleges that Dr.

9   Sander testified falsely that he had seen "hundreds, maybe even a thousand or so beatings in

10  postmortem situations," in explaining the basis for his conclusion that the injuries to both

11  deceased victims were unusually similar. (ECF No. 59 at 259, citing RT 3704.) Second, Petitioner

12  alleges that the prosecution improperly vouched for Dr. Sander's credibility. (ECF No. 59 at 259.)

13  Finally, Petitioner alleges that the State improperly failed to disclose the fact that other

14  prosecutors found Dr. Sander unreliable and that, after Petitioner's trial, Dr. Sander's contract

15  with El Dorado County was terminated. (ECF No. 59 at 259-61.) The California Supreme Court

16  summarily denied relief on this claim (LD 25-C.5), which was not contrary to nor an

17  unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d).

18         1.  Proceedings In State Court

19         During its case-in-chief, the prosecution adduced the testimony of Dr. Sander, who

20  performed the autopsies in this case. (18 RT 3673-3719.) Inter alia, Dr. Sander testified that both

21  victims had contusions and abrasions all over their bodies, in addition to the ligature marks

22  around their necks. (Ibid.) In response to the prosecutor's question, he testified that he had found

23  the "constellation" of injuries to the two deceased victims to be significant, because he had "seen

24  literally hundreds, maybe even a thousand or so beatings in postmortem situations, and they're

25  much more random. I think the interest (sic) we have here are remarkably similar. . . the odds for

26  this being coincidentally random in my experience would be very, very slim." (18 RT 3704.)

27         In his guilt phase closing argument, the prosecutor reminded the jury of this testimony,

28  summarizing it briefly. (24 RT 4577-78; see also 24 RT 4626 (same).) Later in his argument, he

1    referred specifically to Dr. Sander's testimony that both decedents exhibited hymenal tearing in

2    the context of explaining to the jury that they would need to reconcile the evidence in determining

3    what deductions to make from it. (24 RT 4608.) He also reminded the jury of Dr. Sander's

4    testimony describing why and how he concluded the victims' injuries occurred premortem. (24

5    RT 4655-56.) During the sanity phase, the prosecutor cross-examined one of the defense experts

6    by asking him if he was aware of Dr. Sander's autopsy findings of hymenal tearing. (27 RT

7    5211.) At the penalty phase, in closing argument, the prosecutor urged the jury to find the

8    homicides to be extremely aggravated; in making this argument, he recalled the opinion

9    testimony of Dr. Sander that the abrasions to the decedents' necks appeared to reflect pre-mortem

10   fingernail scratches from the victims apparently endeavoring to remove the ligatures from their

11   necks. (40 RT 6653.)

12        In his first petition for habeas corpus relief in state court, Petitioner raised a version of this

13   claim, alleging that the prosecutor knowingly presented the false testimony of Dr. Sander and

14   improperly vouched for it. (LD 25-C.1 at 46-48.) He supported these allegations with three

15   declarations. First, defense trial counsel Richard Meyer declared that, in a trial that occurred two

16   years after Petitioner's trial, Dr. Sander may have misrepresented having performed a particular

17   tissue analysis and, subsequently, that defendant pled to a lesser charge. (LD 25-C.3 Ex. A ¶ 17.)

18   Mr. Meyer declared that he "believe[d] the incident led the county to terminate or not renew its

19   contract with Dr. Sander." (Ibid.) Second, Petitioner tendered the declaration of his state habeas

20   corpus counsel, relaying the purported hearsay statements of an assistant district attorney from El

21   Dorado County who purportedly held a poor opinion of Dr. Sander's work. (LD 25-C.3 Ex. F ¶

22   15.) Finally, Petitioner tendered the declaration of Dr. Joseph Masters who disputed Dr. Sander's

23   conclusions that the beating patterns on the deceased victims were similar and that the abrasions

24   to their necks were more consistent with fingernail scratches than scissor marks. (LD 25-C.3 Ex.

25   D ¶ 6.) The California Supreme Court denied relief summarily, on the merits. (LC 25-C.5.)

26   ////

27   ////

28   ////

157

1        2.   The California Supreme Court's Denial Was Not Contrary To Nor an Unreasonable

2             Application of Clearly Established Federal Law

3        a.   Presentation of False Testimony

4        Under clearly established federal law, a criminal defendant's due process rights under the

5    Fourteenth Amendment are violated if he is convicted "through use of false evidence." Napue v.

6    Illinois, 360 U.S. 264, 269 (1959); see also United States v. Agurs, 427 U.S. 97 (1976) ("[A]

7    conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must

8    be set aside if there is any reasonable likelihood that the false testimony could have affected the

9    judgment of the jury."); Giglio v. United States, 405 U.S. 150, 153 (1972) ("[D]eliberate

10   deception of a court and jurors by the presentation of known false evidence is incompatible with

11   'rudimentary demands of justice.'"); Miller v. Pate, 386 U.S. 1, 7 (1967) ("[T]he Fourteenth

12   Amendment cannot tolerate a state criminal conviction obtained by the knowing use

13   of false evidence."). To obtain a reversal, "the petitioner must show that (1) the testimony [or

14   evidence] was actually false, (2) the prosecution knew or should have known that

15   the testimony [or evidence] was actually false, and (3) that the false testimony [or evidence] was

16   material." Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir. 2010), cert. denied, 563 U.S. 935

17   (2011); see Napue, 360 U.S. at 269; see also United States v. Bagley, 473 U.S. 667 (1985) ("the

18   knowing use of false testimony to obtain a conviction violates due process regardless of whether

19   the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it

20   appeared"); Alcorta v. Texas, 355 U.S. 28, 31 (1957). Each element of the test must be satisfied

21   with competent evidence before a reversal may be granted. See, e.g., Sanders v. Cullen, 873 F.3d

22   778, 801 (9th Cir. 2017) (affirming denial of Napue claim when petitioner "did not support the

23   claim that [the witness] lied or that the prosecution knew his testimony was false"), cert. denied,

24   139 S. Ct. 778 (2019).

25       Here, the state court may have reasonably denied relief on Petitioner's Napue allegations

26   due to Petitioner's failure to make a prima facie showing that the testimony in question was false

27   and that the prosecutor reasonably should have known that it was false. First, Petitioner's

28   allegations, even if credited by a factfinder, do not make a prima facie showing that evidence that

1   was actually false was placed before the jury. Petitioner alleged that Dr. Sander's testimony that

2   he had "seen literally hundreds, maybe even a thousand or so beatings in postmortem situations"

3   (RT 3604) was false, as evidenced by Petitioner's expert's, Dr. Masters', declaration, that

4   "[b]eating deaths represent only a small percentage of homicides," because, by his estimation

5   that, in the same time period in a nearby county, "[t]he annual average number of beating/assault

6   homicides in the county is approximately 10." (LD 25-C.3 Ex. D ¶ 6.) The latter does not

7   contradict the former, however, as Dr. Sander's testimony had not limited its purview to only

8   cases in which beating had been designated the cause of death.

9            Second, Dr. Master's skepticism of Dr. Sander's recollections on which he based his

10  opinions does not, without more, demonstrate that Dr. Sander was testifying falsely, within the

11  meaning of Napue. Napue and its related, clearly established Supreme Court precedent

12  considered only false evidence transmitted to the jury via the testimony of lay – i.e., not expert –

13  witnesses. See Napue, 360 U.S. 264 (considering the false testimony of purported percipient

14  witness of crime with which defendant was charged); Moore v. Illinois, 408 U.S. 786, 798 (1972)

15  (same); Alcorta v. State of Tex., 355 U.S. 28, 31 (1957) (same); Pyle v. State of Kansas, 317 U.S.

16  213, 214 (1942) (same, for multiple lay prosecution witnesses). Expert testimony, however, is

17  different. When an expert testifies as to the purported facts forming the basis of her opinion, those

18  purported facts are not being offered for their truth, but simply to permit the jury to evaluate the

19  weight, if any, to give to the opinion testimony. Williams v. Illinois, 567 U.S. 50, 78 (2012).

20  Consistent with this conceptualization, this Court is aware of no court – and certainly no Supreme

21  Court precedent – that has treated unproven, exaggerated, or mistaken basis testimony from an

22  expert as "false" within the meaning of Napue. See, e.g., Sistrunk v. Armenakis, 292 F.3d 669,

23  675 (9th Cir. 2002) (holding that "although [the trial expert's] testimony was clearly inaccurate, it

24  is certainly not clear that it constituted a 'lie,' especially in the legal sense of the word," where the

25  expert's testimony had "overstated the . . . conclusions" on which her opinion had been based);

26  United States v. Workinger, 90 F.3d 1409, 1416 (9th Cir. 1996) (holding no showing that

27  witness's testimony was false under Napue because the witness's "testimony did have a basis in

28  the facts and in the law and [defendant's expert's] disagreement with [the testifying witness's]

159

analysis did not transform her testimony into a falsehood"); <u>Harris v. Vasquez</u>, 949 F.2d 1497, 1524 (9th Cir. 1990) (holding a "disagreement in expert opinion" does not establish that expert testimony was false, where petitioner tendered the contrary testimony of experts who opined that the trial witness had rendered an improper psychiatric diagnosis due to an allegedly inadequate examination of petitioner). The California Supreme Court's denial of the claim on this basis therefore accords with clearly established federal law.

Additionally, the California Supreme Court may have reasonably denied relief on the basis that Petitioner failed to make a prima facie showing that the prosecutor knew or should have known that Dr. Sander was testifying falsely when he testified that he had seen hundreds or even a thousand autopsies of persons who had indications of having been beaten. Petitioner makes no allegations as to any facts that the prosecutor actually knew or reasonably should have known that would have made him actually or constructively aware that this particular factual assertion was false. (<u>See</u> ECF No. 59 at 258-261; LD 25-C.1 at 46-48.) The state court therefore did not act unreasonably nor contrary to clearly established federal law if it denied relief due to Petitioner's failure to make a prima facie showing of relief on this essential element. <u>See</u> <u>Hein</u>, 601 F.3d at 908 (setting forth elements of claim); <u>see, e.g.</u>, <u>United States v. Pelisamen</u>, 641 F.3d 399, 408 (9th Cir. 2011) (holding <u>Napue</u> claim failed where "[n]othing in the record supports an inference that the government knew that [the] testimony ... was 'false'"); <u>Morales v. Woodford</u>, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The essence of the due process violation is misconduct by the government, not merely perjury by a witness. [Petitioner], however, sets out no factual basis for attributing any misconduct, any knowing presentation of perjury, by the government. Thus there is no basis for granting the writ even if [the witness] did lie." (footnote omitted)), <u>cert. denied</u>, 546 U.S. 935 (2005); <u>Murtishaw v. Woodford</u>, 255 F.3d 926, 959 (9th Cir. 2001) (holding <u>Napue</u> claim failed where, even if testimony at issue was false, petitioner had presented no evidence the prosecution knew it was false), <u>cert. denied</u>, 535 U.S. 935 (2002); <u>see generally</u> <u>Dows v. Wood</u>, 211 F.3d 480, 486-87 (9th Cir.) (factually unsupported argument provides no basis for federal habeas relief, <u>cert. denied</u>, 531 U.S. 908 (2000); <u>Wood v. Bartholomew</u>, 516 U.S. 1, 8 (1995) (per curiam) (improper to grant habeas corpus relief "on the basis of little more than speculation").

1         b.   Vouching

2              A defendant's due process rights may be violated when the prosecutor vouches for the

3    reliability or credibility of prosecution evidence, or suggests that information unknown to the jury

4    supports a prosecution witness's testimony, as doing so "plac[es] the prestige of the government

5    behind a witness through personal assurances of the witness's veracity." United States v.

6    Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993); see Lawn v. United States, 355 U.S. 339, 359

7    n.15 (1958) (prosecutor commits misconduct when he "say[s] []or insinuate[s] that [his] statement

8    [in closing argument] was based on personal knowledge or on anything other than the testimony

9    of those witnesses given before the jury"). Where a habeas petitioner alleges that he is entitled to

10   a new trial due to the prosecutor's improper vouching for prosecution evidence, the court "must

11   determine (1) whether the conduct is vouching, (2) whether the misconduct is cured by

12   instructions to the jury, and (3) whether the closeness of the case requires reversal." United States

13   v. Williams, 375 F. App'x 682, 684 (9th Cir. 2010).

14             Here, Petitioner alleges that the prosecutor impermissibly vouched for the testimony of

15   Dr. Sander on six occasions throughout the trial. (ECF No. 59 at 259, citing 24 RT 4577-78,

16   4608, 4626, 4655-56; 28 RT 5211; 40 RT 6653.) None of these instances reflect vouching, i.e.,

17   that the prosecutor personally assured the jury of Dr. Sander's veracity or otherwise implied that

18   he had personal knowledge that buttressed Dr. Sander's credibility. See Lawn, 355 U.S. at 359

19   n.15. Instead, in each of these instances the prosecutor simply referenced or summarized Dr.

20   Sander's testimony and, in argument, urged the jury to rely on it to credit the prosecution's theory

21   of the case. (See 24 RT 4577-78, 4608, 4626, 4655-4656; 28RT 5211; 40RT 6653.) This was not

22   improper under clearly established federal law and did not deprive Petitioner of his due process

23   rights. See, e.g., United States v. Weatherspoon, 410 F.3d 1142, 1146 (9th Cir. 2005); United

24   States v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992). The California Supreme Court was therefore

25   not unreasonable if it denied relief on this basis.

26        c.   Failure to Disclose Impeachment Information Concerning Dr. Sander

27             Finally, Petitioner alleges that the State violated Petitioner's due process rights as

28   established under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose impeachment

1    information about Dr. Sander, namely, his reputation for poor work quality and that, after

2    Petitioner's trial, Dr. Sander may have performed unreliably in another criminal case and his

3    contract with the county eventually was terminated. (ECF No. 59 at 260-61; see ECF No. 209 at

4    547, 550-57.) Petitioner alleges that this prejudiced him at the time of trial, in the guilt, sanity,

5    and penalty verdicts. (ECF No. 59 at 261.)

6         Due process requires the prosecution to disclose to a criminal defendant material

7    exculpatory evidence, even without a request by the defense. See Kyles v. Whitley, 514 U.S. 419,

8    432-34 (1995); United States v. Bagley, 473 U.S. 667, 682 (1985). This includes evidence that

9    bears on the credibility of prosecution witnesses. See Bagley, 473 U.S. at 676; Giglio, 405 U.S. at

10   154-55. Evidence is material, and therefore its nondisclosure prejudiced the defendant, "if there is

11   a reasonable probability that, had the evidence been disclosed to the defense, the result of the

12   proceeding would have been different." Kyles, 514 U.S. at 433; Bagley, 473 U.S. at 682. Proof of

13   materiality requires a showing that, at a minimum, the suppressed evidence was admissible or

14   could have led to the discovery of admissible evidence. Wood v. Bartholomew, 516 U.S. 1, 2

15   (1995). The burden of production on this claim lies with the Petitioner, who must initially

16   produce "some evidence to support an inference that the government possessed or knew about

17   material favorable to the defense and failed to disclose it." United States v. Price, 566 F.3d 900,

18   910 (9th Cir. 2009).

19        Here, the California Supreme Court could reasonably have denied relief on the basis that

20   Petitioner failed to make a prima facie showing that there existed impeachment information of Dr.

21   Sander at the time of trial, which the prosecutor knew actually or constructively. To the extent

22   Petitioner's allegations relied on post-conviction counsel's representations that another deputy

23   district attorney believed Dr. Sander's work to be subpar, Petitioner failed to make any

24   showing—or even allegations—that there existed evidence that was admissible to impeach Dr.

25   Sander on this basis. See, e.g., People v. Salazar, 35 Cal.4th 1031, 1043 (2005); see generally

26   Evid. Code § 1100 (evidence of reputation generally is inadmissible, with limited exceptions).

27   Petitioner also failed to make any allegations nor set forth any factual support for the notion that

28   the prosecutor in this case should have been aware of the factual basis for his colleague's opinion,

1   even if the latter could be properly characterized as impeachment information under <u>Brady</u>. <u>See</u>

2   <u>Kyles</u>, 514 U.S. at 537. Similarly, to the extent Petitioner's allegations relied on trial counsel's

3   recollections of mistakes or misrepresentations attributed to Dr. Sander in years after Petitioner's

4   trial and Dr. Sander's eventual change of employment (<u>see</u> ECF No. 59 at 260-61), Petitioner also

5   fails to offer any theory of how this demonstrates that impeachment evidence was suppressed at

6   the time of his trial, that the prosecutor knew or should have known of the problems that would

7   later arise in another trial or with Dr. Sander so as to cause his employment to end, or how this

8   purported impeachment information could have prejudiced the verdicts returned in this case.[28]

9   (<u>See</u> ECF No. 59 at 260-61; ECF No. 209 at 547, 550-57.) Because these reflect essential

10  elements for which Petitioner bore the burden to show his factual entitlement to relief (<u>see</u> <u>Wood</u>,

11  516 U.S. at 2; <u>Kyles</u>, 514 U.S. at 433; <u>Bagley</u>, 473 U.S. at 682), the California Supreme Court did

12  not act contrary to nor unreasonably apply clearly established federal law if it concluded that

13  Petitioner had failed to make his prima facie case. <u>See</u> <u>Wood</u>, 516 U.S. at 8; <u>Dows</u>, 211 F.3d at

14  486-87. The undersigned therefore recommends this claim be dismissed.

15  **CLAIM 37**

16          In Claim 37, Petitioner alleges that the trial court committed constitutional error in failing

17  to instruct on the lesser-included offense of second-degree murder on an implied malice theory,

18  for Counts One and Two. The state court's denial of this claim was not contrary to, nor an

19  unreasonable application of, clearly established federal law nor an unreasonable factual

20  determination under section 2254(d).

21  ////

22  ////

23

24  ───────────────
    [28] In some situations, the prosecutor's continued suppression of <u>Brady</u> materials post-trial creates

25  additional legal remedies for a habeas petitioner: it may, for example, be the basis for a reviewing
    court to determine that a procedural default should not be applied. <u>See</u>, <u>e.g.</u>, <u>Strickler v. Greene</u>,

26  527 U.S. 263, 289 (1999); <u>Thomas v. Goldsmith</u>, 979 F.2d 746, 749-50 (9th Cir. 1992). The cases
    acknowledging this do not stand for a broader proposition that information that came to be known

27  to a prosecutor post-trial may be imputed to him at the time of trial and thereby have created a
    kind of retroactive <u>Brady</u> violation, which would seem to be the premise of Petitioner's argument

28  here. <u>See</u> <u>District Attorney's Office v. Osborne</u>, 557 U.S. 52, 68-72 (2009).

1          1.   Proceedings In State Court

2               At the close of the guilt phase, the trial court instructed the jury that the possible verdicts

3    for Counts One and Two were first-degree murder, second-degree murder on an actual malice

4    theory, voluntary manslaughter, or acquittal. (24 RT 4696-4705.) The jury then returned verdicts

5    of guilt of first-degree murder on these counts. (24 RT 4723-24.) On appeal, Petitioner argued

6    that the trial court erred by not also instructing on the lesser-included offense of second-degree

7    murder on an implied malice theory, which was, per Petitioner, consistent with evidence. (LD 25-

8    B.1 at 230-35.) Petitioner argued that this omission violated his rights under the Sixth, Eighth,

9    and Fourteenth Amendments and prejudiced him by stymying the jury's ability to give meaning

10   to the defense's theory of the case. (Ibid.)

11              The California Supreme Court agreed that the trial court had erred, because, as a matter of

12   state law "[a] court must 'instruct, sua sponte, on all theories of a lesser included offense which

13   find substantial support in the evidence.'" Coddington, 23 Cal.4th at 591 (quoting People v.

14   Breverman, 19 Cal.4th 142, 162 (1998)). The court found the error non-prejudicial under state

15   law. Id. at 593.

16         2.   Legal Standard

17              The Due Process Clause of the Fourteenth Amendment requires that, in a capital case, a

18   lesser included offense instruction be given to the homicide charges "when the evidence warrants

19   such an instruction," Hopper v. Evans, 456 U.S. 605, 611-12 (1982), citing Beck v. Alabama, 447

20   U.S. 625, 635 (1980), i.e., "if the evidence would permit a jury rationally to find [a defendant]

21   guilty of the lesser offense and acquit him of the greater." Keeble v. United States, 412 U.S. 205,

22   208 (1973). Reversal is required unless the reviewing court determines the error was harmless

23   beyond a reasonable doubt under Chapman. Hopper, 456 U.S. at 613-14; see Arizona v.

24   Fulminante, 499 U.S. 279, 306 (1991); Rose v. Clark, 478 U.S. 570, 576-77 (1986).

25         3.   The California Supreme Court's Adjudication of This Claim Was Not Contrary to,

26              Nor an Unreasonable Application of, Clearly Established Federal Law

27              The California Supreme Court's denial of relief on this claim is presumed a denial on the

28   merits. Johnson v. Williams, 568 U.S. 289, 298-300 (2013). Because the state court only overtly

1   discussed the state-law basis for the claim and was silent on the federal law aspect of the claim,

2   this Court must consider any reasonable basis for the court's decision that is consistent with

3   clearly established federal law. Richter, 562 U.S. at 98.

4          At base, there were two possible theories that could have driven the California Supreme

5   Court's determination that relief should be denied on Petitioner's federal constitutional claim: the

6   California Supreme Court could have determined that the instructional error did not constitute

7   federal constitutional error, or it could have determined that constitutional error did occur but

8   there was no prejudice from it. See Hopper, 456 U.S. at 613-14; Beck, 447 U.S. at 635. Because

9   the state court could reasonably have determined that the trial court's failure to instruct on an

10  implied-malice theory of second-degree murder did not constitute a federal constitutional

11  violation under clearly established federal law, that determination is entitled to deference. See

12  Richter, 562 U.S. at 98.

13         The United States Supreme Court had, at the time of the state court adjudication, clearly

14  established that the Eighth and Fourteenth Amendments require that, in a capital case, the

15  defendant is entitled to have the jury instructed on a lesser included homicide offense to the

16  capital murder count so long as the evidence supports the instruction. Beck, 447 U.S. at 634-35;

17  see also Delo v. Lashley, 507 U.S. 272, 275 (1993) (per curium) ("to comply with due process

18  state courts need give jury instructions in capital cases only if the evidence so warrants");

19  Fulminante, 499 U.S. at 306 (a "statute improperly forbidding trial court's giving a jury

20  instruction on a lesser included offense in a capital case [is] in violation of the Due Process

21  Clause"); Hopper, 456 U.S. at 611 ("Beck held that due process requires that a lesser included

22  offense instruction be given when the evidence warrants such an instruction."); see also Keeble v.

23  United States, 412 U.S. 205, 208 (1973) (holding that a lesser included offense instruction should

24  be given "if the evidence would permit a jury rationally to find [a defendant] guilty of the lesser

25  offense and acquit him of the greater").

26         As Respondent and Petitioner observe, however, the United States Supreme Court limited

27  the breadth of this rule in Shad v. Arizona, 501 U.S. 624 (1991). (See ECF No. 189 at 122; ECF

28  No. 209 at 606.) There, the Court considered "whether the principle recognized in Beck v.

165

1    Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L.Ed.2d 392 (1980), entitles a defendant to

2    instructions on all offenses that are lesser than, and included within, a capital offense as charged,"

3    concluding that it does not. Shad, 501 U.S. at 627. Rather, Due Process and the Eighth

4    Amendment only require that, in a capital case, the jury be instructed on at least one "third

5    option" in addition to conviction of first-degree murder and acquittal, so long as the third option

6    was supported by the evidence. Id. at 646 (quoting Beck, 447 U.S. at 642). Thus, in Schad, where

7    the defendant was charged with capital murder, the trial court had not erred by only instructing on

8    the lesser-included offense of second-degree murder and not on the lesser-included offense of

9    robbery, as well, although both offenses were supported by the evidence presented. Id. at 647.

10   The Court unequivocally rejected the argument that "the due process principles

11   underlying Beck require that the jury in a capital case be instructed on every lesser included

12   noncapital offense supported by the evidence." Id. at 646.

13          In light of this, the California Supreme Court could reasonably have concluded that

14   clearly established federal law held that constitutional concerns were satisfied when the jury in a

15   capital case is instructed on at least one lesser included offense to the capital homicide that is

16   supported by the evidence, but that there is no constitutional obligation to instruct "on every

17   lesser included noncapital offense supported by the evidence." See Schad, 501 U.S. at 646. That

18   is what occurred here: the jury was instructed on first-degree murder on Counts One and Two, as

19   well as the lesser included offenses of second-degree murder on an actual malice theory and

20   voluntary manslaughter. (24 RT 4696-4705.) Thus, the trial court did not present the jury with the

21   all-or-nothing choice of conviction of capital murder and acquittal, which the Court identified as

22   the gravamen of the concern addressed in Beck. See Schad, 501 U.S. at 646. Although

23   Petitioner's jury was not instructed on every lesser included offense to Counts One and Two—

24   i.e., implied-malice second-degree murder—under clearly established federal law at the time of

25   the state court adjudication, that failure did not constitute a federal constitutional violation, but

26   only a violation of the broader state-law rule. See id. at 627, 646-47; cf. People v. Breverman, 19

27   Cal.4th 142, 168-69 (1998) (acknowledging that California's broader rule, requiring a lesser-

28

166

1  included offense instruction on all offenses for which there was evidentiary support, is

2  "independent of federal law").

3       Accordingly, because the record reveals reasonable basis for the state court's denial of this

4  claim under clearly established federal law, the undersigned recommends it be dismissed. See 28

5  U.S.C. § 2254(d)(1).

6  **CLAIM 40**

7       In Claim 40, Petitioner alleges that, considered cumulatively, the errors alleged in Claims

8  1 through 39 prejudiced the jury's verdicts on Counts One and Two. (ECF No. 59 at 273-74.) He

9  presented a version of this claim on direct appeal, cumulating the guilt-phase errors raised in that

10  proceeding (LD 25-B.1 at 239-42), which the California Supreme Court denied because "several

11  of appellant's claims were waived, many did not establish error, and those that did could not

12  possibly have caused prejudice." Coddington, 23 Cal.4th at 601. He raised another version of this

13  claim in his first petition for writ of habeas corpus, alleging that the cumulative prejudice from

14  the guilt-phase errors he had pled in that proceeding, together with those raised on direct appeal,

15  rendered his trial fundamentally unfair and the guilt-phase verdicts unreliable. (LD 25-C.1 at 78.)

16  The California Supreme Court denied this summarily on the merits. (LD 25-C.5.) The

17  undersigned concludes that these denials are entitled to deference.

18       Under clearly established federal law, the combined effect of multiple trial court errors

19  violates due process where it renders the resulting criminal trial fundamentally unfair. Chambers

20  v. Mississippi, 410 U.S. 284, 298, 302-03 (1973) (combined effect of individual errors "denied

21  [Chambers] a trial in accord with traditional and fundamental standards of due process" and

22  "deprived Chambers of a fair trial."); see also Montana v. Egelhoff, 518 U.S. 37, 53 (1996)

23  ("erroneous evidentiary rulings can, in combination, rise to the level of a due process violation");

24  Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978) ("[T]he cumulative effect of the potentially

25  damaging circumstances of this case violated the due process guarantee of fundamental fairness. .

26  . ."). Thus relief may be warranted even where no single error rises to the level of a constitutional

27  violation or would independently warrant reversal. Chambers, 410 U.S. at 290 n.3. Applying this

28  principle in habeas corpus, the Supreme Court has specifically held that the reviewing court

167

1    should consider the cumulative prejudicial effect of the individual instances of trial counsel's

2    deficient performance, <u>Strickland</u>, 466 U.S. at 695-96, and instances of state misconduct. <u>Wearry</u>

3    <u>v. Cain</u>, 577 U.S. 385, 394 (2016) (per curium); <u>Kyles v. Whitley</u>, 514 U.S. 419, 436 (1995).

4            Here, the state court could have reasonably found that the alleged guilt-phase errors did

5    not meet this standard when considering their prejudice cumulatively. On direct appeal, the state

6    court found that the trial court had erred, under state law, in restricting the presentation of mental

7    health expert evidence and in failing to instruct the jury on second-degree murder on a theory of

8    implied malice murder. <u>Coddington</u>, 23 Cal.4th at 582, 591-92. In the instant proceeding,

9    Petitioner has conceded that he cannot succeed on many of the additional guilt-phase claims (ECF

10   No. 59 at 760) and the undersigned has concluded that the state court was not unreasonable in

11   concluding that the remainder of them do not show constitutional error, save Petitioner's

12   allegations that the trial court's restriction on mental health evidence constituted a violation of his

13   due process rights, which the undersigned assumes arguendo reflected constitutional error that, on

14   its own, was harmless. (Claim 7, *ante*). The errors described in Claims 7 and 37, then, reflect the

15   only possible errors whose cumulative prejudicial effect must be considered. <u>See</u> <u>Kyles</u>, 514 U.S.

16   at 436; <u>Strickland</u>, 466 U.S. at 695-96; <u>Chambers</u>, 410 U.S. at 302-03.

17           The state court may have reasonably denied relief on this claim on the basis that there was

18   virtually no likelihood that any prejudice from the limitation on defense mental health expert

19   testimony was augmented at all by prejudice from the instructional error. Here, at the close of the

20   guilt phase, the jury was instructed on Counts One and Two on three possible homicide theories:

21   first-degree murder; second-degree murder with actual malice; and voluntary manslaughter. (24

22   RT 4696-4705.) Under California law, first-degree murder requires either the unlawful killing

23   during the commission or attempted commission of an enumerated felony, or a homicide resulting

24   from willfulness, premeditation, deliberation, and express malice. <u>People v. Anderson</u>, 70 Cal.2d

25   15, 24-26 (1968). Second-degree murder requires that a homicide was committed during the

26   commission or attempted commission of an enumerated crime, or that it was committed with

27   malice, but without the willfulness, deliberation, and premeditation necessary to sustain a first-

28

                                              168

1   degree murder conviction. People v. Swain, 12 Cal.4th 593, 601, (1996); see also People v. Nieto

2   Benitez, 4 Cal.4th 91, 102 (1992).

3        Second-degree murder on a malice theory (as opposed to second-degree felony-murder)

4   can rely on evidence of express malice or implied malice. "Express malice" in the homicide

5   context reflects "a deliberate intention to take a life." Penal Code § 188(a)(1); see People v. Soto,

6   4 Cal.5th 968, 976 (2018); People v. Saille, 54 Cal.3d 1103, 1114 (1991). In contrast, "implied

7   malice" exists where the defendant has acted with an "abandoned and malignant heart," Penal

8   Code § 188(a)(2); second-degree murder on an implied malice theory, then, reflects "killing

9   result[ing] from an intentional act, the natural consequences of which are dangerous to human

10  life, and the act is deliberately performed with knowledge of the danger to, and with conscious

11  disregard for, human life." People v. Cook, 39 Cal.4th 566, 596 (2006); see People v. Bryant, 56

12  Cal.4th 959, 968 (2013) ("We understand the term 'conscious disregard for life' to refer to the

13  mental component of our definition of implied malice"); Nieto Benitez, 4 Cal.4th at 102-05, 110.

14  To determine whether the defendant has a conscious disregard for human life, "the jury [must]

15  question [the defendant's] subjective thoughts while committing the crime" and, to sustain a

16  finding that this element has been met, evidence must show that the defendant had a "knowing or

17  conscious appreciation of the risk to human life" created by his or her conduct and disregarded

18  that risk. People v. Benson, 210 Cal. App. 3d 1223, 1229 (1989). This standard may be met when

19  the circumstances show the defendant's conduct just before the fatal act was so highly dangerous

20  to human life that virtually no one would be unaware of the risk. See, e.g., People v. Thomas, 53

21  Cal.4th 771, 814-15 (2012) (putting gun to victim's head is highly dangerous and exhibits a

22  conscious disregard for life); People v. Boatman, 221 Cal. App. 4th 1253, 1263 (2013) (implied

23  malice shown where defendant, in jest, pointed gun at victim and cocked it, knowing it was

24  loaded).

25       A defendant commits voluntary manslaughter when a homicide that is committed either

26  with intent to kill (express malice) or with conscious disregard for life (implied malice)—and

27  therefore would normally constitute murder—is nevertheless reduced or mitigated

28  to manslaughter by heat of passion or imperfect self-defense. Bryant, 56 Cal.4th at 968.

1    Alternatively, a defendant can be convicted of voluntary manslaughter where there is only

2    evidence that he acted with conscious disregard of human life causing death of another, but where

3    the other elements of implied-malice second-degree murder are absent (intentional commission of

4    the act, the natural consequences of the act were dangerous to human life, and the defendant knew

5    or reasonably should have known at the time he acted that his act was dangerous to human life).

6    People v. Martinez, 154 Cal. App. 4th 314, 335-36 (2007).

7         In light of these distinctions, the specific premise of the instant claim—cumulating the

8    prejudice of Claims 7 and 37—must be that, had the trial court admitted the proper scope of

9    mental health expert testimony and had the jury been instructed on second-degree implied-malice

10   murder, there is a reasonable likelihood that they would have selected that verdict, i.e., that they

11   would have found that the additional mental health evidence tended to show that Petitioner

12   merely acted with conscious disregard for human life rather than intent to kill. There are several

13   reasons, however, that a reviewing court could reasonably reject this argument.

14        First, in pleading Claim 7, Petitioner only argues that he was prejudiced because, had the

15   trial court not erred in its evidentiary ruling, he could have presented evidence that he did not

16   premeditate or deliberate prior to committing the homicides. (ECF No. 59 at 141-45; see also LD

17   25-B.1 at 130-34.) As set forth above, however, the question of whether or not a defendant

18   premeditated and deliberated prior to a homicide only implicates whether the murder is in the first

19   degree or second degree, but not what form of second-degree murder has been shown. Swain, 12

20   Cal.4th at 601; Nieto Benitez, 4 Cal.4th at 102. The distinction between implied-malice and

21   express-malice second-degree murder only relates to the nature of the defendant's specific intent.

22   See, e.g., Saille, 54 Cal.3d at 1113-14. Here, though, Petitioner does not dispute that he acted with

23   specific intent in committing the homicides. (See ECF No. 59 at 141-45, 266; see also LD 25-B.1

24   at 130-13.) Thus, it would appear that, under the theory of defense that Petitioner argued below,

25   an implied-malice second-degree murder instruction would not be implicated by the mental health

26   expert testimony Petitioner argues should have been admitted. Accordingly, any prejudice

27   engendered by the wrongful restriction of mental health expert testimony was not increased by

28   the lack of an implied-malice second-degree jury instruction, as such an instruction was not

                                      170

1   necessary in order for the jury to give meaning to the testimony Petitioner argues the jury should

2   have heard absent the court's erroneous evidentiary ruling.

3          Second, given the instructions the jury did hear, it is unlikely that mental health evidence

4   would have supported a verdict of second-degree implied-malice murder instead of voluntary

5   manslaughter. Petitioner's theory of his mental state at the time of the homicide was that, after

6   having placed plastic ties around the victims' necks to silence them, he became overwrought and

7   pulled the ligatures tight in a burst of emotional dysregulation. (See ECF No. 59 at 108, 119-20,

8   263, 267; 24 RT 4642-43, 4645, 4650-52.) To sustain the instant claim, then, the reviewing court

9   must conclude that, had the jury heard the evidence described in Claim 7, the jury would have

10  been reasonably likely to conclude that Petitioner's mental health problems obviated his

11  formation of *express* malice, but nevertheless contributed to his having *implied* malice (conscious

12  disregard of human life). The problem with this theory, however, is that the jury was instructed

13  that, "there is no malice aforethought if the jury concludes that the defendant suffered from a

14  mental disease or defect which actually precluded him from performing such malice

15  aforethought." (24 RT 4700.)[29] In other words, if the jury had heard testimony pursuant to Claim

16  7 that caused them to conclude that Petitioner had not formed malice aforethought of any type—

17  either express or implied—the jury was directed to return a voluntary manslaughter verdict or

18  less. It would have been contrary to this instruction for the jury to have concluded that, based on

19  mental health expert evidence, Petitioner had not formed express malice, but had formed implied

20  malice; under the instruction given, if the jury concluded the former, they were required to find

21  that there was no malice aforethought whatsoever. For this reason, too, it seems there could be no

22  additional prejudice from the instructional error that cumulates with the prejudice from the

23  erroneous evidentiary ruling.

24         Finally, on this record, it seems exceptionally unlikely that a jury, even with the benefit of

25  expert mental health testimony, would have found that the evidence demonstrated Petitioner was

26  _____

27  [29] See Saille, 54 Cal.3d at 1117 (after the amendments to the Penal Code that eliminated the
    diminished capacity defense, evidence of the defendant's mental disease or defect remained
    admissible to "show that because of his mental illness . . . , he did not *in fact* form the intent

28  unlawfully to kill (i.e., did not have malice aforethought)").

culpable only of having a conscious disregard for human life during the homicides. In California cases, the type of conduct held to evince implied malice is akin to recklessness, such as pointing a loaded weapon at someone and it accidentally firing. See, e.g., Thomas, 53 Cal.4th at 814-15; Nieto Benitez, 4 Cal.4th at 107-08; Boatman, 221 Cal. App. 4th at 1263; Benson, 210 Cal. App. 3d 1223, 1229; In re Russell H., 196 Cal. App. 3d 916, 920 (1987); People v. Summers, 147 Cal. App. 3d 180, 185 (1983); People v. Love, 111 Cal. App. 3d 98 (1980); People v. Curry, 192 Cal. App. 2d 664 (1961). It also encompasses such acts as leading a high-speed automobile chase, People v. Fuller, 86 Cal. App. 3d 618, 628-29 (1978), and abusing or neglecting a child. People v. Dellinger, 49 Cal.3d 1212, 1222 (1989); People v. Latham, 203 Cal. App. 4th 319, (2012); People v. Burden, 72 Cal. App. 3d 603, 614 (1977). Here, in contrast, the evidence was that Petitioner's acts went beyond mere conscious disregard for human life. The evidence showed that Petitioner had initially bound Ms. Martin and Ms. Walsh and then placed a flexible tie around at least the neck of Ms. Martin, then later tightened the ligature enough to strangle her. See Coddington, 23 Cal.4th at 550. The defense argued to the jury at the close of the guilt phase that the evidence supported the inference that Petitioner had first tied up "them"—i.e., Ms. Martin and Ms. Walsh—then placed a hood over Ms. Martin and "put[] the thing around her neck." (24 RT 4642.) Counsel acknowledged that the evidence was unclear as to whether Petitioner put a flexible tie around Ms. Walsh's neck, "but I submit a fair interpretation is that he did it to both." (Ibid.) According to defense counsel, Petitioner had used the pillowcase to "keep her quiet" because "she was still talking." (Ibid.) Things were "frantic," while Petitioner "wrestl[ed] around" with the four victims for five to twenty minutes. (24 RT 4643.) Ms. Martin was still talking, even with the flexible tie around her neck, stating she could not breathe. (Ibid.) As "they" were continuing to make noise, "then, and only then d[id] he pull them [the flexible ties] tight and kill them." (Ibid.) Defense counsel then conceded that, although the girls did not testify they saw Petitioner do the same thing to Ms. Walsh, "it's a fair assumption" that he did because "there was no noise other than Dottie's gargling sound after he pulled the ligature tight on Mabs." (24 RT 4645.)[30]

_____

[30] This argument accorded with the description of the homicides that Petitioner apparently had given to the mental health experts who later testified at the sanity phase. See Claim 9, ante.

1    These acts did not reflect mere disregard for the possibility that Petitioner's acts might

2    cause death. By placing locking ligatures around the victims' necks, by hearing one victim

3    complain she could not breathe after her ligature was placed, and then by apparently responding

4    to that complaint by returning to the bound victims and tightening the ligatures so as to collapse

5    the victims' airways, Petitioner's acts were well beyond the type of recklessness that sustains

6    implied malice murders. These acts are not analogous to mishandling a loaded weapon, but more

7    akin to pulling the trigger and claiming surprise that a bullet came out. It is not reasonably

8    probable that, even with the addition of mental health expert evidence, the jury would have

9    concluded that implied-malice second-degree murder includes the sequence of acts comprising

10   the homicides of which the jury heard evidence in this case.

11   For these reasons, the undersigned concludes that the state court did not unreasonably

12   apply, nor act contrary to, clearly established federal law in its denial of relief on the allegations

13   forming Claim 40. See 28 U.S.C. § 2254(d). The undersigned recommends this claim be

14   dismissed.

15   **CLAIMS 43 AND 44**

16   In Claim 43, Petitioner alleges that his constitutional rights under the First, Fifth, and

17   Fourteenth Amendments were violated in the sanity phase by the prosecutor's examination of

18   witnesses and closing argument that, per Petitioner, urged the jury to reject Petitioner's insanity

19   defense if he did not believe in a concept of God as the source of moral authority, and by the trial

20   court's failure to sua sponte correct these implications or offer a curative instruction. (ECF Nos.

21   59 at 283-319, 209 at 230.) In Claim 44, Petitioner alleges that trial counsel performed

22   ineffectively for failing to object to each instance of alleged prosecutorial misconduct and in their

23   litigation of the relevant jury instructions. (ECF Nos. 59 at 320-21, 209 at 249-50.) Petitioner

24   raised Claim 43 on direct appeal, which the California Supreme Court rejected. Coddington, 23

25   Cal.4th at 607-11. The undersigned finds that determination is entitled to deference. See 28

26   U.S.C. § 2254(d). Petitioner raised Claim 44 on direct appeal and in his first petition for writ of

27   habeas corpus before the California Supreme Court. That claim was denied on the merits on

28

1  direct appeal, 23 Cal.4th at 607-11, and was summarily denied on habeas corpus. (LD 25-C.5.)

2  The undersigned finds that denial entitled to deference, as well. See 28 U.S.C. § 2254(d).

3        1.  Relevant Proceedings Below

4        Petitioner raised Claim 43 on direct appeal. (LD 25-B.1 at 250-84.) The California

5  Supreme Court denied it:

6      Without identifying the claim as one of prosecutorial misconduct,
7  appellant claims that the prosecution pursued a blatantly unlawful
   and unconstitutional tack during the sanity phase, as a result of which
8  the jury was effectively told it could not find appellant not guilty by
   reason of insanity because his conception of God was pantheistic
9  rather than "Judeo-Christian." As a consequence, appellant asserts,
   the jury was precluded from finding him legally insane,
10 notwithstanding his psychotic delusions. The prosecution's conduct
   in questioning witnesses and in argument, he claims, was contrary to
11 the California M'Naghten test as incorporated into section 25,
   subdivision (b), and violated his religious rights under the First, Fifth,
12 and Fourteenth Amendments. He asserts that had the jury believed
   his defense—that at the time of the killings he was delusionally
13 psychotic; had a delusion that God had commanded or authorized
   him to kidnap and kill; and as a result he believed his conduct was
14 morally justifiable—the jury would have to find him not guilty by
   reason of insanity. The claim lacks merit.

15     First, appellant did not object to the questions asked of witnesses on
   cross-examination of which he now complains or to any aspect of the
16 prosecutor's sanity phase argument. He cannot avoid this threshold
   requirement by failing to identify this claim as one of prosecutorial
17 misconduct. The issue has been waived.

18     Further, the jury was properly instructed in accordance with section
   25, subdivision (b), and *People v. Skinner*, *supra*, 39 Cal.3d 765. The
19 court instructed:

20     "Mental illness and mental abnormality, in whatever form either may
   appear, are not necessarily the same as legal insanity. A person may
21 be mentally ill or mentally abnormal and yet not be legally insane.

22     "A person is legally insane when, by reason of mental disease or
   mental defect he was incapable of knowing or understanding the
23 nature and quality of his act or incapable of distinguishing right from
   wrong at the time of the commission of the offense. The word
24 'wrong' as used in this instruction is not limited to legal wrong, but
   properly encompasses moral wrong as well. Thus, the defendant who
25 is incapable of distinguishing what is morally right from what is
   morally wrong is insane, even though he may understand the act is
26 unlawful."

27     Appellant did not object to this statement of the law when the sanity
   phase instructions were discussed. The jury was properly
28 admonished that the arguments of counsel are not evidence.

Appellant bore the burden of proving his insanity. (§§ 25, 1026; *People v. Tilbury* (1991) 54 Cal.3d 56, 63 [284 Cal.Rptr. 288, 813 P.2d 1318].) He was given the opportunity to do so and to argue his theory. The experts and both sides agreed that appellant knew the nature and quality of his acts and knew that they were unlawful. The only question was whether he also knew that they were morally wrong.

The morality contemplated by section 25, subdivision (b) is, as the prosecutor argued here, not simply the individual's belief in what conduct is or is not good. While it need not reflect the principles of a recognized religion and does not demand belief in a God or other supreme being, it does require a sincerely held belief grounded in generally accepted ethical or moral principles derived from an external source. "[M]oral obligation in the context of the insanity defense means generally accepted moral standards and not those standards peculiar to the accused." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1274 [252 Cal.Rptr. 913].)

Religious beliefs are often the source of generally accepted moral standards, but a defendant need not show that he or she believed that Judeo-Christian standards of morality justified the criminal conduct. An insane delusion that the conduct was morally correct under some other set of moral precepts would satisfy this prong of the M'Naghten test of legal insanity. However, "[t]he fact that a defendant claims and believes that his acts are justifiable according to his own distorted standards does not compel a finding of legal insanity." (*People v. Rittger* (1960) 54 Cal.2d 720, 734 [7 Cal.Rptr. 901, 355 P.2d 645].) As we explained in *Rittger*, this aspect of the M'Naghten test, adapted from the rule of *M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722, is necessary "if organized society is to formulate standards of conduct and responsibility deemed essential to its preservation or welfare, and to require compliance, within tolerances, with those standards." (*People v. Rittger, supra,* 54 Cal.2d at p. 734.)

Defense counsel conceded in argument that appellant had a concept of God that might differ, and had rejected established religion and had his own moral system, but emphasized that whatever it was called, if the jury believed the evidence, it established appellant was following what he believed were commands from that source. If the jury believed that appellant was following what he believed to be signs from God, or from a higher entity, "God, nature, whatever you call it, and therefore did not believe that it was morally wrong," the jury had to find him not guilty by reason of insanity.

Nothing the prosecutor asked or argued was improper, inconsistent with this understanding of the meaning of "wrong" in section 25, subdivision (b), or denied appellant any constitutional due process or religious rights. If anything, appellant received the benefit of his counsel's overly expansive understanding of the concept of morality found in the M'Naghten test, which did not limit that concept to external, generally accepted standards of morality.

The only bases for appellant's claim of impropriety in this regard are the prosecutor's argument and questions the prosecutor put to the

expert witnesses who had testified that the defendant was legally insane, questions based on evidence that appellant had rejected the Judeo-Christian concept of God, had examined other religions, and ultimately evolved his own concept of God as a force running through the universe. Nothing in the prosecutor's questions or his subsequent argument precluded the jury from finding appellant legally insane under the court's instruction or under the test he now argues was the sole appropriate objective means by which to measure his sanity.[FN 36] The prosecutor's argument was an attack on the defense psychiatric experts' conclusion that appellant was legally insane, and their reliance on statements made to them by appellant, whom the prosecutor characterized as a cheat and a liar. This was not an assertion that the law did not permit a finding of legal insanity on the theory that, because a universal force condoned his actions, appellant did not know his conduct was morally wrong.

> FN 36. Appellant posits the following as the test: 1. Did appellant believe he was getting signals from some superior or supernatural force? 2. If so, did appellant believe the superior force was a command or was authorizing him to kill and kidnap? If so, did appellant believe it was right to obey despite the fact that kidnapping and killing were against the law? If so, did appellant believe that other people, if they knew what he knew and believed what he believed likewise would have believed the kidnappings and killings to be justifiable? If so, were the latter thought processes and conclusions a product of mental disease or defect?

The prosecutor charged appellant with manipulating the word "God" to deceive the jury into believing he was mentally ill. He recognized that moral systems may differ, but argued that morality had an external source and was not simply an individual decision as to what is or is not moral. He argued that a moral system has principles or ethics, as opposed to an individual's decision that something was good or bad, and further argued that appellant did what he wanted and then applied the word God in his own moral system to say that his conduct was all right. He accused appellant of creating his own sense of ethics and values and religion, and argued that appellant's religion was not something external to him. It simply reflected his own views. The defense, he argued, had the burden of showing that appellant "really had a moral system, a moral system other than his own, other than simply taking the word God and impressing it on his own lust and desires." The prosecutor did not argue that if appellant actually believed that God or some other external force condoned or commanded his actions appellant was not legally insane.

Defense counsel's closing argument reflected that understanding of the prosecutor's argument.

For these reasons we also reject appellant's claim that the failure of defense counsel to object to either the questions put on cross-examination or the prosecutor's closing argument, to request additional instructions, or to offer authority for an instruction that

176

was offered but refused, [FN 37] constituted ineffective representation.

> FN 37. Defense counsel asked that the court instruct: "The fact that a person may not ascribe to the teaching of any traditionally recognized religious groups does not, in and of itself, establish that the person has rejected legitimate (socially acceptable) concepts of morality. The law recognizes that people have wide ranging concepts concerning the existence of God or other concepts concerning the existence of God or other supernatural phenomena from which a moral system may be derived. The fact that a person's concept of God may not coincide with traditional concepts of that deity does not, in and of itself, preclude a determination that a person believes in a system of morality derived from supernatural phenomena."

Appellant offered no evidence that his belief that God was sending messages through traffic lights and numbers approving his plans was related in any way to a system of morality derived from any generally accepted ethical or moral principles. Inasmuch as he had rejected the Judeo-Christian concept of God and the moral system associated therewith, it was incumbent on appellant to do more than claim that he believed God approved his actions.

Coddington, 23 Cal.4th at 607-10.

Petitioner presented the allegations comprising Claim 44 on direct appeal and in his first petition for writ of habeas corpus. (See ECF No. 131 at 31.) On direct appeal, he argued that defense counsel performed ineffectively for failing to object to the instances of misconduct alleged in Claim 43, failing to request an appropriate curative instruction, and failing to effectively litigate their requested instructions. (LD 25-B.1 at 283-84.) The California Supreme Court denied this on the merits, as set forth above. Coddington, 23 Cal.4th at 607-10. Petitioner raised a version of this claim again in his first petition for writ of habeas corpus, supporting it with declarations from defense counsel Meyer and Dr. Bittle. (LD 25-C.1 at 100-104; LD 25-C.3.) The California Supreme Court denied this claim summarily, on the merits, and "[e]xcept to the extent" the claim alleged ineffective assistance of counsel, the court denied the claim "for the additional reason that [it was] raised and rejected on appeal." (LD 25-C.5.)

////

////

177

1          2.   The State Court's Denial Of Claim 43 Is Entitled To Deference

2          Respondent argues that this Court must defer to the state court's denial of Claim 43

3    because it reflected a denial on independent and adequate grounds of state law, namely, that the

4    claim was forfeited for Petitioner's failure to object to the alleged instances of prosecutorial

5    misconduct or to offer to the trial court an instruction on the grounds he now urges. (ECF Nos.

6    102 at 4, 148 at 17-18.) Petitioner does not dispute that the state court purported to bar this claim

7    on procedural grounds, but urges that that procedural bar is not entitled to deference because it

8    resulted from trial counsel's ineffectiveness and because it was erroneously applied as a matter of

9    state law. (ECF No. 131 at 27-31.) He requests that, if the undersigned determines Respondent

10   has facially shown that the procedural bar applies, then this Court should defer determination of

11   whether trial counsel's ineffectiveness constituted cause and prejudice to disregard the default

12   until such time as Petitioner may make an evidentiary showing on the factual issues intrinsic to

13   the ineffectiveness determination. (ECF No. 131 at 31.)

14          This Court need not resolve the question of the applicability of the asserted procedural bar

15   because Claim 43 is meritless. See Shinn, 142 S. Ct. 1737, 1739; Coleman, 501 U.S. at 755; Bell,

16   543 U.S. at 451 n.3; Smith, 510 F.3d at 1139; Franklin, 290 F.3d at 1232. To the state court,

17   Petitioner alleged the following forms of constitutional error: (1) the prosecutor misstated the law

18   by implying that Petitioner believed in God as a source of moral authority (LD 25-B.1 at 262-64,

19   279); (2) the court's instructions were incomplete on the standard for insanity and did not cure the

20   errors engendered by the prosecutor (LD 25-B.1 at 266-67, 280-83); (3) the prosecutor's

21   misstatements of law violated Petitioner's due process rights by rendering it reasonably likely that

22   the jury applied its instructions incorrectly (LD 25-B.1 at 267-68); (4) the prosecutor's

23   misstatements of law made it reasonably likely the jury rendered its verdict upon application of a

24   vague standard (LD 25-B.1 at 268-69); and (5) the prosecutor's questions and argument violated

25   Petitioner's rights under the Establishment Clause and Free Exercise Clause of the First

26   Amendment (LD 25-B.1 at 272-79).

27          Reversal is required where prosecutorial misconduct "so infected the trial with unfairness

28   as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181. It is

178

1   improper for a prosecutor to misstate the law or otherwise make argument suggesting an

2   "impermissible interpretation" of the law, although the effect of such statements must be

3   considered in the context in which they were made and the instructions as a whole. Boyde, 494

4   U.S. at 384-85. When the alleged misconduct reflects an infringement on a fundamental right –

5   which includes the right to free exercise of religion – reversal is required if the prosecutor's

6   conduct in any way "impermissibly infringe[d]" that right. Donnelly v. DeChristoforo, 416 U.S.

7   637, 643 (1974). Due process also requires that the trial court give full and accurate instructions.

8   See, e.g., Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); Carter v. Kentucky, 450 U.S. 288, 302

9   (1981). Finally, the First Amendment prohibits the state from "promot[ing] . . . any religious

10  doctrine" or discriminating on the basis of religion, County of Allegheny v. A.C.L.U., 492 U.S.

11  573, 590 (1989), or "penalize[ing] or discriminat[ing] against individuals" on the basis of their

12  religious beliefs. Sherbert v. Verner, 374 U.S. 398, 402 (1963).

13          Here, the record does not support the finding that the prosecutor misstated the law or that

14  his questions to witnesses and closing argument suggested to the jury that, in order to find

15  Petitioner insane, they must believe that he believed in a moral code in which a Judeo-Christian

16  God supplied the ultimate moral authority. (See LD 25-B.1 at 262-65.) Such a characterization

17  misconstrues the record, as the prosecutor's questioning and argument were proper given the law

18  and the issues in dispute between the parties. Petitioner's theory of insanity was that by virtue of

19  mental disease or defect, he was incapable of distinguishing moral right from moral wrong at the

20  time of the crimes. (See 38 RT 6407-08.) See People v. Skinner, 39 Cal.3d 765, 777-84 (1985).

21  Under California law, "moral right" and "moral wrong" is defined by reference to some form of

22  extrinsic or community standards including, for instance, belief in God as a moral authority. Id. at

23  783-84; People v. Stress, 205 Cal. App. 3d 1259, 1274 (1988). It does not encompass moral

24  standards that are merely "peculiar to the accused," Stress, 205 Cal. App. 3d at 1274, or, put

25  differently, "[t]he fact that a defendant claims and believes that his acts are justifiable according

26  to his own distorted standards does not compel a finding of legal insanity." People v. Rittger, 54

27  Cal.2d 720, 734 (1960).

28  ////

179

1   In Petitioner's case, the material issue in dispute on the question of sanity was whether

2   Petitioner was incapable of distinguishing between moral right and moral wrong at the time of the

3   crimes, as all of the testifying experts agreed that he had possessed a form of mental defect or

4   disorder. <u>See Coddington</u>, 23 Cal.4th at 558-62. The court-appointed experts testified to their

5   opinions that Petitioner had not been acting pursuant to some form of moral code, but instead that

6   his invocation of a moral system in his discussions with psychiatric experts reflected a "mere

7   rationalization to justify his conduct." <u>Coddington</u>, 23 Cal.4th at 659 (Mosk, J., dissenting). (<u>See</u>

8   32 RT 5813-14, 5835, 5841-42 (Dr. Kaldor); 33 RT 6009-10 (Dr. Bittle).) In contrast, the three

9   defense experts testified that they credited Petitioner's descriptions of having received messages

10  from God via traffic lights before the crimes and that Petitioner's concept of God existed within

11  his sincere understanding of the universe's moral structure. (<u>See</u> 27 RT 5110-37; 29 RT 5555-67;

12  30 RT 5613, 5646-47, 5652-63.) The prosecutor's cross-examination of defense experts probed

13  this area vigorously, questioning the experts on the nature of Petitioner's professed moral beliefs

14  and their conclusions that those beliefs were sincerely held, rather than concocted post-hoc in

15  order to evade responsibility. (<u>See</u> 27 RT 5110-42; 29 RT 5518-19, 5530-31, 5555-67; 30 RT

16  5652-63, 5686-90.) This material dispute was particularly nuanced, given that Petitioner

17  apparently conveyed to some experts that he believed in "[his] own religion . . .based on [his]

18  own observations of the world and what seemed to be right and wrong to [him]," (29 RT 5561;

19  <u>see also</u> 30 RT 5686-90; 32 RT 5781-83, 5813-14, 5842; 33 RT 5956-57, 6009; 34 RT 6048),

20  which Petitioner now describes as an amalgamation of pantheism and deism (ECF No. 59 at 303-

21  04); to other experts, on the other hand, he apparently simply referred to "God" or "the Lord" as

22  the ultimate source of moral authority. (<u>See</u> 27 RT 5110-31 (Dr. Mills); 28 RT 5293, 5310-12; 29

23  RT 5518-19, 5557-67 (Dr. Rosenthal); 30 RT 5609 (Dr. Satten).) Thus, the prosecutor's

24  questioning focused at times on what, precisely, were the nature of Petitioner's moral beliefs.

25  (<u>See</u> 27 RT 5110-42; 29 RT 5518-19, 5530-31, 5555-67; 30 RT 5652-63, 5686-90.)

26  The prosecutor's questions were proper, given the facts in dispute and their materiality to

27  the ultimate question of whether Petitioner was incapable of distinguishing moral right from

28  moral wrong. Upon thorough review of the record, the instances cited by Petitioner do not

180

1   convey, as he alleges, that the prosecutor argued or implied through cross-examination that only a

2   Judeo-Christian God could be a source of moral authority. Rather, each of these instances reflect

3   the prosecutor examining a witness as to what, precisely, they believed Petitioner's moral beliefs

4   were and whether those beliefs included a concept of "God" (27 RT 5121-22, 5125, 5129; 29 RT

5   5557-60, 5566-67; 30 RT 5686-89); on what basis the expert concluded Petitioner was not

6   malingering in these descriptions (27 RT 5126-27; 29 RT 5564-67; 30 RT 5651-53); and arguing

7   that the evidence had not shown that Petitioner had met his burden of proof because there was

8   insufficient credible evidence that Petitioner in fact believed in an extrinsic moral authority as the

9   source of commands. (See 38 RT 6423-24, 6430-41.) All of these instances were proper and none

10  reflect misconduct; as such, none of the instances cited by Petitioner rendered the trial

11  fundamentally unfair, infringed on Petitioner's First Amendment rights, rendered it reasonably

12  likely the jury misunderstood the law, or reflected violations of the Establishment or Free

13  Exercise Clause of the First Amendment. See Boyde, 494 U.S. at 384-85; County of Allegheny,

14  492 U.S. at 590; Darden, 477 U.S. at 181; Donnelly, 416 U.S. at 643; Sherbert, 374 U.S. at 402.

15      Finally, the trial court's instructions accurately reflected the law. Coddington, 23 Cal.4th

16  at 608; see Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (a state court's interpretation of state law,

17  including one announced on direct appeal of the challenged conviction, binds a federal court

18  sitting in habeas corpus). (See 6 CT 1219.) Because the prosecutor's examination and argument

19  were proper, no additional instructions were necessary.  See Estelle, 502 U.S. at 71-72; Carter,

20  450 U.S. at 302.

21      For these reasons, the undersigned recommends Claim 43 be dismissed.

22      3.   The State Court's Denial of Claim 44 Is Entitled to Deference

23      In Claim 44, Petitioner alleges that trial counsel was deficient for failing to object to the

24  instances of prosecutorial misconduct alleged in Claim 43 and for failing to request an accurate,

25  non-prejudicial instruction to cure this misconduct. (ECF No. 59 at 320-21.) Because, however,

26  the prosecutor's questions and argument were not unlawful, there would have been no basis for

27  such objections, and defense counsel was not unreasonable for failing to make unmeritorious

28  argument. Knowles, 556 U.S. at 123; Jones, 463 U.S. 745. Similarly, because the jury was

181

1    properly instructed under state law as to the relevance of Petitioner's moral beliefs in the sanity

2    determination, see Coddington, 23 Cal.4th at 608, trial counsel was not deficient for failing to

3    request additional instruction. See generally Strickland, 466 U.S. at 689-91.

4        For these reasons, the state court's denial of this claim on direct appeal was not error and

5    its denial of this claim in the first petition for writ of habeas corpus was not an unreasonable

6    application of, or contrary to, clearly established federal law. See 28 U.S.C. § 2254(d). The

7    undersigned therefore recommends Claim 44 be dismissed.

8    **CLAIM 45**

9        In Claim 45, Petitioner alleges that defense counsel was ineffective in the sanity phase for

10   failing to investigate and provide complete psychosocial history information to the court-

11   appointed sanity-phase expert Dr. Bittle. (ECF No. 59 at 322-29.) Petitioner raised this claim in

12   his first petition for writ of habeas corpus in state court, which the California Supreme Court

13   summarily denied. (LD 25-C.1 at 80-86; LD 25-C.5.) That denial was not contrary to nor an

14   unreasonable application of clearly established federal law and therefore is entitled to deference.

15   28 U.S.C. § 2254(d).

16       1.  Relevant Proceedings Below

17       In his first petition for writ of habeas corpus in state court, Petitioner alleged that defense

18   counsel performed deficiently in preparation of the sanity phase by failing to conduct an adequate

19   investigation into Petitioner's family history of mental illness and other impairments, namely, his

20   mother's cousin's bipolar disorder and schizophrenia, his great-grandmother's suicide, and

21   alcoholism in his maternal extended family. (LD 25-C.1 at 80-84.) Had trial counsel conducted

22   this investigation, Petitioner alleged, and provided the fruits of that investigation to the defense

23   experts and Dr. Bittle, Dr. Bittle would have concluded that Petitioner likely had suffered from a

24   biologically-based mental illness with psychotic features at the time of the crimes and was thus

25   not capable of distinguishing moral right from wrong. (LD 25-C.1 at 84; LD 25-C.3 Exs. H ¶¶ 3-

26   4, I ¶¶ 3-4.) These materials also would have strengthened the opinions of the defense experts on

27   the question of sanity. (Id. at 84-85, Exs. T ¶¶ 7-8, U ¶¶ 9-10, V ¶¶ 7-8.) Had he provided these

28   materials to the experts, Petitioner alleged, and had these experts so testified, there was a

182

1   reasonable likelihood that the jury would have found Petitioner insane. (LD 25-C.1 at 85-87.) The

2   California Supreme Court denied this claim summarily, on the merits. (LD 25-C.5.)

3       2.   The State Court's Denial of Claim 45 Is Entitled to Deference

4       At the time of Petitioner's trial, defense counsel had a duty to make reasonable

5   investigations in the course of representation. Strickland, 466 U.S. at 690-91. Whether an

6   investigation was reasonable is defined by prevailing professional norms at the time and in light

7   of what counsel knew at the time of the investigation. Wiggins v. Smith, 539 U.S. 510, 523

8   (2003). Counsel must pursue investigative leads apparent in the information they do have, unless

9   they have reason to believe such pursuit would be "counterproductive" or "fruitless." Id. at 525;

10  see also Andrus v. Texas, __ U.S. __, 140 S. Ct. 1875, 1882-83, 207 L. Ed. 2d 335 (2020).

11  "Reasonable investigation" includes reviewing readily-available materials that could impeach the

12  prosecution's case. See Rompilla v. Beard, 545 U.S. 374 (2005). It also includes, in a capital trial,

13  "a thorough investigation of the defendant's background," Williams v. Taylor, 529 U.S. 362, 396

14  (2003), and his "family and social history," Wiggins, 539 U.S. at 524, as mitigation evidence in

15  the penalty phase. See also Andrus, 140 S.Ct. at 1882-83. Finally, depending on the nature of the

16  prosecution's allegations and/or defense theory, reasonable investigation may require defense

17  counsel to consult with appropriate experts. Hinton v. Alabama, 571 U.S. 263, 273 (2014);

18  Richter, 562 U.S. at 105.

19      The Ninth Circuit has squarely rejected Petitioner's theory here, that clearly established

20  federal law required defense counsel to undertake a psychosocial history investigation of any

21  particular breadth in order to provide the fruits of that investigation to a mental health expert in

22  preparation for a guilt- or sanity-phase defense. Raley v. Ylst, 444 F.3d 1085, 1092-93 (9th

23  Cir.), opinion amended and superseded on denial of reh'g, 470 F.3d 792 (9th Cir. 2006);

24  Hendricks v. Calderon, 70 F.3d 1032, 1038-39 (9th Cir. 1995). To be sure, a thorough and

25  complete investigation into a capital defendant's personal and familial history is required for the

26  development of mitigation evidence for the penalty phase, see Williams v. Taylor, 529 U.S. 362,

27  396 (2003); Wiggins, 539 U.S. at 524, but the Supreme Court has never extended such a

28  requirement to the investigation of materials to provide an expert in order for the expert to render

183

1   a reliable opinion. Instead, the lower courts have tended to hold the opposite: that, absent a

2   specific request for particular information from a consulting mental health expert, counsel is not

3   deficient for failing to be aware of what materials the expert may find illuminating. See, e.g.,

4   Raley, 444 F.3d at 1092-93 (defense counsel not deficient in their investigation and preparation of

5   mental health experts, where counsel had provided the experts "basic background information

6   about Petitioner" and experts did not request more information); Bloom v. Calderon, 132 F.3d

7   1267, 1278 (9th Cir. 1997) ("when the defense's only expert requests relevant information which

8   is readily available, counsel inexplicably does not even attempt to provide it, and counsel then

9   presents the expert's flawed testimony at trial, counsel's performance is deficient"); Hendricks,

10  70 F.3d at 1039 ("To require an attorney, without interdisciplinary guidance, to provide a

11  psychiatric expert with all information necessary to reach a mental health diagnosis demands that

12  an attorney already be possessed of the skill and knowledge of the expert."); Lang v. Cullen, 725

13  F. Supp. 2d 925, 1005 (C.D. Cal. 2010) ("Counsel is entitled to rely on the experts' assessment as

14  to the information they require. . .; he need not himself determine what information is necessary

15  to reach a mental health diagnosis and provide it *sua sponte.*"); Bloom v. Vasquez, 840 F. Supp.

16  1362, 1370 (C.D. Cal. 1993) ("In the absence of a specific request, an attorney is not responsible

17  for gathering background material that might be helpful to a psychiatrist evaluating his client.");

18  Card v. Dugger, 911 F.2d 1494, 1512 (11th Cir. 1990) (holding defense counsel "was not

19  obligated to track down every record that might possibly relate to [the defendant's] mental health

20  and could affect a diagnosis").

21        Here, the record and allegations before the state court were that defense counsel

22  conducted investigation into Petitioner's mental health history and personal background relative

23  to his mental health. Defense counsel interviewed Petitioner's family members, friends, and those

24  who knew him during childhood; and collected social history and other records. See Coddington,

25  23 Cal.4th at 558-85. (See LD 25-C.3 Ex. A ¶¶ 75-76, Ex. L ¶ 9; 1 SCT 181-239; 2 SCT 240-392,

26  398-409, 476-89.) Defense counsel provided to consulting mental health experts documents they

27  believed were relevant to the sanity assessment (25 RT 4829-30, 4846-70, 4882 (Dr. Mills); 28

28  RT 5281-82; 29 RT 5515-16 (Dr. Rosenthal); 30 RT 5599-5601 (Dr. Satten)); access to some of

1  Petitioner's family members for interview by the experts (28 RT 5281-82 (Dr. Rosenthal); 30 RT

2  5599-5600 (Dr. Satten)); and access to Petitioner himself for interview by the experts (25 RT

3  4829-30 (Dr. Mills); 28 RT 5281-82 (Dr. Rosenthal); 30 RT 5599-5600 (Dr. Satten)). There is no

4  allegation nor indication in the record that any expert requested any additional information from

5  defense counsel, let alone the particular items identified in this claim. (See generally LD 25-C.3

6  Ex. H; 25 RT 4829-30, 4846-70, 4882 (Dr. Mills); 28 RT 5281-82 (Dr. Rosenthal); 30 RT 5599-

7  5600 (Dr. Satten); see also 32 RT 5752 (Dr. Kaldor) (testifying he made no requests for

8  information from defense counsel); 33 RT 5892-97 (Dr. Bittle) (testifying he received multiple

9  documents from defense counsel upon request); 5 CT 807-14, 827-29; 18 SACT 4928-29 (Dr.

10  Bittle requests and receives specific additional materials to complete his assessment).). Absent

11  that, a reviewing court could not conclude that trial counsel performed deficiently in the

12  investigation of Petitioner's sanity defense by failing to conduct a thorough and complete

13  investigation into his extended family history and provide that information to consulting mental

14  health experts, under clearly established federal law at the time of the state court adjudication. See

15  Raley, 444 F.3d at 1092-93; Hendricks, 70 F.3d at 1039. The state court's denial of this claim on

16  the merits is therefore entitled to deference and the undersigned recommends it be dismissed. See

17  28 U.S.C. § 2254(d).

18  **CLAIM 46**

19       In Claim 46, Petitioner alleges that the prosecution violated his due process rights as set

20  forth in Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose exculpatory information

21  favorable to his insanity defense contained in a report created by an employee of the El Dorado

22  County Mental Health Department, Sandra Branton, who interviewed and assessed Petitioner's

23  mental functioning at the El Dorado County Jail the morning after his arrest. (ECF Nos. 59 at

24  330-33, 209 at 557-58.) This report indicated that, at the time, he presented as suicidal and

25  possibly psychotic, delusional, paranoid and/or symptomatic of a personality disorder, all of

26  which, Petitioner alleges, was highly material to the jury's assessment of his sanity. (Ibid.; see LD

27  25-C.3 Exs. F at ¶ 7, P.) Petitioner presented this claim in his first petition for writ of habeas

28  corpus (LD 25-C.1 at 87-90), which the California Supreme Court denied summarily. (LD 25-

1  C.5.) The undersigned finds that denial was not contrary to nor an unreasonable application of

2  clearly established federal law and is entitled to deference. See 28 U.S.C. § 2254(d).

3  Under Brady, a criminal defendant's due process rights are violated by the prosecution's

4  suppression of evidence that is favorable to the defendant, whether exculpatory or impeachment,

5  and material to guilt or punishment, regardless of the prosecution's good faith or bad faith. 373

6  U.S. at 87; see also United States v. Blanco, 392 F.3d 382, 387 (9th Cir. 2004) ("To establish

7  a Brady violation, the evidence must be (1) favorable to the accused because it is either

8  exculpatory or impeachment material; (2) suppressed by the government, either willfully or

9  inadvertently; and (3) material or prejudicial."). The prosecution has an obligation to disclose

10 such materials even absent a specific defense request. United States v. Agurs, 427 U.S. 97 (1976).

11 This obligation extends to evidence that the prosecution has in its constructive possession or of

12 which it has constructive knowledge, as "the individual prosecutor has a duty to learn of any

13 favorable evidence known to the others acting on the government's behalf in the case, including

14 the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995); see also Strickler v. Greene, 527 U.S.

15 263, 275 n.12 (1999).

16 Here, Petitioner's allegations did not make a prima facie showing that the prosecutor had

17 actual or constructive knowledge or possession of the Branton report or its contents, such that its

18 non-disclosure violated his due process rights. Petitioner made no allegations tending to show that

19 the prosecutor actually knew of the contents of the Branton report, such that his failure to access

20 it from jail records and discover it to the defense would be considered suppression under Brady

21 and Kyles for that reason. (See LD 25-C.1 at 87-90.) See United States v. Agurs, 427 U.S. 97,

22 103 (1976) (Brady forbids suppression of exculpatory or impeachment information "known to the

23 prosecution but unknown to the defense"). Instead, Petitioner theorizes that the Branton report

24 was in the constructive possession of the prosecutor because it was created by an employee of El

25 Dorado County, whose sheriff's office was involved in the crime's investigation, and because the

26 prosecutor could and did access at least some of Petitioner's records from the El Dorado County

27 Jail before and during trial, indicating that the prosecutor could have accessed the Branton report,

28 as well. (ECF No. 209 at 567-69.) These facts, however, do not suffice to show that the

186

1    prosecutor knew of the existence of the Branton report or the exculpatory information contained

2    therein, or that he shirked his obligation to disclose exculpatory materials "known to others acting

3    on the government's behalf in the case." See Kyles, 514 U.S. at 437. Although Petitioner

4    correctly notes that the El Dorado County Sheriff's Department was involved in the investigation

5    into the crimes (see ECF No. 209 at 569, citing 16 RT 3332; 18 RT 3656; 20 RT 3948-49, 3955-

6    56, 4004-17), Ms. Branton was apparently not an employee of the sheriff's department and was

7    not involved in the criminal investigation or prosecution. (See generally LD 25-C.1 at 87-90; LD

8    25-C.3 Ex. F ¶ 7, Ex. P.)  Her role was apparently solely to assess Petitioner's mental status upon

9    intake at the jail, not for purposes related to the investigation and prosecution of his crimes, but

10   rather for appropriate mental health service decisions to be made by jail personnel. (See ibid.)

11   Thus, under the clearly established federal law as set forth in Kyles, it would not be unreasonable

12   for the state court to conclude that Petitioner's allegations had not shown that Ms. Branton had

13   been "acting on the [prosecution's] behalf" in his criminal case. See 514 U.S. at 437; see also

14   United States v. Lowe, 676 F. App'x 728, 730–31 (9th Cir. 2017) (report generated by county

15   hospital not in the constructive possession of federal prosecutor, where there was no evidence

16   county hospital was involved in the criminal prosecution or investigation or that the hospital had

17   provided the report to the prosecutor, either actually or constructively); United States v. Venegas-

18   Reynoso, 524 F. App'x 373, 376-77 (9th Cir. 2013) (no obligation under Brady for prosecutor to

19   turn over materials generated in another jurisdiction by agencies not involved in defendant's

20   criminal investigation or prosecution); United States v. Aichele, 941 F.2d 761, 764 (1991) (no

21   obligation for federal prosecutor to obtain and disclose state correctional records, where the

22   correctional authorities were not involved in the investigation or prosecution of the defendant).

23          The California Supreme Court also would have been reasonable under clearly established

24   federal law if it denied relief on the basis that Petitioner himself knew that he had been assessed

25   by Ms. Branton and could have obtained the report in his own jail records, vitiating any argument

26   that the report or its contents were suppressed by the prosecution. The gravamen of the Brady

27   obligation is that due process is offended when a criminal defendant is denied access to

28   information that may materially assist his defense. See Brady, 373 U.S. at 86-88; Agurs, 427 U.S.

1    at 103 (describing the essence of the <u>Brady</u> rule as forbidding suppression of exculpatory or

2    impeachment information "known to the prosecution but unknown to the defense"); <u>Giles v. State</u>

3    <u>of Md.</u>, 386 U.S. 66, 96 (1967) (White, J., concurring) ("any allegation of suppression boils down

4    to an assessment of what the State knows at trial in comparison to the knowledge held by the

5    defense"). Consistent with this notion, several circuit courts—including the Ninth Circuit—have

6    held that evidence is not suppressed for <u>Brady</u> purposes if the defense independently knew or

7    could have known of its factual predicate. <u>See, e.g.</u>, <u>United States v. Brown</u>, 582 F.2d 197, 200

8    (2d Cir. 1978); <u>Raley v. Ylst</u>, 470 F.3d 792, 804 (9th Cir. 2006); <u>United States v. Aichele</u>, 941

9    F.2d 761, 764 (9th Cir. 1991); <u>United States v. Shaffer</u>, 789 F.2d 682, 690 (9th Cir. 1986); <u>United</u>

10   <u>States v. Griggs</u>, 713 F.2d 672, 674 (11th Cir. 1983) (per curiam). In <u>Raley</u>, for example, the

11   Ninth Circuit held that <u>Brady</u> was not violated from the prosecution's failure to provide the

12   defendant's jail records to the defense, because "Petitioner possessed the salient facts regarding

13   the existence of the records that he claims were withheld. Petitioner knew that he had made

14   frequent visits to medical personnel at the jail. He knew that he was taking medication that they

15   prescribed for him." 470 F.3d at 804. As such, "[t]hose facts were sufficient to alert defense

16   counsel to the probability that the jail had created medical records relating to Petitioner. Because

17   Petitioner knew of the existence of the evidence, his counsel could have sought the documents

18   through discovery" and his non-acquisition of the documents could not fairly be attributed to the

19   prosecutor. <u>Ibid</u>.

20        The circumstances here compel the same result. Per Petitioner's allegations, he was aware

21   of the conversation he had with Ms. Branton and alerted defense counsel to it. (LD 25-C.1 at 87.)

22   Armed with this information, defense counsel could have requested Petitioner's jail records or

23   otherwise sought out Ms. Branton to learn the contents of her report and observations of

24   Petitioner during her assessment. <u>See Raley</u>, 470 F.3d at 804. In such circumstances, Petitioner's

25   failure to find the contents of the Branton report was not attributable to prosecutorial suppression.

26   <u>See id.</u>; <u>Aichele</u>, 941 F.2d at 764; <u>Shaffer</u>, 789 F.2d at 690. The California Supreme Court would

27   not have been unreasonable if it reached the same conclusion. <u>See Fauber v. Davis</u>, 43 F.4th 987,

28   1009 (9th Cir. 2022) ("We do not cite these out-of-circuit lower court cases as reflective of

188

1   clearly established law under § 2254(d)(1), but rather as demonstrating that fairminded jurists

2   could reach the same conclusion that these many courts have."); Maxwell v. Roe, 606 F.3d 561,

3   567 (9th Cir. 2010) ("circuit court precedent may be persuasive in determining . . . whether a

4   state court applied [clearly established federal] law unreasonably"); Kessee v. Mendoza-Powers,

5   574 F.3d 675, 679 (9th Cir. 2009) ("because the state court's interpretation is consistent with

6   many other courts' interpretations, we cannot hold that the state court's interpretation was

7   contrary to, or involved an unreasonable application of, Supreme Court precedent.").

8        For the foregoing reasons, the California Supreme Court did not act contrary to nor

9   unreasonably apply clearly established federal law in ruling that Petitioner had not made a prima

10   facie showing of a Brady violation. See 28 U.S.C. § 2254(d). The undersigned recommends

11   Claim 46 be dismissed.

12   **CLAIM 47**

13        In Claim 47, Petitioner alleges that trial counsel was ineffective in the investigation of

14   Petitioner's sanity defense in failing to request his mental health jail records from his post-arrest

15   detention, which included the Branton report. (ECF No. 59 at 334-35.) Petitioner raised this claim

16   in his first petition for writ of habeas corpus. (LD 25-C.1 at 91.) There, he proffered the

17   declaration of defense counsel Meyer, stating that, in one of his early conversations with

18   Petitioner, Petitioner told him that he had been interviewed the morning after his arrest by a

19   woman he had believed was a county mental health worker and that he had told her that he had

20   committed the kidnappings in response to signs from God. (LD 25-C.3 Ex. A ¶ 66(a).) After trial

21   had begun, defense counsel identified this mental health worker as Sandra Branton and

22   interviewed her. (LD 25-C.3 Ex. A ¶ 66(b).) She could not recall much of her interaction with

23   Petitioner and defense counsel Meyer did not recall if, during their conversation, he asked Ms.

24   Branton if she had generated a report from the interview. (LD 25-C.3 Ex. A ¶ 66(b)-(d); see also

25   LD 25-C.3 Ex. F ¶ 7(e).) He did not subsequently make any specific discovery request for any

26   documents or other materials generated by Ms. Branton relative to her interactions with

27   Petitioner. (LD 25-C.3 Ex. A ¶ 66(c)-(d).) After trial, Petitioner's counsel located the report in

28   Petitioner's jail file from the El Dorado County Sheriff's Department (LD 25-C.3 Ex. F ¶¶ 6,

7(c)), which trial counsel confirmed he had not received at the time of trial. (LD 25-C.3 Ex. A ¶ 66(c).) Inter alia, the report reflected that Petitioner was assessed on May 19, 1987, and, at the time, provided erratic answers to questioning and showed signs of suicidality, delusions, paranoia, and psychosis. (LD 25-C.3 Ex. F ¶¶ 6, 7(c)(2)-(3); Ex. P.) If defense counsel had received the report, he would have provided it to the court-appointed and defense-retained mental health experts. (LD 25-C.3 Ex. A ¶ 66(c).) Court-appointed expert Dr. Bittle declared that, if he had seen the report, as well as other specified material, he would have concluded that it was more likely than not that, at the time of the crimes, Petitioner's mental "condition had reached psychotic and delusional proportions" and that, as such, it was more likely than not that he was incapable of distinguishing moral right from wrong at the time of the crimes. (LD 25-C.3 Ex. I ¶¶ 3(d), 4.) Defense-retained experts Drs. Mills, Rosenthal, and Satten all declared that the contents of the report would have strengthened their respective opinions that Petitioner was not sane at the time of the crimes. (LD 25-C.3 Ex. T ¶¶ 7(d), 8; Ex. U ¶¶ 9(d), 10; Ex. V ¶¶ 7(d), 8.)

The California Supreme Court summarily denied relief on this claim. (LD 25-C.5.) The undersigned finds that denial reflects an unreasonable application of clearly established federal law and is therefore not entitled to deference. See 28 U.S.C. § 2254(d)(1).

1. The California Supreme Court's Determination That Counsel's Performance Was Not Deficient Was an Unreasonable Application of Clearly Established Federal Law

As noted, the Sixth Amendment requires not simply counsel, but effective counsel, and in a criminal case, counsel's effectiveness at trial will likely hinge on the reasonableness of the defense investigations that have informed trial strategy and decision-making. See Wiggins, 539 U.S. at 521-22; Strickland, 466 U.S. at 689-91. Some of these investigative tasks are common across all criminal trials: defense counsel must seek and review the evidence on which the prosecution intends to rely, Rompilla, 545 U.S. at 387-88; must know the law governing access to investigative resources and information, Hinton, 571 U.S. 263; Williams, 529 U.S. at 395; Kimmelman, 477 U.S. at 385; and must make appropriate motions to facilitate the development of the defense. Hinton, 571 U.S. 263. When counsel is representing a defendant facing the death penalty, defense counsel must also undertake, at a minimum, investigation into the defendant's

190

1   life history and mental functioning as the groundwork for a mitigation case. <u>Porter v. McCollum</u>,

2   558 U.S. 30 (2009) (per curiam); <u>Wiggins</u>, 539 U.S. at 521-24; <u>Williams</u>, 529 U.S. at 395-96.

3   This includes necessarily obtaining records documenting same: educational, medical, mental

4   health, social service, employment, and incarceration records. <u>See Porter</u>, 558 U.S. 30; <u>Wiggins</u>,

5   539 U.S. at 524-25; <u>Williams</u>, 529 U.S. at 395-96; <u>see also</u> <u>Robinson v. Schriro</u>, 595 F.3d 1086,

6   1108-09 (9th Cir. 2010); <u>Ainsworth v. Woodford</u>, 268 F.3d 868, 877-78 (9th Cir. 2001).

7          Had Petitioner alleged, therefore, that because this was a capital case, counsel had a duty

8   to seek out Petitioner's jail records and mental health service records in their preparations for the

9   penalty phase, there would be no question that such argument reflected clearly established federal

10  law. <u>See Porter</u>, 558 U.S. 30; <u>Wiggins</u>, 539 U.S. at 524-25; <u>Williams</u>, 529 U.S. at 395-96.

11  Petitioner did not allege, however, that this duty arose from counsel's obligation to prepare a

12  mitigation case; instead, Petitioner alleged to the state court that his duty to seek out the records

13  that included the Branton report inhered to his responsibility to undertake reasonable

14  investigations into his sanity defense. (LD 25-C.1 at 80, 91.) This is a more difficult question, as

15  the Supreme Court has never held specifically on the investigation necessary to prepare a sanity

16  defense to satisfy the basic guarantees of the Sixth Amendment.

17         In this circumstance, the state court was called on to apply Supreme Court precedent to

18  novel factual circumstance in a manner consistent with clearly established law, including

19  extending the Supreme Court's rules from its ineffective-assistance-of-counsel jurisprudence to

20  defense counsel's performance in presenting a sanity defense. <u>See Wiggins</u>, 539 U.S. at 520-21;

21  <u>Williams</u>, 529 U.S. at 388, 407-08. Here, the state court was objectively unreasonable if it

22  determined that counsel's failure to seek Petitioner's mental health jail records accorded with

23  clearly established federal law, given that counsel had reason to believe there was probative

24  information in the records, had exhausted other routes to obtain the information, and had elected a

25  sanity defense.

26         In all of the Supreme Court's ineffective of assistance of counsel cases, the Court has

27  emphasized how factually-dependent the inquiry into deficient performance must be: what

28  reasonable counsel would do depends on the nature of the state's evidence against the defendant,

191

1   see, e.g., Hinton, 571 U.S. at 264-66; Rompilla, 545 U.S at 389; and the nature and strength of the

2   available evidence supportive of the defense. Hinton, 571 U.S. at 264-66; Wiggins, 539 U.S. at

3   523-28; see generally Williams, 529 U.S. at 391; Strickland, 466 U.S. at 689-90. As counsel

4   learns of new leads and new possible avenues of defense, he necessarily must make judgment

5   calls as to what lines of investigation to pursue and which to forego. Rompilla, 545 U.S at 389;

6   Wiggins, 539 U.S. at 525-27. Counsel is not deficient for failing to hunt down every iota of

7   potentially-helpful information as he prepares for trial. Richter, 562 U.S. at 107; Van Hook, 558

8   U.S. at 11; Rompilla, 545 U.S at 389; Wiggins, 539 U.S. at 533.

9           On the other side of the coin, however, counsel may only cease certain lines of

10  investigation if such cessation is reasonable under prevailing professional norms, based on the

11  information counsel knew at the time. Wiggins, 539 U.S. at 525-27, 533-34; Strickland, 466 U.S.

12  at 690-91. Counsel's guiding star must be his obligation "to make the adversarial testing process

13  work in the particular case," by bringing to the case all the "skill and knowledge . . . necessary to

14  accord [the] defendant[] the ample opportunity to meet the case of the prosecution." Strickland,

15  466 U.S. at 685, 690. For example, in Hinton, the Supreme Court held defense counsel deficient

16  for making only a rudimentary investigation into the availability of funds to consult with an

17  expert witness in a case where expert testimony would be critical; by failing to investigate this

18  further, counsel was unreasonable. There, the central dispute at the defendant's trial was whether

19  he had been the person who shot two victims and the state's primary evidence were bullets taken

20  from the victims, which a prosecution expert opined matched a firearm seized from the

21  defendant's home. Hinton, 571 U.S. at 264-66. In light of these facts, the defense investigation

22  centered on two areas: development of witnesses to establish the defendant's alibi and

23  investigation into whether the bullets indeed matched the firearm attributed to him. Ibid. The

24  Supreme Court endorsed this as a reasonable approach, id. at 266, 273, but found deficient

25  defense counsel's failure to seek funds for a qualified firearms expert. Id. at 266-68, 273-75.

26  Because of the nature of the material dispute at the guilt phase, "'the only reasonable and

27  available defense strategy require[d] consultation with experts or introduction of expert

28  evidence.'" Id. at 273 (quoting Richter, 562 U.S. at 106). It was incumbent on defense counsel to

1    not simply hire any expert, but to undertake necessary steps—i.e., researching access to

2    funding—to enable him to retain, consult with, and ultimately present the testimony of an expert

3    who counsel believed was qualified enough to further the "present[ation] [of] an effective

4    defense." Id. at 274. Given the nature of the defense, trial counsel was unreasonable for not

5    undertaking these steps and, instead, cutting short the defense investigation after only developing

6    expert testimony that was minimally helpful and highly impeachable. Ibid.

7        The Court reached a similar conclusion in Rompilla. There, defense counsel knew the

8    prosecution intended to introduce as aggravation at defendant's capital trial evidence that

9    defendant had suffered a prior rape conviction and excerpts from that victim's prior trial

10   testimony. 545 U.S. at 383-84, 389. One of the defense's planned themes in the penalty phase was

11   residual doubt and, given this strategy as well as their knowledge of the prosecutor's proposed

12   aggravation, it was essential for defense counsel to undertake reasonable efforts to learn of the

13   facts of the prior conviction. Id. at 378, 385-90. Defense counsel undertook some investigation to

14   support this theme: they interviewed the defendant and some of his family members. Id. at 379-

15   82, 389. They did not, however, review the court file of the prior conviction. Id. at 383. This, the

16   Supreme Court held, was unreasonable because "[n]o reasonable lawyer would forgo examination

17   of the file thinking he could do as well by asking the defendant or family relations whether they

18   recalled anything helpful or damaging in the prior victim's testimony." Id. at 389.

19        Here, the record is unrefuted that defense counsel knew of and began investigating the

20   possibility of a sanity defense before trial. (See 25 RT 4828 (testimony of Dr. Mills); 29 RT

21   5514-15 (testimony of Dr. Rosenthal); LD 25-C.3 Ex. A ¶ 73(a).) This defense was premised on

22   counsel's belief that Petitioner was suffering some form of mental health crisis during the crimes

23   and/or possessed a mental illness that predated the crimes. (LD 25-C.3 Ex. A ¶ 73(a).) Thus, as

24   counsel was investigating the soundness of this defense, he should have, at a minimum, sought

25   Petitioner's mental health records, particularly those generated around the time of the charged

26   crimes. Seidel v. Merkle, 146 F.3d 750, 756 (9th Cir. 1998) (holding defense counsel performed

27   deficiently because, despite knowing defendant had mental health issues, "[c]ounsel did not

28   obtain Seidel's military, prison, or medical records, which obviously would have provided a full

1    account of his mental health history"); see also Correll v. Ryan, 465 F.3d 1006 (9th Cir. 2006)

2    (defense counsel performed deficiently by failing to obtain defendant's available mental health

3    records, where counsel knew that defendant had received past mental health treatment);

4    Summerlin v. Schriro, 427 F.3d 623, 630 (9th Cir. 2005) (a reasonable investigation into a

5    criminal defendant's mental health functioning "includes examination of mental health records");

6    Douglas v. Woodford, 316 F.3d 1079, 1086 (9th Cir. 2003) (counsel deficient for failing to seek

7    records from a previous mental health assessment defendant had undergone, although counsel had

8    constructive knowledge that the assessment had occurred); People v. Monzingo, 34 Cal.3d 926

9    (1983) (holding trial counsel was unreasonable in failing to review defendant's mental health and

10   incarceration records in investigating possibility of diminished capacity defense, where counsel

11   knew defendant had received past mental health treatment, at 1980 California trial). Once defense

12   counsel knew Petitioner had received some form of mental health assessment, interview,

13   treatment, or intervention at the jail the day after his arrest, reasonable defense counsel would

14   have requested those records as one of the most reliable pieces of evidence of Petitioner's

15   functioning at the time. See Jennings v. Woodford, 290 F.3d 1006, 1010-18 (9th Cir. 2002)

16   (holding defense counsel deficient for failing to seek, inter alia, defendant's jail records and

17   medical records once counsel had reason to believe defendant had a history of mental health

18   problems); Seidel, 146 F.3d at 756 (describing jail mental health records specifically, and mental

19   health and incarceration records generally, as critical "objective sources" of a defendant's mental

20   functioning); Evans v. Lewis, 855 F.2d 631, 637 (9th Cir. 1988) (holding defense counsel

21   deficient for failing to investigate defendant's mental health history, including examining his

22   available prison mental health records). Defense counsel's conduct fell below prevailing

23   professional norms in failing to seek these records. See, e.g., Jennings, 290 F.3d at 1010-18;

24   Seidel, 146 F.3d at 756; Monzingo, 34 Cal.3d 926; see also Brown v. Sternes, 304 F.3d 677, 694

25   (7th Cir. 2002) (holding that "where a defense attorney has received information from a reliable

26   source that his client has had a history of psychiatric problems, but failed to adequately

27   investigate this history, counsel failed to provide effective assistance" and observing that "at least

28   six of our sister circuits have arrived at the same conclusion," including the Ninth Circuit).

194

1    Counsel was further unreasonable in failing to seek these records after interviewing Ms.

2    Branton and learning that she could not independently recall the contents of her interactions with

3    Petitioner. Ms. Branton's cloudy memory heightened the necessity for counsel to seek out any

4    records she had generated contemporaneously to her assessment; it was objectively unreasonable

5    for counsel to cease his investigation at the point at which Ms. Branton indicated she could not

6    remember Petitioner's assessment, rather than take the additional step of seeking discovery of any

7    materials she produced from the assessment. Rompilla, 545 U.S at 389; Wiggins, 539 U.S. at 525-

8    27. Indeed, it is precisely because human memories fade that records are so vital in criminal

9    investigation. See Fedorenko v. United States, 449 U.S. 490, 525 n.14 (1981) ("It of course is

10   never easy to demonstrate the existence of statements or events that occurred long ago [because] .

11   . . memories fade, and even the actor's personal knowledge becomes less reliable."); Christopher

12   B. Mueller & Laird C. Kirkpatrick, Modern Evidence § 8.52, at 1323 (1995) (noting that the

13   statements made in ancient documents tend to be more reliable than statements based upon

14   the memory of a witness testifying to the same material years after the fact); Anthony

15   Amsterdam, Trial Manual 5 For the Defense of Criminal Cases, §§ 108, 112, 113 (1988)

16   (promptly upon entry into case, defense counsel should make every effort to obtain records

17   relevant to the defense, as "[w]itnesses may disappear or forget" helpful information); see

18   generally American Bar Association Standards for Criminal Justice: The Defense Function, 2d

19   ed., § 4-4.1 & Commentary (1986) (defense counsel has duty "to conduct prompt investigation of

20   the circumstances of the case and to explore all avenues leading to facts relevant to the merits of

21   the case and the penalty in the event of conviction," including "[i]nformation concerning the

22   defendant's . . . mental and emotional stability"). Here, once trial counsel knew Petitioner's

23   mental state at the time of the crime would be central to the defense, knew that Petitioner had

24   received some form of mental health assessment in jail shortly after his arrest, and knew that the

25   person conducting the assessment had no independent recollection of the assessment, it became

26   incumbent on counsel to seek Petitioner's mental health jail records. The failure to do so was not

27   reasonable. See, e.g., Alcala v. Woodford, 334 F.3d 862, 870-71 (9th Cir. 2003) (trial counsel

28   deficient for failing to investigate and then present at trial a business record that would have

195

1  corroborated defendant's alibi, instead relying on the testimony of witnesses who could not

2  remember if defendant was present on the day of the crime, as the record "would have been far

3  more helpful than the testimony of the[se] alibi witnesses" with imperfect memories); Hart v.

4  Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999) (counsel deficient for failing to seek out business

5  records that would have corroborated a key witness's recollections); see also LD 25-C.3 Ex. A ¶

6  73 (defense counsel had no strategic reason not to request the report).

7      For all of these reasons, the undersigned concludes that Petitioner made a prima facie case

8  of defense counsel's deficient performance for Claim 47 under governing, clearly established

9  federal law and the state court was unreasonable if it concluded otherwise. See Shinn, 141 S. Ct.

10  at 524.

11      2. The California Supreme Court's Determination That Petitioner Had Not Made a Prima

12         Facie Showing Of Prejudice Was an Unreasonable Application of Clearly Established

13         Federal Law

14      Under clearly established federal law, the reviewing court must consider whether "there is

15  a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

16  would have been different." Strickland, 466 U.S. at 694. A reasonable probability is one

17  "sufficient to undermine confidence in the outcome." Id. at 693. The prejudicial effect of a

18  particular action or omission must be viewed in light of the totality of evidence that the jury

19  heard, including whether the error would have likely provoked a particular response or strategic

20  choice by the prosecutor. Rompilla, 545 U.S. at 390-93; Wiggins, 539 U.S. at 534-36; see also

21  Williams, 529 U.S. at 398-99, 418; Strickland, 466 U.S. at 693-94

22      Here, the jury heard copious evidence at the sanity phase. The undersigned shares the

23  assessment of Justice Mosk, who observed, in his dissent to the California Supreme Court's

24  affirmance, that "[t]he trial of the issue of sanity in this case was one of the most complex and

25  extensive of any that [he had] ever examined;" for instance, "[t]he reporter's transcript of the oral

26  proceedings on sanity fills almost 1,700 pages — exceeding the reporter's transcript of the oral

27  proceedings on guilt and penalty *combined.*" Coddington, 23 Cal.4th at 658 (Mosk, J., dissenting;

28  italics in original). To put it in further perspective, the penalty phase in this case lasted

196

approximately one court day. (6 CT 1201-02, 1246; 39 RT 6516-6612; 40 RT 6634-6704.) At the sanity phase, the three defense experts' testimonies, alone, lasted six times longer as the entire penalty phase; the prosecutor's cross-examination of Dr. Mills was itself longer than the entirety of the penalty phase. (See 25 RT 4822-4905; 26 RT 4922-5069; 27 RT 5074-5265; 28 RT 5269-5445; 29 RT 5449-5590; 30 RT 5593-5692; 31 RT 5700-5729.) The volume of expert testimonial evidence at the sanity phase was matched only in its complexity, with all five experts testifying about mental illness symptomology and diagnostics with a depth and degree of nuance likely exceeding any juror's prior, personal familiarity with any of these concepts. (See 42 RT 6762 [trial court states, "In the some 20 years or more of being involved in the trial process of criminal matters, this Court has never seen a more complete exploration and exposition of the issue concerning the Defendant's mental status."].) See generally Coddington, 23 Cal.4th at 558-62 (briefly describing such evidence). The experts' testimonies took up the vast majority of the sanity phase, supplemented only with the brief testimonies of four lay witnesses called by the defense to corroborate information Petitioner apparently told some of the experts, as well as the brief testimony of one prosecution witness describing the materials to which the defense experts had access. (36 RT 6270-6306; 37 RT 6326-71.) In short, the jury in this case was faced with an exceptionally challenging "battle of the experts" at the sanity phase. See generally Ake, 470 U.S. at 81 (when assessing insanity, "the testimony of psychiatrists can be crucial" to the jurors' understanding of the "complex and foreign" issues before them).

Within this context, however, there existed only few areas of disagreement between the experts. Every expert agreed that, at the time of the crimes, Petitioner possessed a mental disease or defect. (25 RT 4831-45 [Dr. Mills]; 28 RT 5282-89, 5315-20 [Dr. Rosenthal]; 30 RT 5600 [Dr. Satten]; 32 RT 5787-99, 5809 [Dr. Kaldor]; 33 RT 5995-6000 [Dr. Bittle].) Every expert agreed that, whatever Petitioner's particular diagnosis might be, his functioning was seriously impaired during the charged crimes, and that his mental disease or defect began manifesting long before the crimes. (25 RT 4836-49 [Dr. Mills]; 28 RT 5288-93, 5315-20 [Dr. Rosenthal]; 30 RT 5600-13 [Dr. Satten]; 32 RT 5787-99, 5806-10 [Dr. Kaldor]; 33 RT 5920-61, 5995-6009 [Dr. Bittle].) The experts also agreed, and the defense conceded that, at the time of the crimes, Petitioner knew the

1  nature and quality of his acts. (25 RT 4876 [Dr. Mills]; 28 RT 5310 [Dr. Rosenthal]; 30 RT 5612-

2  13 [Dr. Satten]; 32 RT 5809-12 [Dr. Kaldor]; 33 RT 6005-09 [Dr. Bittle].)

3         Thus, when the jury deliberated on whether Petitioner "by reason of mental disease or

4  mental defect he was incapable of knowing or understanding the nature and quality of his act or

5  incapable of distinguishing right from wrong at the time of the commission of the" homicides,

6  Coddington, 23 Cal.4th at 608, the only material dispute before them was whether Petitioner had

7  shown that he had been "incapable of distinguishing what is morally right from what is morally

8  wrong" at that time. Ibid. To meet this prong, the defense had presented the testimonies of Drs.

9  Mills, Rosenthal, and Satten, all of whom had concluded that, due to the nature of Petitioner's

10 symptomology, they believed that Petitioner did not believe the homicides were morally wrong

11 when he committed them. (25 RT 4878-82 [Dr. Mills]; 28 RT 5310-12 [Dr. Rosenthal]; 30 RT

12 5612-13 [Dr. Satten].) To counter this, the prosecutor both impeached the defense experts'

13 testimonies in cross-examination and presented the contrary conclusions of Drs. Bittle and Kaldor

14 in rebuttal. See generally Coddington, 23 Cal.4th at 558-63.

15        In this context, the Branton report possesses several features that would have been

16 particularly impactful at Petitioner's sanity phase. First, it would have obviated or dulled the

17 effect of most of the lines of impeachment the prosecutor pursued against the defense experts.

18 The prosecutor impeached the defense experts, and the defense theory generally, on a few bases.

19 One major theme the prosecutor urged was that the defense experts' opinions were not reliable

20 because the testifying defense experts only began examining Petitioner many months after the

21 crime occurred. (See 38 RT 6413-16.) He repeatedly urged that the most reliable evidence of

22 Petitioner's functioning would have been developed as close in time to the crimes as possible.

23 (See 38 RT 6413-16.) Even more specifically, he argued that the defense experts' opinions were

24 unreliable because they had not taken into account the observations—whatever they may have

25 been—of the nontestifying experts who had seen Petitioner prior to their own examinations. (38

26 RT 6414-16; see, e.g., 38 RT 6416 [arguing, "And so when you come into the picture and you're

27 trying to figure out what happened 15 months ago, is it not important to get the results and to talk

28 to the people that saw Mr. Coddington as close to the crimes as is possible rather than to go into

1  this with a wreckless (sic) abandon as to what those people's findings were?"].) In cross-

2  examining Dr. Mills, he pursued this theme at length (see 26 RT 4943-5036; 27 RT 5203), and he

3  raised it again in his cross-examinations of Drs. Rosenthal and Satten, as well. (28 RT 5342-54;

4  29 RT 5512-16; 30 RT 5625-42.)

5          Had the defense experts' opinions been based in part on the contents of the Branton

6  report, however, it is likely the prosecutor would have foregone this area of impeachment or, if he

7  undertook it, that it would have been compellingly rebutted by the defense. Unlike any of the

8  testifying experts, who first assessed Petitioner months after his arrest, Ms. Branton's report

9  reflects her contemporaneous observations of Petitioner mere days after the crimes. (See LD 25-

10  C.3 Ex. F ¶¶ 6, 7(c)(2)-(3); Ex. P.) In it, she recorded observations that Petitioner was displaying

11  signs of delusions and possible psychosis (LD 25-C.3 Ex. P), which was consistent with the

12  defense experts' later opinions that Petitioner was delusional and/or psychotic during the crimes.

13  (25 RT 4830-35 [Dr. Mills opines that, at the time of the crimes, Petitioner suffered from a

14  delusional disorder, which is a form of psychosis]; 28 RT 5281-93, 5310-16; 29 RT 5497-5501,

15  5580-84 [Dr. Rosenthal opines that, at the time of the crimes, Petitioner was psychotic and that

16  delusions are a form of psychosis]; 30 RT 5601-06, 5612-13 [Dr. Satten opines that, at the time of

17  the crimes, Petitioner suffered from a delusional disorder and psychotic disorder].) These

18  opinions were critical to the defense experts' respective conclusions that, at the time of the

19  crimes, Petitioner could not distinguish moral right from wrong and was therefore insane. (25 RT

20  4876-88; 29 RT 5497-5501, 5580-84; 30 RT 5612-13.) Conversely, Drs. Bittle and Kaldor had

21  concluded that Petitioner had not been delusional or psychotic during the crimes. (32 RT 5787-

22  99; 33 RT 5595-6004.) They both indicated, however, that if Petitioner had been delusional or

23  psychotic, then he would have been insane under the statutory definition. (32 RT 5797-5803,

24  5806-07, 5809-12, 5845-46, 5872; 33 RT 6003-10; see also 29 RT 5580-84 [Dr. Rosenthal

25  indicates this understanding of Drs. Bittle's and Kaldor's opinions]; 38 RT 6426-27 [in sanity-

26  phase closing argument, prosecutor urges the jury to credit the opinions of Drs. Bittle and Kaldor

27  that Petitioner did not display psychosis at the time of the crimes].) Thus, the Branton report

28  would have been especially critical, as it provided corroboration for the conclusion that Petitioner

1   was delusional and/or psychotic at the time of the crimes, from a source that, per the prosecutor,

2   would be the most reliable of all of the materials any expert reviewed, as it was generated closest

3   in time to the crimes.

4         Had the defense experts had the benefit of the Branton report, it would also have blunted

5   the effect of another line of the prosecutor's impeachment of defense experts. The prosecutor

6   urged the jury to conclude that Petitioner had successfully deceived all three defense experts

7   about his behaviors, thoughts, feelings, moral beliefs, and mental processes at the time of the

8   crimes. (See, e.g., 38 RT 6416-25, 6437-41.) During sanity phase closing argument, he contended

9   that the jury should infer that whatever symptoms Petitioner had purported to present to Drs.

10  Mills, Rosenthal, and Satten were simply deception, as Petitioner likely had manipulated these

11  mental health professionals by crafting his statements to them based upon what he had gleaned

12  they would be looking for, which he deduced from his earlier assessments with non-testifying

13  experts. (38 RT 6421-25; see also 38 RT 6437-41 [arguing Petitioner had lied to defense experts

14  about the sincerity of his moral beliefs].) In his cross-examination of defense experts, the

15  prosecutor repeatedly probed why the expert had credited anything Petitioner said during his

16  clinical interviews, suggesting that Petitioner had lied when describing his mental processes that

17  the experts would later come to conclude reflected psychotic or delusional thinking. (See 26 RT

18  5015-72; 27 RT 5136-5205; 28 RT 5352-5418; 30 RT 5681-90.)

19        Had the defense experts supported their conclusions with the observations contained in the

20  Branton report (see LD 25-C.3 Ex. T ¶¶ 7(d), 8; Ex. U ¶¶ 9(d), 10; Ex. V ¶¶ 7(d), 8), the jury

21  likely would have been less inclined to conclude that the defense experts' conclusions had been

22  wholly manipulated by Petitioner's deception. Indeed, the report would have directly undermined

23  the prosecutor's premise that Petitioner had slowly learned how to feign symptoms of a

24  delusional or psychotic disorder through his repeated assessments, given that Ms. Branton saw

25  him before any other mental health professional. The corroboration provided by the Branton

26  report, therefore, reasonably may have caused the jury to credit, rather than discount, the

27  reliability of the defense experts' observations and conclusions.

28  ////

1    The Branton report would have further bolstered the credibility of the defense experts,

2    because it reflected that a mental health professional who was not retained by the defense had

3    agreed with the defense experts' conclusions that Petitioner exhibited signs of delusions and

4    psychosis around the time of the crimes. In addition to the areas of impeachment described above,

5    the prosecutor also urged the jury to rely on the opinions of Drs. Bittle and Kaldor over those of

6    the defense experts because, per the prosecutor, by virtue of being appointed by the court, Drs.

7    Bittle and Kaldor were "impartial." (31 RT 5726-27.) He emphasized this theme in both his

8    sanity-phase opening statement and closing argument. (31 RT 5726-27; 38 RT 6426.) Had the

9    jury known, however, that another "impartial" clinician had made observations consistent with

10   the defense experts' conclusions, this may have tipped the balance towards the jury crediting the

11   defense experts' opinions.

12       Had the Branton report been known of before the sanity phase, additional aspects of the

13   trial likely would have changed, as well. As discussed in conjunction with Claim 54, *post*, the

14   prosecutor breached the defense's work product privilege to obtain the names of four non-

15   testifying experts retained by the defense, as well as the dates on which they respectively visited

16   Petitioner in the jail, and used this improperly-obtained information to, repeatedly and at length,

17   cross-examine defense experts on their knowledge of these prior assessments, insinuating that the

18   defense had deprived them of necessary data on which to base their opinions. This was

19   misconduct. See Coddington, 23 Cal.4th at 603-05. The prosecutor's stated explanation for

20   pursuing this line of impeachment was to highlight for the jury that Petitioner's later assessments

21   by the testifying experts were less reliable than those observations of the mental health

22   professionals who had seen him earlier. (See 26 RT 4968.) Thus, had the prosecutor known that

23   the very first mental health professional to assess Petitioner had seen signs of delusions,

24   psychosis, suicidality, and other disorders, the prosecutor would likely have foregone this area of

25   impeachment and, ergo, not engaged in the extensive misconduct through which the jury was

26   asked to speculate on the findings of the non-testifying experts with whom the defense had

27   consulted.

28   ////

201

1   The import of the Branton report goes beyond simply the effect it would have had on the

2   prosecutor's efforts to impeach defense witnesses, however. The Branton report also would have

3   given court-appointed expert Dr. Bittle cause to reverse his opinion and conclude that Petitioner

4   had been insane at the time of the crimes. This would have altered the evidentiary picture for the

5   jury considerably. Dr. Bittle found the information in the Branton report important, particularly

6   the fact that it indicated that Petitioner had been seen by a county mental health worker the

7   morning after his arrest; that the mental health worker reported Petitioner gave "erratic" answers

8   to a mental status examination; and that the mental health worker, when considering how to

9   diagnose Petitioner, "expressly raised concerns about possible psychotic disorder, paranoid

10  ideation, and delusions." (LD 25-C.3 Ex. I ¶ 3(d).) This information suggested to Dr. Bittle that

11  "at a point shortly after the homicides, Mr. Coddington was showing signs suggestive of a

12  disordered thought process." (LD 25-C.3 Ex. I ¶ 3(d).) Had he possessed this information at the

13  time of Petitioner's trial, he would have testified that it was more likely than not that Petitioner

14  had suffered from a psychiatric condition that was "potentially psychotic," that "there was a

15  strong possibility that, at the time of the homicides, his condition had reached psychotic and

16  delusional proportions," and that "it was more likely than not that, at the time of the homicides,

17  his psychiatric condition was such that he was not capable of distinguishing between moral right

18  and moral wrong." (LD 25-C.3 Ex. I ¶ 4.)

19          The record suggests that Dr. Bittle's opinion may have been given particular weight by the

20  jury. As noted above, in his opening statement at the sanity phase, the prosecutor informed the

21  jury that they would hear from the "impartial lips of the court-appointed psychiatrists" that

22  Petitioner was not psychotic and not insane during the crimes. (31 RT 5726-27.) Defense counsel,

23  in the closing argument of the sanity phase, described Dr. Bittle as one of two experts, along with

24  Dr. Mills, who understood Petitioner the best and had been the most thorough in his assessment.

25  (38 RT 6401.) In his closing argument, the prosecutor emphasized the impartiality of both court-

26  appointed experts, but repeatedly referenced the testimony and findings of Dr. Bittle specifically.

27  (38 RT 6426-27, 6429-30.) Again in the defense's rebuttal closing argument at the sanity phase,

28  defense counsel endorsed the testimony of Dr. Bittle, reminding the jury that the prosecutor had

described Dr. Bittle as "impartial" and suggesting the jury credit Dr. Bittle's description of the case as the most complicated of his career. (38 RT 6441.) Defense counsel again encouraged the jury give weight to Dr. Bittle's testimony, describing him and Dr. Mills as the testifying experts with "the most command of the case," who had shown "genuine concern" in his work. (38 RT 6444.) In light of this, it is reasonable to deduce that the jury may have given Dr. Bittle's opinion greater weight than that of other testifying experts. See, e.g., People v. Cruz, 61 Cal.2d 861, 868, 395 P.2d 889 (1964) (where prosecutor emphasized the reliability of certain evidence through cross-examination and closing argument, "[t]here is no reason why [the reviewing court] should treat this evidence as any less 'crucial' than the prosecutor—and so presumably the jury—treated it"].)[31]

Finally, the Branton report would have been particularly important to the defense's case at the sanity phase, because it would have specifically buttressed a finding that Petitioner was displaying signs of delusions and psychosis the day after his arrest. As all of the experts in this case recognized, the nature of those particular forms of impairment bears directly on the legal question of sanity. (25 RT 4876-88; 29 RT 5497-5501, 5580-84; 30 RT 5612-13; 32 RT 5797-5803, 5806-07, 5809-12, 5845-46, 5872; 33 RT 6003-10.) This accords with a widely-held perception by courts and legal scholars that a person experiencing either delusions or psychosis suffers from a gross misperception of reality that is the quintessence of legal insanity. See, e.g., Kahler v. Kansas, __ U.S. __, 206 L. Ed. 2d 312, 140 S. Ct. 1021, 1026 (2020) (describing that if a defendant "killed someone because of an 'insane delusion that God ha[d] ordained the sacrifice[,]'" that would mean "he could not tell moral right from wrong" and would be precluded from criminal liability in most jurisdictions); ibid. (endorsing scholar's view that a person who

---

[31] Had Dr. Bittle testified on behalf of the defense, this very well may have caused the prosecutor to not tout his impartiality for the jury. This result, however, would likely have had its own consequence beneficial for the defense: had the prosecutor not commented on Dr. Bittle's impartiality before the jury, the trial court likely would not have been in a position to discuss its own beliefs about the court-appointed experts' impartiality before the jury, thereby precluding the judicial misconduct described in Claim 60, *post*. See Coddington, 23 Cal.4th at 616 (California Supreme Court finds trial court committed misconduct when, in the jury's presence, it vouched for the impartiality of experts Bittle and Kaldor).

203

1    commits murder pursuant to "an insane delusion" that the murder was morally necessary reflects

2    that he did not know the moral wrongfulness of his act within the meaning of the M'Naughten

3    test); People v. Elmore, 59 Cal.4th 121, 135, 140 ("[A] belief in the need for self-defense that is

4    purely delusional is a paradigmatic example of legal insanity" and "is quintessentially a claim of

5    insanity under the M'Naghten standard of inability to distinguish right from wrong"); People v.

6    Leeds, 240 Cal. App. 4th 822, 831 (2015), as modified on denial of reh'g (Oct. 27, 2015)

7    ("'Obedience to the law is itself a moral duty. If, however, there is an insane delusion that God

8    has appeared to the defendant and ordained the commission of a crime, we think it cannot be said

9    of the offender that he knows the act to be wrong,'" quoting People v. Schmidt, 216 N.Y. 324,

10    338-40, 110 N.E. 945 (1915) (opinion of Cardoza, J.)); People v. Mejia-Lenares, 135 Cal. App.

11    4th 1437, 1456 (2006) ("Persons operating under a delusion theoretically are insane since,

12    because of their delusion, they do not know or understand the nature of their act or, if they do,

13    they do not know that it is wrong."); People v. Duckett, 162 Cal. App. 3d 1115, 1123 (1984)

14    (holding there was no lawful basis for jury to reject sanity defense, where all testifying experts

15    agreed defendant was insane based on unrefuted evidence of his history of psychosis and

16    delusions); see also Skinner, 39 Cal.3d at 784 (holding there was "clearly sufficient evidence, that

17    [the] defendant could not distinguish right and wrong with regard to his act," where the defendant

18    had delusions that God permitted his killing his wife); Lauren Kois et. al., Combined Evaluations

19    of Competency to Stand Trial and Mental State at the Time of the Offense: An Overlooked

20    Methodological Consideration?, 41 Law & Hum. Behav. 217, 219 (2017) (empirically, juries

21    often find a defendant insane where there is evidence of his psychosis).

22         Taken together, the record resolutely demonstrates a prima facie showing of prejudice.

23    The jury here was faced with a nuanced, challenging question of sanity and the record suggests

24    they deliberated carefully over it. They paid particular attention to the opinions of the testifying

25    experts and their reliability, asking to review numerous materials on which the experts testified

26    they had relied. (6 CT 1197; 14 SACT 3853-54; 19 SACT 5061-63; 38 RT 6500-01.) Had the

27    Branton report been discovered to the testifying experts pretrial, the evidence that the jury heard

28    would have been drastically different from the evidence that the jury did hear, particularly on the

1  critical question of whether Petitioner suffered from delusional or psychotic thinking at the time

2  of the crimes. Likely, too, the jury's weighing of such evidence would not have been muddied by

3  the trial court's and prosecutor's misconduct targeting the defense experts' credibility.

4  Considering the totality of these circumstances, a reviewing court cannot help but conclude that

5  there is a prima facie showing of a reasonable probability that this jury would have reached a

6  different sanity verdict had the Branton report been timely found and provided to the testifying

7  experts, such that the sanity verdict is not worthy of confidence. See Strickland, 466 U.S. at 693-

8  94; Rogers v. Dzurenda, 25 F.4th 1171, 1195-96 (9th Cir. 2022).

9       The California Supreme Court's summary denial of this claim reflects an unreasonable

10  application of Strickland and its progeny and, as such, is not entitled to deference. See 28 U.S.C.

11  § 2254(d)(1).

12  **CLAIM 48**

13       In Claim 48, Petitioner alleges that trial counsel was ineffective in failing to obtain a PET

14  (positron emission tomography) scan of Petitioner to support his insanity defense. (ECF No. 59 at

15  336-38.) Petitioner raised this claim in his first petition for writ of habeas corpus, supported by a

16  declaration from Dr. Bittle stating that, before the commencement of Petitioner's trial, he had

17  suggested a PET scan to defense counsel as a "useful diagnostic tool," which may have revealed

18  organic abnormalities in Petitioner's brain, but his understanding was that "[a]t the time,

19  however, Mr. Coddington would have been transported to the Lawrence Laboratory in Berkeley

20  or the University of California, Irvine, for testing." (LD 25-C.1 at 91-94; LD 25-C.3 Ex. I ¶¶ 6-8.)

21  Dr. Rosenthal also declared that he was "virtually certain" that he had told defense counsel before

22  trial that a PET scan could be "an additional useful diagnostic tool in evaluating" Petitioner. (LD

23  25-C.3 Ex. S ¶ 11.) Petitioner also supported his allegations with a declaration from defense

24  counsel Meyer that, "[o]ne of the psychiatrists," whom he recalled being Dr. Rosenthal, "told

25  [defense counsel] prior to trial about the availability of the PET scan procedure," but defense

26  counsel "did not pursue the matter further." (LD 25-C.3 Ex. A ¶ 62.) He was "not aware" that Dr.

27  Bittle considered it a "valuable diagnostic tool," but if he had been so aware, he likely would have

28  sought to have had Petitioner under the procedure. (Ibid.) During his direct appeal proceedings,

1    Petitioner sought a transport order with the California Supreme Court for transport to a facility in

2    which a PET scan could be performed, and the California Supreme Court denied this motion

3    without prejudice, subject to renewal should Petitioner state a prima facie case for relief in habeas

4    corpus and the court issue an order to show cause. (People v. Coddington, No. S008840 (Cal.

5    Sup. Ct. Sept. 5, 1997 & Nov. 12, 1997).) When Petitioner subsequently raised this claim in his

6    first petition for writ of habeas corpus, the California Supreme Court denied it summarily, on the

7    merits. (LD 25-C.5.) The undersigned concludes that that denial was not an unreasonable

8    application of, nor contrary to, clearly established federal law.

9         1.  Legal Principles

10        As set forth above, effective assistance of counsel, under the Sixth Amendment, includes

11   the requirement that defense counsel conduct reasonable investigations or make a reasonable

12   decision that further investigation would be unnecessary. Wiggins, 539 U.S. at 521; Kimmelman,

13   477 U.S. at 385; Strickland, 466 U.S. at 691. In Strickland, the Supreme Court explained,

14               strategic choices made after thorough investigation of law and facts
15               relevant to plausible options are virtually unchallengeable; and
                 strategic choices made after less than complete investigation are
16               reasonable precisely to the extent that reasonable professional
                 judgments support the limitations on investigation. In other words,
17               counsel has a duty to make reasonable investigations or to make a
                 reasonable decision that makes particular investigations
18               unnecessary. In any ineffectiveness case, a particular decision not to
                 investigate must be directly assessed for reasonableness in all the
19               circumstances, applying a heavy measure of deference to counsel's
                 judgments.

20   466 U.S. at 690-91.

21        The Supreme Court has provided a few benchmarks as to what constitutes reasonable

22   investigation in a criminal case. An investigation is unreasonable if counsel have circumscribed

23   their efforts due to misunderstanding of to what materials they legally had access. See Williams,

24   529 U.S. at 395. Unreasonableness may also be demonstrated by showing that the scope of the

25   investigation was less than that urged by contemporaneous professional norms. See Wiggins, 539

26   U.S. at 522-24 (relying on ABA Standards for Criminal Justice and ABA Guidelines for the

27   Appointment and Performance of Counsel in Capital Cases). Finally, an investigation may be

28   constitutionally flawed if defense counsel, without good reason, fails to pursue investigative leads

1    apparent from the information he possesses. Wiggins, 539 U.S. at 525. Counsel do not perform

2    deficiently, however, if they fail to pursue further investigation upon learning of information that

3    suggests that additional investigation would be of little help to the defense. Ibid.; see also Burger

4    v. Kemp, 483 U.S. 776, 794 (1987); Darden v. Wainwright, 477 U.S. 168, 186 (1986); Strickland,

5    466 U.S. at 699. The reviewing court must "apply[] a heavy measure of deference to counsel's

6    judgments" and bear in mind that unreasonableness is not shown by the fact that a more

7    "thorough," "prudent," or "appropriate" investigation was available, Burger, 483 U.S. at 795, but

8    rather that no reasonable trial counsel would have ended the investigation at the juncture at which

9    the petitioner's counsel did, in order to make a reasonable strategic decision about the election

10   and presentation of a defense. Strickland, 466 at 688-91.

11         2.   The California Supreme Court's Denial of this Claim Is Entitled to Deference

12         The California Supreme Court could have reasonably concluded that Petitioner had not

13   made a prima facie showing that defense counsel performed deficiently, based on the record

14   before it. See Shinn, 141 S. Ct. at 524. Petitioner's factual allegations are, at base, that defense

15   counsel was unreasonable in failing to obtain a PET scan of Petitioner upon Dr. Bittle's

16   suggestion, although counsel had received and considered a similar suggestion from a defense

17   expert. (LD 25-C.1 at 91-94; LD 25-C.3 Ex A ¶ 62; Ex I ¶¶ 6-8; Ex S ¶ 11.) Based on the

18   information known to counsel at the time, see Strickland, 466 at 688-91, however, the

19   undersigned cannot conclude every reasonable jurist would agree that no reasonable defense

20   counsel would have failed to act on Dr. Bittle's suggestion for PET scan testing. Richter, 562 U.S.

21   at 105.

22         The record indicates several reasons why reasonable counsel may have foregone a PET

23   scan in the development of Petitioner's sanity defense. In his declaration submitted to the state

24   court in habeas corpus proceedings, Dr. Bittle described a PET scan as "a useful diagnostic tool"

25   for identifying organic brain abnormalities (LD 25-C.3 Ex. H ¶ 6, Ex. I ¶¶ 6-7), but, at the time of

26   trial, Petitioner had undergone several forms of diagnostic tools that could indicate organic brain

27   damage, and none had indicated organicity. Defense expert Dr. Mark Mills testified that

28   Petitioner's testing "demonstrate[d] moderately conclusively there were no organic factors"

1   present relative to Petitioner's mental functioning. (25 RT 4838.) These tests included an MRI,

2   the results of which, per Dr. Mills, showed that "it turns out that Mr. Coddington's brain is

3   normal" (25 RT 4873) and a BEAM scan that also showed his brain functioning was within

4   normal limits. (25 RT 4874.) Defense expert Dr. Fred Rosenthal also testified that he interpreted

5   the MRI and BEAM scan results to reflect no evidence of organic brain damage. (28 RT 5313.)

6   Court-appointed expert Dr. Bruce Kaldor testified that he also considered an organic component

7   to Petitioner's mental functioning, so referred Petitioner to another specialist for testing and

8   ultimately found "no evidence of organic mental disorder." (32 RT 5758-59, 5799.) Petitioner

9   made no allegations in his habeas corpus proceedings that, notwithstanding these findings, there

10  existed at the time indications of his organic brain damage that should have alerted counsel to the

11  appropriateness of further testing. (See generally LD 25-C.1 at 91-94; LD 25-C.3 Ex. A ¶ 62, Ex.

12  I ¶¶ 6-8, Ex. S ¶ 11.) Given this, it was not unreasonable for defense counsel to have relied on the

13  multiple forms of testing Petitioner had undergone, which indicated no organic brain defects, and

14  not pursue additional testing in hopes of a more favorable result without any factual basis to

15  believe such a pursuit would bear fruit. See Wiggins, 539 U.S. at 525; Burger, 483 U.S. at 794;

16  Strickland, 466 U.S. at 699; see also Boyer v. Chappell, 793 F.3d 1092, 1103 (9th Cir. 2015)

17  (defense counsel not deficient for failing to test defendant for brain damage because, "Confronted

18  with multiple medical evaluations, none of which identified organic brain damage, [defense] trial

19  counsel could justifiably have concluded that further investigation was unnecessary"); Leavitt v.

20  Arave, 464 F.3d 609 (9th Cir. 2011) (defense counsel not deficient for failing to seek MRI to

21  determine if defendant had brain damage, where multiple psychiatric assessments had indicated

22  no signs of organicity); Earp v. Cullen, 623 F.3d 1065, 1076 (9th Cir. 2010) ("When there is no

23  'objective indication' that a defendant has . . . brain damage, we cannot label counsel 'ineffective

24  for failing to pursue this avenue'" of investigation); Edwards v. Ayers, 542 F.3d 759, 773 (9th

25  Cir. 2008) (counsel not deficient for failing to further investigate possibility of defendant's

26  organic brain impairment where four consulting experts had found no evidence of it).

27  ////

28  ////

1       Additionally, the record indicates defense counsel did consider the possibility of seeking

2    to have Petitioner undergo a PET scan but forewent it on a reasonable basis: the advice of a

3    defense expert. Defense expert Dr. Mills testified that he and defense counsel had

4           discussed briefly the possibility of obtaining a positron-emission
            tomography, a so-called PET scan, and I said I didn't think it would
5           particularly productive, but it might be, but it was expensive and it
            was a hassle, and it would expose Mr. Coddington to a fair amount
6           of radiation, and it would be logistically very awkward.

7    (26 RT 4941.) Defense counsel would not have been unreasonable in relying on his expert's

8    advice, that the PET scan would be of marginal utility and was not necessary to a reliable

9    diagnosis and that, in light of this, was not worth its challenges. See, e.g., Stokley v. Ryan, 659

10   F.3d 802, 813 (9th Cir. 2011) (trial counsel not deficient for relying on defense expert's

11   recommendations for further testing); Babbitt v. Calderon, 151 F.3d 1170, 1174 (9th Cir.

12   1998), as amended (Aug. 27, 1998) (trial counsel not deficient for relying on psychiatric expert's

13   conclusions).

14       Finally, reasonable trial counsel may have foregone a PET scan given that there was no

15   material dispute at the sanity phase that Petitioner was seriously mentally ill at the time of the

16   crimes and had a long-standing mental illness which impaired his thinking and behavior. See

17   Coddington, 23 Cal.4th at 558-62. The PET scan results could only indicate whether there was an

18   organic etiology to his mental disease or defect, but because this prong of the sanity definition

19   was not in material dispute, defense counsel reasonably could have elected to focus the

20   investigative efforts into more pressing areas of defense. See, e.g., Strickland, 466 U.S. at 699

21   (trial counsel not unreasonable for failing to continue to investigate areas for which evidence is

22   already well-developed); Bobby v. Van Hook, 558 U.S. 4, 11 (2009) (same); cf. Hinton, 571 U.S.

23   at 273 (counsel deficient in failing to investigate sole area of material dispute at trial).

24       For these reasons, the California Supreme Court was not unreasonable in concluding that

25   Petitioner had failed to make a prima facie showing of entitlement to relief and the undersigned

26   recommends that this claim be dismissed. See 28 U.S.C. § 2254(d).

27   ////

28   ////

209

1    **CLAIMS 49 AND 50**

2           In Claims 49 and 50 Petitioner alleges that defense counsel performed ineffectively by

3    failing to provide complete and accurate information to Drs. Bittle and Kaldor. In Claim 49,

4    Petitioner alleges that trial counsel was deficient by failing to provide Dr. Rosenthal's report to

5    Dr. Bittle (ECF No. 59 at 339-40) and, in Claim 50, he alleges that trial counsel was deficient in

6    failing to provide Drs. Bittle and Kaldor with prosecution investigator Birtwell's report of his

7    conversation with Allen Hacker concerning Petitioner and with information from Allen and

8    David Hacker indicating that Petitioner had not been particularly interested in killing women or

9    with using flexible ties as a homicide method. (ECF No. 59 at 341-43.)[32] Petitioner presented

10   these claims to the state court in his first petition for writ of habeas corpus (LD 25-C.1 at 95-98),

11   supported by a declaration from defense counsel Meyer averring that he had not provided Drs.

12   Bittle or Kaldor these materials and that he had no strategic reason for the failure (LD 25-C.3, Ex.

13   A ¶¶ 61, 70), and a declaration from Dr. Bittle averring that, had he had these materials as well as

14   those discussed in Claims 45 and 47, he would have concluded that Petitioner likely had suffered

15   from a biologically-based mental illness with psychotic features at the time of the crimes and was

16   not capable of distinguishing moral right from wrong. (LD 25-C.1 at 84; LD 25-C.3 Exs. H ¶¶ 3-

17   4, I ¶¶ 3-4.)

18           The state court denied both claims summarily, on the merits. (LD 25-C.5.) The

19   undersigned concludes that those denials are entitled to deference.

20           1.  Legal Standard

21           Petitioner identifies the clearly established federal law governing these claims as the

22   general rule that defense counsel performs deficiently if he fails to take reasonable steps to

23   engage in the adversarial process to the extent necessary to ensure the defendant a fair trial. See

24   Strickland, 466 U.S. at 685-86. (See ECF No. 209 at 96-105, 289, 403.) Prejudice is shown where

25   there is a reasonable probability of a more favorable verdict absent the deficiency. Strickland, 466

26

27   [32] In state court, Petitioner had also alleged that the prosecutor committed misconduct by failing
     to convey this information to Drs. Bittle and Kaldor, but he abandons this allegation in the instant
28   proceeding. (ECF No. 209 at 403 n.81.)

1   U.S. at 687-88. There appears to be no clearly established Supreme Court precedent addressing,

2   specifically, the obligations of defense counsel to ensure the accuracy of a mental examination

3   conducted by a court-appointed expert. The Courts have noted, however, the vastly different roles

4   that court-appointed experts and party-retained experts play in a criminal trial. See Ake v.

5   Oklahoma, 470 U.S. 68, 80-82, 84 (1985); Jones v. Ryan, 52 F.4th 1104 (9th Cir. 2022). A court-

6   appointed expert's "findings [are] not confidential" and such expert has "'no obligation to protect

7   or further the interests of the defendant.'" Jones, 52 F.4th at 1128, quoting Lambright v. Schriro,

8   490 F.3d 1103, 1121 (9th Cir. 2007); see Smith v. McCormick, 914 F.2d 1153, 1158-60 (9th Cir.

9   1990). For this reason, it is not unusual for defense counsel to limit the materials he provides the

10  court-appointed expert and to rely on a defense-retained expert to provide an alternative opinion

11  to the jury, based on a far greater swath of underlying data. See Jones, 52 F.4th at 1128-30;

12  Pawlyk v. Wood, 248 F.3d 815, 826 (9th Cir. 2001); Harris v. Vasquez, 949 F.2d 1497, 1517 (9th

13  Cir. 1990); see also Ake, 470 U.S. at 83 (court-appointed expert could not be relied on, as a

14  defense-retained expert would be, to "assist in evaluation, preparation, and presentation of the

15  defense").

16         2.   The State Court's Denial of Claim 49 Was Not Contrary to, or an Unreasonable

17              Application of, Clearly Established Federal Law

18         In the instant case, the state court could have reasonably concluded that Petitioner had not

19  made a prima facie showing that defense counsel's performance in the failure to have provided

20  Dr. Rosenthal's report to Dr. Bittle prior to the latter's testimony reflected an unreasonable

21  tactical judgment or that it prejudiced him. The record demonstrates that Dr. Bittle was provided

22  with extensive materials, including numerous investigative reports of the crimes, Petitioner's

23  military records, Petitioner's academic records, Petitioner's writings, and results of psychiatric

24  testing performed by other clinicians. (5 CT 793-94, 798-99, 807-08, 810-14, 879; 1 SCT 181-

25  239; 2 SCT 240-392, 398-409, 476-89.)

26         Given what Dr. Bittle was provided, the undersigned is not persuaded that every

27  reasonable defense counsel would have provided a copy of Dr. Rosenthal's report to a court-

28  appointed expert. Between the time that Dr. Rosenthal generated the report and the time that he

211

1   testified, the provision of his report to a court-appointed expert would have raised work product

2   concerns for reasonable defense counsel. As this case demonstrates, had Dr. Rosenthal not

3   testified but had his report nevertheless been provided to a court-appointed expert, that expert

4   could have testified to its contents, including to communications between Petitioner and Dr.

5   Rosenthal that had been protected by the attorney-client privilege. See People v. Ledesma, 39

6   Cal.4th 641, 695 (2006); Coddington, 23 Cal.4th 604-06. Thus, prior to Dr. Rosenthal's

7   testimony, a prudent defense counsel may have elected not to disclose Dr. Rosenthal's report to

8   Dr. Bittle in case Dr. Rosenthal did not testify. Once Dr. Rosenthal did testify, these concerns

9   would become moot; at that point, however, the defense had already received notice that Dr.

10   Bittle would be testifying on behalf of the state (see, e.g., 19 SCT 5008-21) and Dr. Bittle had

11   already prepared a report that was unfavorable to the defense. (See 3 SCT 490-66; 33 RT 5895

12   [report completed on April 7, 1988].) Reasonable defense counsel may have decided, in light of

13   this, that it would be more tactically advantageous to present the contrary opinion(s) of defense

14   expert(s), rather than attempt to sway the opinion of the court-appointed expert with the opinion

15   of one of the defense experts. See generally Ake, 470 U.S. at 83; Jones, 52 F.4th at 1128-30;

16   Pawlyk, 248 F.3d at 826; Harris, 949 F.2d at 1517. This may have been especially likely in the

17   instant case, where Drs. Rosenthal's and Bittle's respective testimonies seem to suggest that they

18   relied on the same types of information in reaching their conclusions, giving particular weight to

19   their respective clinical interviews of Petitioner and reviews of his writings. (See 28 RT 5281-84;

20   33 RT 5895-5913; LD 25-C.3, Ex. S at 1-2.) In light of this, reasonable defense counsel could

21   have concluded that there was little to gain from allowing Dr. Bittle to review Dr. Rosenthal's

22   report prior to the former's testimony.

23         Finally, as Respondent aptly argues (ECF No. 189 at 143), reasonable defense counsel

24   could have been concerned that providing Dr. Rosenthal's report to Dr. Bittle before the latter

25   testified could have backfired spectacularly for the defense, had Dr. Bittle disagreed with Dr.

26   Rosenthal's conclusions and then utilized his own testimony to contradict Dr. Rosenthal's

27   opinions or methods. See, e.g., United States v. Nacchio, 555 F.3d 1234, 1265 (10th Cir. 2009)

28   (disclosure of defense expert's report permits the prosecutor to have a "preview of [the]

212

1  Defendant's litigation strategy"); <u>Galentine v. Holland Am. Line-Westours, Inc.</u>, 333 F. Supp. 2d

2  991, 994 (W.D. Wash. 2004) (in a civil context, observing that defendant may be prejudiced if a

3  plaintiff's expert is able to review the defense expert's report before the plaintiff's expert renders

4  her opinion). For all of these reasons, the state court may have reasonably concluded that

5  Petitioner failed to show that no reasonable defense counsel would have omitted Dr. Rosenthal's

6  report from the materials provided to the court-appointed experts.

7      The state court also could have reasonably concluded that Petitioner failed to make a

8  prima facie showing of prejudice from the defense's failure to provide Dr. Rosenthal's report to

9  Dr. Bittle. In cross-examining Dr. Bittle, the defense asked him about the kind of information and

10  observations that Dr. Rosenthal had included in his report: Petitioner's history of disordered

11  thinking, his decompensation in the years before the crimes, and the findings of psychological

12  testing. (34 RT 6021-91; LD 25-C.3, Ex. S at 1-2.) Dr. Bittle discussed his having considered this

13  data, however, nothing changed his opinion concerning Petitioner's sanity. (<u>See</u> 34 RT 6021-91.)

14  Petitioner directs the court to nothing specific in Dr. Rosenthal's report that would have been

15  additional, fruitful grounds for cross-examination, as opposed to the areas of cross-examination

16  that defense counsel did pursue. (<u>See</u> ECF No. 59 at 339-40, 209 at 292-93.) Given this, the state

17  court could have reasonably concluded that there was no basis to deduce that, had Dr. Rosenthal's

18  report been provided to Dr. Bittle, the jury would have heard evidence that was so materially

19  different from that which they did hear, that there was a reasonable probability of a favorable

20  sanity verdict. <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88.

21      For all of these reasons, the state court's denial of Claim 49 was not contrary to, nor

22  reflected an unreasonable application of, clearly established federal law and the undersigned

23  recommends this claim be dismissed. <u>See</u> 28 U.S.C. § 2254(d).

24      3.  The State Court's Denial of Claim 50 Was Not Contrary to, or an Unreasonable

25          Application of, Clearly Established Federal Law

26      The state court also reasonably denied relief on Claim 50. Preliminarily, some of

27  Petitioner's allegations of deficient performance fail as being contradicted by the record. As

28  explained in the discussion of Claim 14, *ante*, nothing in the record before the state court tended

213

1   to establish that the state had knowledge that David Hacker had disavowed a statement that

2   Petitioner had been obsessed with flexible ties as a method of killing people, either from

3   investigator Birtwell's report or another source. To the extent, then, that the instant claim alleges

4   defense counsel performed deficiently for failing to provide Dr. Bittle the purported disavowal

5   contained in the Birtwell report, it must fail.

6          Assuming arguendo that defense counsel was deficient in failing to provide Dr. Bittle

7   materials that contradicted David and Allen Hacker's statements as reported in the FBI reports

8   that Dr. Bittle received, the state court could have reasonably concluded that Petitioner had not

9   made a prima facie showing of prejudice. The FBI statements at issue, attributed to Allen and

10  David Hacker, tended to suggest that Petitioner had been "obsessed" or "especially interested" in

11  particular kinds of homicides long before the crimes in this case. (See ECF No. 59 at 341.) Dr.

12  Bittle's testimony, however, did not appear to credit this perspective. In his testimony, Dr. Bittle

13  described his belief that Petitioner's principal plan was to kidnap and live with the minor girls and

14  that homicide was simply incidental to effectuating that plan. (33 RT 5920-52; 34 RT 6027-28,

15  6087-88.) He did not convey that he believed Petitioner had been obsessed with or interested in

16  homicide, but rather that Petitioner had killed Ms. Martin and Ms. Walsh to keep them quiet so

17  that he could fulfil his ultimate desires with the surviving victims. (33 RT 5920-36; 34 RT 6027-

18  28.) Given, therefore, that Dr. Bittle did not appear to give any particular weight to the statements

19  attributed to Allen or David Hacker, and that his testimony did not suggest those statements had

20  had any effect whatsoever on the clinical opinions to which he testified, a reviewing court could

21  reasonably conclude that there was no showing of prejudice, i.e., no reasonable likelihood that the

22  jury's evaluation of the evidence would have changed in a material way had information

23  contradicting the Hackers' purported statements been provided to Dr. Bittle. See Strickland, 466

24  U.S. at 687-88.

25         Finally, Petitioner made no allegations nor any showing as to how Dr. Kaldor's testimony

26  would have changed had the materials at issue been provided him, or otherwise how the sanity

27  verdict would have been different had these materials been provided to Dr. Kaldor. (See ECF No.

28  59 at 341-43.) The state court was not unreasonable to the extent it denied relief on these

1    unsupported and conclusory allegations. See Pinholster, 563 U.S. at 188 n.12; Gomez, 66 F.3d at

2    204-05; Borg, 24 F.3d 20, 29 (9th Cir. 1994).

3         For these reasons, the state court was not unreasonable in denying relief on Claim 50 and

4    the undersigned recommends it be dismissed.

5    **CLAIM 54**

6         In Claim 54, Petitioner alleges that the prosecutor violated his federal constitutional rights

7    by improperly obtaining information about non-testifying experts consulted by the defense and

8    then cross-examining defense witnesses with and making closing argument highlighting that

9    information. (ECF No. 59 at 362-87.) The California Supreme Court denied this claim on direct

10   appeal in a reasoned opinion. Coddington, 23 Cal.4th at 603-06. The undersigned concludes that

11   denial was an unreasonable application of clearly established federal law.

12        1.   Relevant Proceedings Below

13        At the sanity phase, three defense-retained mental health experts testified on behalf of

14   Petitioner: Dr. Mills, Dr. Rosenthal, and Dr. Satten. See Coddington, 23 Cal.4th at 558-60. The

15   defense had consulted with at least four additional mental health experts, who had had some form

16   of in-person contact with Petitioner while he was awaiting trial; these were Dr. Custer, Dr.

17   French, Dr. Dougherty, and Dr. Mates. (36 RT 6267.) It was undisputed that the experts who

18   testified had not relied on any information from the non-testifying experts in reaching their

19   opinions. (See 26 RT 5009-10, 5014-17; 28 RT 5353-58, 5367-75; 30 RT 5633-44.)

20        Before the sanity phase began, the prosecutor made clear he intended to impeach the

21   testifying defense experts with information concerning Petitioner's contacts with non-testifying

22   experts. Towards the end of the guilt phase, defense counsel brought to the court's attention that

23   the prosecutor had learned the identities of defense consulting mental health experts through his

24   relationship with employees of the county Sheriff's Department:

25             I believe early on in this case I expressed a concern to the Court that
               the Sheriff's Department would relay information to Mr. Tepper
26             concerning the psychiatrists who were visiting our client. And I
               thought that at the time Mr. Tepper and I reached a stipulation on the
27             record that he would not communicate with the jail staff concerning
               who saw our client.
28

215

He had no business making that type of inquiry and I thought the matter was resolved. Since Mr. Coddington has been in Placerville, he's been seen by two psychiatrists. Mr. Tepper gloriously comes before me and announces the name of these people within hours after they see my client. And it's obvious to me, that he is communicating with the Sheriff's Department and getting information as to who's seeing our client.

I think that is contrary to the agreement which was reached early on in this case and I think it's highly inappropriate that he's getting discovery in this fashion.

We have to have psychiatrists sign in when they see our client; that should not be made available to the District Attorney, and it's obvious he's taking advantage of this situation as I have described.

(22 RT 4309.) The prosecutor responded that he had never agreed not to access the jail logs to learn who was visiting Petitioner and now that he "ha[d] the information . . . [he] would intend to use the information." (22 RT 4310.) The court recalled that counsel had previously had an in-chambers discussion about it but could not recall the prosecutor having specifically promised not to seek out and/or utilize information he learned from the jail logs. (Ibid.) Defense counsel represented that the prosecutor had learned the identity of consulting defense expert Dr. Custer through contacts with jail staff. (22 RT 4311.) The court deferred ruling on the issue. (22 RT 4311-12.)

Just before the sanity phase began, defense counsel raised the issue again in a motion in limine. Defense counsel explained that the prosecutor had "indicated in informal discussions that he would like to get into the area of how many psychiatrists we've had evaluate Mr. Coddington, . . . but I think it would be certainly inappropriate to try to discover how many psychiatrists we have had see Mr. Coddington." (19 SACT 4976-77.) The prosecutor initially declined to respond to this argument, concerned that doing so "would compromise [his] trial strategy," but the court opined that allowing the jury to hear that there had been additional, non-testifying experts employed in the case could prejudice the defendant by causing the jury to disdain the extensive judicial resources used in the case. (19 SACT 4977.) Defense counsel agreed with this possibility of prejudice and additionally argued that the jury could draw the inference that the non-testifying experts were not called to testify because they had reached conclusions unfavorable to the defense

216

1    and that, regardless of the prejudice, the prosecutor's conduct had improperly intruded onto

2    defense work product. (19 SACT 4978; <u>see also</u> 19 SACT 4997.)

3         The prosecutor then responded. He first disclosed that "a good portion" of what he had

4    learned about the defense non-testifying experts was from "mutual friends coming up and saying,

5    'Why didn't you call me first?' . . . in effect at cocktail parties." (19 SACT 4979.) He may have

6    "peeked their admissions by perhaps saying something in jest to them." (19 SACT 4979.) He

7    specified that he had learned in this manner that Dr. Mates and Dr. Dougherty "were involved"

8    with the case on behalf of the defense. (19 SACT 4979.)

9         The prosecutor then argued that the jury was entitled to hear that the defense had

10   consulted with non-testifying mental health experts for three reasons. First, the fact that the

11   defense did not call some experts to testifying would suggest that the defense had "shop[ped]" for

12   favorable opinions among experts. (19 SACT 4978-79.) Second, the prosecutor argued that

13   Petitioner had likely learned to become more sophisticated in manipulating the testifying defense

14   experts by having undergone similar examinations with the non-testifying experts, and that

15   defense counsel even may have coached Petitioner to this result. (19 SACT 4980-82, 5000-01.)

16   Third, if the testifying experts did not rely on information from the non-testifying experts in

17   rendering their opinions, then the former could be impeached on the basis that their opinions were

18   premised on incomplete underlying data. (19 SACT 5001-03, 5006-07.)

19        The defense argued that the prosecutor's intrusion into defense work product constituted a

20   due process violation. (19 SACT 4999-5000, 5003.) He also argued that it altered the defense

21   strategy, because the only way to counteract the prosecutor's insinuations would be to call the

22   experts at issue to testify. (19 SACT 4999, 5011.)

23        The trial court ruled that neither the prosecutor's obtaining information about the non-

24   testifying experts nor his use of that information at trial implicated the defense's work product

25   privilege. (19 SACT 4998, 5010.) The court ruled that, under Evidence Code section 352, it was

26   more prejudicial than probative for the prosecutor to utilize his knowledge of Petitioner's

27   examinations by non-testifying experts to insinuate that the defense had shopped for favorable

28   opinions, but it was proper for the prosecutor to rely on this information to suggest that the

1    testifying experts' opinions were unreliable because they were based on incomplete data. (19

2    SACT 5012-14.)

3           The court again considered the issue during the prosecutor's cross-examination of Dr.

4    Mills, the first expert whom the defense called to testify at the sanity phase. During the course of

5    cross-examination, the prosecutor began to question Dr. Mills on his knowledge of other experts

6    who had assessed Petitioner and the defense objected, leading to a bench conference. (26 RT

7    4966-67.) In the bench conference, the prosecutor confirmed having learned of the identities of

8    some of the nontestifying experts from visitor logs at the jail (26 RT 4974-75), and again argued

9    that the line of cross-examination was proper because it suggested Dr. Mills had not relied on the

10   "very pertinent" information of other mental health professionals' assessments of Petitioner,

11   which had occurred closer in time to the crime than Dr. Mills' assessment. (26 RT 4968.) The

12   trial court credited this argument and admonished defense counsel that they could not "hide

13   behind work product." (26 RT 4969-73.) Defense counsel argued that allowing the prosecutor's

14   line of cross-examination violated state law governing work product protections, attorney-client

15   privilege, a statute providing for the confidentiality of defense investigation in capital cases, and

16   the Sixth Amendment. (26 RT 4978-5000.) The court expressed some ambivalence about the

17   propriety of the prosecutor learning information about the nontestifying experts from his

18   relationship with employees of the Sheriff's Department (see 26 RT 4988-89, 4999), but ruled the

19   prosecutor had a right to question the testifying experts on their knowledge that Petitioner had had

20   some contact with other mental health professionals prior to the testifying experts' assessments of

21   him. (26 RT 5001-04.)

22          The prosecutor then cross-examined Dr. Mills about his knowledge of other mental health

23   professionals' contact with Petitioner:

24              Q:    Now, sir, were you aware that a Dr. Custer and his wife had
                      both examined the defendant?
25
                A:    I was unaware that his wife had. I believe Mr. Meyer, at one
26                    point, mentioned that he had consulted a Dr. Custer in
                      reference to some issues of gambling.
27
                Q:    I see. And what did you – and is Dr. Custer a psychiatrist, to
28                    your knowledge?

218

A:   My knowledge does not include whether he is a psychiatrist, psychologist, or a self-proclaimed expert on gambling, or whatever.

Q:   I see. So you're not aware, though, of what his findings were?

A:   That's correct. I am not aware of anything other than that simple fact, as I stated it.

Q:   And how about a psychiatrist, Dr. Al French? He practices in Sacramento, sir. Are you aware that Mr. Coddington was seen by Dr. Al French?

A:   Yes.

Q:   And how is it that you became aware that Mr. Coddington was seen by Dr. Al French, M.D., a psychiatrist?

A:   Mr. Meyer told me.

Q:   I see. And did you ever find out what conclusions or opinions Dr. French reached?

A:   No.

Q:   Now are you aware that the defendant was seen by a Dr. Jacob Mates?

A:   No.

Q:   A psychiatrist who practices in San Francisco, a graduate of Harvard University and also a lawyer, Dr. Jacob Mates, M.D., L.L.B.?

(26 RT 5009-10.) Defense counsel objected to the prosecutor's misconduct in phrasing his

questions so as to get before the jury information about the nontestifying experts' qualifications,

and the court held another bench conference on the issue. (26 RT 5010.) The court confirmed its

earlier ruling, rejecting defense counsel's arguments that even the identities of the nontestifying

experts were protected as work product and attorney-client privileged communications. (26 RT

5010-13.) In the course of this bench conference, the prosecutor again confirmed that he had

learned of the identities of some of the nontestifying experts from jail logs, but stated that,

contrary to his prior representations, he had learned of the identity of Dr. Mates when he

attempted to retain him on behalf of the prosecutor's office. (26 RT 5011-12.)

After this conference, the prosecutor further pursued this line of cross-examination with

Dr. Mills, asking if he was aware of "the constellation of Custer, French, Mates, and Dougherty,

219

1   and Dr. Kurtzman[33] predated Rosenthal, Satten, Kaldor, Bittle, Michael Reid, Steven Wiggins[34]

2   and [Dr. Mills]" and whether he would have wanted to talk to them before rendering his opinion,

3   based on the prosecutor's representation of Dr. Mates' qualifications, representation of the fact

4   that Dr. Custer was "[a] mental health professional," representations that at least some of the non-

5   testifying experts were "psychiatrists," and representations that at least one member of the

6   "constellation" was "a psychiatrist that has been trained in observing, in picking up the more

7   sophisticated nuances of behavior." (26 RT 5014-15.) Dr. Mills agreed that talking to such

8   experts may be "of some value" to his opinion. (26 RT 5014-15.)

9            During the course of this line of questioning, the prosecutor had displayed a piece of paper

10  to the jury and, as Dr. Mills answered his questions, the prosecutor added names to the paper that

11  apparently reflected the mental health professionals who had purportedly seen Petitioner. (27 RT

12  5073; see 26 RT 5015-17.) In addition to listing their names, the prosecutor also "purported to put

13  down the degrees of one of the doctors, Dr. Mates." (27 RT 5073.)

14           The prosecutor then asked Dr. Mills if it was correct that "one, two, three, four, five, six,

15  seven, eight, nine, ten, mental health professionals interviewed and conducted a clinical interview

16  with the Defendant before [Dr. Mills] saw him." (26 RT 5017.) When Dr. Mills replied that he

17  was unaware if that was true, the prosecutor told the court, in front of the jury, that "[defense]

18  counsel and I are going to enter into a stipulation here that Dr. Custer saw the Defendant on

19  August 2nd and again on August 3rd; that Dr. Dougherty saw the Defendant on August the 4th;

20  that Dr. French saw the Defendant on August the 7th." (26 RT 5017.) Defense counsel then

21  informed the court, off the record, that he did not know if any of the dates supplied by the

22  prosecutor were correct. (26 RT 5018.) The court replied that it trusted the prosecutor's

23

24  _____

25  [33] Dr. Kutzman had administered some psychological tests to Petitioner, on which Dr. Mills and
    other testifying experts did rely. (See 26 RT 5007-08; 28 RT 5342-50; 30 RT 5636, 5639; 33 RT

26  5967; 34 RT 6021.)

27  [34] Drs. Reid and Wiggins also had administered neuroimaging tests to Petitioner, the results of
    which Dr. Mills and other testifying experts relied. (See 26 RT 5006-07; 33 RT 5913-14, 5967-

28  68; 34 RT 6021.)

220

1    representations as an officer of the court; defense counsel then agreed to the stipulation. (26 RT

2    5018.)

3          After the bench conference, the prosecutor returned to this line of cross-examination with

4    Dr. Mills. (26 RT 5018.) This time, the prosecutor's inquiries focused on whether Dr. Mills

5    would expect all of the nontestifying experts would have performed their clinical examinations in

6    the same way and, if so, whether Petitioner could have learned to respond to their questions in a

7    deceitful manner. (26 RT 5018-27.) Later, after the prosecutor had continued cross-examining Dr.

8    Mills at length on his knowledge of Petitioner's past deceitful behavior, the prosecutor then asked

9    if Dr. Mills knew if Petitioner had tried to deceive Dr. Dougherty, Dr. Mates, and Dr. French; to

10   each question, Dr. Mills replied that he did not know. (27 RT 5203.)

11         When the second defense expert, Dr. Rosenthal, testified, the prosecutor also cross-

12   examined him on his knowledge of the work of nontestifying defense experts. After Dr.

13   Rosenthal described having referred Petitioner to Dr. Katzman for testing, the prosecutor asked if

14   he was aware that Petitioner had been "seen by other mental health professionals" before Dr.

15   Rosenthal's assessment of him and if he knew their identities. (28 RT 5352.) Dr. Rosenthal

16   responded that defense counsel had mentioned Dr. French and Dr. Custer. (28 RT 5352.) He

17   understood that Dr. Custer was an expert in obsessional gambling disorders, but he did not review

18   any reports by Dr. Custer and was not aware of his conclusions. (28 RT 5353-54.) The prosecutor

19   asked if Dr. Rosenthal would want to know if Dr. Custer had concluded that Petitioner's

20   gambling practices reflected obsession; before Dr. Rosenthal could answer, the prosecutor

21   withdrew the question upon defense objection. (28 RT 5353-58, 5365.)

22         The prosecutor then asked Dr. Rosenthal if he knew Dr. French had examined Petitioner.

23   (28 RT 5367.) Dr. Rosenthal repeated that defense counsel had mentioned it. (<u>Ibid</u>.) The

24   prosecutor asked Dr. Rosenthal if he was acquainted with Dr. French, if they had ever worked

25   together, and, when they worked on the same case, if they "[w]ere on opposite sides." (28 RT

26   5367.) The prosecutor asked if Dr. Rosenthal was in any professional associations with Dr.

27   French and if he knew of Dr. French's reputation as "prominent in the local forensic community,

28   capable in the local forensic community, well-credentialed." (28 RT 5368.)

1    The prosecutor then asked Dr. Rosenthal if he was aware that Dr. Dougherty had
2    examined Petitioner, whether he knew Dr. Dougherty, and whether he had relied on Dr.
3    Dougherty's findings in developing his own opinion, to which Dr. Rosenthal replied he had not.
4    (28 RT 5370, 5374.) The prosecutor asked Dr. Rosenthal if he was aware Dr. Mates had
5    examined Petitioner and whether he knew Dr. Mates. (28 RT 5374.) He then asked if "it would be
6    highly relevant to have the findings of those four people, Dr. Custer, Dr. French, Dr. Dougherty,
7    and Dr. Mates in order for [Dr. Rosenthal] to prepare [his] evaluation of the Defendant." (28 RT
8    5374.) When Dr. Rosenthal replied that he believed he had adequate materials on which to render
9    a reliable opinion, the prosecutor pressed the point, asking, "But, doctor, those people, to the
10   extent that they are mental health professionals, that is, either psychiatrists or psychologists,
11   would you consider it critical that you have access to their findings to make your diagnosis?" (28
12   RT 5375.) Dr. Rosenthal replied that he did not believe they were critical, but he could not say
13   definitively without seeing their findings. (Ibid.)

14   The prosecutor cross-examined the third defense expert, Dr. Satten, similarly. Shortly into
15   his cross-examination, the prosecutor asked Dr. Satten if he was aware of "the history" of
16   Petitioner having been examined by other mental health professionals prior to Dr. Satten's
17   assessment. (30 RT 5625.) When he replied that he knew that Petitioner had been interviewed by
18   Drs. Rosenthal, Bittle, and Kaldor, the prosecutor asked if he knew of any other mental health
19   professionals involved in the case. (30 RT 5633.) In response to the prosecutor's further
20   questions, he testified that defense counsel had told him that these prior contacts had occurred,
21   but he had not received the results of them. (30 RT 5634.) The prosecutor asked if he was aware
22   of the identities and credentials of those persons, and Dr. Satten replied that he knew some of
23   them. (30 RT 5634.) The prosecutor then asked Dr. Satten to state the identities and qualifications
24   of the nontestifying experts of whom Dr. Satten was aware, and Dr. Satten replied that he knew of
25   Dr. Mates, who he believed to be a psychiatrist, and "Kolter, who was supposed to be an expert in
26   gambling and the psychology of gambling." (30 RT 5634.) The prosecutor asked if he meant
27   "Custer," and Dr. Satten replied, "Probably, yes. Thank you." (Ibid.) The prosecutor asked if he

28

222

knew where Drs. Mates and Custer practiced, and Dr. Satten replied that he believed Dr. Mates

practiced in San Francisco and Dr. Custer practiced in Maryland. (30 RT 5634.)

The prosecutor then engaged in the following exchange with Dr. Satten:

> Q:    Now, other than Dr. Mates and Dr. Custer, were you aware of anyone else that had seen the defendant other than Bittle, Kaldor, Rosenthal, Mates, and Custer?
>
> A:    No, I was not aware of anybody else.
>
> Q:    So you didn't know that a Dr. Al French, a psychiatrist, had seen the defendant?
>
> A:    No, I did not.
>
> Q:    Did you know that a Dr. Frank Dougherty, a psychologist, had seen the defendant?
>
> A:    Yes, I knew that.
>
> Q:    So when you told me who you knew and who you didn't, I refreshed your recollection by mentioning Dougherty?
>
> A:    Yes.
>
> Q:    What did you understand Dr. Dougherty's involvement to have been?
>
> A:    He was a psychologist who reviewed some previous psychological testing and specifically went into details of the responses the defendant gave on the MMPI.
>
> Q:    So it was your impression, sir, that Dr. Dougherty became involved after others had given psychological testing?
>
> A:    Yes.
>
> Q:    Now, if I told you that Dr. Dougherty became involved before any other people had given psychological testing, would that have any bearing on your opinion?
>
> A:    No.

(30 RT 5635.) The prosecutor then asked if Petitioner could have learned to become more

sophisticated in his responses to Dr. Satten due to his past contacts with "Dr. Custer from

Maryland, Dr. Frank Dougherty, Dr. Al French, . . . Dr. Jacob Mates" and others, to which Dr.

Satten replied it might have been possible. (30 RT 5637-38.) Later, the prosecutor asked if it

could have been valuable to see how Petitioner had responded to questions posed by Drs. Custer,

1   Mates, and French, and Dr. Satten replied that it might be valuable. (30 RT 5644.) The prosecutor

2   followed this by asking, "But that's something you don't have access to?" to which Dr. Satten

3   assented. (30 RT 5644.)

4         Throughout the cross-examinations of Drs. Mills, Rosenthal, and Satten, defense counsel

5   repeatedly objected to the questions described herein, which the trial court overruled. (26 RT

6   5014, 5018, 5020, 5203; 28 RT 5353, 5354-58, 5368-69; 30 RT 5633; see also 27 RT 5073

7   [objecting to the prosecutor's demonstrative exhibit].)

8         At the close of the sanity phase, the parties entered a stipulation that,

9         The official records of the El Dorado County Jail, Lake Tahoe
          Division, would show that the defendant, Herbert James Coddington,
10        was visited by Dr. Custer on August 2nd and August 3rd, 1987; by
          Dr. Al French on August 7th, 1987; by Dr. Frank Dougherty on
11        August 4th, 1987; and by Dr. Jacob Mates on December 9th, 1987.

12   (36 RT 6267.) The defense entered the stipulation with the proviso that they maintained their

13   objection to any of this information being before the jury. (36 RT 6267; see also 35 RT 6205.)

14         In his closing argument at the sanity phase, the prosecutor argued that the jury should rely

15   on the fact of Petitioner having previously been seen by four non-testifying mental health

16   professionals and draw inferences negative to the defense from that fact. He began his argument

17   by acknowledging that the jury could rely on the opinions of the mental health experts who had

18   testified but suggested that the defense experts were not credible and their opinions were not

19   reliable. (38 RT 6409-13.) In making this argument, he stated:

20         I'm talking about the fact that this crime happened back on May 16th
          and May 17th of 1987. It was not until January, seven months later,
21        that the Defendant entered the plea of not guilty by reason of insanity.
          And in that interim of some seven months, four mental health
22        professionals, other than the ones you heard, on behalf of the defense
          examined Mr. Coddington. And then the trial was set to commence
23        on June 20th, and following the commencement of the trial, those
          doctors that appeared here, or certain of those doctors, were still
24        examining Mr. Coddington. . . . and some of the other doctors were
          not even aware of the fact that any of these workups had been done
25        beforehand. And you have to ask yourself does that make good
          medical sense.
26

27   (38 RT 6413.) The prosecutor then analogized, at length, to a patient needing heart surgery and

28   whether it would be medically sound for the operating cardiologists to have no idea what the

1    patient's previous physicians had observed. (38 RT 6413-15.) He capped this analogy by

2    explaining, "I could carry this out point by point, but I'm telling you that simply because it's

3    psychiatrists does not mean that they do not have an obligation to go about their work in a

4    professional manner where they know what's going on." (38 RT 6415.) He then continued:

5           I don't attribute any connivance or evil to these gentlemen. The
            defense team are professionals, and they are honorable men. But you,
6           as jurors, must ask yourself what is going on here when there have
            been four prior mental health professionals and we have no
7           knowledge of what their findings were, and the doctors that finally
            did the workup have no knowledge of what their findings were. And
8           bear in mind when the defense psychiatrists are examining Mr.
            Coddington, indeed a portion of the examination is how does he
9           present himself today, but the really critical gut issue is what was
            going on in that man's mind 15 months ago.
10
            And so when you come in the picture and you're trying to figure out
11          what happened 15 months ago, is it not important to get the results
            and to talk to the people that saw Mr. Coddington as close to the
12          crime as is possible rather than to go into this with a wreckless (sic)
            abandon as to what those peoples' findings were?
13

14   (38 RT 6415-16.)

15          On direct appeal, Petitioner argued that the prosecutor's conduct violated state law, as

16   well as Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. (LD 25-

17   B.1 at 306-33.) The California Supreme Court denied relief on the merits:

18          In preparation for the sanity phase of the trial, appellant was
            examined by seven psychiatrists retained by the defense. Only Drs.
19          Mills, Rosenthal, and Satten were called to testify. The names of the
            other experts were not revealed to the prosecutor,[33] who learned them
20          through jail sign-in sheets and social contacts.

21                 FN33:    At the close of the sanity phase the parties
                   stipulated that Drs. Custer, Mates, French, and
22                 Dougherty had visited appellant in jail.

23          In anticipation that the prosecution would seek to elicit evidence that
            those experts had also examined appellant, appellant sought an in
24          limine ruling that reference to those examinations be excluded on
            grounds that admission of evidence that other psychiatrists had seen
25          appellant and the content of their interviews would violate the
            attorney-client and work product privileges. The prosecutor
26          acknowledged that he might seek to argue to the jury that the defense
            had consulted several experts before finding ones who would testify
27          that appellant was legally insane and seek to establish that an
            individual who took psychological tests repeatedly could become
28          sufficiently familiar with them to tailor responses favorably.

                                          225

The court ruled that the fact that additional psychiatric reports existed was not shielded as work product, and that during cross-examination of the testifying experts, those experts could be asked if they were aware that other studies and tests had been done. The actual reports were within the work product privilege. Defense counsel then agreed with the court that admission of evidence that other examinations had been made might raise an Evidence Code section 352 problem and the court ruled that eliciting evidence that the defense had been "shopping around" for psychiatric experts was more prejudicial than probative and could not be admitted unless for some legitimate purpose other than simply showing that additional psychiatrists had examined appellant.

During cross-examination of Drs. Mills, Rosenthal, and Satten the prosecutor was permitted, over objection based on the work product and attorney-client privileges, to ask whether they were aware that Drs. Custer, Mates, and French had evaluated appellant. He was also permitted, over objection, to list the credentials of Dr. Mates.

In closing argument during the sanity phase the prosecutor emphasized that the defense experts who did testify were engaged many months after the crimes were committed and had no knowledge of the findings of the psychiatrists, engaged by the defense, who had examined appellant earlier and closer to the time of the events.[34]

> FN 34: Arguing that the presentation of expert evidence did not compel the jurors to leave behind their common sense and logic in assessing whether the experts were persuasive, the prosecutor said: "I'm talking about the fact that this crime happened back on May 16 and May 17 of 1987. It was not until January, seven months later, that the Defendant entered the plea of not guilty by reason of insanity. And in that interim of some seven months, four mental health professionals, other than the ones that you heard, on behalf of the defense examined Mr. Coddington." Suggesting that a surgeon would not proceed without considering reports and opinions of others who had examined the patient, he argued that psychiatrists have the same obligation and that "[Y]ou, as jurors, must ask yourself what is going on here when there have been four prior mental health professionals and we have no knowledge of what their findings were, and the doctors that finally did the workup have no knowledge of what their findings were . . . . And bear in mind . . . the really critical gut issue is what was going on in that man's mind 15 months ago. [¶] And so when you come in the picture and you're trying to figure out what happened 15 months ago, is it not important to get the results and to talk to the people that saw Mr. Coddington as close to the crime as is possible rather than to go into this with a reckless abandon as to what those people's findings were?

////

226

Appellant claims that this violated both the attorney-client and work product privileges, constituted impermissible comment on the exercise of a privilege (Evid. Code, § 913),[35] and denied him due process and the right to counsel guaranteed by the Fifth and Sixth Amendments to the United States Constitution.

FN 35: Evidence Code section 913: "(a) If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding.

"(b) The court, at the request of a party who may be adversely affected because an unfavorable inference may be drawn by the jury because a privilege has been exercised, shall instruct the jury that no presumption arises because of the exercise of the privilege and that the jury may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."

In light of the interrelationship between Evidence Code sections 952, 954, and 913, we deem counsel's objection on attorney-client privilege ground as one encompassing violation of Evidence Code section 913.

We agree that the prosecutor's use of this information was improper. While there was no violation of the attorney-client privilege, the prosecutor's cross-examination of the defense experts and his argument did violate the work product privilege. Any error in permitting the questions and argument was harmless, however.

The attorney-client privilege is "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." (Evid. Code, § 954.) That privilege encompasses confidential communications between a client and experts retained by the defense. (Evid. Code, § 952; *People v. Lines* (1975) 13 Cal.3d 500, 509–510, 119 Cal.Rptr. 225, 531 P.2d 793.) Neither evidence that appellant had been examined by experts other than those who testified nor evidence that the testifying experts were aware or not aware of the opinions of the nontestifying experts disclosed a confidential communication between defense counsel and appellant or appellant and any psychiatrist. Therefore, the decision of the defense to call only three of the experts who had examined appellant did not constitute the exercise of the attorney-client privilege and comment was not precluded by Evidence Code section 913.

The work product privilege, now codified in Code of Civil Procedure section 2018 and applicable in criminal as well as civil proceedings (*People v. Collie* (1981) 30 Cal.3d 43, 59, 177 Cal.Rptr. 458, 634

227

1    P.2d 534), absolutely bars the use of statutory discovery procedures
     to obtain "[a]ny writing that reflects an attorney's impressions,
2    conclusions, opinions, or legal research or theories" (Code Civ.
     Proc., § 2018, subd. (c)), and bars discovery of any other aspect of
3    an attorney's work product, unless denial of discovery would unfairly
     prejudice a party. (*Id.,* subd. (b).)
4
5    This privilege reflects "the policy of the state to: (1) preserve the
     rights of attorneys to prepare cases for trial with that degree of
     privacy necessary to encourage them to prepare their cases
6    thoroughly and to investigate not only the favorable but the
     unfavorable aspects of the case; and (2) to prevent attorneys from
7    taking undue advantage of their adversary's industry and efforts."
     (Code Civ. Proc., § 2018, subd. (a).)
8
9    The prosecutor's cross-examination and his invitation to the jury to
     infer that defendant had been examined by other experts who had not
10   been called to testify contravened that policy. Work product
     encompasses the investigation of defendant's mental state to assess
     both the favorable and the unfavorable aspects of the case. It also
11   encompasses counsel's impressions and conclusions regarding
     witnesses who would be favorable and those who would not be so.
12   (*Nacht & Lewis Architects, Inc. v. Superior Court* (1996) 47
     Cal.App.4th 214, 217, 54 Cal.Rptr.2d 575.) It follows that the party's
13   decision that an expert who has been consulted should not be called
     to testify is within the privilege. (*County of Los Angeles v. Superior
14   Court* (1990) 222 Cal.App.3d 647, 656–658, 271 Cal.Rptr. 698.)

15   The prosecutor did not seek or learn the identities of the nontestifying
     experts through discovery. Regardless of how the information is
16   obtained, however, if a party were permitted to use information about
     pretrial investigation that reveals opposing counsel's thought
17   processes and reasons for tactical decisions, thorough investigation
     would be discouraged. By inviting the jury to infer that the other
18   experts were not called because their testimony would not be
     favorable, the prosecutor also took advantage of defense counsel's
19   efforts and industry. Appellant failed to object to that aspect of the
     argument, however, and his questions to the defense experts who did
20   testify elicited only answers that knowledge of the nontestifying
     experts' opinions would not have had any bearing on their own
21   diagnoses. For that reason, and because defendant's mental state was
     thoroughly explored by the five experts who did testify, and those
22   experts disagreed only as to the severity of his mental illness, any
     error in permitting the cross-examination was clearly harmless.
23

24   Coddington, 23 Cal.4th at 603-06.

25        2.   The State Court Was Unreasonable Under Clearly Established Federal Law In Finding

26   That the Prosecutor's Misconduct Did Not Violate Petitioner's Constitutional Rights

27        In its opinion, the state court acknowledged that Petitioner had argued that the

28   prosecutor's misconduct violated his federal constitutional rights, but, in denying relief, only

                                          228

1    expressly held that the prosecutor's misconduct did not prejudice him under the state-law

2    standard. Coddington, 23 Cal.4th at 604-06. The parties do not dispute that this reflects a denial

3    on the merits of the federal constitutional claim. (See ECF No. 189 at 152 n.19; ECF No. 209 at

4    197-206.) The state court's denial of the constitutional aspect of this claim, therefore, is entitled

5    to deference if there is any reasonable basis for it. See Johnson, 568 U.S. at 301-02; Richter, 562

6    U.S. at 98-100.

7         The state court was unreasonable in concluding that the prosecutor's misconduct did not

8    violate Petitioner's rights under the federal constitution. The state court's analysis recognized the

9    prosecutor's in-court behavior—his cross-examination of defense witnesses and argument to the

10   jury—as the only misconduct that occurred. See Coddington, 23 Cal.4th at 606. Under clearly

11   established federal constitutional law, the prosecutor's use of his position to intrude upon defense

12   work product in the first instance, by seeking out information from Sheriff's Department staff

13   about the identities of mental health professionals visiting Petitioner pretrial, combined with his

14   later exploitation of that intrusion at trial, violated Petitioner's Sixth Amendment and due process

15   rights.

16        a.   Sixth Amendment Right to Counsel

17        The Sixth Amendment guarantees the right to effective counsel for a criminal defendant.

18   Strickland, 466 U.S. at 686; Powell v. State of Ala., 287 U.S. 45, 58 (1932). The Supreme Court

19   has recognized that the work-product doctrine, in a criminal defense context, is necessary for

20   counsel to function effectively. In United States v. Nobles, 422 U.S. 225, 238 (1972), it held the

21   work-product doctrine was "vital" to "assur[e] the proper functioning of the criminal justice

22   system," in that it "provid[es] a privileged area within which [defense counsel] can analyze and

23   prepare his client's case." See also Hickman v. Taylor, 329 U.S. 495, 510-11 (1947)

24   (emphasizing the importance of work product protections to the proper functioning of counsel).

25   The state's infringement into the defense's work product may violate the Sixth Amendment

26   where it has "compromised [defense] counsel's ability to investigate and prepare the defense case

27   thoroughly." Nobles, 422 U.S. at 240 n.15; see also Weatherford v. Bursey, 429 U.S. 545, 549

28   (1977) (state's violation of criminal defendant's privileged communications with his attorney

                                          229

1  violates the Sixth Amendment where the record shows "at least a realistic possibility of injury to

2  [the defendant] or benefit to the State"); cf. United States v. Morrison, 449 U.S. 361, 364-65

3  (1981) (describing cases where state agents intruded on attorney-client privilege as Sixth

4  Amendment violations); Geders v. United States, 425 U.S. 80, 91 (1976) (holding trial court's

5  limitation on criminal defendant's contact with his counsel was a Sixth Amendment violation).

6          The Supreme Court's decision in Weatherford is instructive. There, Mr. Weatherford was

7  an undercover law enforcement agent who committed an act of vandalism with Mr. Bursey and

8  others. 429 U.S. at 547-49. When Mr. Bursey was arrested, Mr. Weatherford was fictitiously

9  arrested and charged as well, in order to maintain his undercover status. Ibid. Mr. Weatherford

10  then attended meetings with Mr. Bursey and his attorney, where they discussed trial tactics. Ibid.

11  Mr. Weatherford did not share with the prosecution any information he obtained from those

12  meetings, but he later testified at Mr. Bursey's trial regarding his undercover activities and the

13  vandalism. Ibid. After his conviction, Mr. Bursey sued Mr. Weatherford and others, alleging a

14  deprivation of his Sixth Amendment right to the assistance of counsel. Ibid.

15          The Supreme Court held that Mr. Bursey's Sixth Amendment rights had not been violated

16  for several reasons. First, the jury heard no evidence nor anything else that Mr. Weatherford had

17  learned from his attendance at the meetings with Mr. Bursey and his lawyer. Weatherford, 429

18  U.S. at 555. Second, there was a factual finding that Mr. Weatherford had not communicated

19  anything about the contents of those meetings to the prosecuting attorney or any other member of

20  the prosecution team. Id. at 556. Third, the prosecution had not directed Mr. Weatherford to

21  attend the meetings for the purpose of gleaning information about the defense strategy. Id. at 557

22  ("Moreover, this is not a situation where the State's purpose was to learn what it could about the

23  defendant's defense plans and the informant was instructed to intrude on the lawyer-client

24  relationship or where the informant has assumed for himself that task and acted accordingly.")

25  Based on these reasons—"[t]here being no tainted evidence in this case, no communication of

26  defense strategy to the prosecution, and no purposeful intrusion by Weatherford"—the Sixth

27  Amendment was not violated. Id. at 558.

28  ////

1        Under this guiding authority, the state court was unreasonable in failing to recognize that

2   the State violated Petitioner's Sixth Amendment right to counsel when the prosecutor sought out,

3   obtained, then used to his advantage at trial, defense work product.[35] Here, the record was

4   undisputed that the prosecutor intentionally sought out information about the identities of mental

5   health professionals who had seen Petitioner, for the purpose of ascertaining the defense trial

6   strategy. The prosecutor admitted unrepentantly that he had sought this information from

7   employees of the Sheriff's Department, who monitored the visitor logs of the jail housing

8   Petitioner, and from nontestifying experts with whom he conversed. (22 RT 4311; 26 RT 4974-

9   75, 5011-12; 19 SACT 4979.) Unlike Weatherford, where the prosecutor had no knowledge of the

10  informant's improperly-gained information concerning defense strategy, here, the prosecutor not

11  only knew of this information—for he had been the one to intentionally seek it—but relied on it

12  in forming his trial strategy, apprising the trial court well before the commencement of the sanity

13  phase that he intended to use the defense's work product as a basis for cross-examining the

14  defense experts and for impeaching the defense's sanity-phase theory generally. (22 RT 4310; 26

15  RT 4968; 19 SACT 4978-5007.) Finally, unlike in Weatherford, the jury heard of the information

16  deriving from the defense's work product; indeed, the prosecutor placed it before the jury in

17  virtually every conceivable fashion. He repeatedly and at length examined the defense experts on

18  their knowledge of the defense work product. (26 RT 5009-10, 50014-27; 27 RT 5203; 28 RT

19  5352-58, 5367-74; 30 RT 5625-44.) These questions, at times, included factual information that

20  the witness had not supplied, including the names, credentials, and favorable professional

21  reputations of the non-testifying experts, and dates on which they saw Petitioner. (26 RT 5009-10,

22  5014-15; 28 RT 5367-68, 5375; 30 RT 5634-35.) He created a demonstrative exhibit for the jury,

23  comprised of identifying facts about the nontestifying experts, which he referenced during his

24  cross-examination. (26 RT 5015-17, 5073; 27 RT 5073.) In the jury's presence, and apparently

25  without defense counsel's agreement, he announced that the defense would stipulate to facts that

26

27  [35] The state court found that, as a matter of state law, the prosecutor had violated Petitioner's
    attorney work product. Coddington, 23 Cal.4th at 605-06. The federal court must defer to that
28  determination. See Bradshaw, 546 U.S. at 76.

1   the prosecutor had learned from his intrusion into the defense work product. (26 RT 5017-18.) In

2   his closing argument, he forcefully advocated that the jury should consider the information

3   concerning the nontestifying experts and pressed the jury to draw inferences negative to Petitioner

4   from that information. (38 RT 6413-16.) In short, the record here undisputedly shows a Sixth

5   Amendment violation under Weatherford, as the totality of circumstances demonstrates that the

6   state's intrusion on defense work product created "at least a realistic possibility of . . . benefit to

7   the State." See Weatherford, 429 U.S. at 549.

8           For the same reasons, the record satisfies the Court's holding in Nobles that the

9   prosecutor's violation of defense work product "compromised [defense] counsel's ability to

10  investigate and prepare the defense case thoroughly." See Nobles, 422 U.S. at 240 n.15. Before

11  the sanity phase began, defense counsel learned that the prosecutor was endeavoring to learn what

12  mental health professionals were seeing Petitioner and was intending to use this information to

13  counter the defense case at the sanity phase. (See 22 RT 4309-11; 19 SACT 4976-77.) This would

14  logically have had a chilling effect on the defense preparations, as counsel would need to weigh

15  the benefit from consulting with a particular expert in developing the defense strategy against the

16  potential cost of the prosecutor using the fact of that consultation adversely to the defense.

17  Elsewhere, both the California Attorney General and the California Supreme Court have

18  recognized that this creates a constitutionally intolerable dilemma for defense counsel, as counsel

19  cannot "'ha[ve] to steer between the Scylla of . . . disclosing some of the defense to the

20  prosecution and the Charybdis of keeping the defense secret but, in so doing, foregoing the

21  necessary . . . preparation'" of the defense. People v. Anderson, 43 Cal.3d 1104, 1133 (1987)

22  (quoting 66 Ops. Cal. Atty. Gen. 407, 408-410 (1983).) The prosecutor's action additionally

23  altered the defense strategy because, through his cross-examination, the defense was faced with

24  the additional dilemma of whether to call as witnesses the consulting experts whom they had not

25  expected would testify to rebut the prosecutor's insinuations about their work, or to not call those

26  persons as witness and thereby leaving the insinuations unrefuted. (See 19 SACT 4999, 5011.)

27  Ergo, it appears on this record that the nature of prosecutor's violation of defense work product

28

1    would have comprised defense counsel's ability to competently investigate and prepare the

2    defense case at the sanity phase. See Nobles, 422 U.S. at 240 n.15.

3         For these reasons, the state court's failure to recognize the prosecutor's misconduct as

4    violative of Petitioner's Sixth Amendment rights was unreasonable.

5         The state court was also unreasonable in concluding that the error was harmless. Under

6    clearly established federal law, the prejudice for violations of the federal Constitution is analyzed

7    under Chapman, 386 U.S. 18, when the claim arises on direct appeal. This includes claims that

8    the introduction of certain evidence or the misconduct of the prosecutor violated the defendant's

9    Sixth Amendment right to counsel. Moore v. Illinois, 434 U.S. 220, 232 (1977); Milton v.

10   Wainwright, 407 U.S. 371 (1972). In considering prejudice, the reviewing court considers the

11   totality of evidence on which the jury rested its verdict. Yates, 500 U.S. at 404-05.

12        Here, the state court concluded that the prosecutor's misconduct was harmless because the

13   prosecutor's "questions to the defense experts who did testify elicited only answers that

14   knowledge of the nontestifying experts' opinions would not have had any bearing on their own

15   diagnoses" and "because defendant's mental state was thoroughly explored by the five experts

16   who did testify, and those experts disagreed only as to the severity of his mental illness."

17   Coddington, 23 Cal.4th at 606. That characterization understates the record so greatly as to be

18   unreasonable. As detailed in the undersigned's discussion of Claim 47, the sanity phase evidence

19   presented a challenging and narrow question for the jury, for which expert testimony was

20   essential and on which the defense-retained and court-appointed experts disagreed; namely, did

21   Petitioner's mental defects manifest during the crimes as delusions, psychosis, or some other

22   impairment that precluded his understanding of moral right and wrong. In order to reach any

23   conclusion about this question, the jury had to rely on the testimony of the experts. In so doing,

24   they necessarily had to reach decisions on how credible the defense experts were and how much

25   weight to give any of their testimonies. The prosecutor's repeated insinuations, comments,

26   questions, and argument encouraged the jury to conclude that the defense experts had reached

27   their opinions based on incomplete data and, further, to deduce that the defense had strategically

28   chosen certain experts to testify and chosen what materials to provide them in order to manipulate

1    the jury. In short, the state court's analysis elided the very nature of what the material dispute was

2    for the jury at the sanity phase, as well as the total evidentiary picture they were provided to

3    resolve that question. In this way, it was unreasonable. See Yates, 500 U.S. at 404-05; Chapman,

4    386 U.S. 18.

5          The state court was also unreasonable by concluding that the prejudicial effect of the

6    prosecutor's questions, comments, and argument was mitigated by the fact that the defense

7    testifying experts "answer[ed] that knowledge of the nontestifying experts' opinions would not

8    have had any bearing on their own diagnoses." Coddington, 23 Cal.4th at 606. This misstates the

9    record, thus reflecting an unreasonable factual conclusion under section 2254(d)(2). Upon the

10   prosecutor's cross-examination on the issue, Dr. Mills agreed that learning what the nontestifying

11   experts had observed in Petitioner could have been "of some value" to his opinion. (26 RT 5014-

12   15.) Dr. Rosenthal similarly testified, when pressed by the prosecutor, that he could not rule out

13   that the nontestifying experts' findings would have assisted him in making a diagnosis, but he

14   could not say with certainty without having seen their findings. (28 RT 5375.) Dr. Satten likewise

15   testified on cross-examination that it may have been valuable to his diagnosis to have learned how

16   Petitioner had responded to questions posed by the non-testifying experts. (30 RT 5644.) Thus,

17   because the state court's finding of no prejudice was premised, in part, on a factual finding that

18   was unreasonable because it was contradicted by the record, its determination of this issue is not

19   entitled to deference under 28 U.S.C. section 2254(d)(2). See Pinholster, 563 U.S. at 184 n.7.

20         When viewing the record accurately, the state court's conclusion of no prejudice becomes

21   even more unreasonable. By conceding that the unknown information possessed by the

22   nontestifying experts may very well have influenced their conclusions about Petitioner, the

23   defense experts provided the prosecutor with the very strategic advantage he sought to achieve:

24   he was able to generate a doubt in the reliability of the opinions of the testifying defense experts

25   as the jury considered and weighed them. This was demonstrated floridly in the prosecutor's

26   closing argument at the sanity phase, wherein he elaborately compared the defense testifying

27   experts to inept physicians who rush into surgery without obtaining a medical history of their

28   patient. The state court's opinion failed to account for how the experts' capitulations to the

1    prosecutor's premise amplified the effect of the misconduct, given the totality of what the jury

2    heard. It therefore was unreasonable under clearly established federal law. See Brown, 142 S. Ct.

3    at 1517, 1520, 1525.

4              b. Fifth Amendment Right to Due Process

5              The California Supreme Court was also unreasonable under clearly established federal law

6    in failing to recognize that the prosecutor's conduct violated Petitioner's due process rights. Due

7    process is violated where the jury receives evidence that is so extremely unfair that its admission

8    violates "fundamental conceptions of justice," United States v. Lovasco, 431 U.S. 783, 790

9    (1977), which reflect "'the community's sense of fair play and decency.'" Dowling v. United

10   States, 493 U.S. 342, 353 (1990) (quoting Rochin v. California, 342 U.S. 165, 173 (1952)); see

11   generally Darden, 477 U.S. at 181; Donnelly, 416 U.S. at 643. While "the Due Process Clause has

12   little to say regarding the amount of discovery which the parties must be afforded, . . . it does

13   speak to the balance of forces between the accused and his accuser." Wardius v. Oregon, 412 U.S.

14   470, 474 (1973). Under the due process clause, "[t]he State may not insist that trials be run as a

15   'search for truth' so far as defense witnesses are concerned, while maintaining 'poker game'

16   secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the

17   details of his own case while at the same time subjecting him to the hazard of surprise concerning

18   refutation of the very pieces of evidence which he disclosed to the State." Id. at 475-76.

19             That is precisely what occurred here. The prosecutor took "undue advantage of [his]

20   adversary's industry and efforts," see Rico v. Mitsubishi Motors Corp., 42 Cal.4th 807, 817-18

21   (2007), violating both state law and the fundamental notions of a fair criminal trial. His

22   intentional, repeated intrusions into defense work product for the purpose of gleaning the defense

23   strategy and developing a cross-examination tactic to derogate it were grounds for discipline

24   under state law, including his disqualification from the case. Rico, 42 Cal.4th at 819; State Comp.

25   Ins. Fund v. WPS, Inc., 70 Cal. App. 4th 644, 655 (1999). Courts expect even higher ethical

26   standards from prosecutors than they do attorneys in civil cases. See, e.g., Morrow v. Superior

27   Ct., 30 Cal. App. 4th 1252, 1262 (1994), as modified (Jan. 5, 1995). A California prosecutor

28   performs a "unique function . . . in representing the interests, and in exercising the sovereign

                                          235

1  power of the State." People v. Espinoza, 3 Cal.4th 806, 820 (1992). He or she "is not only the

2  defendant's adversary, but is also the 'guardian of the defendant's constitutional

3  rights.'" Morrow, 30 Cal. App. 4th at 1254-55. Thus, he or she must not "act in a manner that

4  circumvents and thereby dilutes the protection afforded by the right to counsel." Maine v.

5  Moulton, 474 U.S. 159, 171 (1985)

6        Elsewhere, the California courts have recognized this. In Gardner v. Superior Ct., 185 Cal.

7  App. 4th 1003 (2010), the California Court of Appeal held that the statute providing for

8  confidentiality of defense investigation in capital cases had been enacted "to insure that every

9  safeguard designed to guarantee defendant a full defense be observed" because a human "life is at

10  stake" in capital cases. Id. at 1010 (citing Woodson v. North Carolina, 428 U.S. 280, 305 (1976)

11  and Keenan v. Super. Ct., 31 Cal.3d 424, 430 (1982)). In Morrow, the Court of Appeal held that

12  "the court's conscience is shocked" such that dismissal was the appropriate remedy, where the

13  prosecutor had "orchestrate[d] an eavesdropping upon a privileged attorney-client communication

14  in the courtroom and acquire[d] confidential information." Morrow, 30 Cal. 4th at 1261.

15  Although prosecutors "may strike hard blows, [they are] not at liberty to strike foul ones," Berger

16  v. United States, 295 U.S. 78, 88 (1935), and "[b]y conspiring to violate petitioner's

17  constitutional rights, the prosecutor struck a foul blow." Morrow, 30 Cal. 4th at 1261; see

18  also id. at 1254-55 ("The intentional breach of the prosecutor's duty is the antithesis of his or her

19  obligation.").

20        Having breached his ethical duties by seeking out defense work product in order to form

21  trial tactics to counter them, the prosecutor then consummated the due process violation by

22  utilizing the information he had learned to his advantage at trial. The prosecutor's misconduct

23  served to lighten his burden in defending against Petitioner's sanity case, as he utilized this

24  information to impeach defense experts, substantiate such impeachment with a stipulation, and

25  argue to the jury that they should find in the State's favor based in part on deductions they drew

26  from the defense work product. Moreover, as described above, it necessarily had a ripple effect

27  on the defense's preparations for trial, as they had to plan their trial strategy for "the hazard of

28  surprise concerning refutation of the very pieces of evidence which" the prosecutor had

1   improperly learned. See Wardius, 412 U.S. at 475-76. In short, the prosecutor's actions unfairly

2   tipped the balance in his favor, contravening the most foundational precepts of due process. See

3   ibid.; Lovasco, 431 U.S. at 790; Dowling, 493 U.S. at 353. The California Supreme Court was

4   unreasonable in failing to recognize this.

5          By finding no prejudice, the state court necessarily concluded that reversal was not

6   required under Donnelly, i.e., that the prosecutor's misconduct had not "infected the trial with

7   unfairness." Donnelly, 416 U.S. at 634; Darden, 477 U.S. at 183 n. 15; see Ford v. Perry, 999

8   F.3d 1214, 1225 (9th Cir. 2021), cert. denied, 214 L. Ed. 2d 58, 143 S. Ct. 169 (2022)

9   (California's standard for prejudice for state law errors, set forth in Watson, is the equivalent to

10  Darden's standard for whether prosecutorial misconduct rendered a trial fundamentally unfair in

11  violation of the defendant's due process rights); People v. Frye, 18 Cal. 4th 894, 966, 959 P.2d

12  183, 220 (1998) (the reviewing court's finding of harmlessness under California's state-law

13  standard necessarily means it found no federal due process violation). This was unreasonable. For

14  the reasons set forth in the previous sections, the state court should have also found that the

15  prosecutor's misconduct infected the trial with unfairness, given the totality of evidence before

16  the jury at the sanity phase, the narrowness of the material disputes at the sanity phase, and the

17  critical importance of the jurors' judgment of the defense experts' credibilities in resolving those

18  material disputes. Cf. People v. Anderson, 43 Cal.3d 1104, 1133-34, 742 P.2d 1306, 1322 (1987)

19  (trial rendered fundamentally unfair where disclosure of defense work product "ma[kes] its way

20  to the prosecution"). The state court's determination that the misconduct was not prejudicial

21  under Watson—and thus did not meet the standard for showing a due process violation as a

22  matter of federal constitutional law—was unreasonable in light of the totality of the record before

23  the state court.[36] See Richter, 562 U.S. at 98, 102.

24

---

25  [36] Neither party has, at this stage, briefed whether Petitioner has proven his entitlement to relief
    on this claim under Brecht. The undersigned concludes that Petitioner's allegations of prejudice
26  are not plainly meritless (see Shinn, 142 S.Ct. at 1737, 1739; Coleman, 501 U.S. at 755), but
    defers reaching a recommendation on whether this claim should be granted or denied on the
27  merits until such time that both parties have had an opportunity to brief the issue. See, e.g.,
    Lonberg v. City of Riverside, 571 F.3d 846, 849 (9th Cir. 2009).
28

1    For all of these reasons, the state court's denial of Claim 54 is not entitled to deference. 28

2    U.S.C. § 2254(d).

3    **CLAIM 55**

4    In Claim 55, Petitioner alleges that trial counsel was ineffective in failing to obtain an

5    agreement on the record with the prosecutor that he would not seek out the work product

6    described in Claim 54, or for failing to obtain a court order directing the Sheriff to maintain

7    confidentiality for Petitioner's jail visiting logs. (ECF No. 59 at 388.) Petitioner presented this

8    claim in his first petition for writ of habeas corpus, which the state court denied summarily. (LD

9    25-C.5.) The undersigned finds that the denial is entitled to deference.

10    In order to make a prima facie showing of deficient performance, Petitioner had to show

11    that no reasonable defense counsel would have failed to take the steps that he had identified. See

12    Strickland, 466 at 688-91. In other words, he would have to show that it was objectively

13    unreasonable for defense counsel to trust that the prosecutor would not seek out defense work

14    product in order to use it to his advantage at Petitioner's trial. The undersigned cannot agree. As

15    the Attorney General recognizes, "The state court could have reasonably concluded that a

16    reasonably competent counsel would not have anticipated that the prosecutor would violate an

17    informal agreement regarding the discovery of experts. Moreover, a reasonably competent

18    attorney would not likely anticipate that the prosecutor would violate the work-product privilege

19    ...." (ECF No. 189 at 153.) The prosecutor's conduct in this case fell below the standards the

20    judicial system and its actors expect of a prosecutor. Under California law at the time, in every

21    case, both civil and criminal, "[a]n attorney ha[d] an obligation not only to protect his client's

22    interests but also to respect the legitimate interests of fellow members of the bar, the judiciary,

23    and the administration of justice." Kirsch v. Duryea, 21 Cal.3d 303, 309 (1978). In a comparable

24    situation in a civil case, the California Supreme Court held an attorney acted unethically for

25    utilizing his opponent's ill-gotten work product in preparing his own case for trial, such that it

26    was proper for the trial court to have disqualified him. Rico, 42 Cal.4th at 819. "Courts expect

27    even higher ethical standards from prosecutors," however, than other members of the bar.

28    Morrow, 30 Cal. App. 4th at 1262. Thus, it is "outrageous" and "shock[ing]" for a prosecutor to

1   intentionally invade the province of the defendant's attorney-client relationship. Id. at 1261, 1263

2   n.4. The California Supreme Court could reasonably have found that here, the prosecutor's

3   actions were so inconsistent with his basic obligations as an officer of the court that a reasonable

4   defense counsel would not have expected him to have undertaken them. On this basis, the state

5   court could reasonably have found that defense counsel was not deficient under prevailing law.

6   The denial of this claim is therefore entitled to deference. See 28 U.S.C. § 2254(d)(1).

7   **CLAIM 56**

8       In Claim 56, Petitioner alleges that his trial was rendered fundamentally unfair by the

9   prosecutor's questioning of defense sanity-phase expert Dr. Satten concerning the prosecution's

10  right to have Petitioner examined by a mental health expert. He raised this on direct appeal, which

11  the California Supreme Court denied on the merits. The undersigned concludes that denial is

12  entitled to deference.

13      1.  Relevant Proceedings Below

14      On cross-examination, the prosecutor asked defense expert witness Dr. Satten if he had

15  known that Petitioner had been examined by other mental health professionals prior to Dr.

16  Satten's interview. (30 RT 5625.) Dr. Satten responded that he understood that Petitioner had

17  been previously examined by Dr. Kaldor and Dr. Bittle. (30 RT 5626.) Then, the following

18  exchange occurred:

19      Q:   Do you have an understanding as to their capacity in
20           evaluating Mr. Coddington? . . . In other words, who direct
             that they do what they did? Who told them to go see this
21           young man and make an evaluation?

22      A:   I don't know for sure. It was either the Court or yourself, the
             prosecuting attorney.

23      Q:   Doctor, do you believe that I have a right to cause a defendant
24           to be examined by a psychiatrist retained by the prosecution?
             Is that your understanding of the state of the law in California,
25           that I would have a right to have either Dr. Bittle or Dr.
             Kaldor sit down with that gentleman and perform that kind of
26           evaluation?

27      A:   Under certain circumstances, I think you do have the right. I
             could be wrong about that.

28      Q:   I see. Do you know of any cases that allow that to happen?

239

(30 RT 5626.) Defense counsel then objected on relevance grounds, which the court overruled.

(30 RT 5627.) The prosecutor then continued:

> Q:   Do you know any case law or any statutory law that allows the prosecution to retain a psychiatrist or psychologist that could sit down with the defendant and have a right absent agreement by the defense to do that?
>
> A:   Well absent agreement, no. With agreement, yes.
>
> Q:   All right. So that if these gentlemen had agreed, that could have taken place. Did you think that was the fact?
>
> A:   No, I thought he was – the doctors were probably appointed by the Court.

(30 RT 5627.) The defense objected again, which the court sustained. (30 RT 5627-30.) Defense counsel asked the court to strike the problematic questions and their responses. (30 RT 5630.) The court then admonished the jury:

> two or three questions ago by the district attorney a comment was made and it wasn't put as a question by [the prosecutor]. And the comment was to the effect: So if these gentlemen had agreed, that could have taken place, i.e., the psychiatric exam of the defendant by a doctor retained by the prosecution. That comment by the district attorney is struck. The jury is cautioned to disregard it and treat it as though you'd not heard of it.

(30 RT 5630.)

On direct appeal, Petitioner argued that the prosecutor's questions, to the extent they implied Petitioner had refused to allow a prosecution psychiatric expert to examine him, were misconduct that violated his due process rights. The California Supreme Court denied this, holding that the prosecutor's questions were misconduct under state law but were not prejudicial:

> During his cross-examination of Dr. Satten, a defense witness, the prosecutor asked the witness who had asked Drs. Bittle and Kaldor to see appellant, to which the witness replied that he did not know and "it was either the Court or yourself, the prosecuting attorney." The prosecutor followed up by asking the doctor if he thought a prosecutor had the right to have a defendant examined; the doctor responded that he believed this was possible in some circumstances. The prosecutor then asked if the witness had cases for that proposition. Defense counsel objected on relevancy grounds, but the court ruled that the question was appropriate since the witness had been offered as a forensic expert in psychiatry. The witness said that this was possible only with the consent of the defense. When the prosecutor then asked if "these gentlemen" (defense counsel) had

240

1   agreed it could have taken place, and the witness responded that he thought the court had appointed the doctors, defense counsel again
2   objected to the inappropriate line of inquiry and renewed his earlier objection on the ground that the witness had been asked for a legal
3   opinion.

4   The court ordered the jury to disregard the answer that the examination could take place if defense counsel agreed. The judge
5   expressed doubt that allowing the jury to know that the prosecutor may not have a defendant examined was inappropriate, and ruled that
6   asking if there were any cases asked for "historical fact," not a legal opinion.

7

8   Appellant contends that the prosecutor's comment, that the People had no right to have the defendant examined and the insinuation that appellant had refused to consent, denied due process. To the extent
9   that this is a claim that the prosecutor's line of questions was misconduct, we agree. What the witness thought about who ordered
10  the examinations by Drs. Bittle and Kaldor was irrelevant, as was the witness's understanding of the law. His expertise was in the field of
11  psychiatry. As a forensic expert, he dealt with psychiatric questions that arise in judicial and administrative proceedings, but that did not
12  qualify him as an expert who may offer an opinion on the law. While the prosecutor did not directly state that he had no right to have the
13  examination performed, the questions and the answers he elicited conveyed that impression and thereby conveyed an erroneous
14  impression of the law. When a defense of insanity has been offered, the defendant waives the Fifth and Sixth Amendment rights to the
15  extent necessary to permit the prosecution to obtain an examination of the defendant's condition. The defendant may preserve his rights
16  by refusing to cooperate, but comment on that refusal is permissible. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1190 [9 Cal.Rptr.2d 834,
17  832 P.2d 146].)

18  Thus, the prosecutor could have requested that the defendant submit to an examination.
19
20  To the extent that this is a claim that the court erred in admitting irrelevant evidence, we also agree.

21  We do not agree that either the questions or the testimony elicited from Dr. Satten caused any prejudice to the defense, however. Even
22  assuming the jury believed that the prosecution did not have the right to seek an examination of defendant, there is no basis for assuming
23  that they believed that additional evidence about appellant's mental condition would have been more effective in impeaching the defense
24  experts than was the testimony of Drs. Bittle and Kaldor, who were called as prosecution witnesses. And, if the jury believed that the
25  prosecution did have such a right if appellant agreed, but that he had refused to submit to examination, the fact that he had submitted to
26  examination by the two psychiatrists appointed by the court would dispel any inference that the refusal was because appellant had
27  something to hide. The jury was aware that appellant had been examined by the five psychiatrists who testified and had given
28  generally consistent information to each. Thus, there is no likelihood

241

1

that the jury would assume that appellant feared that one selected by
the prosecution might elicit different, damaging information.

2

3   Coddington, 23 Cal.4th at 611-12.

4          2.   The California Supreme Court's Denial of This Claim is Entitled to Deference

5          Here, the state court was reasonable in finding that, although the prosecutor's questions

6   were improper, Petitioner had not shown that his federal constitutional rights were violated. The

7   undersigned has set forth *ante* the clearly established federal law governing claims of

8   prosecutorial misconduct. Critically for this claim, the Supreme Court has established a high bar

9   for showing that a prosecutor's comments or questions were so egregious, pervasive, or otherwise

10  likely to influence the jury's assessment of the evidence that the trial was rendered fundamentally

11  unfair. See Darden, 477 U.S. at 181-83. Further, when the trial court gives the jury a curative

12  instruction, it is presumed that the jury follows it and that no due process violation occurred,

13  unless the record demonstrates an "overwhelming probability that [the jury] will be unable" to

14  follow the instruction and "a strong likelihood that the effect of the evidence would be

15  devastating to the defendant." Greer, 483 U.S. at 766, 767 n.8; see also People v. Tully, 54

16  Cal.4th 952, 1020 (2012) (same presumption exists as a matter of California state law).

17         Here, Petitioner cannot show that no reasonable jurist would find that he had failed to

18  make a showing of a due process violation under clearly established federal law. In Greer, the

19  Supreme Court held that the record "clearly" demonstrated that, under the totality of the

20  circumstances, a prosecutor's improper comment did not violate the defendant's due process

21  rights because "[t]he sequence of events [was] a single question, an immediate objection, and two

22  curative instructions." Greer, 483 U.S. at 766-67. The same result obtains in the instant case.

23  Almost immediately after the prosecutor made the improper comments, defense counsel objected

24  and the trial court admonished the jury to disregard the comments. (30 RT 5630.) At the time of

25  the admonition, defense counsel raised no issue with its verbiage or otherwise indicated to the

26  trial court that they believed the admonition inadequate. (See 30 RT 5630.) At the end of the

27  sanity phase, the court again instructed the jury that they could not consider for any purpose "any

28  evidence that was stricken out by the court." (38 RT 6484-85.) Petitioner makes no argument as

1  to why these particular instructions would have been unable to be followed by the jury, by an

2  overwhelming probability. See Greer, 483 U.S. at 767 n.8.

3         The prosecutor's comments, too, were brief, reflecting a few lines amongst Dr. Satten's

4  lengthy testimony, rather than part of a pervasive pattern of continuing misconduct. See

5  Donnelly, 416 U.S. at 639. Because the comments occurred during the prosecutor's cross-

6  examination of a defense witness, the defense had the option of addressing them directly or

7  indirectly in their redirect examination of Dr. Satten and/or closing argument, thereby

8  distinguishing this case from those where the offensive comments were among the last things the

9  jury heard before deliberation, without defense challenge. See, e.g., United States v. Velazquez, 1

10  F.4th 1132, 1140 (9th Cir. 2021); see generally Darden, 477 U.S. at 182 (reviewing court must

11  consider comments in context of entire trial). Under Greer and related precedent, it would not be

12  unreasonable for the state court to conclude that the totality of these circumstances indicated that

13  no due process violation occurred. See Greer, 483 U.S. at 766-67; Darden, 477 U.S. at 182.

14         For these reasons, the state court's denial of this claim was not contrary to, or an

15  unreasonable application of, Supreme Court authority. The undersigned recommends that Claim

16  56 be dismissed.

17  **CLAIMS 58 AND 59**

18         In Claim 58, Petitioner alleges that the prosecutor committed prejudicial misconduct by

19  commenting on Petitioner's demeanor, both while he was in the presence of the jury and while he

20  was not, when cross-examining defense witness Dr. Mills. (ECF No. 59 at 399-02.) Petitioner

21  raised this claim on direct appeal. (LD 25-B.1 at 340-43.) The California Supreme Court denied

22  the claim in a reasoned opinion. Coddington, 23 Cal.4th at 612-13. Respondent argues that this

23  claim is procedurally barred or, alternatively, that the state court's merits denial is entitled to

24  deference. (ECF Nos. 102 at 4-5, 189 at 156-58.) The undersigned concludes that the state court's

25  denial of this claim through application of the contemporaneous objection rule is entitled to

26  deference and that Petitioner cannot show prejudice in an analysis of whether there is cause and

27  prejudice to excuse that procedural default.

28  ////

In Claim 59, Petitioner alleges that his trial counsel performed ineffectively by failing to object to the conduct identified in Claim 58. (ECF No. 59 at 403-04.) He raised this claim on direct appeal and again in his first petition of habeas corpus, which the California Supreme Court denied. (LD 25-C.5.) Coddington, 23 Cal.4th at 612-13. The undersigned concludes that those denials are also entitled to deference.

1.   Relevant Proceedings Below

Towards the end of the prosecutor's cross-examination of sanity-phase defense expert witness Dr. Mills, the prosecutor probed him on whether he believed "we [are] dealing with a trickster of the first order or are we dealing with a fairly honorable man?" (27 RT 5183.) Defense counsel objected to the prosecutor's use of the word "trickster" and the jury was dismissed as the court and counsel discussed the objection. (27 RT 5183-88.) At the end of the recess, the jury returned to the courtroom and the prosecutor immediately took up this line of questioning again, commencing with the following:

Q:      Doctor, you've had a chance to observe Mr. Coddington during the trial?

A:      Between trying to answer your questions, I have had, yes, some chance.

Q:      When the jury is out, have you had an opportunity to engage Mr. Coddington in conversation, just as you did?

A:      Yes.

Q:      And do you notice when the jury is not here, he's a rather ebullient, engaging gentleman, eager to talk?

A:      I'm not sure I would characterize it quite that way.

Q:      How would you characterize it, sir?

A:      That he is willing to talk, that he appears somewhat lonely.

Q:      Do you notice that he's particularly eager to engage you in conversations about gambling and odds and the practices of different clubs?

A:      That's true today. It hasn't been true in the previous days.

Q:      Doctor, getting back to . . . when you interviewed him, you had the awareness of his motive to dissimulate. You were aware that he was a very intelligent individual, almost in the

244

1                  genius category. Did you have any awareness, sir, that he might be person well practiced in deceiving and deception?

2

3        A:     Well, I was aware that his gambling practices involved a certain amount of deception.

4  (27 RT 5188-89.) The prosecutor then continued questioning Dr. Mills at length as on his

5  knowledge of and deductions from conduct that the prosecutor characterized as deceitful. (27 RT

6  5189-5211.)

7        On direct appeal, Petitioner argued that the prosecutor's comments and questions to Dr.

8  Mills were misconduct as violations of Petitioner's rights under the Fifth, Sixth, and Fourteenth

9  Amendments and that defense counsel was ineffective for failing to object. (LD 25-B.1 at 340-

10  43.) The California Supreme Court denied relief, explaining:

11             Appellant complains that the prosecutor questioned Dr. Mills regarding appellant's asserted "ebullience" during conversations

12             with the witness while the jury was not present. He complains that the questions were designed to suggest to the jury that he was putting

13             on an act when the jury was present, and to invite the inference that appellant was a deceitful person. This, he claims, constituted

14             prosecutorial comment that infringed his Fifth Amendment right not to testify, denied due process by introducing irrelevant evidence, and

15             violated his Sixth Amendment right to confrontation and cross-examination by offering the prosecutor's observations.

16

17             To the extent that this is a claim of prosecutorial misconduct or of the erroneous admission of evidence, it was waived by appellant's

18             failure to object. It lacks merit in any event. The prosecutor's questions were not comments or evidence. The jury was instructed

19             that the statements of counsel are not evidence and that the jurors should never assume an insinuation suggested by a question was true.

20             It is not improper to call the jury's credibility of a witness. (*People v. Heishman* (1988) 45 Cal.3d 147, 197 [246 Cal.Rptr. 673, 753 P.2d

21             629].) This was not an improper invitation to the jury to infer criminal conduct from appellant's behavior. A major theme of the

22             prosecution in the sanity phase was that appellant had the ability to and had in fact manipulated the experts who examined him. It is not

23             improper to suggest to a jury through evidence and comment based thereon that a defendant is a "con man." (*People v. Stansbury* (1993)

24             4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756].)

25             In fact, Dr. Mills responded to the question by saying he was not sure he would characterize appellant as being ebullient, engaging and

26             eager to talk in the jury's absence.

27  <u>Coddington</u>, 23 Cal.4th at 612-13.

28  ////

1    In his first petition for writ of habeas corpus, Petitioner again alleged that his trial counsel

2    was ineffective for failing to object to the prosecutor's improper question, supported with a

3    declaration from defense counsel that he had no strategic reason for the failure. (LD 25-C.3, Ex.

4    A ¶ 26.) The California Supreme Court denied relief summarily, on the merits. (LD 25-C.5.)

5         2.   The State Court Denied Claim 58 on Independent and Adequate State Law Grounds

6    Respondent argues that Claim 58 is procedurally barred from consideration on the merits

7    in this proceeding because the California Supreme Court defaulted the claim for not having been

8    properly preserved with a contemporaneous objection. (ECF No. 102 at 2, 4-5.) Petitioner accepts

9    that state court's ruling reflects that it denied the claim through the application of a state

10   procedural bar as well as on the merits, but argues that the default should be excused because it

11   resulted from trial counsel's deficient performance or, alternatively, that this Court should hold

12   that the contemporary objection rule was not an independent and adequate state-law rule at the

13   time of Petitioner's trial. (ECF No. 131 at 36-38.) The undersigned finds that the state court

14   applied an independent and adequate state procedural bar to the claim, and that Petitioner cannot

15   show prejudice in his cause-and-prejudice allegations.

16   The language employed by the California Supreme Court indicates that it denied this

17   claim on procedural grounds and, in the alternative, held it to be meritless. The Court stated, "To

18   the extent that this is a claim of prosecutorial misconduct or of the erroneous admission of

19   evidence, it was waived by appellant's failure to object. It lacks merit in any event." Coddington,

20   23 Cal.4th at 612. The first statement plainly denies the claim on procedural grounds, finding "it

21   was waived." Ibid. This stands in contrast to those cases where the state court uses ambiguous

22   language suggesting that a particular state procedural rule might apply, see Harris, 489 U.S. at

23   264-66; Caldwell, 472 U.S. at 327-28; or simply cites a state rule in the midst of its discussion of

24   the merits of the federal constitutional claim. See Long, 463 U.S. at 1040-41. In its second

25   sentence, the California Supreme Court's use of the phrase "in any event," indicates holdings in

26   the alternative, i.e., that the court believed that either ground sufficed as a reason to deny the

27   claim. See Sochor v. Fla., 504 U.S. 527, 534 (1992); see, e.g., Glenn v. Bartlett, 98 F.3d 721, 725

28   (2d Cir. 1996) (describing "in any event" as a "talismanic phrase" indicating an alternative

246

1    holding). In <u>Sochor</u>, the Supreme Court held that virtually identical language—where the state

2    court state that a claim of error "must fail" because it was not preserved with an objection at trial,

3    but "[i]n any event, [petitioner's] claims here have no merit"—reflected alternative holdings, one

4    of which was a merits denial and one of which was the invocation of a procedural bar. 504 U.S. at

5    534. As such, the state court had indicated "with requisite clarity," under <u>Long</u> and its progeny,

6    that the denial was "based on [an] alternative state ground." <u>Ibid</u>.

7           When a state court has based its denial on alternative grounds, one of which is an

8    independent and adequate state law, the federal court must defer to that denial as a matter of

9    comity. <u>Sochor</u>, 504 U.S. at 534; <u>Harris</u>, 489 U.S. at 264 n.10; <u>McKenna v. McDaniel</u>, 65 F.3d

10   1483, 1488 (9th Cir. 1995); <u>see generally</u> <u>Coleman</u>, 501 U.S. at 729. Here, the language

11   employed by the California Supreme Court indicates two alternative bases for its denial, one of

12   which was its application of the state's contemporary objection rule. Accordingly, the federal

13   court is presumptively foreclosed from reaching the merits of this federal constitutional claim.

14   See <u>Sochor</u>, 504 U.S. at 534.

15          As noted, Petitioner accepts this premise (<u>see</u> ECF No. 131 at 36-38) but argues that

16   California's contemporary objection rule was not independent and adequate at the time of

17   Petitioner's trial. The Ninth Circuit has rejected this argument repeatedly, holding that

18   California's contemporary objection rule is independent and adequate such that it provides a

19   lawful basis for deferring to the state court's denial of a federal constitutional claim. <u>See</u>, <u>e.g.</u>,

20   <u>Fairbank v. Ayers</u>, 650 F.3d 1243, 1256 (9th Cir. 2011) (California contemporary objective rule

21   independent and adequate, where defense counsel failed to object to prosecutor's questions he

22   later alleged were improper); <u>Melendez v. Pliler</u>, 288 F.3d 1120 (9th Cir. 2002) (California

23   contemporary objective rule independent and adequate, where defense counsel failed to object to

24   the admission of certain evidence); <u>Garrison v. McCarthy</u>, 653 F.2d 374, 377 (9th Cir. 1981)

25   (California contemporary objection rule adequate where defense interposed no objection to

26   admission of evidence); <u>cf.</u> <u>Inthavong v. Lamarque</u>, 420 F.3d 1055, 1058 (9th Cir. 2005)

27   (assuming without deciding that the California contemporary objective rule was independent and

28   adequate); <u>Vansickel v. White</u>, 166 F.3d 953, 957 (9th Cir. 1999) (same).

247

3. Petitioner Has Not Shown Cause and Prejudice to Excuse His Procedural Default of Claim 58

Nevertheless, the federal court may review the merits of a defaulted claim if the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750. Ineffective assistance of trial counsel is cause for procedural default. Shinn, 142 S. Ct. at 1733; Martinez v. Ryan, 566 U.S. 1, 17 (2012); Coleman, 501 U.S. at 755; Murray v. Carrier, 477 U.S. 478, 488, 492, 496 (1986). To meet this standard, Petitioner must show that trial counsel's performance was deficient and prejudicial under the Sixth Amendment, as set forth in Strickland. Martinez, 566 U.S. at 9-12; Coleman, 501 U.S. at 753-55; Murray, 477 U.S. at 487-88, 492-96. Prejudice in this analysis requires the petitioner to show the error worked to his actual and substantial disadvantage, infecting the entire trial with constitutional error. See Murray v. Carrier, 477 U.S. 478, 494 (1986); United States v. Frady, 456 U.S. 152, 170 (1982); Leavitt v. Arave, 383 F.3d 809, 838 (9th Cir. 2004); Correll v. Stewart, 137 F.3d 1404, 1415 (9th Cir. 1998).

Here, Petitioner alleges that his trial counsel's ineffectiveness constituted cause and prejudice to excuse the procedural default that resulted in the state court's denial of this claim. (ECF No. 131 at 37-38.) Both Petitioner and Respondent take the position that, if Petitioner makes a prima facie showing of relief on both prongs, the court may engage in some form of evidentiary development on the cause-and-prejudice allegations for this claim. (See ECF Nos. 131 at 37-38; 148 at 15; 209 at 33.) The Supreme Court, however, has recently expressed "doubt" that section 2254(e)(2) accommodates such a construction. Shinn, 142 S. Ct. at 1738.

For the particular cause-and-prejudice allegations raised in this claim, the undersigned need not resolve the question left open in Shinn, however, because the bulk of Petitioner's cause and prejudice allegations do not rely on evidence outside of the record. Specifically, the only extra-record evidence Petitioner identifies as necessary to resolve the claim is testimony from defense counsel that they had no strategic reason for failing to object to the prosecutor's

248

1    questions. (ECF Nos. 209 at 408, 411, 577; 131 at 37-38.) Petitioner's prejudice allegations,

2    however, rely wholly on the record. (See ibid)

3           Even assuming that it was objectively unreasonable for defense counsel to fail to object to

4    the prosecutor's improper questions, the record does not support a finding of prejudice under

5    Strickland. The prosecutor's questions to Dr. Mills concerning Petitioner's demeanor in front of

6    and outside the presence of the jury were improper and inflammatory in nature, to be sure. See,

7    e.g., United States v. Young, 470 U.S. 1, 7-10 (1985); Taylor v. Kentucky, 436 U.S. 478, 485

8    (1978); Allen v. Woodford, 395 F.3d 979, 1015 (9th Cir. 2005); United States v. Schuler, 813

9    F.2d 978, 980-82 (9th Cir. 1987). These questions reflected, however, only a brief exchange

10   within the multiple days of Dr. Mills' testimony, virtually two full days of which consisted of

11   cross-examination. (See 25 RT 4888-4905; 26 RT 4923-5048; 27 RT 5074-5222, 5253-59, 5262-

12   64.) Moreover, although the theme of the prosecutor's improper questions to Dr. Mills was

13   derogatory towards Petitioner—suggesting that he was actively endeavoring to deceive the jury—

14   this was a theme that the prosecutor urged repeatedly through the sanity phase in his cross-

15   examinations of defense witnesses, in ways that Petitioner does not claim were improper. (See 27

16   RT 5136, 5158-59, 5179, 5189-5200 [additional cross-examination of Dr. Mills]; 28 RT 5397-

17   5419, 5501 [cross-examination of Dr. Rosenthal]; 36 RT 6285-6305 [cross-examination of

18   Michael Rappaport]; 37 RT 6344-52 [cross-examination of Kathy Coddington], 6366 [cross-

19   examination of Genevieve Coddington].) In this overall context, Petitioner cannot show that it is

20   reasonably probable that the six questions the prosecutor posed to Dr. Mills purporting to describe

21   Petitioner's demeanor in- and out of the jury's presence were, alone, so impactful as to affect the

22   jury's assessment of whether Petitioner had proven insanity. See Strickland, 466 U.S. at 691-93.

23          Accordingly, Petitioner has not shown that there is cause and prejudice to excuse the

24   procedural default the state court applied to this claim; there likewise has been no showing that

25   additional evidentiary development on this question is warranted under the law, given the nature

26   of Petitioner's prejudice argument. See 28 U.S.C. § 2254(e); Shinn, 142 S.Ct. at 1733; Landrigan,

27   550 U.S. at 474. Thus, the undersigned must defer to the state court's denial of Claim 58 and

28

1  recommend its dismissal. See <u>Sochor</u>, 504 U.S. at 534; <u>Harris</u>, 489 U.S. at 264 n.10; <u>Coleman</u>,

2  501 U.S. at 729.

3        4.   The State Court's Denial of Claim 59 Is Entitled to Deference

4        For the same reason, the state court did not act contrary to, nor unreasonably apply,

5  clearly established federal law if it concluded that Petitioner had failed to make a prima facie

6  showing of prejudice for Claim 59. In Claim 59, Petitioner's allegations mirror those alleged as

7  the cause and prejudice for excusal of the default for Claim 58. (See ECF No. 209 at 411; ECF

8  No. 131 at 37-38.) The federal court also utilizes the same constitutional standard in assessing

9  both the substantive claim set forth in Claim 59 and the cause-and-prejudice allegations raised for

10  Claim 58. See <u>Martinez</u>, 566 U.S. at 9-12; <u>Coleman</u>, 501 U.S. at 753-55; <u>Murray</u>, 477 U.S. at

11  487-88, 492-96. Therefore, for the same reasons that Petitioner cannot show a reasonable

12  probability that, but for trial counsel's failure to object, the sanity verdict would have been

13  different, for purposes of Claim 58, he also cannot show that the state court was unreasonable in

14  concluding he had failed to make a prima facie showing of same when it denied relief on the

15  allegations comprising Claim 59. Accordingly, the state court's denial of Claim 59 is entitled to

16  deference and the undersigned recommends it be dismissed.

17  **CLAIM 60**

18        In Claim 60, Petitioner alleges that the trial was rendered fundamentally unfair by the trial

19  court's comments vouching for the credibility of court-appointed experts Drs. Bittle and Kaldor.

20  (ECF No. 59 at 405-12.) The California Supreme Court denied relief on the merits in a reasoned

21  opinion, <u>Coddington</u>, 23 Cal.4th at 615-17, which the undersigned finds is entitled to deference.

22  See 28 U.S.C. § 2254(d).

23        1.   Relevant Proceedings Below

24        During his cross-examination of defense witness Dr. Bittle, the prosecutor asked the

25  doctor "why would it be that two psychiatrists who are retained by the Court, the Court having

26  examined their credentials and selected them for this test, what is there about psychiatry that

27  allows them to reach one opinion and you, sir, to reach another opinion?" (25 RT 4892.) Defense

28  counsel objected and, in ruling on the objection in the presence of the jury, the trial court stated,

1

2

3

4

5

6

> I guess I have to disagree with you on both points, Mr. Meyer. First of all, I think it's within fair comment the allegiance aspect of it. The doctor's explained that he's not for sale, but certainly you know as well as I know that there are certain people this Court wouldn't employ, and that Dr. Kaldor and Dr. Bittle are well known to the Court and to counsel, and that through a process of talking and exploring various names we arrived at Bittle and Kaldor. You were part of that process, as was the District Attorney, as was the Court. I know those people's credentials, I've had them testify as experts before, and I think Mr. Tepper's characterization is a correct one.

7

(25 RT 4893.)

8

9

10

11

12

Later in the sanity phase, Dr. Kaldor testified that he had become involved in Petitioner's case by having "received a telephone call from Judge Finney asking if I would participate in being a court-appointed doctor." (32 RT 5749.) Defense counsel objected and, in a sidebar, asked the court to clarify that Dr. Kaldor had not been the "personal choice" of the court. (32 RT 5749-50.) The court explained to the jury:

13

14

15

16

17

18

> [C]ounsel's asked me to explain to you we don't have a formal list, as such, in El Dorado County, and that's for a good reason. Every time we find a competent psychiatrist and Sacramento County finds out about it, then they get him so busy we can't use him anymore. So we have in our minds psychiatrists that are available and we have confidence in and in this process I think Dr. Kaldor's name was one of five or six that we explored, and I don't think the other names would be of any meaning to you, so I won't rattle them off, but there were five or six that we thought to be appropriate, and Dr. Kaldor and Dr. Bittle were two names that both sides stipulated would be acceptable.

19

20

(32 RT 5750-51.) At the end of the sanity phase, the court instructed the jury that they were the sole judges of the believability of the witnesses and the weight to give any witness's testimony.

21

(38 RT 6486.)

22

23

24

25

26

On direct appeal, Petitioner argued that the trial court's comments constituted vouching for the credibility of Drs. Kaldor and Bittle, which violated his rights under the Fifth and Sixth Amendments and rendered the death sentence unreliable, in violation of the Eighth Amendment. (LD 25-B.1 at 344-51.) The California Supreme Court held that the court's comments constituted improper vouching, but that the error was not prejudicial:

27

28

> There is a reasonable likelihood that a juror might infer from those exchanges the court had vouched for the witness's credibility and thereby invited the jury to give special credence to Dr. Kaldor's

251

testimony. The fact that an expert witness has been appointed by the court may be revealed to the jury (Evid. Code, § 722), but vouching, which constitutes an attempt to personally vouch for a witness's credibility, is improper. (*People v. Stansbury*, *supra*, 4 Cal.4th at p. 1059.)

The judge may have intended only to explain that Dr. Kaldor was appointed pursuant to the regular practice of the court, that the court knows the qualifications of experts considered for appointment pursuant to that practice, and that both sides agreed to this appointment. That would have been proper since the jury understands and expects that the party who retains an expert is familiar with the credentials of the expert. (See *People v. Fauber* (1992) 2 Cal.4th 792, 822 [9 Cal.Rptr.2d 24, 831 P.2d 249].) Like a judicial grant of immunity (see *People v. Freeman* (1994) 8 Cal.4th 450, 489 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]), court appointment of an expert does not itself constitute vouching and would not be seen as such by a jury. In the context in which the court made these remarks, however, the jury may have understood the explanation to mean that the judge personally vouched for the credibility of Dr. Kaldor and Dr. Bittle.

Nonetheless, any error in this regard was not prejudicial. The jurors were instructed that they were the sole judges of the believability of a witness and the weight to be given to the testimony of witnesses. Nothing in the court's explanation of the appointment of the two court-appointed psychiatrists implied that credibility of defendant's experts was in question, and, as noted before, all of the experts agreed that appellant was mentally ill. Only their assessment of the impact of that illness on his awareness that his conduct was morally wrong differed.

To the extent that appellant may be arguing that the questions put to Dr. Mills by the prosecutor regarding his retention by the defense were improper, the claim lacks merit. As we observed in *People v. Johnston* (1957) 48 Cal.2d 78, 87 [307 P.2d 921], it is inevitable that in the course of direct or cross-examination the jury will learn if an expert witness has been retained by a party. That information is relevant to possible bias and may be considered by the jury in weighing the testimony of the expert.

Coddington, 23 Cal.4th at 616-17.

    2.  The California Supreme Court's Denial Was Not Contrary to, Nor an Unreasonable

        Application of, Clearly Established Federal Law

A fundamentally fair trial, as guaranteed by the due process clause, includes that the judge is "detached, fair and impartial." Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 531 (9th Cir. 1986); see Murchison, 349 U.S. at 136 (a "fair trial in a fair tribunal is a basic requirement of due process"). Under this standard, the trial court errs when it indicates an opinion on one of the

1    issues of fact before the jury or argues on behalf of one of the parties. Shad, 799 F.2d at 531. This

2    includes vouching for the credibility of a witness. See, e.g., United States v. Polizzi, 500 F.2d

3    856, 890 (9th Cir. 1974); People v. Banks, 59 Cal.4th 1113, 1206 (2014). A new trial is only

4    warranted where the petitioner shows that the trial court's comments prejudiced him, in light of

5    the record as a whole. United States v. Bennett, 702 F.2d 833, 836 (9th Cir. 1983) ("Before a

6    jury's verdict will be overturned because of the conduct of a trial judge in 'rebuking or punishing

7    an attorney' or otherwise intervening in the proceedings, 'it must appear that the conduct

8    measured by the facts of the case presented together with the result of the trial, was clearly

9    prejudicial to the rights of the party,'" quoting United States v. Eldred, 588 F.2d 746, 750 (9th

10   Cir. 1978)); see generally Davis v. Ayala, 576 U.S. 257, 267 (2015) ("The test for whether a

11   federal constitutional error was harmless depends on the procedural posture of the case. On direct

12   appeal, the harmlessness standard is the one prescribed in Chapman . . .").

13          Here, the state court could have reasonably concluded that, to the extent the trial court's

14   error infringed on Petitioner's constitutional rights to due process, confrontation, or a reliable

15   sentencing determination, such error was harmless beyond a reasonable doubt.[37] See Brown, 142

16   S. Ct. at 1517, 1520, 1525; Davis, 576 U.S. at 267; Chapman, 386 U.S. at 24. The trial court's

17   comments were brief, comprising only a few sentences amongst multiple days of sanity-phase

18   expert testimony. The nature of the comments were mild: although they could be construed as

19   approval of Drs. Kaldor and Bittle, they did not impugn or denigrate the defense or defense expert

20   witnesses, and were in the context of endeavoring to explain the Superior Court's informal expert

21   appointment process. The comments occurred almost two full weeks before the jury would begin

22   deliberations at the sanity phase; in contrast, minutes before commencing deliberations, the jury

23   was instructed that they were the sole judges of witnesses' credibility. (See 32 RT 5750-51; 38

24   RT 6486, 6496.) These facts all suggest harmlessness. See Chapman, 386 U.S. at 25 (prejudice

25   shown where prosecutor's improper comments and court's erroneous instructions were

26

27   [37] The state court's holding was only expressly based on state law, see Coddington, 23 Cal.4th at
     616-17, and thus the federal court must consider any reasonable basis for the state court's denial,
28   consistent with clearly established federal law. Johnson, 568 U.S. at 298; Richter, 562 U.S. at 98.

1   "continuously and repeatedly impressed [on] the jury"); United States v. Morgan, 376 F.3d 1002,

2   1009 (9th Cir. 2004) (holding that the trial judge's misconduct at trial did not prejudice the

3   defendant in light of the court's curative instructions). In light of the totality of the record at the

4   sanity phase, a reviewing court could reasonably conclude that the court's brief, mild comments

5   were beyond a reasonable doubt harmless to the sanity verdict. See Chapman, 386 U.S. at 25-26;

6   cf. Brown, 142 S. Ct. at 1530-31.

7       For this reason, the state court's decision is entitled to deference, see 28 U.S.C. § 2254(d),

8   and the undersigned recommends Claim 60 be dismissed.

9   **CLAIM 77**

10      In Claim 77, Petitioner alleges that trial counsel rendered ineffective assistance of counsel

11  by failing to object to the prosecutor's cross-examination of a defense sanity-phase witness as to

12  Petitioner's past conduct at banks, eliciting testimony that deposits of $9,999 had been made in

13  that amount to avoid an I.R.S. reporting requirement for deposits of $10,000 or larger. (ECF No.

14  59 at 466-67.) Petitioner raised this claim in his first petition for writ of habeas corpus, which the

15  California Supreme Court denied summarily. (LD 25-C.5.) That denial is entitled to deference

16  under 28 U.S.C. section 2254(d).

17      In the habeas corpus proceedings in state court, Petitioner identified one instance during

18  the sanity phase in which the prosecutor questioned defense witness Michael Rapoport on why

19  deposits were made into Petitioner's bank account, on certain dates, in amounts approximating

20  $9,999.  (LD 25-C.1 at 120-21, citing 36 RT 6306, 37 RT 6374, 6419-20.) Defense counsel did

21  not object to this question. (See 36 RT 6306.) Petitioner alleged that this reflected deficient

22  performance because there had been no foundation to establish that Petitioner had willfully and

23  knowingly acted to evade reporting requirements, as required to establish criminal liability under

24  the federal Money Laundering Control Act; per Petitioner, such a showing would have been

25  impossible because he did not, in fact, have such knowledge or willfulness. (LD 25-C.1 at 119-

26  20.) Had counsel objected on this basis, Petitioner alleged, the trial court would have sustained

27  the objection and there is a reasonable probability the result of the sanity proceeding would have

28  been favorable, particularly when considered cumulatively with counsel's other errors. (Ibid.)

254

1       The California Supreme Court did not act contrary to nor unreasonably apply clearly

2   established law in denying this claim, as Petitioner's allegations did not make a prima facie

3   showing of trial counsel's deficient performance. See 28 U.S.C. § 2254(d); Richter, 562 U.S. at

4   105. Under California law at the time of Petitioner's trial, Mr. Rapoport could be cross-examined

5   on "any matter within the scope of the direct examination." Evid. Code § 773. The right to cross-

6   examine is fundamental to the fairness of a criminal trial and has two purposes: "to test the

7   credibility, knowledge, and recollection of the witness" and "to elicit additional evidence." Fost v.

8   Superior Ct., 80 Cal. App. 4th 724, 733 (2000) (citing Sharp v. Hoffman, 79 Cal. 404, 408 (1889)

9   and 3 Witkin, California Evidence 3d. ed. (1986) § 1873). One limitation on this broad right is

10   that, in order to cross-examine a witness on their knowledge of a criminal defendant's prior bad

11   acts, the examiner must have a "good faith" belief that those acts actually occurred. See, e.g.,

12   People v. Ramirez, 13 Cal.5th 997, 1131 (2022), reh'g denied (Oct. 12, 2022); People v. Earp, 20

13   Cal.4th 826, 860 (1999); People v. Vasquez, 224 Cal. App. 2d 206, 211 (1964).

14       Here, the record does not support a finding that the prosecutor's question to Mr. Rapoport

15   as to why deposits of $9,999 were made to Petitioner's bank account was objectionable. On direct

16   examination, Mr. Rapoport testified that he was a friend of Petitioner's from 1983 to 1986 and,

17   during that time, they gambled together and began investing their money together. (36 RT 6278-

18   81.) Mr. Rapoport further testified on direct examination that, being a stockbroker, he was aware

19   that if Petitioner undertook any brokerage investments, there would be some documents generated

20   from those investments. (36 RT 6284-85.) On cross-examination, Mr. Rapoport explained that

21   such documents are generated to comply with reporting requirements to the I.R.S. and S.E.C. and

22   as information for the investing consumer. (36 RT 6295.) The prosecutor probed in some depth

23   Mr. Rapoport's knowledge of Petitioner's finances during the period of their friendship. (36 RT

24   6285-95, 6298-6301.) Mr. Rapoport revealed, in the course of this cross-examination, that he and

25   Petitioner had pooled their resources, along with a few other people, and together they gambled

26   together as a team by counting cards in card games at casinos. (36 RT 6299-6301.) Mr. Rapoport

27   detailed the manner in which their money was pooled, retained, and distributed among the team,

28   including that it was sometimes deposited into an account held by Petitioner. (36 RT 6301-04.)

1    The prosecutor then asked, "Drawing your attention to the deposits that were made by Mr.

2    Coddington in March . . . would you know, sir, why those transactions appear to each be in the

3    area of $9,999?" and Mr. Rapoport replied, "To try to avoid filling out the form the IRS would

4    require at $10,000." (36 RT 6306.) Afterwards, the parties stipulated that federal law required

5    financial institutions to report a withdrawal or deposit exceeding $10,000. (37 RT 6374.) During

6    the sanity phase, Petitioner's sister, Kathy Ann Coddington, testified that she and Petitioner had

7    an agreement whereby she published his writings under her name to avoid him paying taxes on

8    the revenue from them. (37 RT 6341-42, 6344-45.) In his closing argument at the sanity phase,

9    the prosecutor argued that Petitioner was repeatedly deceitful in the years before and including

10   the crimes, including that he had used "fraud and schemes to defraud the revenue collecting

11   services of the country."[38] (37 RT 6419-20.)

12          In light of this record, defense counsel was not deficient for failing to object to the

13   prosecutor's question about the deposits of $9,999, as such a question was not improper. At the

14   time the question was posed, Mr. Rapoport had testified of his personal knowledge of Petitioner's

15   finances, given Mr. Rapoport's unique position of having pooled financial resources with

16   Petitioner for their gambling ventures and his apparent reliance on Petitioner to serve as their

17   group's "banker" for at least some of their joint endeavors. (36 RT 6303-04.) Mr. Rapoport also

18   testified, based on his professional knowledge, of his understanding of the reporting requirements

19   for bank deposits. (36 RT 6295.) Thus, the prosecutor's question to Mr. Rapoport about whether

20   he knew why deposits had been made in particular ways both served to "test the . . . knowledge[]

21   and recollection" of Mr. Rapoport and to "elicit additional evidence" of which Mr. Rapoport may

22   have had personal knowledge. See Fost, 80 Cal. App. 4th at 733. This was squarely proper under

23   California law. See ibid.

24          The record does not support Petitioner's interpretation that this question was posed to

25   suggest that Petitioner had engaged in prior bad acts—namely, criminal violation of the federal

26   Money Laundering Control Act—without evidentiary basis to believe he had committed such a

27

28   [38] Petitioner does not allege that counsel were ineffective for entering the stipulation or for failing
     to object to the prosecutor's argument. (See ECF No. 59 at 466-67.)

1   crime. (See ECF No. 59 at 466-67.) The prosecutor's question did not imply that any crime had

2   been committed at all; to the extent it implied anything, it, at most, suggested that Petitioner had

3   intended to evade reporting requirements by structuring his deposits in a particular way, i.e., that

4   he had acted deceitfully based on what he and Mr. Rapoport understood the law to be. (See 37 RT

5   6419-20 [arguing same].) This implication does not appear to have been in bad faith (see Earp, 20

6   Cal.4th at 860), given Mr. Rapoport's testimony up to that point describing Petitioner's history of

7   deceitful behavior (see 36 RT 6278-79, 6301) and control over the combined finances of the

8   gambling group, including deciding whether to deposit winnings into a bank account. (See 36 RT

9   6298-6300, 3605-06.) There was no misconduct on this basis.

10      Because the prosecutor's question was not improper, defense counsel did not perform

11   deficiently for failing to object to it. See Knowles, 556 U.S. at 123; Jones, 463 U.S. 745. As such,

12   the California Supreme Court did not act contrary to, nor unreasonably apply, clearly established

13   federal law by concluding that Petitioner had not made a prima facie showing of ineffective

14   assistance of counsel. Richter, 562 U.S. at 105. The undersigned therefore recommends Claim 77

15   be dismissed. See 28 U.S.C. § 2254(d).

16   **CLAIMS 79 AND 140**

17      In Claim 79, Petitioner alleges that his trial counsel performed deficiently by failing to

18   request that the jury be reinstructed at the end of the sanity phase not to draw adverse inferences

19   from his failure to testify in that phase, which prejudiced the sanity verdict. (ECF No. 59 at 470.)

20   In Claim 140, Petitioner makes the same allegations as to the penalty phase, asserting that there is

21   a reasonable likelihood that the penalty verdicts on Counts One and Two would have been more

22   favorable had the jury been so instructed. (ECF No. 59 at 672.) Petitioner presented both claims

23   in state court in his first petition for writ of habeas corpus (LD 25-C.1 at 128, 206), which the

24   California Supreme Court denied summarily. (LD 25-C.5.) Those denials were not contrary to or

25   an unreasonable application of clearly established federal law, nor an unreasonable factual

26   determination. See 28 U.S.C. § 2254(d).

27      In order to make a prima facie showing of defense counsel's ineffectiveness at trial, a

28   petitioner must show that counsel's performance fell below an objective standard of

1    reasonableness, i.e., that no reasonable defense counsel would have taken the action complained

2    of. Strickland, 466 U.S. at 688-89. Under AEDPA, Petitioner must show that no reasonable jurist

3    could conclude that trial counsel's performance had met contemporaneous standards for the

4    representation of capitally-charged persons extant at the time of his trial, under clearly established

5    federal law. Richter, 562 U.S. at 101. Here, the state court was not objectively reasonable if it

6    concluded that Petitioner had failed to show that his trial counsel's performance was deficient

7    under the standards clearly established by the United States Supreme Court at the time of the state

8    court's adjudication.

9         At the time of Petitioner's trial, defense counsel had a duty, generally, to make appropriate

10   motions and request appropriate instructions. See, e.g., Debarge v. Stewart, 39 F. App'x 577, 578

11   (9th Cir. 2002); United States v. Span, 75 F.3d 1383, 1387 (9th Cir. 1996). It was not clear,

12   however, that at the sanity phase of a criminal trial or at the penalty phase of a capital trial, all

13   reasonable defense counsel would request that the jury be instructed per CALJIC 2.60 to draw no

14   adverse inferences from the defendant's failure to testify at that phase. Under state law at the time

15   of trial and the time of the adjudication of the first petition for writ of habeas corpus in state court,

16   so long as a guilt-phase instruction did not state that it only applied at the guilt phase, the jury was

17   presumed to apply it to subsequent trial phases. People v. Contreras, 58 Cal.4th 123, 167 (2013);

18   People v. Valdez, 55 Cal.4th 82, 173-74 (2012); People v. Morales, 48 Cal.3d 527, 569-70

19   (1989); People v. Brown, 46 Cal.3d 432, 460 (1988); People v. Gates, 43 Cal.3d 1168, 1209

20   (1987); see also Coddington, 23 Cal.4th at 625, 642 (holding same in rejecting Petitioner's direct

21   appeal claims that the trial court's failure to repeat these instructions in the sanity and penalty

22   phases violated his constitutional rights). In light of this presumption, a reasonable defense

23   counsel may have failed to request the jury be reinstructed with CALJIC 2.60 for this reason. See

24   generally Richter, 562 U.S. at 110 (counsel does not perform deficiently "for failing to prepare

25   for what appear to be remote possibilities"); Knowles, 556 U.S. at 123 (counsel not deficient for

26   failing to make a request that would likely have been denied); Jones, 463 U.S. 745 (counsel has

27   no professional duty to raise frivolous arguments).

28   ////

258

1    Specific to Claim 140, Petitioner posits that the prosecutor's comments in penalty-phase

2    closing argument triggered the necessity of the jury to be reinstructed with CALJIC 2.60 because

3    the prosecutor had urged the jury to draw a negative inference from Petitioner's failure to testify.

4    (ECF No. 59 at 670-72.) The record does not support this interpretation. See Claim 103, *post*; see

5    also Coddington, 23 Cal.4th at 642. Given this, it is not the case that no reasonable jurist could

6    find that defense counsel performed unreasonably in failing to request the instruction at the

7    penalty phase. See Richter, 562 U.S. at 101.

8    Finally, an additional, alternative reason would have justified reasonable trial counsel's

9    failure to request the instruction at issue in the penalty phase: although under state law, the jury

10    was presumed to believe the instruction applied at the penalty phase absent conflicting

11    instruction, as a matter of federal constitutional law, the instruction might not apply to penalty

12    proceedings at all. In White v. Woodall, 572 U.S. 415 (2014), the Court considered whether a

13    trial court had acted contrary to, or unreasonably applied, clearly established federal law by

14    refusing to instruct the jury at the close of the penalty phase not to draw any adverse inferences

15    against the defendant for his failure to testify at that phase at his 1998 capital trial in Kentucky.

16    See Woodall v. Com., 63 S.W.3d 104, 114 (Ky. 2001), as amended (Jan. 15, 2002). The Court

17    held that the trial court's ruling was neither contrary to nor an unreasonable application of clearly

18    established federal law, because the Court's precedent had only made such an instruction required

19    at the guilt phase of a trial but had never addressed whether an analogous rule governed the

20    penalty phase. White, 572 U.S. at 420-21. In fact, the Court observed, ample precedent could

21    support a conclusion that the rule should not apply to sentencing proceedings, given that the

22    sentencer may consider the defendant's remorse when fixing sentence, and thus "*some* actual

23    inferences might be permissible at the penalty phase" from the defendant's failure to testify. Id. at

24    422 (emphasis in original); see also id. at 423 (describing this as a "perfectly reasonable"

25    interpretation of Supreme Court jurisprudence). In light of this, the state court could have

26    reasonably concluded that Petitioner did not show that no reasonable defense counsel could have

27    reached the same conclusion as the United States Supreme Court, that the constitutional concerns

28    underlying CALJIC 2.60 did not apply equally to the penalty phase as to the guilt phase, and ergo

1  could have foregone requesting this instruction in the penalty phase for this reason. See

2  Strickland, 466 U.S. at 688-89.

3      Accordingly, the California Supreme Court was reasonable in denying Petitioner relief on

4  Claims 79 and 140, as his counsel's deficient performance could not be demonstrated under

5  clearly established federal law extant at the time of the state court adjudication. See 28 U.S.C. §

6  2254(d); Richter, 562 U.S. at 101. The undersigned therefore recommends Claims 79 and 140 be

7  dismissed.

8  **CLAIM 82**

9      In Claim 82, Petitioner alleges that the cumulative errors at the guilt and sanity phases

10  prejudiced the sanity verdict such that reversal of that verdict is required. (ECF No. 189 at 476-

11  77.) He raised this claim on direct appeal, which the California Supreme Court denied on the

12  merits. Coddington, 23 Cal.4th at 626-28. He raised a version of this claim again in his first

13  petition for writ of habeas corpus in state court, cumulating the errors raised in that petition as

14  well as those raised on direct appeal. (LD 25-C.1 at 135.) The California Supreme Court denied it

15  summarily on the merits. (LD 25-C.5.) The undersigned concludes that those denials are not

16  entitled to deference.

17      First, the undersigned has concluded that the state court acted unreasonably under clearly

18  established federal law in concluding Petitioner was not prejudiced by the prosecutor's

19  misconduct described in Claim 54. As such, the state court's later cumulative prejudice analysis

20  was fundamentally flawed by being premised on its unreasonable prejudice finding for Claim 54.

21  Because the state court was unreasonable in its application of clearly established federal law by

22  discounting the prejudicial effect of this misconduct, it necessarily unreasonably discounted the

23  prejudicial effect of that error when combined with others.

24      Similarly, the undersigned has concluded that the state court was unreasonable in finding

25  that Petitioner was not prejudiced by the ineffective assistance of counsel described in Claim 47.

26  The state court unreasonably failed to appreciate the prejudicial effect of defense counsel's failure

27  to obtain this information, and thus necessarily approached its cumulative error analysis with the

28  same unreasonable error.

1         In its denial of this claim on direct appeal, the state court also unreasonably discounted the

2   defense evidence and the possibility that the jury could credit it. A state court unreasonably

3   applies clearly established federal law when it fails to account for aspects of the record that

4   support petitioner. See, e.g., Williams, 529 U.S. at 398. Here, on direct appeal, the state court

5   seemed to conclude that Petitioner's theory of insanity was fundamentally not credible because all

6   of the evidence indicated "that appellant, not some outside force, formulated the plan to take the

7   girls and later to kill the chaperones. God neither commanded those acts nor told him to stop."

8   Coddington, 23 Cal.4th at 627-28. Petitioner had not claimed, however, that "some outside force"

9   or God himself commanded his actions. Cf. State v. Singleton, 211 N.J. 157, 200, 48 A.3d 285,

10   310 (2012) (Hoens, J., dissenting) (decrying a similar opinion as misunderstanding a claim of

11   deific command hallucination as a basis for insanity, as "[a]pparently only a booming voice from

12   heaven, presumably admitting of only a singular direction, will meet the test for deific command.

13   That constricted version of the test serves only to substitute as part of the fabric of our law an

14   exceedingly narrow view of religious traditions found only in the cinema."). All of the evidence

15   was that Petitioner's plans were constructs of his impaired mind, with three experts finding that

16   they were premised on delusions. (25 RT 4830-35; 28 RT 5281-93, 5310-16; 29 RT 5497-5501,

17   5580-84; 30 RT 5601-06, 5612-13; 32 RT 5780-5812; 33 RT 5595-6009.) There was ample

18   evidence that Petitioner formulated an idea of kidnapping and living romantically with his victims

19   after he had begun showing signs of a mental health disorder. (25 RT 4842-64; 27 RT 5241; 28

20   RT 5296-5301, 5418, 5518-20.) There was also ample evidence that could have permitted a jury

21   to conclude that this idea was initially merely a vague fantasy until Petitioner's mental disorders

22   became so pronounced that he sincerely believed God was communicating to him that he was

23   morally permitted to indulge in these fantasies. (25 RT 4878-81; 27 RT 5110-18, 5164-67, 5216;

24   28 RT 5290-94, 5308-09, 5315-20; 29 RT 5552-66; 30 RT 5605-12, 5644-54; 34 RT 6087.)

25   Although the California Supreme Court saw no important distinction between Petitioner's initial

26   fantasies of hostage-taking and his later effectuation of a plan to make that fantasy a reality, many

27   legal scholars appreciate that very distinction as critical when conceptualizing legal culpability

28   and moral decision-making. See, e.g., Federica Coppola, Motus Animi in Mente Insana: An

1    <u>Emotion-Oriented Paradigm of Legal Insanity Informed by the Neuroscience of Moral Judgments</u>

2    <u>and Decision-Making</u>, 109 J. Crim. L. & Criminology 1, 28-30, 39-45 (2019); Stephen P.

3    Garvey, <u>Are Attempts Like Treason?</u>, 14 New Crim. L. Rev. 173, 183, 187-89, 195 (2011); Evan

4    Tsen Lee, <u>Cancelling Crime</u>, 30 Conn. L. Rev. 117, 139-40 (1997); 8 Am. Jur. Proof of Facts 2d

5    231 (1976). The jury, similarly, could have reasonably credited the premise of the theory of

6    insanity Petitioner presented.

7          The state court also discounted the possibility the jury could credit the defense evidence in

8    other ways. The court stated, "None of the information appellant gave to the experts related in

9    any way to his ability to understand or his actual understanding that his acts were not acceptable

10    under any generally accepted moral or ethical standards of behavior." <u>Coddington</u>, 23 Cal.4th at

11    628. That is inaccurate. An enormous proportion of all the experts' testimonies concerned their

12    assessment of Petitioner's professed moral beliefs and what his "actual understanding" of the

13    morality of his criminal acts had been. (27 RT 5110-42; 29 RT 5518-19, 5530-31, 5555-67; 30

14    RT 5613, 5646-47, 5652-63, 5686-90; 32 RT 5813-14, 5835, 5841-42; 33 RT 6009-10.) (<u>See</u> 30

15    RT 5652-63, 5686-90.) Indeed, that was one of the few material disputes among the experts at the

16    sanity phase. (<u>See</u> discussion of Claim 43, *infra*.)

17          The state court's general skepticism of the viability of Petitioner's sanity defense appears

18    unfounded, as well. Juries and judges, including in California and at the time of Petitioner's trial,

19    found defendants insane when their criminal acts were compelled by messages they believed they

20    were receiving from God. <u>See</u>, <u>e.g.</u>, <u>Hudec v. Superior Ct.</u>, 159 Cal. Rptr. 3d 879, 880 (Ct.

21    App.), <u>review granted and opinion superseded sub nom.</u> <u>Hudec v. S.C.</u>, 309 P.3d 837 (Cal. 2013),

22    and <u>aff'd</u>, 60 Cal.4th 815, 339 P.3d 998 (2015); <u>People v. Sudar</u>, 158 Cal. App. 4th 655, 657

23    (2007), <u>as modified</u> (Jan. 2, 2008); <u>People v. Hernandez</u>, 22 Cal.4th 512, 518-19 (2000); <u>People</u>

24    <u>v. Sword</u>, 29 Cal. App. 4th 614, 619 (1994); <u>Skinner</u>, 39 Cal.3d at 783-84; <u>People v. Hudec</u>, 213

25    Cal. Rptr. 184, 185-86 (Ct. App. 1985). Scholars and jurists, too, have recognized this particular

26    form of mental impairment as plainly meeting the second prong of the <u>M'Naughten</u> test. <u>See</u>, <u>e.g.</u>,

27    <u>Kahler</u>, 206 L. Ed. 2d 312; <u>Skinner</u>, 39 Cal.3d at 784; <u>Leeds</u>, 240 Cal. App. 4th at 831; <u>Schmidt</u>,

28    216 N.Y. at 338-340 (opinion of Cardoza, J.)). Although the jury was free to share the California

1   Supreme Court's skepticism, the court was unreasonable in failing to account for the possibility

2   that they did not. In fact, the record indicates that the jurors believed this to be a close case on the

3   question of sanity. (See 6 CT 1197; 14 SACT 3853-54; 19 SACT 5061-63; 38 RT 6500-01.) The

4   errors identified by the California Supreme Court and those identified by the undersigned in the

5   sanity phase all centered on the reliability and credibility of the respective experts' opinions at the

6   sanity phase. Given the critical importance of the experts' testimonies to the sanity verdict, the

7   jury's assessment of those testimonies could reasonably have been altered had the identified

8   errors not occurred. The state court's contrary conclusion was unreasonable, given the totality of

9   the record before it.

10  **CLAIMS 85, 86, AND 87**

11          In Claims 85, 86, and 87, Petitioner alleges that defense counsel was ineffective for failing

12  to present certain expert testimony in the penalty phase. In Claim 85, Petitioner alleges that

13  defense counsel was deficient in failing to present available testimony from the sanity-phase

14  experts that, at the time of the homicides, Petitioner "was under the influence of extreme mental

15  or emotional disturbance," see Penal Code § 190.3(d), and his "capacity . . . to conform his

16  conduct to the requirements of law was impaired as a result of mental disease or defect." See

17  Penal Code § 190.3(h). (ECF No. 59 at 490-94.) Had this testimony been presented, Petitioner

18  alleges, there is a reasonable probability that the jury would have returned a life verdict. (Ibid.) In

19  Claim 86, Petitioner argues that this prejudice is even greater when considered cumulatively with

20  the prejudice from deficiencies alleged in Claims 45, 46, 47, and 48; had the sanity-phase experts

21  had access to the information implicated in those claims, their opinions that statutory factors (d)

22  and (h) applied to Petitioner would have been strengthened. (ECF No. 59 at 495-96.) In Claim 87,

23  Petitioner alleges that defense counsel was deficient in failing to present available expert

24  testimony that he would likely perform well in prison if sentenced to life and, had the jury heard

25  this testimony, there is a reasonable probability that at least one juror would have elected a life

26  sentence. (ECF No. 59 at 497-99.) Petitioner presented all three claims in his first petition for writ

27  of habeas corpus (LD 25-C.1 at 144-47), which the California Supreme Court denied summarily.

28  (LD 25-C.5.) The undersigned concludes that those denials are entitled to deference.

263

1    As discussed previously, in this proceeding Petitioner must not only make a prima facie

2    showing that trial counsel's conduct fell below an objective standard of reasonableness and there

3    was a reasonable likelihood of a more favorable verdict absent counsel's deficiencies, but must

4    also show that no reasonable juror could conclude otherwise, on both prongs, under clearly

5    established Supreme Court precedent. See Shinn, 141 S. Ct. at 524; Richter, 562 U.S. at 98, 104-

6    105; Strickland, 466 U.S. at 687. When considering deficient performance, a reviewing court

7    must apply a "strong presumption" that counsel's actions reflected "sound trial strategy."

8    Strickland, 466 U.S. at 688-89. Repeatedly, the Supreme Court has held it is "not difficult" to

9    conclude that trial counsel exercises reasonable professional judgment in failing to present

10   mitigation evidence that he had reasonably expected would open the door to damaging rebuttal

11   evidence and cross-examination. Strickland, 466 U.S. at 698-99; see also Burger, 483 U.S. at 791-

12   94; Darden, 477 U.S. at 186.

13   Here, defense counsel could have exercised reasonable professional judgment in failing to

14   call expert psychiatric witnesses to testify about the application of factors (d) and (h) to

15   Petitioner, given the record before the state court in this case. Prior to the penalty phase, the jury

16   had heard extensive evidence describing Petitioner's mental functioning at the time of the crime,

17   including evidence that he had become emotionally overwhelmed while executing the crimes and

18   that his disordered thinking impaired his ability to conform his conduct to the law. The additional,

19   bare opinions of Drs. Mills, Rosenthal, Satten, and Bittle that these descriptions are encompassed

20   by the statutory language of the mitigators would have been, in large part, cumulative with

21   evidence that the jury had already heard. See Burger, 483 U.S. at 791-94; Darden, 477 U.S. at

22   186; Strickland, 466 U.S. at 698-99. At the same time, however, presenting any or all of these

23   experts to testify in the penalty phase carried significant strategic risks. Principally, regarding

24   Drs. Mills, Rosenthal, and Satten, the jury had previously heard and rejected the defense theory

25   reliant on their opinions at the sanity phase and, thus, reasonable defense counsel could have

26   deduced that the jury would give their opinions little weight in the penalty phase. Furthermore, as

27   detailed in the discussion of Claim 9, in the sanity phase the prosecutor elicited from the sanity-

28   phase experts numerous statements by Petitioner describing the homicides that are profoundly

264

1    unsympathetic in nature, such as his reported disdain for Ms. Martin as she pleaded she could not

2    breathe (33 RT 5920-21), the flippancy with which he described the killings (33 RT 5924; see

3    also 25 RT 4876), and the fundamentally selfish apathy he seemed to express when describing the

4    decedents as, essentially, obstructions to his "sweet hostage" scheme. (25 RT 4876; 27 RT 5172;

5    28 RT 5427; 32 RT 5780-83, 5870.) Drs. Bittle and Kaldor also testified at the sanity phase that

6    Petitioner talked about the killings without apparent remorse. (32 RT 5793, 5845; 33 RT 5994; 34

7    RT 6077.) Had any of the sanity-phase experts been called again at the penalty phase, the

8    prosecutor could have elicited these facts again on cross-examination or rebuttal, thereby

9    undercutting any sympathetic effect the experts' testimony may have had for Petitioner. In these

10   circumstances, it was reasonable for defense counsel to elect a strategy of arguing that mitigating

11   factors applied, rather than propounding the testimony of the sanity-phase expert witnesses to

12   make that point. See Burger, 483 U.S. at 791-94; Darden, 477 U.S. at 186; Strickland, 466 U.S. at

13   698-99. Certainly, the state court was not unreasonable for reaching this conclusion (see

14   Strickland, 466 U.S. at 698-99 [on similar facts, "there can be little question, even without

15   application of the presumption of adequate performance, that trial counsel's defense, though

16   unsuccessful, was the result of reasonable professional judgment"]), and therefore the

17   undersigned recommends Claims 85 and 86 be dismissed. See 28 U.S.C. § 2254(d).

18          A similar result obtains for Claim 87. Petitioner alleges that it was objectively

19   unreasonable for defense counsel not to present available testimony that Petitioner would perform

20   well in prison if given a life sentence, but such testimony too carried with it the possibility of

21   ruinous cross-examination and rebuttal. Under California law at the time of Petitioner's trial, if a

22   defense witness had so testified at the penalty phase, the prosecution would have been permitted

23   to cross-examine the witness searchingly on his or her knowledge of the defendant's prior acts of

24   violence. See Wong, 558 U.S. at 25-26; see, e.g., People v. Martinez, 47 Cal.4th 911 (2010);

25   People v. Winbush, 2 Cal.5th 402, 478-79 (2017); People v. Carter, 36 Cal.4th 1215, 1275-1276

26   (2005); People v. Earp, 20 Cal.4th 826 (1999); People v. Clark, 5 Cal.4th 950, 1014-16

27   (1993); People v. Mattson, 50 Cal.3d 826, 877-78 (1990); People v. Hendricks, 44 Cal.3d 635,

28   641-42 (1988), opinion modified on denial of reh'g (Apr. 21, 1988); People v. Gates, 43 Cal.3d

1   1168, 1211 (1987). Here, the record showed that sanity-phase experts, including Dr. Kaldor, who

2   Petitioner now alleges should have been called as a defense penalty-phase witness, knew that

3   Petitioner had reported having committed a prior act of violence (29 RT 5471; 32 RT 5807-09; 33

4   RT 5989-90; 34 RT 6078-83) and defense counsel took pains to minimize the jury's learning

5   about the details of this event and considering it at the penalty phase. (25 RT 4740-53, 4755-

6   4819; 40 RT 6626; 19 SCT 4963-72, 4990-94, 5022-33, 5049-53; 19 SACT 4984-88, 5014-53.)

7   Defense counsel's concerns were strategically sound, given how profoundly aggravating it would

8   be for the jury to learn of Petitioner's prior violent act(s). See, e.g., People v. Polk, 63 Cal.2d 443,

9   450 (1965) ("evidence of other crimes . . . may have a particularly damaging impact on the jury's

10  determination whether the defendant should be executed"); Stephen P. Garvey, Aggravation and

11  Mitigation in Capital Cases: What Do Jurors Think?, 98 Colum. L. Rev. 1538, 1559 (1998)

12  (empirical studies of capital jurors find that jurors consider defendant's prior history of violence

13  as one of the most aggravating circumstances); cf. 19 SACT 4987, 5014, 5017 (trial court

14  observes that this evidence would be "super prejudicial" at the penalty phase, such that if the jury

15  heard of it at the sanity phase, a new jury may have needed to be empaneled for the penalty

16  phase). It was therefore not unreasonable for defense counsel to elect not to call an expert to

17  opine on Petitioner's likely successful adjustment to prison, lest such inflammatory information

18  emerge on cross-examination or rebuttal. See Burger, 483 U.S. at 791-94; Darden, 477 U.S. at

19  186; Strickland, 466 U.S. at 698-99. The state court was not unreasonable if it denied Petitioner

20  relief on this basis. See Shinn, 141 S. Ct. at 524; Richter, 562 U.S. at 98, 104-105; Strickland, 466

21  U.S. at 687. The undersigned recommends Claim 87 be dismissed. See 28 U.S.C. § 2254(d).

22  **CLAIM 89**

23      In Claim 89, Petitioner alleges that defense counsel was ineffective in failing to advise

24  him that it was permissible to show emotion during the trial, prejudicing him at the penalty phase.

25  (ECF No. 59 at 502-04.) The California Supreme Court's summary denial of this claim in habeas

26  corpus proceedings (see LD 25-C.5) was not an unreasonable application of, nor contrary to,

27  clearly established federal law and is entitled to deference.

28  ////

1    Petitioner identifies the clearly established federal law governing this claim as Strickland,

2    which requires "petitioner [to] demonstrate that counsel's representation 'fell below an

3    objective standard of reasonableness.'" Wiggins, 539 U.S. at 521, quoting Strickland, 466 U.S. at

4    688. (ECF No. 209 at 98; see id. at 505 [incorporating same].) This standard is, fundamentally, to

5    "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing

6    process." Strickland, 466 U.S. at 688. (ECF No. 209 at 103.) Specifically, this has been held to

7    include avoiding conflicts of interest, knowing relevant law, and investigating the case. (ECF No.

8    209 at 103-05 [collecting cases].)

9    None of the cases cited by Petitioner, however, directly discuss defense counsel's duty to

10   advise the defendant how to comport himself during trial, and Strickland and its progeny would

11   seem to suggest this principle only very obliquely, as it is arguably encompassed by counsel's

12   duty to ensure a fair trial that subjects the prosecution to a meaningful adversarial testing and, in a

13   capital trial, to promote a sympathetic view of the defendant by the jury. See, e.g., Wiggins, 539

14   U.S. at 521; Strickland, 466 U.S. at 688. Petitioner presents no additional authorities tending to

15   establish how reasonable counsel would have advised their client regarding courtroom decorum

16   and the extent to which emotional displays could be permitted. See, e.g., Wiggins, 539 U.S. at

17   521; (American Bar Association standards may be indication of what is reasonable); Williams,

18   529 U.S. at 396 (same); see generally Wong v. Belmontes, 558 U.S. 15, 16 (2009) (habeas

19   petitioner bears burden to prove deficient performance when alleging ineffective assistance of

20   counsel); Walker, 709 F.3d at 939 (federal habeas petitioner bears "the burden to demonstrate that

21   'there was no reasonable basis for the state court to deny relief'" under 28 U.S.C. § 2254(d).)

22   Under clearly established federal law and in light of the record before the trial court, the

23   undersigned concludes that Petitioner had not shown that defense counsel unreasonably failed to

24   advise him to show emotion during the trial.

25   Petitioner alleged in state court that he may have misunderstood the trial court's

26   admonition to spectators to remain quiet during court proceedings to include him as well; that he

27   remained quiet and unemotional during trial in response to the court's admonition to spectators;

28   and that trial counsel should have explained to Petitioner that the court's admonition to spectators

1   was not directed at him and that it was, in fact, "permissible to show emotions such as the sadness

2   during the testimony describing the deaths of the chaperones and/or the ordeals of the teenagers."

3   (LD 25-C.1 at 155; see ECF No. 89 at 503.) These allegations were, at best, speculative and in

4   some instances were contradicted by the record and, as such, the state court was entitled to give

5   them little weight. Pinholster, 563 U.S. at 188 n.12; Clark, 5 Cal.4th at 770.

6          Petitioner's argument is first premised on the speculation that he refrained from showing

7   emotion during much of the trial because he mistakenly believed the court's admonition to

8   spectators applied to him, as well. (LD 25-C.1 at 154-55; LD 25-C.3 Ex. L-1.) This premise,

9   however, is inconsistent with the record. During voir dire, the court admonished Petitioner:

10              Before we call the next juror, Mr. Coddington, I've noted on several
                occasions, and I haven't said anything, but at this time I will because
11              when [a prospective juror] was giving his answers, you were shaking
                your head vigorously in apparent assent to what was being said by
12              either counsel or by [the prospective juror]. Your attorneys can best
                advise you on how to behave, but I think that conduct can only be to
13              your detriment if it continues, and I would advise you right now I
                would not allow that during the trial portion of the proceedings at all.
14

15   (7 RT 1441; see also ECF No. 59 at 400 [Petitioner acknowledging that "the court had warned

16   petitioner during voir dire not to show emotion during the jury's presence"].) Again, during the

17   sanity phase, the court observed to Petitioner that he was behaving agitatedly that day and the

18   prior day and admonished him to speak in a quieter voice to his attorneys and not to nod or shake

19   his head during testimony. (28 RT 5390.) It therefore would seem a reasonable conclusion that

20   Petitioner's subsequent reserved demeanor was responsive to these admonitions, rather than his

21   having misunderstood the court's admonition to spectators.

22          The record additionally demonstrates reasons the state court may have rejected the notion

23   that defense counsel should have "advised Mr. Coddington that it was permissible to show his

24   emotions" (ECF No. 59 at 503) and that no reasonable defense counsel would have failed to do

25   so. The record demonstrates that Petitioner struggled at times to contain his emotions in court, but

26   these references uniformly indicate that Petitioner seemed agitated, not "sad[]" about the effects

27   of his crimes, as he now alleges. (See ECF No. 59 at 503.) As noted above, during the sanity

28   phase, the court remarked that Petitioner had appeared to become "agitated" during that day, as

                                                    268

1    well as the previous day. (28 RT 5390.) In the guilt phase, Petitioner elected to remove himself

2    from the courtroom because "he did not think he could handle being present during the playing

3    of" prosecution Exhibit 135, which was an audio recording relating to the crimes (21 RT 4148),

4    and again at the penalty phase, Petitioner left the courtroom just prior to closing arguments

5    because, per defense counsel, he was "very agitated" about this tape being played during

6    argument and had "reached a point where he doesn't feel he can contain himself if [the

7    prosecutor] continues to, in his opinion, distort what Mr. Coddington's life has been." (40 RT

8    6628, 6632.) These instances were consistent with the defense's evidence that Petitioner could

9    become overwhelmed or behave unpredictably when stressed. (See 22 RT 4333-4347 (testimony

10   of Allen Hacker).)

11       The record would also appear to belie the allegation that Petitioner likely would have

12   displayed sadness if advised to display his emotions about his criminal acts. Both Dr. Bittle and

13   Dr. Kaldor testified that Petitioner had expressed no remorse about the crimes during their

14   respective, extensive interviews with him. (32 RT 5793, 5845; 33 RT 5994; 34 RT 6077.) And, as

15   noted above, Petitioner displayed not sadness but agitation so severe he felt he needed to absent

16   himself from the courtroom twice when confronted with evidence relating to his kidnapping,

17   detention, and sexual assaults of the minor victims. In view of the unsupported nature of this

18   allegation, then, the state court may have lawfully given it little weight. Pinholster, 563 U.S. at

19   188 n.12; Clark, 5 Cal.4th at 770.

20       When considering allegations of deficient performance, the reviewing court must

21   "reconstruct the circumstances of counsel's challenged conduct, and . . . evaluate the conduct

22   from counsel's perspective at the time." Strickland, 466 U.S. at 689. Here, given the

23   unpredictability of Petitioner's emotional displays, his instances of agitation extant on the record,

24   the trial court's mid-trial admonition to him specifically, and the indications that he did not, in

25   fact, feel remorse or sadness for what he inflicted on his victims, the undersigned is not persuaded

26   that every reasonable defense counsel would have urged Petitioner to display more emotion

27   throughout the trial, nor that, by failing to do so, counsel were shirking their duties to render

28   Petitioner sympathetic to the penalty jury. The state court did not unreasonably apply Strickland

269

1    or related case law by concluding that Petitioner had not demonstrated that defense counsels'

2    performance in this regard fell below an objective standard of reasonableness. See Strickland, 466

3    U.S. at 688. The undersigned therefore recommends this claim be dismissed. See Shinn, 141 S.

4    Ct. at 524.

5    **CLAIMS 92 AND 93**

6        In Claim 92, Petitioner alleges that the trial court erred in accepting the waiver of his

7    presence during penalty phase closing arguments and, in Claim 93, alleges that defense counsel

8    was ineffective by failing to litigate this issue adequately. (ECF No. 59 at 511-24.) The California

9    Supreme Court denied the former in a reasoned opinion on direct appeal, Coddington, 23 Cal.4th

10   at 629-30, and denied the latter summarily in habeas corpus. (LD 25-C.5.) The undersigned

11   concludes that both determinations are entitled to deference.

12       1.   Relevant Proceedings Below

13       After the close of evidence at the penalty phase, the court held a conference with counsel

14   concerning the scope of oral argument and the jury instructions. (40 RT 6622-33.) Defense

15   counsel expressed that, based on the prosecutor's closing arguments in other cases, he was "very

16   concerned that in this situation he may argue things that are designed to inflame the jury"; the

17   court responded that counsel could lodge a contemporaneous objection should just argument

18   emerge. (40 RT 6626.) Defense counsel then informed the court that Petitioner "prefer[ed] . . . to

19   not hear any of the argument," as defense counsel understood that the prosecutor intended to

20   replay a portion of People's Exhibit 135. (40 RT 6628.) Counsel described that Petitioner, "feels

21   very – he is very agitated, I would say." (Ibid.) Defense counsel and Petitioner then conversed

22   privately in the court's chambers. (40 RT 6629.) After this conversation, counsel reported to the

23   court that Petitioner "says mentally he can't take sitting here listening to Mr. Tepper." (Ibid.) The

24   court then addressed Petitioner directly:

25           Mr. Coddington, it's my understanding that you have expressed a
             desire to not be present during the argument of Mr. Tepper, the
26           prosecutor. I don't think I've ever had such a request before, and that
             doesn't mean that any significance should be placed because of that,
27           but I'd have to believe that if you absent yourself during his
             argument, a juror or the jury could conclude that that's tantamount to
28           an admission or a concurrence by you in what Mr. Tepper's saying

                                                 270

since you're not here to be seen by the jury, and I think that it can inure to your detriment that you absent yourself. You've certainly been a model of decorum during the trial. I have no criticism of you at all for that, but you're the only one that knows whether or not you can take the argument that Mr. Tepper's going to give now, or whether you believe that that will put so much pressure on you that you can't withstand it. And I don't know what the argument is going to be. I can tell you that I expect he's going to pull out all the stops and try and convince the jury that you should be put to death, and that's not going to be pleasant for anyone to hear, and you're the one that's going to have to determine whether or not you can sit here and listen to that and behave as I would expect you to. Obviously, if you were to break and lose control of yourself, I'd have to have you removed from the courtroom until you could regain control of yourself. So I guess I'll leave it up to you. As I say, I've never had this request before, but if you feel more comfortable in not being here, I would respect that right, but I have to tell you as a former trial attorney and as a judge that I think that that inures to your detriment to absent yourself.

I think it would be – for what it's worth, I think it would be more neutral if you were gone for the whole entire argument, both sides. I think it would be neutral for the Court to say that you had asked to be absent from the entire argument of the case and be out of the jury's sight and mind as far as being a participant in the proceeding. But if you absent yourself just from the prosecutor's argument, then I think it's detrimental. And obviously this has hit me this morning and I have not had time to reflect or think about it a whole lot, but that's the way I would react to it. So you can talk to your attorneys further if you wish, and then they can tell me what you want to do.

(40 RT 6630-31.)

Petitioner then conferred with counsel, who reported to the court that, "[i]n explaining his position to me, Mr. Coddington, while certainly acknowledging his responsibility for the crimes that he committed in this case, feels like he's sat and listened to Mr. Tepper for the last three months . . . and he's reached a point where he doesn't feel he can contain himself of Mr. Tepper continues to, in his opinion, distort what Mr. Coddington's life has been" and "that's the frustration he feels in trying to contain himself in this particular situation." (40 RT 6631-32.) Counsel informed the court that they had advised Petitioner "in our opinion he should be here, but we've also told him it's his trial." (40 RT 6632.) Counsel then informed the court that it was Petitioner's "preference to be absent during both arguments." (Ibid.) As closing arguments were set to begin after the conclusion of the bench conference, the court asked the bailiffs to return Petitioner to the jail; defense counsel interjected that Petitioner wished to remain present for the

271

1    remainder of the bench conference and when stipulations were entered into the record. (Ibid.) The

2    court then clarified, "he wants to be here during the stipulations?," to which Petitioner personally

3    replied, "Sure," followed by defense counsel's reply, "Yes, your Honor, that's fine, and he'll just

4    leave." (40 RT 6633.)

5          The jury returned and the court entered stipulations into the record, then both sides rested.

6    (40 RT 6635-36.) Petitioner was excused and returned to jail. (40 RT 6633, 6636.) The court

7    instructed the jury that Petitioner was excused because he asked not to be present and the jury was

8    to make no assumptions nor deductions about his absence. (40 RT 6637.)

9          2.   The California Supreme Court's Denial of Claim 92 Is Entitled to Deference

10          On direct appeal, Petitioner argued that his waiver of his presence was inadequate and

11    thus his absence violated his rights under the Fifth, Sixth, and Fourteenth Amendments, as well as

12    state statutory requirements. (LD 25-B.1 at 411-36.) The California Supreme Court expressly held

13    that the waiver arguably violated statutory requirements that it be in writing, but that any error

14    was harmless under California's Watson standard. Coddington, 23 Cal.4th at 629-30; see

15    generally Fry v. Pliler, 551 U.S. 112, 116 (2007) (holding that similar harmlessness language did

16    not reflect application of Chapman); Brown, 142 S. Ct. at 1526 (same). Therefore, because the

17    California Supreme Court denied the federal claim on the merits sub silento, this Court must

18    consider whether there was any reasonable basis for it consistent with clearly established

19    Supreme Court precedent. Johnson, 568 U.S. at 298-300; Pinholster, 563 U.S. at 188; Richter,

20    562 U.S. at 98, 102. The undersigned concludes that Petitioner failed to show that his waiver was

21    constitutionally infirm.

22          As explained in the undersigned's discussion of Claim 31, *ante*, at the time of the state

23    court adjudication, there was no clearly established federal law that capitally-charged defendants

24    could not waive their presence at trial. Because the proceeding at issue was a closing argument,

25    rather than the taking of evidence, Petitioner's legal interest in being present does not arise out of

26    the Sixth Amendment, but out of the due process clause. See Stincer, 482 U.S. at 745; Snyder,

27    291 U.S. at 105-06; Gagnon, 470 U.S. at 526.  For Petitioner's waiver of this right to be valid, the

28

1   record must show that it was made knowingly, intelligently, and voluntarily. See Olano, 507 U.S.

2   at 733; Campbell, 18 F.3d at 672.

3        Here, the totality of circumstances indicate that Petitioner's waiver was knowingly,

4   intelligently, and voluntarily made. The record indicated that, although Petitioner did not

5   personally make the request to the court, his counsel made the request in his presence,

6   representing that they were making it on Petitioner's behalf. (40 RT 6628-32.) If counsels'

7   characterizations or representations were incorrect, Petitioner could have alerted the court to this,

8   but he did not. (See generally 40 RT 6632-33 [Petitioner addresses court directly about desire to

9   remain present for stipulations to be entered].) The court stated on the record that Petitioner had a

10  right to be present, its understanding of the possible benefits Petitioner would forego and the

11  detriment that might accrue by waiving his presence, and that the decision ultimately rested with

12  Petitioner. (40 RT 6630-31.) Defense counsel, too, indicated having counselled Petitioner

13  similarly. (40 RT 6628-32.) In similar situations, courts have found a defendant's waiver of his

14  presence to be constitutionally adequate. See, e.g., United States v. Parra-Ruiz, 116 F.3d 487 (9th

15  Cir. 1997); Amaya-Ruiz, 121 F.3d at 495-96; Campbell v. Blodgett, 978 F.2d 1502, 1507-08 (9th

16  Cir. 1992), on reh'g sub nom. Campbell v. Wood, 18 F.3d 662 (9th Cir. 1994); Brewer, 670 F.2d

17  at 119. Although Petitioner now posits the court should have done more because of its knowledge

18  of his mental health impairments, there were no indications in the record that Petitioner was not

19  competent, at that time, to execute a waiver and, moreover, the evidence established that, despite

20  his mental health problems, Petitioner's cognitive functioning was superior, such that there

21  appears no basis to conclude that Petitioner likely did not understand the court's or counsel's

22  statements concerning the waiver. See, e.g., Coddington, 23 Cal.4th at 561 (recounting evidence

23  that "appellant, . . . was very intelligent, with an IQ of 142 to 145"). On this record, the

24  undersigned concludes that the state court was not unreasonable if it found that Petitioner had

25  failed to show that his waiver was not knowing, intelligent, and voluntary.

26       Additionally, the state court could have reasonably concluded that any error was harmless.

27  See Brown, 142 S. Ct. at 1520, 1525; Davis, 576 U.S. at 269-70; Fry, 551 U.S. at 119. As with

28  Petitioner's waiver of his presence at the guilt phase, the record indicated that Petitioner

1   voluntarily absented himself from the penalty phase closing argument because he believed he

2   could not maintain his composure in court during it and that he was, per his counsel, already

3   agitated even contemplating the argument. (40 RT 6629-32.) Thus, the state court could have

4   reasonably concluded that any infirmity in Petitioner's waiver was harmless because the record

5   indicated a likelihood that Petitioner would have been removed from the courtroom due to his

6   lack of decorum. See Davis, 576 U.S. at 270-86 (holding improper exclusion of defendant and

7   defense counsel from jury selection was harmless because the trial court would have reached the

8   same rulings had counsel been present); see generally Snyder, 291 U.S. at 108 (no constitutional

9   prohibition on removing a disruptive defendant from courtroom). Alternatively, the state court

10  could have reasonably concluded that Petitioner's arguments that he would have comported

11  himself decorously and presented positively during the closing arguments were speculative,

12  conclusory, and unsupported by the record, given that the record demonstrated that Petitioner was

13  agitated just prior to the commencement of the arguments, and that this agitation derived from his

14  feelings about what the contents of the prosecutor's argument would be. See generally Pinholster,

15  563 U.S. at 188 n.12 (quoting Clark, 5 Cal.4th at 770) (state court entitled to give little weight to

16  speculative allegations or those unsupported by the record); Richter, 562 U.S. at 109 (in habeas

17  review, court must adhere to the factual record before the state court and may not grant relief

18  based on speculation unsupported by the record). On either basis, the state court was not

19  unreasonable if it concluded any infirmity of the waiver of Petitioner's presence during the

20  closing arguments was harmless.

21      For these reasons, the state court's denial of Claim 92 is entitled to deference and the

22  undersigned recommends it be dismissed.

23      3.   The California Supreme Court's Denial of Claim 93 Is Entitled to Deference

24      The state court also was reasonable in denying relief on Claim 93. In Claim 93, Petitioner

25  alleges that his trial counsel were deficient in failing to argue that Petitioner's presence was not

26  waivable, in failing to request a more robust colloquy, and failing to "request that Mr. Coddington

27  be offered the intermediate option of asking for a short recess if in fact [the prosecutor's] remarks

28  became unbearable." (ECF No. 59 at 523.) None of these allegations suffice to make a facial

274

1  showing of deficient performance. As set forth above, the trial court's acceptance of Petitioner's

2  waiver accorded with governing law; it is not the case that Petitioner could not waive his presence

3  or that his waiver was constitutionally infirm. Consequently, trial counsel were not deficient in

4  failing to make these arguments to the trial court. See, e.g., Ochoa, 50 F.4th at 889; Pinkston, 506

5  F. App'x at 542-43; Rupe v. Wood, 93 F.3d at 1445.

6          Regarding Petitioner's allegation that defense counsel should have requested that the trial

7  court offer Petitioner the option to ask for a recess during the prosecutor's closing argument if he

8  became overwhelmed, this too fails to demonstrate that counsel's performance was deficient. The

9  record shows that Petitioner possessed a preference to absent himself entirely from the argument,

10 rather than simply during the playing of Exhibit 135, and then opted to absent himself from both

11 arguments rather than draw attention to his being absent from the prosecutor's argument

12 specifically. (40 RT 6628-32.)  There seems no support for the inference that counsel somehow

13 shirked their responsibilities to their client by not advocating for an outcome in which, per the

14 record, Petitioner had no interest. Additionally, reasonable defense counsel could have concluded

15 that it was not strategically wise to request the trial court suggest the possibility of a mid-

16 argument recess to Petitioner if he became too agitated, as that option would have had the

17 downsides of highlighting for the jury the portion of the argument that Petitioner found troubling,

18 as well as risking the possibility that the jury would have seen whatever signs of agitation

19 Petitioner displayed that would compel granting of a recess. Finally, and of particular importance,

20 Petitioner cites no authority for the notion that the trial court was obligated to inform him of

21 remedies like the possibility of recess, or that defense counsel would have had to make a request

22 to the court for this information to have been communicated to Petitioner. See generally

23 Strickland, 466 U.S. at 697 (petitioner bears burden on both prongs of ineffective assistance of

24 counsel claim); Walker, 709 F.3d at 939 (petitioner bears "the burden to demonstrate that 'there

25 was no reasonable basis for the state court to deny relief'"). For all of these reasons, the state

26 court reasonably could have found that Petitioner had not made a prima facie showing that his

27 trial counsel performed deficiently. The undersigned therefore recommends Claim 93 be

28 dismissed.

275

1   **CLAIMS 99 AND 100**

2          In Claim 99, Petitioner alleges that the trial court violated his Sixth Amendment right to

3   an impartial jury and his Eighth and Fourteenth Amendment rights to a reliable sentencing

4   determination when the trial court made comments to some jurors that implied the penalty phase

5   deliberations could take less than a day, thereby coercing them into delivering a death verdict.

6   (ECF No. 59 at 546-50.) Petitioner raised this claim on direct appeal, which the California

7   Supreme Court denied in a reasoned opinion. <u>Coddington</u>, 23 Cal.4th at 636-37. In Claim 100,

8   Petitioner alleges that trial counsel performed ineffectively by failing to object to the trial court's

9   comments. (ECF No. 59 at 551.) This claim was raised in Petitioner's first petition for writ of

10  habeas corpus (LD 25-C.1 at 169-72), which the California Supreme Court summarily denied.

11  (LD 25-C.5.) The undersigned concludes that the state court's denial of both claims is entitled to

12  deference.

13          1.   Proceedings In State Court

14          The penalty phase began on the afternoon of Wednesday, September 14, 1988 (39 RT

15  6509), with both parties giving opening statements and the defense presenting three witnesses.

16  (39 RT 6518-6608.) Just before recessing for the evening, outside the presence of the jury,

17  counsel and the court discussed the scheduling for the remainder of the trial, including possible

18  scheduling conflicts raised by some of the jurors and alternate jurors. (39 RT 6608-10.) The court

19  then addressed scheduling briefly with the entire jury, informing them that it expected one

20  witness to testify the next day, which "I'm sure [will] be done by noon, probably before noon,

21  and at that time I'll tell you what the completion of the trial schedule is." (39 RT 6611.) Then,

22  outside the presence of the rest of the jury, the court questioned those jurors (Ms. McIver and Mr.

23  Hollingsworth) and alternate jurors (Ms. Gladis and Mr. Gray) who had expressed scheduling

24  problems. (39 RT 6611-18.) To all four, the court stated that "what we're toying with doing is

25  breaking tomorrow and reconvening on Wednesday of next week, and we think we can wrap the

26  whole thing up next Wednesday, possibly we would go into Thursday." (39 RT 6612.) Jurors

27  McIver and Hollingsworth replied that they could accommodate such a schedule, as did alternate

28  juror Gladis, but alternate juror Gray stated he had a conflict on the following Tuesday. (39 RT

1   6612-13.) The court then had all of the jurors and alternate jurors leave the courtroom, at which

2   point counsel and the court further discussed scheduling and the court indicated it would dismiss

3   alternate juror Gray due to his scheduling conflict. (39 RT 6614-16.) When the court then sought

4   to reconvene with the two jurors and two alternate jurors, however, only Juror McIver and

5   alternate juror Gray were present, as Juror Hollingsworth and alternate juror Gladis had already

6   departed for the day. (39 RT 6616-17.) The court excused alternate juror Gray. (39 RT 6617.) To

7   Juror McIver, the court then explained, "we're going to meet tomorrow and we're going to meet

8   Tuesday. My guess is that this case will be over Tuesday, or Wednesday at the latest. Now,

9   obviously you know how accurate I've been before, but I think you can count on Wednesday

10  being free of this." (39 RT 6617-18.)

11          On direct appeal, Petitioner argued that the court's comments to the two jurors and

12  alternate jurors that "we think we can wrap the whole thing up next Wednesday, possibly we

13  would go into Thursday" and comment to Juror McIver that he predicted she would "be[] free of

14  this" on the following Tuesday or Wednesday were coercive, in violation of his federal

15  constitutional rights, and were reasonably likely to have contributed to at least one juror electing a

16  death sentence. (LD 25-B.1 at 459-63.) The California Supreme Court denied the claim:

17              Appellant argues that the implication that penalty phase deliberation
18          would be short suggested to the jurors that the penalty decision would
            be easy. If the court's statement conveyed that impression it was
19          improper. Generally, the court may comment on evidence and on the
            credibility of a witness, "so long as its remarks are accurate,
20          temperate, and 'scrupulously fair'" (*People v. Melton* (1988) 44
            Cal.3d 713, 735 [244 Cal.Rptr. 867, 750 P.2d 741]), but that
21          authority does not extend to offering a view on how the balance of
            aggravating and mitigating factors should be weighed in the penalty
22          phase of a capital case. Appellant did not object to the court's
            comment, however, and thus did not preserve this claim for appeal.
23          (*People v. Wader* (1993) 5 Cal.4th 610, 647 [20 Cal.Rptr.2d 788, 854
            P.2d 80].)

24              In any event, we do not agree with appellant's assertion that the
25          comment would have undue and improper influence on the jury. The
            court had discussed scheduling with the jury on several occasions,
26          apologizing when an early recess was necessary if witnesses were
            not available, and had expressed understanding of the jurors' need to
27          cope with outside obligations. The jurors were aware that past
            estimates had been inaccurate and would understand that this
28          estimate too was being offered only to ease their concerns. At this
            stage of the trial the jurors, who had already deliberated guilt and

                                            277

1         sanity, were familiar with the deliberative process and of the
overarching importance of that process in determining the
2  appropriate penalty. It is not reasonably probable that the court's
estimate had any impact on the deliberative process at the penalty
3  phase of the trial.

4  Coddington, 23 Cal.4th at 636-37.

5         In his first petition for writ of habeas corpus in state court, Petitioner alleged that his trial

6  counsel performed ineffectively by failing to object to the court's comments, on all the bases set

7  forth on direct appeal, and further supported with a declaration from trial counsel stating he had

8  no tactical reason not to object. (LD 25-C.1 at 169-72.) The California Supreme Court denied

9  relief summarily on the merits. (LD 25-C.5.)

10        2.   Governing Legal Standard

11         Under the Sixth and Eighth Amendments, "[a]ny criminal defendant, and especially any

12  capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body."

13  Lowenfield v. Phelps, 484 U.S. 231, 241 (1988). A court's comments or charges to the jury may

14  have a coercive effect if, "'in [their] context and under all the circumstances'" (Lowenfield, 484

15  U.S. at 239, quoting Jenkins v. United States, 380 U.S. 445, 446 (1965)), they would have had a

16  "tendency" (Brasfield v. United States, 272 U.S. 448, 450 (1926)) to encourage the jury to cut

17  short the deliberative process or to return a particular verdict. See Lowenfield, 484 U.S. at 234,

18  238-41; Jenkins, 380 U.S. at 446; Brasfield, 272 U.S. 448; Smith v. Curry, 580 F.3d 1071, 1082-

19  84 (9th Cir. 2009) see generally Harrison v. Gillespie, 640 F.3d 888, 902-04 (9th Cir. 2011). For

20  example, the Supreme Court has found it coercive for the trial court to tell a deadlocked jury,

21  "You have got to reach a decision in this case," (Jenkins, 380 U.S. at 446), or to ask the numerical

22  division of a hung jury. Brasfield, 272 U.S. 448; Burton v. United States, 196 U.S. 283, 304

23  (1905).

24        3.   Claim 99 Should Be Dismissed As Meritless

25         Respondent has asserted that Claim 99 is procedurally barred because the California

26  Supreme Court denied it for Petitioner's failure to object at the trial court. (ECF Nos. 102 at 6,

27  148 at 27-28.) Petitioner challenges the independence and adequacy of the contemporary

28  objection bar and argues alternatively that any default was caused by trial counsel's

1   ineffectiveness, incorporating the allegations of Claim 100. (ECF No. 131 at 57-58.) In the

2   interest of judicial economy, the undersigned concludes that Claim 99 should be dismissed as

3   meritless, irrespective of the applicability of any default. See Shinn, 142 S. Ct. at 1737, 1739;

4   Coleman, 501 U.S. at 755; Bell, 543 U.S. at 451 n.3; Franklin, 290 F.3d at 1232.

5          Viewing the trial court's comments to jurors McIver and Hollingworth "in [their] context

6   and under all the circumstances," see Lowenfield, 484 U.S. at 239, they would not have tended to

7   have a coercive effect on the jury's verdict for several reasons. Principally, the comments were

8   not made to the jury during the course of their deliberations, but were made the afternoon the

9   penalty phase commenced, after which the jury would go on to hear arguments and receive

10  instructions before then beginning their deliberations. (See 40 RT 6635-10.) The instructions they

11  received from the court urged them to deliberate carefully and fully with one another. (40 RT

12  6695-96.) Shortly after the jury began penalty-phase deliberations, the court told them that they

13  could continue deliberating as long as they wished that evening. (40 RT 6708.) Taken together,

14  the temporal distance between the court's comments to jurors McIver and Hollingsworth and the

15  intervening instructions and comments that underscored the seriousness and importance of full

16  and fair deliberations place this case in stark contrast to those where coercion has been found,

17  where the court responded to mid-deliberations questions about deadlock. See Lowenfield, 484

18  U.S. at 234, 238-41; Jenkins, 380 U.S. at 446; Brasfield, 272 U.S. 448; Burton, 196 U.S. at 304;

19  Smith, 580 F.3d at 1082-84; Jiminez v. Myers, 40 F.3d 976, 980-81 (9th Cir. 1994) (per curiam).

20  Moreover, in those cases, the trial court's problematic comments had been made to the jury as a

21  whole, see ibid.; here, the record only demonstrated that at most two deliberating jurors had heard

22  the remarks at issue. (39 RT 6611-18.)

23         The nature of the trial court's comments, too, belie a finding that they were coercive.

24  Unlike the comments of courts that have plainly or obliquely urged a swift resolution of

25  deliberations (see, e.g., Jenkins, 380 U.S. at 446; Brasfield, 272 U.S. 448; Burton, 196 U.S. at

26  304; Smith, 580 F.3d at 1082-84; Jiminez, 40 F.3d at 980-81), here, the trial court's comments

27  were more ambiguous, referring simply to "wrap[ping] . . . up" the case and the trial being "over"

28  by a particular date. (39 RT 6612, 6617-18.) As the California Supreme Court correctly observed,

279

1    see Coddington, 23 Cal.4th at 636-37, these comments were similar to other discussions the court

2    had had with the jurors at various points in the trial concerning scheduling estimates, and most

3    likely would have been understood in that manner. (See, e.g., 30 RT 5690-92; 34 RT 6194; 36 RT

4    6316-17; 39 RT 6507; 40 RT 6634.) Finally, on this record, it seems unlikely that a juror would

5    understand an implication that deliberations would likely last, at most, a day would mean that

6    they would be "extremely short," i.e., that they would reflect an abbreviated or desultory

7    deliberation. (See ECF No. 59 at 547.) Although it may be the case that, across California cases,

8    penalty phase deliberations tended to last longer, here, the jury's guilt, special circumstance, and

9    sanity deliberations had each also lasted less than a day. (See 6 CT 1084-1085, 1087-94, 1167,

10   1171, 1197, 1201, 1203.) Likewise, at the time the court made the comments at issue, it also

11   indicated to the jury that the entire evidentiary portion of the penalty phase would last one court

12   day or less. (See 39 RT 6611.) Given this context, see Lowenfield, 484 U.S. at 239, it does not

13   seem reasonable to conclude that a juror would understand the court's reference to deliberations

14   lasting one court day as indicating a belief that they would be particularly brief, let alone that they

15   should be curtailed in favor of a death verdict.

16        For these reasons, Petitioner did not show to the state court and cannot show now that the

17   trial court's comments were coercive within the meaning of governing precedent. The

18   undersigned therefore recommends Claim 99 be dismissed. See Shinn, 142 S. Ct. at 1737, 1739.

19        4.   The State Court's Denial of Claim 100 Is Entitled to Deference

20        The California Supreme Court could reasonably have concluded that Petitioner had not

21   made a prima facie showing of ineffective assistance of defense counsel in Claim 100, as it was

22   premised on trial counsel being deficient for failing to have objected to the trial court's comments

23   set forth in Claim 99. (See ECF No. 59 at 551; LD 25-C.1 at 169-72.) Because the court's

24   comments identified in Claim 99 were not coercive, defense counsel was not deficient in failing

25   to object to them. See, e.g., Ochoa, 50 F.4th at 889; Sihner, 697 F. App'x at 510-11; Lisalda, 78

26   F. App'x at 17. The California Supreme Court therefore did not unreasonably apply nor act

27   contrary to clearly established federal law in finding that Petitioner had not stated a prima facie

28

                                                280

1  claim for relief for Claim 100, see Richter, 562 U.S. at 98, and the undersigned recommends

2  Claim 100 be dismissed. 28 U.S.C. § 2254(d).

3  **CLAIMS 101, 102, 103, 104, 105, 106, 109, 110, 111 AND 112**

4       In Claims 101, 103, 105, 109, and 111, Petitioner alleges that the prosecutor committed

5  misconduct in his penalty phase closing argument and, in Claims 102, 104, 106, 110, and 112, he

6  alleges that defense counsel was ineffective in failing to object to those instances of misconduct.

7  (ECF No. 59 at 552-75, 582-88.) He raised Claims 101, 103, 105, 109, and 111, on direct appeal,

8  which the California Supreme Court denied in a written opinion. (LD 25-B.1 at 464-94, 501-07.)

9  Coddington, 23 Cal.4th at 633-35. He raised Claims 102, 104, 106, 110, and 112, in his first

10  petition for writ of habeas corpus in the state court, which the California Supreme Court denied

11  summarily. (LD 25-C.1 at 172-79, 186-88; LC 25-C.5.) The undersigned concludes that the state

12  court's denials of these claims are entitled to deference. See 28 U.S.C. § 2254(a).

13       1.  Proceedings In State Court

14       On direct appeal, Petitioner argued that the prosecutor violated his rights under the Fifth,

15  Eighth, and Fourteenth Amendments by arguing that the jury could not consider sympathy for

16  Petitioner's family members when rendering its penalty phase verdict [now, Claim 101] (LD 25-

17  B.1 at 464-77); arguing that Petitioner had shown no remorse for the crimes [Claim 103] (LD 25-

18  B.1 at 478-86); arguing that Petitioner would enjoy certain activities if incarcerated with a life

19  sentence [Claim 105] (LD 25-B.1 at 486-94); arguing that Petitioner was more deserving of death

20  due to his victims' status as elderly women, rather than other kinds of victims [Claim 109] (LD

21  25-B.1 at 501-04); and by referring to Petitioner by animalistic names during closing argument

22  [Claim 111] (LD 25-B.1 at 505-07). The California Supreme Court denied all five claims:

23          Appellant contends that numerous other aspects of the prosecutor's
penalty phase argument were improper. He cites as misconduct the
24          prosecutor's arguments that the jurors should not permit sympathy
for appellant's parents to influence their penalty determination;[43] that
25          appellant had not expressed remorse;[44] that appellant should be put
to death to prevent him from engaging in various noncriminal
26          activities;[45] and that the murder victims were not longshoremen,
bikers, gang members, truckers, or johns.[46] He also cites as
27          misconduct the prosecutor's assertedly inflammatory and derogatory
references to appellant . . . .
28

> No objection was made to any of the argument appellant now claims was improper.[47] The rule, that failure to object or request an admonition to the jury, and thereby to afford the trial court the opportunity to cure the impact of misconduct by admonition to the jury, constitutes a waiver of an appellate claim of prejudicial misconduct, applies to a prosecutor's penalty phase argument. (*People v. Samayoa*, *supra*, 15 Cal.4th at p. 854.) We have, nonetheless, reviewed the prosecutor's argument and conclude that it did not exceed proper bounds. It was tied to the evidence, related the evidence to the factors upon which the penalty decision should be based, and was not argument that would invite a verdict based on passion or prejudice.

Coddington, 23 Cal.4th at 633-35 (footnotes omitted).

In his first petition for writ of habeas corpus, Petitioner alleged that trial counsel had rendered ineffective assistance of counsel by failing to object to the above instances of misconduct. (LD 25-C.1 at 172-79, 186-88 (Claims D13, D14, D15, D16, D18, D19)). The California Supreme Court denied these claims – corresponding to Claims 102, 104, 106, 110, and 112 of the Amended Petition in the instant proceeding – summarily, both on the merits and "[e]xcept to the extent petitioner claim[ed] ineffective assistance of counsel, . . . for the additional reason that they were raised and rejected on appeal." (LD 25-C.5.)

2.   Relevant Legal Standards

Prosecutorial misconduct, such as inappropriate argument, violates a defendant's due process rights and thereby merits habeas corpus relief when the conduct "'infected the trial with unfairness.'" Darden, 477 U.S. at 181, quoting Donnelly, 416 U.S. at 643; see also Smith v. Phillips, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial"). Alleged instances of misconduct must be reviewed "in the context of the entire trial." Donnelly, 416 U.S. at 639; see also Miller, 483 U.S. at 765-66. Habeas relief is warranted only if the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637. In a capital case, the Eighth Amendment may be offended where the prosecutor's argument undermined the reliability of the jury's sentencing determination. Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985).

Under Strickland, defense counsel performs deficiently by failing to raise meritorious objections, but is not deficient for failing to object to unobjectionable conduct or otherwise failing to make

282

1  futile or frivolous arguments. See, e.g., Ochoa, 50 F.4th at 889; United States v. Sihner, 697 F.

2  App'x 510, 510-11 (9th Cir. 2017); Lisalda v. Stewart, 78 F. App'x 15, 17 (9th Cir. 2003).

3          3.   Claims 101, 103, 105, 109, and 111 Are Meritless

4          Respondent has asserted that Claims 101, 103, 105, 109, and 111, are procedurally barred

5  because the California Supreme Court denied them for Petitioner's failure to object at the trial

6  court, reflecting an independent and adequate ground for the denial under section 2254. (ECF

7  Nos. 102 at 6, 148 at 28-37.) Petitioner argues that the state court did not deny these claims on

8  state procedural grounds or, if it did, the procedural bar is not entitled to deference because it was

9  not adequate, it was not warranted under state law, and/or it resulted from trial counsel's

10 ineffectiveness. (ECF No. 131 at 64-68, 70-72.) The undersigned declines to resolve the question

11 of the applicability of any procedural bar to these claims because the underlying claims at issue

12 are, ultimately, meritless. See Shinn, 142 S.Ct. at 1737, 1739; Coleman, 501 U.S. at 755; Bell,

13 543 U.S. at 451 n.3; Franklin, 290 F.3d at 1232.

14         a.   The Prosecutor's Conduct Identified In Claim 101 Was Not Misconduct

15         In Claim 101, Petitioner alleges that the prosecutor committed misconduct by arguing, at

16 the close of the penalty phase,

17
18
19
20
21
22
23
        The parents of Herbert James Coddington have suffered untold
        misery. But nowhere in the factors that His Honor will tell you about,
        nowhere in this framework (indicating) of analysis is there anywhere
        where this jury may have sympathy for anyone beyond this railing
        (indicating). There is not one bit of sympathy that can be applied by
        this jury for anyone that sits beyond this place in the courtroom, on
        either side. And your focus is on Herbert James Coddington the
        sinner, and the crimes that Herbert James Coddington committed.
        The jury cannot allow sympathy for the parents to intrude upon its
        verdict. They can only allow sympathy for Herbert, the defendant, as
        expressed in these factors (indicating) to be balanced and considered
        as you go through the evidence.

24 (40 RT 6661-62.) Petitioner alleges that this error was "compounded" by the prosecutor having

25 argued, just prior to making this argument, that Petitioner had been raised by "warm and loving,"

26 rather than "repressive and hard," parents. (ECF No. 59 at 557-58, quoting 40 RT 6658-59.)

27 Petitioner argues, fundamentally, that the Eighth Amendment permits the jury to consider

28 sympathy towards the defendant's family as mitigation evidence and that the prosecutor

1   improperly suggested that Petitioner's having had warm, loving parents should be considered

2   aggravating. (ECF No. 59 at 552-60.)

3          Neither of these arguments were improper. The Eighth Amendment requires that, "[i]n

4   capital cases the sentencer not be precluded from considering, as a mitigating factor, any aspect of

5   a defendant's character. . . that the defendant proffers as a basis for a sentence less than death."

6   Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986); see also Penry v. Lynaugh, 492 U.S. 302, 328

7   (1989) ("the jury must be able to consider and give effect to any mitigating evidence relevant to a

8   defendant's background and character"). While the fact that the defendant is loved by family may

9   be admissible as indirect evidence of his character, see, e.g., People v. Ochoa, 19 Cal.4th 353,

10  454-56 (1998), the Supreme Court has never held that the Eighth Amendment either permits or

11  forbids a capital sentencing jury to consider sympathy for the defendant's family as itself

12  mitigating. See, e.g., People v. Jones, 15 Cal.4th 119, 188 (1997) (observing the Supreme Court

13  has not "decided whether the jury may consider evidence of the impact a judgment of death

14  would have upon the defendant's family"); People v. Cooper, 53 Cal.3d 771, 844 n.14 (1991)

15  (collecting cases and observing same); cf. Pinholster, 563 U.S. at 191 (observing that some

16  California capital defense counsel presented a "'family sympathy' mitigation defense" in the mid-

17  1980s, but not addressing the constitutional propriety of such a defense). As courts have

18  observed, see, e.g., Coleman v. Saffle, 869 F.2d 1377, 1393 (10th Cir. 1989); Ochoa, 19 Cal.4th

19  at 456, such a construction would seem at odds with the Supreme Court's long, consistent line of

20  jurisprudence that the jury may consider a broad range of mitigation evidence, so long as it

21  illuminates the defendant's own character. See Penry, 492 U.S. at 328; Skipper, 476 U.S. at 4-5;

22  Enmund v. Florida, 458 U.S. 782, 801 (1982); Eddings v. Oklahoma, 455 U.S. 104, 110, 114

23  (1982); Lockett v. Ohio, 438 U.S. 586, 604 (1978); see also Jones v. Butler, 864 F.2d 348, 360

24  (5th Cir. 1988) (holding prosecutor did not commit misconduct when arguing that jury should not

25  elect a life sentence over a death sentence on the basis of sympathy for capital defendant's

26  family). It is on this basis, for instance, that the California Supreme Court eventually held that

27  sympathy for the defendant's family was not a lawful form of mitigation under the Eighth

28  Amendment. Ochoa, 19 Cal.4th at 456. In light of this, the prosecutor's argument here was not

1   contrary to law when it urged the jury that they could only base their penalty-phase verdict on

2   "sympathy for Herbert, the defendant" and not consider their feelings of sympathy for the

3   defendant's parents or anyone else. (See 40 RT 6661-62.)

4           The prosecutor also did not improperly urge the jury to consider Petitioner's positive

5   upbringing as aggravation evidence. The passage cited by Petitioner, which Petitioner

6   characterizes as reflecting that the prosecutor argued that "the Coddingtons' love for Mr.

7   Coddington was a reason to impose death" (ECF No. 59 at 557-58), contains the following

8   argument by the prosecutor:

9                   Let me talk to you about the evidence and the testimony that you
                    ladies and gentlemen heard at this phase of the trial.
10
                    Four honorable and fine people appeared before you. Joanne Garner,
11                  the school friend of Ms. Coddington's, Vladamis Grigoriew, the
                    gentleman that is in the automobile industry, G. Herbert Coddington,
12                  the father, and Genevieve Coddington, the mother.

13                  Ladies and gentlemen, we talked about the fact that at this phase of
                    the trial, the whole range and panoply of evidence is before you. And
14                  somewhere we heard that Mr. Coddington had a repressive and
                    terrible childhood.
15
                    And yet, when we now examine that childhood, and examine the
16                  videotape, and examine the witnesses, and examine the parents, we
                    find that Herbert Coddington had a warm and loving childhood. . . .
17                  [H]e had parents that were warm and loving.

18                  And what is for (sic) Herbert Coddington is not the product of
                    repressive and hard parents. . . .
19
                    So whatever theory was originally advanced about a hard and
20                  repressive childhood, when we see Mr. Coddington's childhood in
                    an accurate and full perspective, it simply is not true that he was
21                  raised in some manner that was productive of the person and
                    individual that Herbert Coddington is today. . . .
22

23   (40 RT 6658-59.)

24           A fair reading of the record shows that the prosecutor's argument is simply that, to the

25   extent any witness or other evidence had indicated that Petitioner had had a difficult childhood,

26   that was untrue; he did not urge the jury to find Petitioner's experiences with loving parents

27   aggravating. (See, e.g., 32 RT 5784 (Dr. Kaldor testifies Petitioner reported that "from a very

28   early age [he] felt unjustly treated" by his parents); 33 RT 5970-71 (Dr. Bittle testifies that

1   Petitioner "was angry at his parents," for their "controlling" treatment of him as a child).) A

2   capital defendant's traumatic life experience is quintessentially mitigating, see, e.g., Wiggins, 539

3   U.S. 510, and the absence of mitigation is not aggravating. See Allen v. Woodford, 395 F.3d 979,

4   1018 (9th Cir. 2005). At the same time, however, it is also not the case that a prosecutor commits

5   misconduct by arguing that there is no evidence to indicate that a certain mitigating factor is

6   present. See Tuilaepa v. California, 512 U.S. 967, 975-78 (1994). Here, that is all that occurred.

7   There was no misconduct.

8         For these reasons, the undersigned finds Claim 101 meritless and recommends it be

9   dismissed, irrespective of whether the state court properly denied it through the application of a

10   state procedural bar. See Shinn, 142 S.Ct. at 1737, 1739; Franklin, 290 F.3d at 1232; 28 U.S.C. §

11   2254(d).

12         b.   The Prosecutor's Conduct Identified In Claim 103 Was Not Misconduct

13         In Claim 103, Petitioner alleges that the prosecutor committed misconduct in arguing that

14   Petitioner's failure to express remorse for his crimes should be considered in aggravation which

15   violated his due process and Eighth Amendment rights, as well as by urging an adverse inference

16   from Petitioner's failure to testify in violation of his Fifth Amendment rights. (ECF No. 59 at

17   562-66.) The prosecutor argued:

18
19         And so we've answered the questions of who was killed: elderly
           ladies who were defenseless. Where they were killed: in a place and
20         under a circumstance where neither could anticipate this kind of
           danger. And how they were killed: with a Flex-cuf around their necks
           that was tightened at least in several increments.

21         And what about Herbert James Coddington, the sinner? Is he
22         remorseful, sorry, apologetic for what he has done? And the answer
           is profoundly 'no'. From the witness stand last week you heard from
23         the lips of a fine gentleman, an honorable person, Mr. G. Herbert
           Coddington, the defendant's father, quote: "The things that my son
24         did are just the most horrible things I can imagine. My heart goes out
           to the people he has harmed. I don't know what to say." And
25         somewhere those words were in the heart of a fine and honorable
           gentleman, the father of the defendant Herbert James Coddington,
26         but Herbert James Coddington, the snake, the jackal, the vulture,
           professes no words whatsoever in remorse for what he has done.

27   (40 RT 6656.)

28   ////

1    Under California law at the time of Petitioner's trial, a defendant's lack of remorse for the

2    capital crime was not a statutory aggravating factor, see Penal Code § 190.3, but his

3    remorsefulness could be considered in mitigation. See People v. Walker, 47 Cal.3d 605, 650

4    (1988). Thus, it was not improper for a prosecutor to argue the absence of this mitigating factor,

5    so long as he did not "affirmatively advance[e] defendant's lack of remorse as an aggravating

6    circumstance." Ibid.; see also People v. Proctor, 4 Cal.4th 499, 545 (1992); People v. Carrera, 49

7    Cal.3d 291, 339 (1989), as modified on denial of reh'g (Nov. 21, 1989).

8    Here, the record does not support a finding that the prosecutor's argument urged the jury

9    to consider Petitioner's remorse as an independent aggravating circumstance. Instead, the passage

10   cited by Petitioner occurred within the context of the prosecutor reminding the jury of some of the

11   details of the homicides, including a statement Petitioner had made to a friend indicating his

12   enjoyment. (40 RT 6647-56.) Immediately after the passage cited by Petitioner, the prosecutor

13   described Petitioner's elaborate planning for his crimes that Petitioner had undertaken,

14   contrasting that evidence with the sympathetic defense witnesses who had testified during the

15   penalty phase about their knowledge of Petitioner as a child. (40 RT 4456-62.) In this context, the

16   passage that Petitioner cites as misconduct clearly did not advance Petitioner's lack of remorse as

17   an independent aggravating circumstance, but rather formed part of the prosecutor's larger

18   argument that the circumstances of the crimes were incredibly aggravating, including Petitioner's

19   elaborate planning of and professed enjoyment of them, and unmitigated by any empathy or

20   remorse towards his victims. (40 RT 5547-56.) This was not improper under California law, see

21   Walker, 47 Cal.3d at 650, and ergo did not reflect a violation of Petitioner's due process or Eighth

22   Amendment rights.

23   The record also does not support a finding that the prosecutor's argument constituted an

24   improper comment on Petitioner's failure to testify in violation of his Fifth Amendment rights as

25   set forth in Griffin v. United States, 380 U.S. 609 (1965). The portion of the prosecutor's

26   argument cited by Petitioner would not reasonably have been interpreted by the jury as a

27   comment on Petitioner's failure to testify. See Griffin, 380 U.S. at 614. The portion cited by

28   Petitioner immediately followed the prosecutor having quoted post-crime statements Petitioner

287

made to friends (40 RT 6647) and psychiatric experts (40 RT 6650-51) concerning the crimes. In this context, the jury would have understood the prosecutor's references to Petitioner having not expressed remorse as referring to those statements, not to his failing to have testified at trial. See Coddington, 23 Cal.4th at 642 (finding same and holding that, as a result, trial court had no obligation to instruct on defendant's failure to testify).

For these reasons, the undersigned finds Claim 103 meritless and recommends it be dismissed. 28 U.S.C. § 2254(d); see Shinn, 142 S.Ct. at 1737, 1739; Franklin, 290 F.3d at 1232.

c.   The Prosecutor's Conduct Identified In Claim 105 Was Not Misconduct

In Claim 105, Petitioner alleges that the following argument constituted misconduct:

> And there is a time when the prosecutor has to say: How would it feel to stand in the shoes of the jurors and return that kind of a verdict [of death]? . . . And then I asked myself: "What about the other side of the coin?"

> What if I were a juror in the case of the People of the State of California versus Herbert James Coddington and there were no date set for the execution?

> What if, despite the savage beating that Herbert Coddignton gave Dorothy Walsh, as shown in the picture, Herbert Coddington sat in a cell, composing further science fiction?

> What if, despite placing a Flex-cuf around the neck of Mabs Martin, and pulling it tight in increments, and tightening it down, Herbert Coddington was in prison drafting further accounts of the "Black Tams"?

> What if, despite the fact that Herbert Coddington said to Michael Szermeta: "It is better than I ever expected," Herbert Coddington lay on his back reading Playboy Magazine?

> What if, despite the fact that Herbert Coddington trussed up Mabs Martin and Dorothy Walsh much like turkeys, stuffed them into a trash bag and slept by their side, Herbert Coddington continued to pan grievance (sic) of how he had been cheated by life, by his parents, by the casinos, by the system, and possibly by the warden?

> What if, despite stripping Mabs Martin and Dorothy Walsh of their rings and jewelry, Herbert James Coddington on a daily basis played board games, Parchesi, chess, and Monopoly?

> What if, despite the conviction of two murders, a rape, two counts of oral copulation, and two counts of rape with a foreign object, Herbert Coddington continued to make entries in his autobiography and continued to keep records of his sexual prowess?

What if, despite the most atrocious, cruel, sadistic, immoral attack on two elderly ladies, Herbert Coddington devised a method to overreach and cheat the casinos, and he published his results under the name of K. Coddington?

Being a juror is to accept the most solemn commitment in this courtroom. It is perhaps the most difficult job of all.

Somewhere in the analysis of those analyses, somewhere in the moral weighing Herbert Coddington must atone, and the sinner must pay for his sins in the manner that you, as the collective conscience of this State, of this community, determine to be appropriate.

(40 RT 6669-70; see ECF No. 59 at 568-73.) Petitioner argued that these comments on his hypothetical pursuits while in prison constituted non-statutory aggravators, urged the jury to penalize Petitioner for engaging in constitutionally protected activities, reflected unproven prior bad acts, and were speculative, any or all of which rendered them misconduct. (ECF No. 59 at 568-73.)

The undersigned cannot agree with these characterizations. Petitioner relies on excerpts of the prosecutor's argument in making his claim (see ECF No. 59 at 568), but reviewing the argument as a whole and in the context in which the jury heard it, it is plain that the thrust of the prosecutor's argument was to contrast the horror of Petitioner's crimes with the quotidian human experiences he might enjoy while imprisoned, as a means of urging that a life sentence was an insufficient punishment. Most of the specific examples employed by the prosecutor derived from evidence that the Petitioner had engaged in those particular pursuits. (See 26 RT 5062-63 (testimony of Dr. Mills describing Petitioner's fiction writing); 28 RT 5305-06 (Dr. Rosenthal identifying Defense Exhibit O as Petitioner's masturbation chart); 32 RT 5784 (testimony of Dr. Kaldor describing Petitioner's grievances with his family); 33 RT 5970-71 (testimony of Dr. Bittle of Petitioner's grievances about his family and others); 34 RT 6021 (testimony of Dr. Bittle describing Petitioner having created an autobiography); 36 RT 6277-6312 (testimony of Michael Rappaport about his knowledge of Petitioner's development of gambling methods); 37 RT 6339-6354 (testimony of Kathy Coddington about her publishing relationship with Petitioner).) It was, consequently, within the wide latitude given to prosecutors to fashion arguments based on the evidence and the reasonable inferences therefrom and did not constitute misconduct. See, e.g.,

1  United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir. 1993), as amended on denial of

2  reh'g (Apr. 15, 1993).

3          d.   The Prosecutor's Misconduct Reflected In Claims 109 and 111 Did Not Constitute a

4               Due Process Violation

5          The prosecutor's arguments identified in Claims 109 and 111 constituted misconduct, but

6  the record does not support a finding that they deprived Petitioner of a fair trial, in violation of his

7  due process rights. See Miller, 483 U.S. at 765-66; Darden, 477 U.S. at 181; Smith, 455 U.S. at,

8  219; Donnelly, 416 U.S. at 639, 643.

9                   i.   Claim 109

10         In Claim 109, Petitioner argues that the following argument by the prosecutor constituted

11  misconduct:

12              The law tells us to look at the circumstances of the crime of which
               the defendant was convicted in the present proceeding. Did Mr.
13             Herbert James Coddington kill a rough neck in an oil town bar? Did
               Mr. Herbert James Coddington kill a longshoreman in a waterfront
14             cafe? Did Mr. Herbert James Coddington kill a biker, clad in steel-
               toed boots and the colors of a gang? Did he kill a 200-pound
15             truckdriver as he stepped from the cab of a Kenworth diesel? No. He
               killed Mabs Martin, age 69, and Dorothy Walsh, age 73, two
16             grandmothers. . . .

17              Mabs Martin and Dorothy Walsh didn't go to a motorcycle
               establishment for drinks. They didn't buy from someone selling
18             wares in a back alley. They didn't go to a motel that sells rooms by
               the hour. Mabs Martin and Dorothy Walsh . . . were chaperones for
19             two children.

20  (40 RT 6647, 6649.)

21         The California Supreme Court determined this argument was not misconduct because,

22  after this portion of the argument, the prosecutor "went on to contrast activities in which a person

23  might be aware that they were entering a place of danger from those in which the two women

24  were killed. Calling the attention of the jury to the age and vulnerability of the murder victims as

25  circumstances of the crime . . . is not improper" under Penal Code § 190.3. Coddington, 23

26  Cal.4th at 635 n.46. The undersigned cannot agree. Although the prosecutor's argument later

27  made the point indicated by the state court—that the homicide victims had no reason to expect

28  they were entering a dangerous situation (40 RT 6648-50)—the first portion identified by

                                        290

1    Petitioner did not reflect that point. In that section of the prosecutor's argument, none of the

2    hypothetical comparisons invoked by the prosecutor reflected a person entering a place of known

3    danger; on the contrary, the prosecutor described benign activities of being in a bar in an "oil

4    town," being in a café on the waterfront, simply existing as a biker who is wearing gang colors,

5    and stepping out of the cab of a truck. (40 RT 6647.) The prosecutor's argument was clearly

6    focused on the hypothetical identities of the persons engaged in these activities: "a rough neck,"

7    "a longshoreman," "a biker, clad in steel-toed boots and the colors of a gang," and "a 200-pound

8    truckdriver," as contrasted with "two grandmothers." (Ibid.) This was misconduct. The Eighth

9    Amendment does not permit imposition of the death penalty based on the jury's perceptions of

10   the general worthiness of the victim and, as such, "comparative judgments of this kind—for

11   instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the

12   murderer of a reprobate does not"—are unlawful. Payne v. Tennessee, 501 U.S. 808, 823 (1991);

13   see also Booth v. Maryland, 482 U.S. 496, 505-06 & n.8 (1987) (under the Eighth Amendment,

14   there is no "justification for permitting such a decision to turn on the perception that the victim

15   was a sterling member of the community rather than someone of questionable character," and,

16   more broadly, "[o]f course, our system of justice does not tolerate such distinctions"). The

17   prosecutor's argument here went beyond suggesting that the victims did not engage in risky

18   behavior, but rather that, because they were grandmothers instead of being bikers, longshoremen,

19   truckdrivers, or "rough necks," their deaths were especially lamentable. (See 40 RT 6646-47.)

20   This invited the jurors to engage in precisely the kind of comparative hypothesizing that injects

21   arbitrariness into the sentencing decision and that is fundamentally antithetical to the notion of the

22   fair, even-handed administration of justice. See Payne, 501 U.S. at 823; Booth, 482 U.S. at 505-

23   06 & n.8. It therefore was improper. See Caldwell, 472 U.S. at 334; Gardner v. Fla., 430 U.S.

24   349, 357-58 (1977).

25                     ii.     Claim 111

26        In Claim 111, Petitioner argues that the following arguments by the prosecutor were

27   misconduct:

28             [Ms. Martin and Ms. Walsh] were chaperones for two children. And

                                              291

1
2
3
4
5
6

Herbert James Coddington struck like a rattlesnake from behind a rock without any warning. The women were mercilessly beaten, choked and killed in an environment and under a circumstance that signaled no possible warning. There was nothing about the events on that Saturday, May 16, 1987, wherein Mabs Martin or Dorothy Walsh could have possibly envisioned, anticipated or even remotely suspected that they were entering the den of a vicious killer. They didn't lift a rock and find a snake. The snake had his venomous fangs when the women were unguarded and vulnerable, and it was then that Herbert Coddington struck with all of the cunning and venom he could muster.

7

(40 RT 6649-50.)

8
9
10
11

And before Herbert Coddington placed the two women into the trash bags, trussed as I've shown you in the photographs, he removed the jewelry of each. Mr. Coddington is not only a snake that strikes, he's not only a jackal that kills in slow and torturous increments, but he's a vulture that strips the bodies and leaves only the bones; part of Mr. Coddington's nature, not to waste.

12

(40 RT 6654; see ECF No. 59 at 586.)

13      A prosecutor's dehumanization of a defendant facing the death penalty conflicts with the

14  most foundational Eighth Amendment principle controlling application of the death penalty: "the

15  determination of whether a human life should be taken or spared" is "so grave" a decision that it

16  may not rest on "arbitrary and capricious" considerations. Gregg v. Georgia, 428 U.S. 153, 189

17  (1976). Instead, the jury must be made to understand "the truly awesome responsibility of

18  decreeing death for a fellow human," Caldwell v. Mississippi, 472 U.S. 320, 329-30 (1985), and

19  approach that decision "with meticulous care." Godfrey v. Georgia, 446 U.S. 420, 443

20  (1980) (Burger, C.J., dissenting); see also Woodson v. North Carolina, 428 U.S. 280, 303-05

21  (1976); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) ("[T]his

22  Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is

23  afforded process that will guarantee, as much as is humanly possible, that the sentence was not

24  imposed out of whim, passion, prejudice, or mistake."). Moreover, in every criminal case, it is

25  "undoubtedly . . . improper" for the prosecutor to refer to the defendant as an animal, Darden, 477

26  U.S. at 180, as doing so inflames the passions and prejudices of the jury and thereby can

27  undermine the fairness of the trial. See id. at 180-81; Viereck v. United States, 318 U.S. 236, 247

28  (1943); see, e.g., People v. Hawkins, 10 Cal.4th 920, 961 (1995), as modified on denial of

292

1   reh'g (Oct. 18, 1995) ("We do not condone the use of such terms [calling defendant a snake and

2   rabid dog] in argument.").

3          Here, the first portion of the prosecutor's argument cited by Petitioner was arguably

4   proper, while the second portion was not. In the first cited instance, the prosecutor repeatedly

5   compared Petitioner to a snake in his attacks on the homicide victims. This dehumanizing choice

6   of metaphor was facially improper, see Darden, 477 U.S. at 180, but it also is of the type that

7   courts have considered acceptable because it reflected a genuine commentary on the evidence

8   presented. See, e.g., United States v. Taxe, 540 F.2d 961, 968 (9th Cir. 1976) (not improper for

9   prosecutor to refer to defendant as a "parasite" and "scavenger" where such descriptions could be

10  understood as references to the evidence the jury heard about how crimes were committed). Here,

11  the totality of the prosecutor's argument in this portion invoked a snake as an analogy

12  highlighting that Petitioner had not appeared dangerous to the victims; had hidden his violent

13  plans from them; had lured them into his home, and then had suddenly attacked them violently. In

14  this context, a juror could understand the prosecutor's argument as principally invoking an

15  analogous circumstance in which a person misapprehends a danger that awaits them and was,

16  therefore, arguably not improper. See id. (See 40 RT 6649-50.)

17         As the prosecutor continued this argument, however, it veered into impropriety. The

18  prosecutor capped his snake comparison with a litany of animals that he believed Petitioner

19  resembled: a snake, a jackal, and a vulture. (40 RT 6654.) Although these also purported to

20  simply analogize from the evidence of Petitioner having "kill[ed] in slow and torturous

21  increments" and having taken jewelry from the decedents (ibid.), by linking all of these animal

22  analogies together, the prosecutor's argument had an overall rhetorical effect greater than the sum

23  of its parts. In comparing Petitioner to animal after animal, the prosecutor telegraphed clearly that

24  Petitioner was subhuman and that he belonged in a cohort of beasts. Such urging, however, was

25  incompatible with the Eighth Amendment, which demands that the jury approach their penalty

26  deliberations with awareness of their "truly awesome responsibility of decreeing death for a

27  fellow human," Caldwell, 472 U.S. at 329-30, and consider the full humanity of the defendant in

28  reaching that determination. See id., 472 U.S. at 329; Woodson, 428 U.S. 280; Gregg, 428 U.S. at

1    189; McGautha, 402 U.S. at 208. Under the Eighth Amendment, therefore, the prosecutor's

2    comments were improper.

3                    iii.    Neither Form of Misconduct Violated Petitioner's Due Process Rights

4            Under Darden v. Wainwright, however, neither of these instances of misconduct, either

5    singly or cumulatively, were so impactful as to have rendered the penalty phase fundamentally

6    unfair. 477 U.S. at 181; see also Donnelly, 416 U.S. at 639 (individual instances of misconduct

7    must be reviewed "in the context of the entire trial"). In Darden, the prosecutor's guilt-phase

8    closing argument was replete with invectives that were beyond the pale, including calling the

9    defendant an "animal," positing that the defendant should be made to walk on a leash, wishing he

10   could see the defendant's face shot off by a shotgun blast, repeatedly wishing the defendant

11   would commit suicide, and arguing—at the guilt phase—that the jury should sentence the

12   defendant to death. 477 U.S. at 180-181, nn.10-12. The Court held these statements "undoubtedly

13   were improper" and "deserve[] the condemnation it has received from every court to review it."

14   Id. at 179-80. They did not, however, render the trial fundamentally unfair in violation of the

15   defendant's due process rights, for several reasons: the comments did not misstate the evidence

16   nor implicate specific constitutional rights of the defendant, were in response to some analogous

17   defense argument, the defense could and did counter many of these characterizations in rebuttal

18   argument, the court instructed the jury to decide the case on the evidence rather than argument,

19   and the evidence against the defendant was strong. Id. at 181-83.

20           Considering these factors and taking the prosecutor's comments in the context of the

21   argument and the trial as a whole, Darden, 477 U.S. at 179-83; Donnelly, 416 U.S. at 639,

22   Petitioner cannot show that the improper argument deprived him of a fair trial. These particular

23   arguments were brief, fleeting references in a much longer argument. (Compare 40 RT 6647,

24   6654 with 40 RT 6636-70, 6687-89.) They did not misstate the evidence nor impugn Petitioner's

25   invocation of his fundamental rights, such as the right to be silent or have counsel. See Darden,

26   477 U.S. at 181-83. The improper comments were made in the prosecutor's initial closing

27   argument, not his rebuttal argument, providing defense counsel the opportunity to address them if

28   he so chose. See id. The trial court instructed the jury to render their penalty phase decision on the

                                                  294

1    evidence alone and that argument was not evidence. (40 RT 6690, 6694.) Finally, the nature of

2    the crime was especially aggravating—including the grim manner by which the victims were

3    killed; the evidence of their frightened, violent last moments; the deplorability of the "sweet

4    hostage" scheme their deaths were in service of—rendering it unlikely the prosecutor's few

5    overreaching comments had any effect on the jury. (See, e.g., 40 RT 6679 (defense counsel, in

6    penalty phase closing argument, acknowledging "obviously it's a terrible, brutal crime. Every

7    adjective in the dictionary that describes despicable can be used to describe what happened to

8    those women and those little girls on this day in May in 1987.").) Under governing precedent,

9    there was no due process violation. See Darden, 477 U.S. at 181; Smith, 455 U.S. at, 219;

10   Donnelly, 416 U.S. at 639, 643.

11        Accordingly, because Claims 101, 103, 105, 109, and 111, are meritless, and in the

12   interest of efficient administration of justice, the undersigned recommends dismissal of these

13   claims. See Shinn, 142 S. Ct. at 1737, 1739; Franklin, 290 F.3d at 1232.

14        4.  The State Court's Denials of Claims 102, 104, 106, 110, and 112 Are Entitled to

15            Deference

16        The California Supreme Court could reasonably have concluded that Petitioner had not

17   made a prima facie showing of ineffective assistance of defense counsel in Claims 102, 104, 106,

18   110, and 112. See 28 U.S.C. § 2254(d). Claims 102, 104, and 106 fail because each one is

19   premised on counsel's deficiency in failing to object to the prosecutor's conduct identified in

20   Claims 101, 103, and 105, respectively. (See ECF No. 59 at 561, 567, 574-75; LD 25-C.1 at 172-

21   83.) Because the prosecutor's conduct as set forth in Claims 101, 103, and 105 was not improper,

22   defense counsel was not deficient in failing to object to it. See, e.g., Ochoa, 50 F.4th at 889;

23   Sihner, 697 F. App'x at 510-11; Lisalda, 78 F. App'x at 17. The California Supreme Court

24   therefore did not unreasonably apply nor act contrary to clearly established federal law in finding

25   that Petitioner had not stated a prima facie claim for relief for Claims 102, 104, and 106. See

26   Richter, 562 U.S. at 98. The undersigned therefore recommends Claim 102, 104, and 106 be

27   dismissed. 28 U.S.C. § 2254(d).

28   ////

1    The California Supreme Court also could have reasonably denied relief on Claims 110 and

2    112 upon reasonably concluding that Petitioner failed to make a prima facie showing of prejudice

3    for defense counsel's failure to object to the misconduct reflected in Claims 109 and 111,

4    respectively. The question of whether the prosecutor's misconduct rendered a trial fundamentally

5    unfair under Darden is, functionally, the equivalent question of whether there was a reasonable

6    probability that the verdict would have been different had defense counsel objected to it, under

7    Strickland. Hein v. Sullivan, 601 F.3d 897, 914-15 (9th Cir. 2010). Thus, for the same reasons

8    that the prosecutor's comments identified in Claims 109 and 111 did not render the trial

9    fundamentally unfair, there is no reasonable probability the penalty verdict would have been more

10   favorable had defense counsel timely objected, due to the fleeting nature of the comments in the

11   context of a much longer argument, the trial court's instructions regarding the consideration of

12   evidence and argument generally, the fact that the argument did not intrude on Petitioner's

13   fundamental rights, and the very aggravated circumstances of the murders. See Strickland, 466

14   U.S. at 695-96, 700. The state court would not have been unreasonable if it denied relief on

15   Claims 110 and 112 on this basis, see Richter, 562 U.S. at 98, and the undersigned recommends

16   these claims also be dismissed. 28 U.S.C. § 2254(d).

17   **CLAIM 118**

18   In Claim 118, Petitioner alleges that his trial counsel performed ineffectively in his

19   penalty phase closing argument. Petitioner raised this on direct appeal, which the California

20   Supreme Court denied on the merits in a reasoned opinion, holding that counsel's conduct was

21   not deficient under governing law. Coddington, 23 Cal.4th at 655. Petitioner raised this claim

22   again in his first petition for writ of habeas corpus, which the California Supreme Court partially

23   denied as successive and otherwise denied on the merits. (LD 25-C.5.) The undersigned

24   concludes that the state court's denials of this claim are entitled to deference.

25   Under clearly established federal law, defense counsel has a duty to challenge the

26   prosecution's case and, in a capital case, to present a powerful case for a life sentence. Wiggins,

27   539 U.S. 510; Strickland, 466 U.S. at 688. This encompasses making strategically-sound choices

28   about use of the defense penalty phase closing argument. See generally Herring v. New York, 422

296

1   U.S. 853, 858-59 (1975) ("There can be no doubt that closing argument for the defense is a basic

2   element of the adversary factfinding process in a criminal trial."); United States v. Swanson, 943

3   F.2d 1070, 1075 (9th Cir. 1991) (describing defense closing argument as a "critical stage of [trial]

4   proceedings" that requires counsel to advocate for her client). It is unreasonable, for example, for

5   defense counsel in penalty phase closing argument to minimize the import of a death sentence.

6   Wade v. Calderon, 29 F.3d 1312, 1324-25 (9th Cir. 1994); cf. United States v. Swanson, 943 F.2d

7   1070, 1075 (9th Cir. 1991). At a minimum, counsel's closing argument must address mitigating

8   factors and how they relate to the evidence in the case. Mayfield v. Woodford, 270 F.3d 915, 928

9   (9th Cir. 2001); In re Marquez, 1 Cal.4th 584 (1992).

10          Here, defense counsel's argument discussed the mitigating factors in light of the evidence

11   presented and urged the jury to return a life sentence despite the aggravated nature of the

12   homicides. (40 RT 6676-86.) A better, more forceful, and more comprehensive argument may

13   very well have been available. (See ECF No. 59 at 604-14; LD 25-C.3 Ex. A ¶ 46; see generally

14   Mark Costanzo and Julie Peterson, Attorney Persuasion in the Capital Penalty Phase: A Content

15   Analysis of Closing Arguments, 50 J. of Social Issues 126 (1994) (content analysis of defense

16   penalty phase arguments).) Upon review of what counsel delivered, the undersigned cannot

17   conclude that the state court was unreasonable in concluding that the argument given accorded

18   with governing Supreme Court authority. Defense counsel urged the jury that a life sentence was

19   just and appropriate, discussed some of the mitigating evidence presented, and argued that

20   Petitioner's mental health problems were mitigating, while also acknowledging the adverse

21   verdicts the jury had returned at the guilt and sanity phases. (40 RT 6676-86.) A reasonable

22   reviewing court could find this adequate under governing precedent at the time of the state court

23   adjudication. See Wiggins, 539 U.S. 510; Strickland, 466 U.S. at 688; Mayfield, 270 F.3d at 928;

24   Wade, 29 F.3d at 1324-25; Marquez, 1 Cal.4th 584. The undersigned therefore recommends

25   Claim 118 be dismissed. See 28 U.S.C. § 2254(d); Shinn, 141 S. Ct. at 524.

26   **CLAIM 120**

27          In Claim 120, Petitioner alleges that trial counsel performed ineffectively by stipulating to

28   the omission of certain mitigating factors from the penalty-phase jury instructions. (ECF No. 59

297

at 618-20.) Petitioner raised this claim on direct appeal (LD 25-B.1 at 536-38), which the California Supreme Court denied on the merits in a reasoned opinion, holding that Petitioner had shown neither deficient performance nor prejudice. Coddington, 23 Cal.4th at 655. The undersigned finds that determination entitled to deference under 28 U.S.C. section 2254(d).

At the close of the penalty phase, defense counsel and the prosecutor agreed to the modification of CALJIC 8.84.1 to delete certain mitigating factors that the defense considered inapplicable to the case. (40 RT 6624-26.) These included, inter alia, those factors codified at Penal Code section 190.3(f)—"Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct"—and 190.3(g)—"Whether or not defendant acted under extreme duress or under the substantial domination of another person." Coddington, 23 Cal.4th at 655. The jury was subsequently instructed with the modified instruction. Ibid. (6 CT 1261-62.)

The California Supreme Court's conclusion that this did not reflect deficient performance was not contrary to, or an unreasonable application of, clearly established federal law nor did it rest on an unreasonable factual determination. See 28 U.S.C. § 2254(d). Petitioner argues that deletion of these factors could have hamstrung the jury in fully considering and giving effect to the evidence they heard of Petitioner's mental health impairments and how and why they affected his actions at the time of the crime. (See ECF No. 59 at 618-20; LD 25-B.1 at 536-38.) The California Supreme Court, however, was reasonable in concluding that Petitioner had not shown that no reasonable defense counsel would have made the same decision. See Richter, 562 U.S. at 105; Strickland, 466 U.S. at 688-89. The instructions as given to Petitioner's jury at the penalty phase did permit the jury to consider as mitigating "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired as a result of mental disease or defect," and "any other circumstance that extenuates the gravity of the crime even though it is not a legal excuse for the crime or any other sympathetic or other aspect of the defendant's character, background, history or mental condition that the defendant

298

1   offers as a basis for a sentence less than death, whether or not related to the offense for which he

2   is on trial." (40 RT 6694-95; 6 CT 1261-62.) These instructions, together and individually,

3   informed the jury of their power to consider the mental health evidence the defense had presented

4   in assessing and weighing factors in mitigation; because the jury was instructed that the number

5   of mitigators or aggravators should not influence their penalty decision (40 RT 6697), the fact

6   that Petitioner's mental health evidence arguably implicated multiple statutory mitigators should,

7   itself, have had no bearing on the penalty phase verdict, so long as the instructions given allowed

8   the jury to "consider all relevant mitigation evidence." See Tuilaepa, 512 U.S. at 972-73 (quoting

9   Blystone v. Pennsylvania, 494 U.S. 299, 307 (1990).) Here, because that was satisfied by the

10  instructions that were given, trial counsel may have reasonably concluded that further instructions

11  that provided additional ways to conceptualize the mental health evidence were unnecessary. See,

12  e.g., Leavitt v. Arave, 682 F.3d 1138, 1140 (9th Cir. 2012) (defense counsel did not perform

13  deficiently by failing to object to an instruction that was not reasonably likely to confuse the

14  jury).

15         Further facts militate towards the reasonableness of counsel's stipulation. See generally

16  Strickland, 466 U.S. at 690 (emphasizing that deficient performance must be considered in light

17  of the information known to counsel at the time). Petitioner posits that factor (f), that the

18  defendant "reasonably believed" circumstances existed that provided "moral justification" for the

19  homicides (Penal Code § 190.3(f)), encapsulated the defense theory at sanity such that its

20  omission of this language from the penalty phase jury instructions would have impaired the jury's

21  consideration of this evidence. (See ECF No. 59 at 618-20; LD 25-B.1 at 536-38.) Reasonable

22  defense counsel, however, could have reached a contrary conclusion: that, by their sanity verdict,

23  this jury had rejected the theory that Petitioner had actually believed he had a moral justification

24  for the homicides, and thus this jury would be disinclined to give any mitigating weight to this

25  interpretation of the mental health evidence. Moreover, factor (f) by its plain language requires

26  that the defendant's belief in his moral justification was "reasonable," but the thrust of

27  Petitioner's sanity-phase presentation was that Petitioner's belief that a higher power had

28  commanded him to commit the crimes was not reasonable, but rather had resulted from his

1    delusional, disordered, and/or psychotic state. See Coddington, 23 Cal.4th at 558-63; see

2    generally People v. Visciotti, 2 Cal.4th 1, 75 (1992) (the language used in sections 190.3(f) and

3    (g) are understood by their plain meanings). Reasonable defense counsel, therefore, could have

4    concluded that omission of this factor from the penalty phase jury instructions was consistent

5    with the evidence the jury had heard and that its omission would have had little effect on the

6    jury's ability to consider the mental health evidence they had heard when determining penalty.

7           Reasonable defense counsel may have reached a similar conclusion concerning the

8    deletion of factor (g), that the defendant "acted under extreme duress" (Penal Code § 190.3(g)),

9    from the penalty phase jury instructions. Given the plain meaning of the word "duress," it would

10   have been reasonable to conclude that it was very unlikely that any juror would have found that

11   factor applicable to the evidence in Petitioner's case. Duress implies fear of another person

12   causing the defendant's death if the defendant does not comply with that person's demands. See,

13   e.g., People v. Wilson, 36 Cal.4th 309, 331 (2005); People v. Subielski, 169 Cal. App. 3d 563,

14   567 (Ct. App. 1985); Availability of Defense., 1 Witkin, Cal. Crim. Law 4th Defenses § 56

15   (2022) (collecting California cases). Courts have held that it does not encompass the defendant

16   acting on delusions, hallucinations, or other impairments to his reason that may engender, in him,

17   a feeling of having to act. See, e.g., People v. Geddes, 1 Cal. App. 4th 448, 456 (1991) ("[t]he

18   concept of duress is simply inapplicable" to a defendant who committed arson in response to his

19   delusions); see generally People v. Bacigalupo, 1 Cal.4th 103, 126 & n.4 (1991), as modified on

20   denial of reh'g (Jan. 30, 1992), cert. granted, judgment vacated on other grounds sub

21   nom. Bacigalupo v. California, 506 U.S. 802 (1992) (California law does not acknowledge the

22   concept of "imperfect duress," i.e., that the defendant had an honest but unreasonable belief that

23   he would be killed or harmed if he did not perform the act at issue). In light of this, reasonable

24   defense counsel could have concluded that there would be no harm in deleting this factor from the

25   penalty phase jury instructions, as it would be exceedingly improbable that any juror would

26   understand the mental health evidence to implicate "duress" under the plain meaning of that

27   word, particularly given that the jury would be otherwise instructed about mitigation evidence

28   and how to consider it. (See 40 RT 6694-97.)

                                                    300

1    For these same reasons, the California Supreme Court reasonably concluded that

2    Petitioner had not shown a reasonable probability that the jury's penalty phase verdict would have

3    been more favorable had these factors been included in the jury instructions: it is highly unlikely

4    that a juror would have found either factor applied, given their plain language and in light of the

5    evidence presented, and because the other instructions enabled the jury to give full consideration

6    of, and assign any mitigating weight they chose, to the mental health evidence they heard. As

7    such, there was no prejudice from any deficiency. See, e.g., James v. Borg, 24 F.3d 20, 27 (9th

8    Cir. 1994) (petitioner "cannot make [a] showing" of prejudice from failing to request an

9    instruction, where jury ultimately received proper instructions).

10    For these reasons, the California Supreme Court's decision denying relief on this claim is

11    entitled to deference under section 2254(d)(1) and (d)(2). The undersigned recommends Claim

12    120 be dismissed.

13   **CLAIMS 125 AND 126**

14    In Claim 125, Petitioner alleges that the penalty phase jury instructions were defective for

15    failing to instruct jurors that Penal Code section 190.3(d) and (h) factors could only be considered

16    as mitigation, and that their absence could not be considered aggravation. (ECF No. 59 at 631-

17    37.) Per Petitioner, the instructions' failure to so specify rendered it reasonably likely that at least

18    one juror treated these factors as aggravators, thereby denying him due process of law and a

19    reliable sentencing determination. (ECF No. 59 at 635, citing Zant v. Stephens, 462 U.S. 862, 885

20    (1983).) In Claim 126, Petitioner alleges that defense counsel's failure to request the instructions

21    be amended to specify these points reflected ineffective assistance of counsel. (ECF No. 59 at

22    638.) The undersigned finds that the California Supreme Court's denial of both claims is entitled

23    to deference. See 28 U.S.C. § 2254(d).

24    1.   Proceedings In State Court

25    Petitioner raised Claim 125 on direct appeal, arguing that the jurors would be likely to

26    misapply the penalty phase jury instruction as evidenced by their voir dire responses, social

27    science research indicating similar instructions are often misapplied, and the prosecutor's

28    argument concerning the relevance of Petitioner's borderline personality disorder diagnosis to the

penalty determination. (LD 25-B.1 at 547-54.) Petitioner also argued that defense counsel had been ineffective for failing to request an amendment to the instruction. (LD 25-B.1 at 554.) The California Supreme Court denied this claim on the merits, holding:

> The jury was properly instructed to rely on evidence. Appellant's reliance on an insanity or mental illness defense was not itself evidence. We see no possibility that the jury would misunderstand the instruction in the manner suggested by appellant. Nor would a reasonable juror fail to identify evidence of mental illness as mitigating. (*People v. Benson*, *supra*, 52 Cal.3d 754, 802, 276 Cal.Rptr. 827, 802 P.2d 330.) Thus, the failure of defense counsel to request further instructions cannot be deemed incompetent or prejudicial.
>
> In sum, the record does not support appellant's assertion that the jury relied on an invalid aggravating factor.

Coddington, 23 Cal.4th at 638-39.

In his first petition for writ of habeas corpus in state court, Petitioner reraised his allegations of ineffective assistance of counsel and supported them with a declaration from defense counsel averring that he had no tactical reason not to request an amendment to the instruction. (LD 25-C.1 at 200-02.) The California Supreme Court denied relief summarily, on the merits and, "[e]xcept to the extent the claim alleged ineffective assistance of counsel," on the additional basis that the claim had been previously raised and rejected on appeal. (LD 25-C.5.)

2.  The California Supreme Court's Denial of Claim 125 Is Entitled to Deference

A jury instruction violates the defendant's due process or other "constitutional" rights "only if 'there is a reasonable likelihood' that the jury . . . interpreted the instruction" in a manner contrary to law. Calderon v. Coleman, 525 U.S. 141, 146 (1998) (per curiam) (quoting Boyde, 494 U.S. at 380); see also McGuire, 502 U.S. at 72 (reviewing court must determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution"). In making this evaluation, the reviewing court considers the instructions as a whole, in light of "all that has taken place at the trial" and through the lens of common sense. Johnson v. Texas, 509 U.S. 350, 368 (1993) (quoting Boyde, 494 U.S. at 381).

Here, Petitioner is correct that, under California state law, the factors at issue in this claim could only be considered in mitigation. People v. Hamilton, 48 Cal.3d 1142, 1184 (1989), as

1    modified on denial of reh'g (Aug. 17, 1989). The California Supreme Court, however, was not

2    unreasonable in concluding that Petitioner had not shown that there was reasonable likelihood a

3    juror would misapply the instruction in the manner Petitioner indicates. The jury was properly

4    instructed on the law, including, specifically, that they were to make their penalty phase

5    determinations based only on the evidence (40 RT 6694, 6696, 6698) and that it could only

6    consider those factors that the evidence had shown were "applicable." (40 RT 6694). This

7    instruction is not vague, nor does it fail to give adequate guidance to a capital sentencing jury. See

8    Tuilaepa, 512 U.S. at 979; Harris v. Pulley, 692 F.2d at 1194; Williams v. Calderon, 52 F.3d at

9    1484. The jury is presumed to have understood and followed it. See Weeks, 528 U.S. at

10   234; Richardson, 481 U.S. at 211. The prosecutor's argument, despite Petitioner's contention, did

11   not suggest to the jury that Petitioner's diagnosis of borderline personality disorder was

12   aggravating, but rather that his diagnosis did not obviate his moral blameworthiness for the

13   crimes. (See 40 RT 6662-66.) On the record as a whole, a reviewing court could reasonably

14   conclude that the instructions were not reasonably likely to mislead the jury, see Calderon, 525

15   U.S. at 146, and did not infect the trial with unfairness. See McGuire, 502 U.S. at 72. The state

16   court denial of this claim is entitled to deference. See Richter, 562 U.S. at 101; Yarborough, 541

17   U.S. at 664.

18          3.   The California Supreme Court's Denial of Claim 126 Is Entitled to Deference

19          Petitioner alleges in Claim 126 that defense counsel performed deficiently by failing to

20   request an amendment to the penalty phase instructions on all the bases set forth in Claim 125.

21   (ECF No. 59 at 638; see LD 25-C.1 at 200-02.) Because Petitioner fails to show that the

22   instruction was defective, defense counsel were necessarily not deficient for failing to seek an

23   amendment to it. See Knowles, 556 U.S. at 123; Jones, 463 U.S. 745; Ochoa, 50 F.4th at 889. The

24   California Supreme Court was reasonable if it denied relief on this basis. See Richter, 562 U.S. at

25   98. The undersigned therefore recommends Claim 126 be dismissed.

26   **CLAIM 147**

27          In Claim 147, Petitioner alleges that, when considered cumulatively, all of the errors at all

28   phases of the trial prejudiced him at the penalty phase. (ECF No. 59 at 684-85.) Petitioner raised a

1    version of this claim on direct appeal (LD 25-B.1 at 598-605), which the California Supreme

2    Court denied on the merits in a reasoned opinion. Coddington, 23 Cal.4th at 643. Petitioner raised

3    this claim again in his first petition for writ of habeas corpus in state court, alleging cumulative

4    prejudice from those errors raised in that pleading as well as on direct appeal. (LD 25-C.1 at 212.)

5    The California Supreme Court denied that claim summarily on the merits. (LD 25-C.5.) The

6    undersigned concludes that denial is entitled to deference.

7        Under clearly established federal law, the penalty phase verdict must be reversed if the

8    cumulative effect of all of the errors at trial rendered the penalty phase fundamentally unfair. See

9    Chambers, 410 U.S. at 290 n.3; Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Parle v.

10   Runnels, 505 F.3d 922, 928 (9th Cir. 2007). Here, the state court may have reasonably found that

11   that standard had not been met, both in the version of this claim raised on direct appeal and in the

12   version of this claim raised in Petitioner's first habeas corpus proceeding. See Richter, 562 U.S. at

13   98.

14       The nature of the errors that occurred in the first two phases of the trial render it

15   reasonable to conclude that they were unlikely to have affected the jury's penalty phase verdict in

16   a material way. Some of these errors related only to the narrow legal questions before the jury in

17   rendering their guilt- or sanity-phase verdicts. Under state law, the jury should have been

18   instructed on one additional lesser-included offense to the homicide counts and should have been

19   able to receive expert testimony on the specific ways Petitioner's mental health impairments

20   affected his premeditation, deliberation, and intent for the charged crimes. At the sanity phase, the

21   jury was deprived of evidence flowing from the Branton report, which memorialized Petitioner's

22   functioning shortly after his arrest, which was relevant to experts' assessments of whether he was

23   legally insane at the time of the crimes. Errors at the sanity phase also impacted the weight the

24   jury may have given the opinions of the defense experts, whose opinions differed from the court-

25   appointed experts primarily on the issues of what clinical diagnosis best described Petitioner's

26   functioning and whether he was insane during the crimes.

27       These errors were serious and very well may have altered the jury's consideration of the

28   specific legal questions they were charged with resolving via their guilt- and sanity-phase

304

1    verdicts. These errors, however, do not implicate the penalty phase verdict in the same way. Even

2    despite the errors, the jury heard extensive and detailed evidence of Petitioner's mental

3    functioning, from friends, family, and multiple experts at the sanity phase. Those witnesses

4    related Petitioner's mental decompensation over time and their observations of his functioning,

5    including mitigating aspects, such as descriptions of his stress, confusion, and anxiety during

6    times of mental health crisis, and his loved ones' concern as he struggled. Viewing this evidence

7    from the perspective of the penalty-phase jury, it served as mitigation that they could consider

8    and weigh to "gauge [Petitioner's] moral culpability." Porter v. McCollum, 558 U.S. 30, 41

9    (2009). Although the scope of this evidence had been circumscribed at the earlier phases of the

10   trial, it had only been circumscribed on aspects that related to the standards of legal culpability at

11   issue in those earlier phases (Claims 7 and 37) or the weight the jury should give to defense

12   experts' opinions (Claims 47, 54, and 60), which, as noted, did not differ materially from those of

13   their court-appointed counterparts on the issue of whether Petitioner had suffered from a serious

14   mental illness for much of his adult life. This places this case in stark contrast to those where the

15   petitioner has shown that there would have been a markedly different evidentiary picture of the

16   defendant before the penalty-phase jury, had particular errors not occurred. See, e.g., Porter, 558

17   U.S. at 41 (penalty phase prejudice shown where the jury had heard "absolutely none" of the

18   available, compelling evidence in mitigation); Rompila, 545 U.S. at 393 (penalty phase relief

19   warranted where available evidence not presented to the jury "adds up to a mitigation case that

20   bears no relation to the few naked pleas for mercy actually put before the jury"); Williams, 529

21   U.S. at 398 (penalty phase prejudice shown where jury had heard nothing of the "graphic

22   description of Williams' childhood, filled with abuse and privation, or the reality that he was

23   'borderline mentally retarded'"); Bean v. Calderon, 163 F.3d 1073, 1081 (9th Cir. 1998) (penalty

24   phase prejudice shown where "the family portrait painted at the federal habeas hearing was far

25   different from the unfocused snapshot handed the superior court jury").

26        The prejudice analysis also requires the reviewing court to "reweigh the evidence in

27   aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. Here,

28   the primary aggravating circumstance was the circumstance of the crimes (Penal Code § 190.3(a);

1   see Coddington, 23 Cal.4th at 565-66), which were shocking and nightmarishly repugnant. The

2   record supports defense counsel's description of the crimes as "obviously . . . terrible," "brutal,"

3   and "every adjective in the dictionary that describes despicable." (40 RT 6679.) In particular, the

4   lengths Petitioner went to in planning and carrying out the crimes were remarkable, reflecting a

5   level of single-mindedness in their execution that, in the undersigned's experience, is truly

6   unusual among homicide cases, even capitally-eligible ones. (See also 42 RT 6752-54 [trial court

7   observing same, in its experience].) Put simply, although there was one principle aggravating

8   circumstance in this case, the evidence adduced would have permitted a jury to have given it great

9   weight.

10          Reweighing the evidence in aggravation against the mitigation evidence the jury could

11   have heard absent the errors of the trial, a reviewing court could reasonably have concluded that

12   the latter "would barely have altered the sentencing profile presented" to the jury. See Strickland,

13   466 U.S. at 700. The errors that had occurred in the earlier phases of the trial only minimally

14   affected the scope of mitigating evidence available to the jury and, accordingly, the state court

15   could have reasonably concluded that they were not so great, even cumulated with the effect of

16   any of the misconduct that occurred in penalty-phase closing arguments, to have rendered the

17   penalty phase fundamentally unfair. See Chambers, 410 U.S. at 290 n.3; Donnelly, 416 U.S. at

18   643. The state court's denials of this claim are therefore entitled to deference. 28 U.S.C. §

19   2254(d).

20   **CLAIMS 149 AND 150**

21          In Claims 149 and 150, Petitioner challenges several features of California's statutory

22   scheme for the imposition of the death penalty on the basis that they fail to ensure that the death

23   penalty is "limited to those offenders who commit 'a narrow category of the most serious crimes'

24   and whose extreme culpability makes them 'the most deserving of execution,'" as required under

25   the Eighth Amendment. See Roper v. Simmons, 543 U.S. 551, 568 (2005) (quoting Atkins v.

26   Virginia, 536 U.S. 304, 319 (2002)). In Claim 150, Petitioner alleges that the California statutory

27   scheme extant at the time of his trial failed to narrow the class of death-eligible defendants (ECF

28   No. 59 at 690-98), and, in Claim 149, Petitioner alleges that, as a result of these statutory failures,

California was required under the Fifth, Sixth, Eighth, and Fourteenth Amendments to have

employed an intercase proportionality review for capital cases on appeal and its failure to do so

further mandates reversal of his sentence. (ECF No. 59 at 688-89.) The California Supreme Court

denied relief on these claims on direct appeal (Coddington, 23 Cal.4th at 656), which was not

contrary to nor an unreasonable application of clearly established federal law nor an unreasonable

factual determination.

    1.   Governing Legal Standard

    At the time of the state court's adjudication of Petitioner's direct appeal in 2000, the

United States Supreme Court had clearly established the Eighth Amendment's requirements for

imposition of the death penalty:

> To pass constitutional muster, a capital sentencing scheme must
> "genuinely narrow the class of persons eligible for the death penalty
> and must reasonably justify the imposition of a more severe sentence
> on the defendant compared to others found guilty of murder." Zant
> v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d
> 235 (1983); cf. Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49
> L.Ed.2d 859 (1976). Under the capital sentencing laws of most
> States, the jury is required during the sentencing phase to find at least
> one aggravating circumstance before it may impose death. Id., at
> 162-164, 96 S.Ct., at (reviewing Georgia sentencing
> scheme); Proffitt v. Florida, 428 U.S. 242, 247-250, 96 S.Ct. 2960,
> 2964-2965, 49 L.Ed.2d 913 (1976) (reviewing Florida sentencing
> scheme). By doing so, the jury narrows the class of persons eligible
> for the death penalty according to an objective legislative
> definition. Zant, supra, 462 U.S., at 878, 103 S.Ct., at 2743
> ("[S]tatutory aggravating circumstances play a constitutionally
> necessary function at the stage of legislative definition: they
> circumscribe the class of persons eligible for the death penalty").

Lowenfield v. Phelps, 484 U.S. 231, 244 (1988); see also Arave v. Creech, 507 U.S. 463, 474

(1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every

defendant eligible for the death penalty, the circumstance is constitutionally infirm"). States have

considerable leeway in establishing and defining aggravating factors, Kansas v. Marsh, 548 U.S.

163, 173-74 (2006)—for instance, they "may be contained in the definition of the crime or in a

separate sentencing factor (or in both)," Tuilaepa v. California, 512 U.S. 967, 971-72 (1994)—so

long as the aggravators are not vague. See id. at 973-74; Walton v. Arizona, 497 U.S. 639, 654

(1990); Arave, 507 U.S. at 471; Godfrey v. Georgia, 446 U.S. 420, 428 (1980).

1   2. The California Supreme Court's Denial of Claims 149 and 150 Is Entitled to

2    Deference

3   The California statutory scheme for the imposition of the death penalty provides that a

4 defendant becomes eligible for the death penalty when the factfinder finds him guilty of first-

5 degree murder and finds true beyond a reasonable doubt one of the special circumstances set

6 forth in Penal Code section 190.2. Pen. Code § 190.4. Once this threshold is met, the case

7 proceeds to a penalty phase, during which the jury is instructed to consider numerous

8 aggravating or mitigating factors listed in Penal Code section 190.3 in deciding whether to

9 impose the death penalty on the defendant. See Tuilaepa, 512 U.S. at 975. If the jury returns a

10 death verdict, the trial court considers an automatic motion to modify the verdict, wherein the

11 court reviews the evidence in light of the statutory aggravating and mitigating circumstances and

12 determines "whether the jury's findings and verdicts that the aggravating circumstances

13 outweigh the mitigating circumstances are contrary to law or the evidence presented," stating on

14 the record the reasons for his findings.  Penal Code § 190.4(e). If the trial court declines to

15 modify the verdict, the case is automatically appealed to the California Supreme Court, which is

16 not statutorily required to undertake an intercase proportionality review of the defendant's

17 sentence. Ibid.; Penal Code § 1239; Pulley v. Harris, 465 U.S. 37, 53 (1984).

18   This capital sentencing scheme has repeatedly been held to meet Eighth Amendment

19 standards. In Pulley, the respondent raised a similar challenge as Petitioner raises in his Claim

20 149: that the California scheme fails under the Eighth Amendment for failing to include an

21 appellate intercase proportionality review of capital cases. The Court held squarely that its cases

22 "do not establish proportionality review as a constitutional requirement." Pulley, 465 U.S. at 45.

23 The Court then discussed, relative to California's 1977 statute, the precise theory that Petitioner

24 here raises in Claim 149 relative to the statute's 1978 amendment: that California's sentencing

25 scheme fails to meaningfully narrow the class of death-eligible defendants such that, in that

26 jurisdiction, intercase proportionality review is necessary to effectuate Eighth Amendment

27 safeguards against the arbitrary imposition of the death penalty. See id. at 51. (See ECF No. 59

28 at 688-89.) The Court acknowledged that there might, hypothetically, "be a capital sentencing

308

system so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review," but "the 1977 California statute is not of that sort." Pulley, 465 U.S. at 51. Rather, because the law required "the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small sub-class of capital-eligible cases," and then allowed the jury, in the penalty phase, to consider a list of relevant aggravating and mitigating factors, the statute minimizes the risk of arbitrary application of the death penalty. Id. at 53. This goal was further effectuated by California statute providing that death verdicts are reviewed automatically by the trial court and by the Supreme Court. See ibid. Based on all of these factors, the Court concluded, "on its face, this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under Furman and our subsequent cases." Ibid.; see also Karis v. Calderon, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002) (rejecting a narrowing challenge to California's capital sentencing scheme, concluding, "California has identified a subclass of defendants deserving of death and by doing so, it has 'narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed'"); Mayfield v. Woodford, 270 F.3d 915, 924 (9th Cir. 2001) (holding that, based on the features of California's death penalty scheme described herein, "[a] reasonable jurist could not debate, therefore, that the . . . California statute . . . narrowed the class of death-eligible defendants at both the guilt and penalty phases, [and therefore] was constitutional").

On direct appeal, Petitioner challenged this conclusion, arguing in Claim 150 that the 1978 California statute scheme fails, as an empirical matter, to actually narrow the class of death-eligible defendants, as "[m]ost murders in California constituted first-degree murder" by the statutory definitions and "most murders that qualified as first-degree murder . . . ipso facto qualified under section 190.2 as capital murder." (LD 25-B.1 at 619-20 & n.464.) To support this argument, Petitioner relied on data analysis of published California Supreme Court decisions from 1988 to 1992 of first- and second-degree murder convictions. (LD 25-B.1 at 622.) Of the 300 cases examined, "a first-degree murder with at least one special circumstance was found or

1  proved in 238—or 79%—of the cases," indicating that the statutes functionally did not narrow

2  the class of death-eligible defendants. (LD 25-B.1 at 623.)

3        There are several reasons why it would have been reasonable for the state court to

4  conclude that this showing was not so compelling as to disturb the Supreme Court's conclusion

5  in Pully that the California capital sentencing scheme comported with the Eighth Amendment.

6  Primarily, there was no clearly established precedent that the data presented alone could

7  demonstrate that the Eighth Amendment was violated. To be sure, the United States Supreme

8  Court has recognized the import of the actual application of a jurisdiction's death penalty in

9  assessing whether it constitutes cruel and unusual punishment under the Eighth Amendment. In

10 Furman, several of the justices whose opinions comprise the majority relied on the manner in

11 which the death penalty empirically had been imposed in concluding that Georgia's capital

12 sentencing scheme was unconstitutional. Furman v. Georgia, 408 U.S. 238, 256-57 (1972) (con.

13 opn. of Douglas, J.) (racial and economic discrimination in application of death penalty relevant

14 in concluding statute violated the Eighth Amendment); id. at 309-10 (conc. opn. of Stewart, J.)

15 (rare application of death penalty relevant to Eighth Amendment analysis); id. at 313 (conc. opn.

16 of White, J.) (actual administration of death penalty relevant to Eighth Amendment analysis).

17 The Court, however, has never held that such empirical observations alone can render a state's

18 death penalty scheme constitutionally defective. Rather, determinative to all of the Court's

19 considerations of the Eighth Amendment challenges to a death penalty statute on narrowing

20 grounds has been the plain language of the operative statutes. See Gregg, 428 U.S. at 189 (joint

21 opinion of Stewart, Powell, and Stevens, JJ.) (holding Furman "mandates that where discretion is

22 afforded a sentencing body on a matter so grave as the determination of whether a human life

23 should be taken or spared, that discretion must be suitably directed and limited so as to minimize

24 the risk of wholly arbitrary and capricious action"); see, e.g., Pulley, 465 U.S. at 53 (analyzing

25 only statutory provisions when considering whether California capital sentencing scheme

26 violates Eighth Amendment); Maynard v. Cartwright, 486 U.S. 356, 362 (1988) (Furman

27 requires that statute "channel[s] and limit[s] . . . the sentencer's discretion in imposing the death

28 penalty"); Godfrey, 446 U.S. at 428 (to satisfy Eighth Amendment, statute must provide

1   "sentencer with 'clear and objective standards' that provide 'specific and detailed guidance,' and

2   that 'make rationally reviewable the process for imposing a sentence of death'"). In other words,

3   the Court has never squarely addressed a situation that Petitioner alleges here, where the statute

4   facially narrows but operatively does not, but historically the Court has given great weight to the

5   plain language of the statute in conducting its Eighth Amendment analyses.

6       Moreover, even if one reads Supreme Court precedent to acknowledge the cognizability

7   of an Eighth Amendment as-applied challenge to a state's capital sentencing scheme, the state

8   court would not have been unreasonable in concluding that the data proffered here did not make

9   that showing. Petitioner posits that the data show that "most murders committed between 1978

10  and 1990 were first-degree murders, and an overwhelming number of first-degree murder cases

11  were, or could have been, special-circumstance cases." (LD 25-B.1 at 624-25.) This appears to

12  be an overstatement of the study's actual findings, which were confined to only cases resolved

13  on appeal in the period of 1988 through 1991 and only those cases in which an appeal was

14  sought. See ibid. The study also did not appear to address at all the question of how many

15  murder arrests in California in any period could have resulted in first-degree murder charges,

16  despite Petitioner's broad argument. See ibid. Petitioner also did not address the question of why

17  the statistical narrowing reflected by his data indicated that the Eighth Amendment was violated

18  or, put differently, what statistical threshold should be held to show an Eighth Amendment

19  violation and why. See ibid.

20      Finally, as this Court has elsewhere observed, the type of data relied on by Petitioner is

21  distinct qualitatively from that considered in Furman, where the lead opinion relied, in part, on

22  the infrequent application of the death penalty amongst the pool of death-eligible defendants to

23  find an Eighth Amendment violation. See Furman, 408 U.S. at 309-13. The state court therefore

24  "could reasonably have determined that [Petitioner's] apples-to-oranges comparison was

25  insufficient support for a prima facie showing of an Eighth Amendment violation." Cornwell v.

26  Warden, San Quentin State Prison, No. 2:06-CV-00705-TLN-KJN, 2018 WL 934542, at *119–

27  22 (E.D. Cal. Feb. 15, 2018), report and recommendation adopted, No. 2:06-CV-00705-TLN-

28  KJN, 2019 WL 12117105 (E.D. Cal. Mar. 19, 2019).

1    Thus, because the 1978 California capital sentencing scheme, on its face, "limits the

2  death sentence to a small sub-class of capital-eligible cases" through its use of special

3  circumstances; permits the sentencing jury to consider relevant aggravating and mitigating

4  factors in considering punishment; and provides for post-trial sentence review, the state court

5  was not unreasonable under clearly established federal law in finding the statutory scheme

6  constitutional. See Pulley, 465 U.S. at 53. There was no clearly established federal law

7  recognizing that the type of data proffered to the state court concerning the application of this

8  system would, alone, impugn that conclusion. See Pulley, 465 U.S. at 53; Maynard, 486 U.S. at

9  362; Godfrey, 446 U.S. at 428; Gregg, 428 U.S. at 189. As such, the state court was not

10  unreasonable in denying relief on Claim 150.

11    Consequently, the state court was also not unreasonable in denying relief on Claim 149.

12  In Claim 149, Petitioner alleged that the California statute's failure to narrow adequately the

13  class of death-eligible defendants rendered it essential under the Eighth Amendment that

14  California appellate courts conduct an intercase proportionality review in capital appeals. Pulley,

15  however, controls here and there the Supreme Court squarely rejected this argument on legally

16  indistinguishable facts. Pulley, 465 U.S. at 53; see also Allen, 395 F.3d at 1018 (holding that

17  neither due process, equal protection, nor the Eighth Amendment require proportionality review

18  in capital sentencing). Given this, the California Supreme Court's denial of this claim was

19  neither contrary to, or an unreasonable application of, clearly established federal law, nor based

20  on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas

21  relief on this claim and the undersigned recommends it be dismissed.

22  **CLAIM 157**

23    In Claim 157, Petitioner alleges that trial counsel provided ineffective assistance of

24  counsel by failing to communicate a pretrial plea offer to him, which Petitioner alleges he would

25  have accepted. (ECF No. 59 at 728-42.) He presented this claim in his second petition for writ of

26  habeas corpus in state court (LD 41-1 at 9-18), which the California Supreme Court denied

27  summarily on the merits. In re Coddington, No. S107502 (Cal. Sup. Ct. May 20, 2010). The

28

1    undersigned concludes that that denial was an unreasonable application of clearly established

2    federal law.

3        1.   Relevant Proceedings Below

4        In his second petition for writ of habeas corpus, Petitioner alleged that, before trial, the

5    prosecutor had made a plea offer to defense counsel, wherein the prosecution would not seek the

6    death penalty if Petitioner withdrew his plea of not guilty by reason of insanity. (LD 41-1 at 9-

7    18.) Defense counsel did not communicate this offer to Petitioner, believing the latter would

8    reject it. (Ibid.) Had the offer been communicated, Petitioner alleged, he would have accepted it.

9    (Ibid.)

10       Petitioner supported his allegations with two declarations. In relevant part, defense

11   counsel Richard Meyer declared:

12           I was appointed to represent Herb Coddington on May 20, 1987, two
             days after Mr. Coddington's arrest on May 18, 1987. Mr.
13           Coddington's was my first death penalty case. . .

14           During the course of our investigation, I discussed with Mr.
             Coddington whether he wanted me to approach the District Attorney
15           and try to negotiate a life without possibility of parole resolution,
             thereby sparing him a potential death sentence. We discussed the law
16           regarding the defense of insanity.

17           Herb told me that he felt that he was mentally ill. He did not want to
             ask the prosecutor for a deal to avoid the death penalty because he
18           felt he belonged in a mental hospital, not a prison. Herb wanted to
             pursue an insanity defense. I was concerned that in light of the
19           circumstances surrounding the crime, Herb's level of intelligence,
             and apparent functioning ability, a jury would be very skeptical of a
20           claim of insanity. I expressed to Herb my concerns in this regard.
             Herb's position remained unchanged.
21
             As our case preparation continued, I began to feel more positive
22           about the viability of the insanity defense. Dr. Mark Mills was a very
             valuable addition to the defense team. As time went by, I felt that our
23           insanity case was gaining momentum. Herb was privy to these
             positive developments.
24
             The District Attorney became aware that we had lined up at least
25           three psychiatrists who would testify that Herb was insane at the time
             of the crimes. I cannot pinpoint the exact date, but I specifically and
26           unequivocally recall the District Attorney, Ron Tepper, making the
             specific overture to agree to a life without the possibility of parole
27           disposition if Mr. Coddington would forego the insanity defense.
             Without recalling the specific words I used, I let Mr. Tepper know
28           that Mr. Coddington would not agree to such a resolution.

                                        313

1
2
3
4
5
6
7

On March 29, 2002, I met with Jennifer Corey, Herb's federal habeas attorney. Ms. Corey interviewed me for several hours. In the course of the conversation, as I was telling Ms. Corey about how I felt our expert witnesses had gone over with the jury, I mentioned that, prior to the sanity phase, the District Attorney had seemed worried that we had a strong sanity phase case and planned to put on experts with good credentials. My recollection was that the District Attorney seemed particularly concerned about the opinion and credentials of Dr. Mills. I told her that the District Attorney had even offered a deal for a life sentence if Mr. Coddington would not put on an insanity case. Ms. Corey asked why Mr. Coddington didn't take the deal. I told her that Herb said he wasn't interested in a life sentence.

8
9
10

I met with Ms. Corey again on May 19, 2002. Ms. Corey asked me to describe in detail the circumstances surrounding the plea offer. I described the discussion with Ron Tepper in as much detail as I could recall. I told her that I had gotten the impression that the District Attorney was concerned about losing the sanity phase.

11
12
13
14
15

Ms. Corey then asked me to describe in detail the circumstances surrounding my explanation of the plea offer to Mr. Coddington. I thought about it for some time, but could not recall a specific conversation when I told Herb about the plea offer. I specifically recall the earlier hypothetical discussions I had had with Herb regarding the issue of whether he wanted to take a deal with a stipulated term of life without the possibility of parole, but I could not recall ever telling Herb about the aforementioned actual plea offer after the District Attorney proposed it to me. I also could not recall ever telling Steve Tapson about the offer. . . .

16
17
18
19

I am well aware of my obligation to communicate plea offers to my client. The only explanation I have for why I did not tell Herb about the District Attorney's plea offer is that Herb had previously stated his unwillingness to agree to a stipulated term of life without the possibility of parole and had made clear his desire to present all the evidence we might accumulate relating to the defense of insanity.

20

(LD 41-2, Ex. 1 ¶¶ 2, 4-10, 12.)

21

        In the Informal Response, Respondent argued that the claim was procedurally barred and

22

failed to make a prima facie showing of relief, but presented no factual materials to rebut

23

Petitioner's allegations. (See LD 43-A; see generally People v. Romero, 8 Cal.4th 728, 742

24

(1994) ("Through the informal response, the custodian or real party in interest may demonstrate,

25

by citation of legal authority and by submission of factual materials, that the claims asserted in

26

the habeas corpus petition lack merit and that the court therefore may reject them summarily,

27

without requiring formal pleadings (the return and traverse) or conducting an evidentiary

28

hearing.").)

1      With his Informal Reply, Petitioner submitted his own declaration in support of his

2  allegations:

3          My lead trial counsel was Rick Meyer. Early in the case, Mr. Meyer
           asked me if I'd be interested in him pursuing a plea bargain that
4          probably would require me to spend the rest of my life in prison. I
           told him there was no way I'd accept that kind of deal. I felt I was
5          sick and should be in a hospital receiving treatment. Incarceration in
           the South Lake Tahoe jail was a living hell. Losing my liberty so
6          suddenly and completely was extremely traumatic. I was unable to
           accept the situation. On top of that, because I was on suicide watch
7          for the first part of my incarceration in South Lake Tahoe, I was
           essentially kept in solitary confinement 24 hours a day. I was not
8          allowed to go to "yard", which was an indoor space in that jail. My
           cell had no window. I was not permitted to have a television or radio
9          in the cell. And I could not read without getting a headache because
           the jail staff allowed everyone to have their eyeglasses but me.
10         Especially in those first few months, the staff treated me like I wasn't
           human. The conditions of my confinement felt unbearably
11         oppressive. When Mr. Meyer asked me how I would feel about
           taking a deal, I thought that what I was experiencing was what
12         incarceration would always be like. I hadn't yet figured out how to
           make even one day under such conditions reasonably tolerable. The
13         idea of spending the rest of my life like that was inconceivable.

14         Mr. Meyer never told me that Mr. Tepper was interested in striking
           any sort of deal. The first time I heard about that was from Ms. Corey
15         in April of 2002.

16         If Mr. Meyer had come to me right after my arrest and said the D.A.
           was willing to give up the death penalty if I'd give up my NGI plea,
17         because of the way I was feeling at that time I would have turned the
           offer down.
18
           If offered the same deal a year later, however, I would have taken it,
19         for several reasons.

20         First, conditions had improved somewhat. Incarceration was still
           terrible and I'd never stopped complaining about it. But by the end
21         of my stay in the South Lake Tahoe jail, I was allowed yard time and
           a television, I'd learned that not all inmates were out to kill or hurt
22         me because of what I'd done, and my glasses had been returned to
           me. In Placerville, my cell had a window and was on a pod that
23         opened onto a common area, and the yard was outside. As the initial
           shock of losing my freedom faded some, I grew more accustomed to
24         my situation. In May of 1987 incarceration in a prison setting had
           seemed inconceivable, but that was no longer true by the time trial
25         began.

26         In May of 1987, furthermore, I was hoping for an NGI verdict that
           would have placed me in a mental hospital. Between then and my
27         trial, however, other inmates had made it very clear to me that time
           in a mental institution was much worse than time in prison, that
28         conditions there were very, very restrictive. I would have told Mr.

315

Meyer to forget about the NGI defense except I thought I was going to be executed and for my mother's sake I wanted the official record to show that I did what I did because I was sick, not evil. Also, everyone was telling me that NGI was my best chance of not getting a death sentence. I was pretty pessimistic about my chances in the sanity phase because Placerville juries were supposed to be so conservative, but I was even more pessimistic about what the jury would do in the penalty phase. By the time of trial, if offered a choice between spending the rest of my life in prison and sticking with a defense that was probably going to end with a death verdict and at best was going to land me in a horribly oppressive place for the criminally insane, I definitely would have taken the deal. It would have been the only sure way to avoid getting executed.

It also would have been a big relief for my parents. I would have been able to spare them the terrible ordeal of sitting through a trial that they feared was going to end in their greatest nightmare coming true.

Taking the deal simply would have given me the option to live out my life in prison. I would have figured that, if things got bad enough, I could always kill myself or get myself killed. That didn't seem too hard to pull off if you were serious about it.

(LD 51-1, Ex. 5 ¶¶ 2-9.) Petitioner also tendered his contemporaneous jail records from El Dorado County, showing that he was on suicide watch from May 19, 1987 through May 29, 1987. (LD 51-1, Ex. 10.) He also submitted declarations from his mother and father averring that they would have supported him accepting a plea deal that resulted in his not being exposed to the possibility of a death sentence. (LD 51-1, Exs. 8, 9.)

Petitioner also tendered a declaration from James Esten, a veteran administrator of the California Department of Corrections, who declared that, during the course of his experience with the Department of Corrections in the 1980s, he

heard many inmates complain or express the belief that, for a person committed to a Department of Mental Health facility pursuant to an NGI, MDSO, or SVP sentence, the conditions of confinement are more restrictive and onerous than they would be if the inmate were incarcerated at a state prison serving a term of life without possibility of parole.

(LD 51-1, Ex. 7 ¶ 2.) Based on Mr. Esten's knowledge of "the conditions at the two types of institutions, . . . there was and is a valid and objective basis for such a perception." (Ibid.) Petitioner also tendered records from the Department of Corrections tending to corroborate Mr. Esten's perspective. (LD 51-1, Ex. 11.)

316

1      In support of his Informal Reply, Petitioner also submitted a supplemental declaration

2  from Mr. Meyer. In it, he declared that Petitioner had initially been housed at the South Lake

3  Tahoe Jail but was moved to the Placerville jail when the proceedings were transferred there. (LD

4  51-1, Ex. 6 ¶ 2.) He also declared that, when preparing for trial, he believed there was "a very real

5  possibility" the jury would return a death verdict if the case proceeded to a penalty phase, so he

6  "definitely would have recommended" Petitioner accept the prosecutor's offer, if he had been

7  aware of Petitioner's willingness to entertain the offer. (LD 51-1, Ex. 6 ¶ 3.) Finally, Mr. Meyer

8  declared that he "had no doubt" that Judge Finney would have accepted the plea agreement

9  proposed by the prosecutor, based on his past experiences with the judge. (LD 51-1, Ex. 6 ¶ 4.)

10      Petitioner also tendered the declaration of his second counsel, Stephen Tapson, who

11  declared that, based on his extensive experience before Judge Finney, he was "certain" that the

12  judge would have approved of a plea agreement that would have resulted in a life sentence for

13  Petitioner in this case. (LD 51-1, Ex. 12 ¶ 2.)

14      Petitioner had requested an evidentiary hearing to resolve any factual disputes raised by

15  his allegations. (LD 51-1 at 6.) By summarily denying relief, the California Supreme Court

16  implicitly denied this request. See In re Coddington, No. S107502 (Cal. Sup. Ct. May 20, 2010).

17      2.   Governing Legal Standard

18      The Sixth Amendment's guarantee of effective assistance of counsel, as described in

19  Strickland, extends to plea bargaining. See Missouri v. Frye, 566 U.S. 134, 148 (2012)

20  (describing this claim as an "application of Strickland"); Lafler v. Cooper, 566 U.S. 156, 162

21  (2012) (the "question for this Court is how to apply Strickland's prejudice test where ineffective

22  assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing

23  trial"); see generally Strickland, 466 U.S. at 687-88; see also Hedlund v. Ryan, 854 F.3d 557, 576

24  (9th Cir. 2017) (holding Lafler and Frye are applications of the law clearly established in

25  Strickland); Buenrostro v. United States, 697 F.3d 1137, 1140 (9th Cir. 2012) (same). Defense

26  counsel performs deficiently by failing "to communicate formal offers from the prosecution to

27  accept a plea on terms and conditions that may be favorable to the accused." Frye, 566 U.S. at

28  145; see also ibid. ("When defense counsel allowed the offer to expire without advising the

317

defendant or allowing him to consider it, defense counsel did not render the effective assistance

the Constitution requires.") Whether the prosecution made a formal offer to the defense is a

factual question. See Frye, 566 U.S. at 146-47.

To show prejudice from counsel's failure to communicate a plea offer to the defendant,

the petitioner

> must show that but for the ineffective advice of counsel there is a
> reasonable probability that the plea offer would have been presented
> to the court (i.e., that the defendant would have accepted the plea and
> the prosecution would not have withdrawn it in light of intervening
> circumstances), that the court would have accepted its terms, and that
> the . . . sentence . . . under the offer's terms would have been less
> severe than under the judgment and sentence that in fact were
> imposed.

Lafler, 566 U.S. at 164; see also Frye, 566 U.S. at 147.

    3.   The State Court Unreasonably Applied Clearly Established Federal Law In

           Concluding Petitioner Had Not Made a Prima Facie Claim of Right to Relief

Under clearly established federal law, the state court was unreasonable in concluding that

Petitioner's allegations failed to set forth a prima facie showing of entitlement to relief on this

claim.

      a.   Petitioner Made a Prima Facie Showing that a Formal Plea Offer Was Not

              Communicated to Him By Counsel

First, Petitioner made a prima facie showing that the prosecutor made a formal offer to the

defense of terms that were favorable to Petitioner and that defense counsel failed to communicate

this offer to Petitioner. The record before the state court was that, after the prosecutor had learned

that the defense was prepared to call three mental health experts to testify at the sanity phase, the

prosecutor made a "specific overture to agree to a life without the possibility of parole disposition

if Mr. Coddington would forego the insanity defense." (LD 41-2, Ex. 1 ¶ 7.) Defense counsel

described that he understood this "specific overture" to be an "actual plea offer." (LD 41-2, Ex. 1

¶¶ 7, 10; see also LD 41-2, Ex. 1 ¶¶ 8, 9, 11, 12, 13 (describing the offer as a "deal" and a "plea

offer").) Both defense counsel Meyer and Petitioner himself declared that this offer had not been

communicated to Petitioner at any time after it was made. (LD 41-2, Ex. 1 ¶¶ 2, 4-10, 12; LD 51-

1   1, Ex. 5 ¶¶ 2-9.) None of these facts were controverted in the state court. (See generally LD 43-

2   A.)

3          Respondent disputes what these uncontroverted facts show, but, in so doing, highlights

4   why evidentiary development was called for in the state court, not why no prima facie showing

5   was made. First, Respondent seizes on Mr. Meyer's use of the term "overture" at one place in his

6   declaration as evidence that whatever the prosecutor had communicated to him was a mere

7   "overture" as distinct from a "formal offer." (ECF No. 189 at 276-77.) This fails to provide a

8   reasonable basis for the state court's denial for several reasons. First, Respondent's argument

9   treats "overture" as some kind of term of art that Mr. Meyer, by invoking, necessarily meant to

10  imply something less than a formal offer. This, though, has no support in California law. When

11  the Court in Frye discussed a "formal offer" that needed to be communicated to a client, the Court

12  observed that some jurisdictions had processes that required that an actual, or "formal," plea offer

13  be presented in writing or be placed on the record. See Frye, 566 U.S. at 146-47. Any such

14  requirements for "formalizing" a plea offer did not exist in California at the time of Petitioner's

15  trial, however. See id. (listing jurisdictions); In re Alvernaz, 2 Cal.4th 924, 938 n.7, 830 P.2d 747,

16  756 (1992). Thus, while it may be true that in some jurisdictions the term "formal offer" implies

17  that particular statutory formalities had been met, here, there would appear no reasonable basis

18  for a court to conclude that Mr. Meyer's use of the word "overture" was necessarily intended to

19  convey something distinct from—and lesser than—the terms "plea offer," "actual plea offer," and

20  "deal" that he utilized elsewhere in his declaration. (See LD 41-2, Ex. 1 ¶¶ 2, 4-10, 12.)

21         Viewing Mr. Meyer's declaration in its entirety supports this interpretation. Respondent

22  focuses on the term "overture" utilized in one sentence of the declaration, arguing that it must be

23  interpreted to reflect that the prosecutor was simply willing to engage in negotiations. (ECF No.

24  189 at 276-77.) To be sure, in some cases, courts have found no "formal offer" was extended

25  where the prosecutor simply communicated a willingness to engage in plea discussions. See

26  Ramirez v. United States, 751 F.3d 604, 607-08 (8th Cir. 2014). The record does not support that

27  interpretation in this case. Throughout his declaration, Mr. Meyer makes clear that the prosecutor

28  made a specific offer to drop the death penalty if Petitioner withdrew his plea of not guilty by

1    reason of insanity, based on his knowledge of the evidence the defense was prepared to present at

2    the sanity phase. (See LD 41-2, Ex. 1 ¶¶ 2, 4-10, 12.) There was no factual information before the

3    state court to refute Mr. Meyer's averments or to otherwise indicate that the prosecutor's

4    statements to defense counsel should have been understood as mere empty rhetoric, rather than an

5    offer of the particular concession the state was willing to make and the specific concession it

6    would require of Petitioner in return, i.e., a plea offer.

7           To the extent, though, the state court shared Respondent's belief that by describing the

8    prosecutor's communication as an "overture" in one place in his declaration, and describing it as

9    a "plea offer" elsewhere, Mr. Meyer's declaration was ambiguous as to whether the prosecutor

10   had in fact communicated an offer to him, then an evidentiary hearing was necessary to resolve

11   the question. Whether the prosecutor communicated an offer to Mr. Meyer or simply made

12   statements indicating a willingness to engage in negotiations is a question of fact. See Frye, 566

13   U.S. at 146-47; cf. Gibson v. De La Salle Inst., 66 Cal. App. 2d 609, 625 (1944) (as a matter of

14   California contract law, whether a party's statements constituted an offer or simply an invitation

15   to negotiate is a factual question). To make a prima facie showing of his entitlement to relief,

16   Petitioner had to plead allegations, which, if true, would have entitled him to relief, see

17   Pinholster, 563 U.S. at 188 n.12; Clark, 5 Cal.4th at 770; Duvall, 9 Cal.4th at 474-75; supported

18   with "reasonably available documentary evidence," Duvall, 9 Cal.4th at 974, to demonstrate that

19   "he ha[s] sufficient evidence for a reasonable fact finder to conclude" that he has proved his

20   claim. Nunes, 350 F.3d at 1054-55. If the reviewing court found ambiguity in the materials

21   tendered to support his allegations, or believed further factual inquiry was necessary to resolve

22   the truth of Petitioner's allegations, then the proper procedure would be to hold an evidentiary

23   hearing. See, e.g., Alvernaz, 2 Cal.4th at 930-33; People v. Snyder, 14 Cal. App. 4th 1166, 1177

24   (1993), abrogated on other grounds by People v. Brown, 8 Cal.4th 746 (1994); see also People v.

25   Langi, 73 Cal. App. 5th 972, 979-80, 984 (2022); see generally Duvall, 9 Cal.4th at 974-79

26   (describing the elaborate fact-finding mechanisms under California habeas corpus procedure to

27   test the veracity of the allegations of the petition, all of which occur after the issuance of the order

28   to show cause); cf. Sw. Ctr. for Biological Diversity v. Berg, 268 F.3d 810, 820 (9th Cir. 2001)

1   (evidentiary hearing required when ambiguities exist in pleadings or the evidentiary materials

2   offered in support thereof); City of Oakland, Cal. By & Through Bd. of Port Comm'rs (Port of

3   Oakland) v. FERC, 754 F.2d 1378, 1380-81 (9th Cir. 1985) (same); Rosenthal v. Great W. Fin.

4   Sec. Corp., 14 Cal.4th 394, 414 (1996) (same).

5          In Snyder, for example, the California Court of Appeal ordered an evidentiary hearing in a

6   habeas corpus case where the petitioner had alleged his counsel had failed to communicate a plea

7   offer to him. In support of his petition, he adduced declarations from himself and his counsel. 14

8   Cal. App. 4th at 1173-74. These declarations, however, appeared somewhat inconsistent with

9   each other on the issues of material fact:

10              there is a factual issue as to whether the plea bargain offer was ever
                communicated to appellant. Appellant says that he was not told of
11              the offer, but his counsel seems to dispute this. Additionally, on the
                record before us, it cannot be determined whether appellant would
12              have accepted the offer, if communicated to him.

13   Id. at 1177. "Under these circumstances," the court concluded, "there are factual issues which

14   must be resolved by the trial court at an evidentiary hearing." Ibid.

15          Thus, it does not appear consistent with California law that the California Supreme Court

16   would have summarily denied relief on the basis that one declaration submitted in support of his

17   factual allegations could be read to contain an ambiguity. Given that, per California law, such a

18   reading would support the ordering of an evidentiary hearing rather than a summary denial, it

19   does not offer a reasonable basis on which the California Supreme Court may have denied

20   Petitioner relief on this claim. See Pinholster, 563 U.S. at 188 (when considering the bases on

21   which the state court may have summarily denied relief, federal court presumes California

22   Supreme Court follows those procedures set forth in California decisional law).

23          The same result obtains from Respondent's argument that the California Supreme Court

24   could have found there was no prima facie showing made, because Mr. Meyer's declaration could

25   be read as ambiguous on the precise terms of the prosecutor's plea offer, including whether it had

26   an expiration date. As with the previous argument, a reasonable reading of Petitioner's factual

27   allegations and the evidentiary materials he offered in their support suffice to permit a factfinder

28   to conclude that an offer was actually made. See Pinholster, 563 U.S. at 188 n.12; Nunes, 350

1   F.3d at 1054-55; Clark, 5 Cal.4th at 770; Duvall, 9 Cal.4th at 474-75. In his petition, he alleged

2   that the prosecutor approached defense counsel after defense counsel had disclosed having three

3   experts prepared to testify at the sanity phase. (LD 41-1 at 11.) The record showed that, of the

4   testifying defense experts, Dr. Satten began his work on the case in July 1988; the guilt phase

5   began on July 19, 1988. (30 RT 5632-33; see 16 RT 3288.) Dr. Rosenthal, one of the other

6   testifying defense experts, testified that he only completed developing his opinion after the

7   defense had rested at the guilt phase. (See 22 RT 4347; 29 RT 5514-15.) Taken together, the

8   record and the evidence proffered with the habeas petition suggest that the prosecutor's offer was

9   made during or after the guilt phase, and was that Petitioner would withdraw his plea of not guilty

10  by reason of insanity before the sanity phase began and, in reciprocity, the prosecutor would

11  cease seeking the death penalty. Accordingly, there were sufficient factual allegations that the

12  terms of the offer were specific enough to, as a matter of fact, constitute an "offer" within the

13  meaning of California contract law. See Frye, 566 U.S. at 146-47; Alvernaz, 2 Cal.4th at 930-33;

14  Snyder, 14 Cal. App. 4th at 1177; Gibson, 66 Cal. App. 2d at 625. Again, the fact that factfinding

15  might be necessary to ascertain the truth of this allegation or accuracy of the evidence on which it

16  was based militates towards the necessity of the reviewing court permitting evidentiary

17  development, not a holding that no prima facie showing had been made. See Alvernaz, 2 Cal.4th

18  at 930-33; Snyder, 14 Cal. App. 4th at 1177; Langi, 73 Cal. App. 5th at 979-80.

19          Respondent's next argument also offers no reasonable basis for the state court's denial.

20  Respondent argues that the California Supreme Court could have concluded, based on the record

21  before it, that defense counsel may have been reasonable in failing to communicate the

22  prosecutor's offer to Petitioner, based on Petitioner's previous lack of interest in changing his

23  plea. (See ECF No. 189 at 278.) This is foreclosed as a matter of law. At the time of Petitioner's

24  trial, defense counsel had a duty to "communicate promptly to the accused all proposals made by

25  the prosecutor, and ensure that the accused's choice on the question of a guilty plea is an

26  informed one, made 'with full awareness of the alternatives, including any that arise from

27  proposals made by the prosecutor.'" Alvernaz, 2 Cal.4th at 935; see also Frye, 566 U.S. at 145

28  (defense counsel had duty, under prevailing professional norms, to "promptly communicate and

1   explain to the defendant all plea offers made by the prosecuting attorney"); see generally Florida

2   v. Nixon, 543 U.S. 175, 187 (2004) (defendant possesses "'the ultimate authority' to determine"

3   his plea in a criminal case). The state court would have been unreasonable if it denied relief on

4   the belief that defense counsel performed consistently with contemporaneous professional norms

5   in electing not to communicate the prosecutor's plea offer to Petitioner, and thus this offers no

6   basis on which to defer to the state court judgment. See Richter, 562 U.S. at 98, 102.

7                     b.   Petitioner Made a Prima Facie Showing of Prejudice

8           Petitioner also made sufficient allegations in the state court showing that, had the plea

9   offer been timely communicated to him, there is a reasonable probability that he would have

10  accepted it; that there were no intervening circumstances that would have caused the prosecutor

11  to withdraw it; that the trial court would have accepted it; and that the plea offer's terms would

12  have been less severe than the judgment actually imposed. See Lafler, 566 U.S. at 164; Frye, 566

13  U.S. at 147.

14          Petitioner presented ample evidence to the state court to show that there was a reasonable

15  probability that he would have accepted the offer when it was made, during or at the close of the

16  guilt phase. In his declaration, he declared under penalty of perjury that he would have accepted

17  the offer. (LD 51-1, Ex. 5 ¶ 5.) He explained in that declaration his reasons why he would have

18  accepted this offer after having indicated the opposite a year prior, namely, that his initial refusal

19  resulted from his suicidality at the time and his misapprehension, at the time, that commitment in

20  a state prison would be a preferable outcome than a life sentence in a penal institution. (LD 51-1,

21  Ex. 5 ¶¶ 2-9.) This explanation could be credited by a factfinder as facially reasonable and,

22  further, was corroborated with additional evidentiary materials. He also tendered declarations

23  from both of his parents supporting Petitioner's allegation that he believed accepting the deal

24  would have accorded with his parents' preferences. (LD 51-1, Ex. 5 ¶ 8; Ex. 8; Ex. 9.) He

25  tendered declarations from his trial counsel that he would have encouraged Petitioner to take the

26  deal, irrespective of the strength of the evidence of insanity counsel had believed they had

27  developed. (LD 51-1, Ex. 6 ¶¶ 2-3.)  He tendered jail records of his suicidality around the time of

28  his initial conversation with counsel about the deal (LD 51-1, Ex. 10), and a declaration from a

1  Department of Corrections veteran and Department of Corrections records, tending to substantiate

2  Petitioner's articulated concerns about conditions in the state prisons and hospitals at the time.

3  (LD 51-1, Ex. 7; Ex. 11.)

4         There was, in short, ample evidentiary support for Petitioner's allegation that he would

5  have accepted the deal if presented to him, and nothing in the record that would have rendered

6  these materials facially not credible. See Alvernaz, 2 Cal.4th at 945. Indeed, the materials

7  presented here in support of Petitioner's allegation of prejudice are far more extensive than those

8  where California courts have held that petitioner presented sufficient evidence of prejudice such

9  that he was summarily entitled to habeas corpus relief without any need for evidentiary hearing.

10  In People v. Johnson, 36 Cal. App. 4th 1351 (1995), as modified (Aug. 8, 1995), the California

11  Court of Appeal ordered a habeas petition granted where the petitioner alleged his counsel had

12  prejudicially misinformed him about his sentencing exposure prior to his plea. In support of his

13  prejudice allegations, the petitioner tendered his own declaration in which he stated, "that had he

14  been correctly advised of his maximum potential sentence he would have gone to trial rather than

15  accept the plea bargain." Johnson, 36 Cal. App. 4th at 1355. The State argued that the declaration

16  was "self-serving," but the Court of Appeal held that it sufficed to show that the prejudice in the

17  case was "clear," such that a remand for evidentiary hearing "would serve no real purpose."

18  Johnson, 36 Cal. App. 4th at 1358. Here, in contrast, Petitioner tendered extensive materials that

19  supported his allegations of prejudice, such that the state court would have been objectively

20  unreasonable in concluding that he had not made a prima facie showing on this prong. See

21  Pinholster, 563 U.S. at 188; Nunes, 350 F.3d at 1054-55; Clark, 5 Cal.4th at 770; Duvall, 9

22  Cal.4th at 474-75.

23         Petitioner also made a prima facie showing that the other aspects of the prejudice element

24  were met. Petitioner alleged that the trial court would not have needed to approve the plea

25  agreement, given California statute, and Respondent does not dispute this. (LD 51-1 at 25-27;

26  ECF No. 189 at 276-79.) In any event, Petitioner also alleged and presented the declarations of

27  defense counsel Meyer and Tapson declaring that they believed, based on their past dealings with

28  this particular trial judge, that he would have approved the plea agreement, had he been required

324

1   to by statute. (LD 51-1 at 27, Ex. 6 ¶ 4, Ex. 12 ¶ 2.) Respondent tendered no factual materials

2   creating a dispute on this issue, nor directs the court to any law contradicting Petitioner's

3   allegations on this. (See ECF No. 189 at 276-79.) There was, therefore, nothing before the state

4   court indicating that this allegation was facially not credible. See Duvall, 9 Cal.4th at 474-75;

5   Romero, 8 Cal.4th at 742.

6        The record before the state court also did not demonstrate any "intervening

7   circumstances" after the time the prosecutor made the offer that would have caused him to

8   withdraw it. See Lafler, 566 U.S. at 164; Frye, 566 U.S. at 147. Respondent posits that the

9   prosecutor could have withdrawn the offer from having pangs of regret, due to his personal desire

10   to secure a death verdict. (ECF No. 189 at 278-79.) This is entirely speculative, and therefore

11   would not have offered a lawful basis for the state court to reject Petitioner's allegation out of

12   hand. See Duvall, 9 Cal.4th at 474-75; Romero, 8 Cal.4th at 742. Moreover, Respondent makes

13   no argument—nor is the undersigned able to discern one—as to why this should be considered an

14   "intervening circumstance" within the meaning of clearly established federal law. See Lafler, 566

15   U.S. at 164; Frye, 566 U.S. at 147; see ECF No. 189 at 278-79. It is not reasonably likely the

16   California Supreme Court denied relief on this basis or, if it did, such a determination was an

17   unreasonable application of the governing clearly established federal law.

18        Finally, Petitioner alleged that the offer made was less severe than the sentence he

19   ultimately received. See Lafler, 566 U.S. at 164; Frye, 566 U.S. at 147. (LD 41-1 at 9-18.)

20   Respondent does not dispute this. (See ECF No. 189 at 276-79.)

21        For all of these reasons, Petitioner made a prima facie showing of his entitlement to relief

22   on this claim. Upon consideration of the entirety of the record before the state court, there was no

23   "reasonable basis for the state court to deny relief" summarily that was "[]consistent with the

24   holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 98, 102. Petitioner has

25   shown that the state court's denial of this claim is not entitled to deference. 28 U.S.C. §

26   2254(d)(1).

27   ////

28   ////

1 **CLAIM 158**

2       In Claim 158, Petitioner alleges that he "was denied his right to a fair trial by an

3 independent tribunal, and his right to the minimum guarantees for the defense under customary

4 international law." (ECF No. 59 at 743.) Specifically, he alleges that "[t]he factual and legal

5 issues presented Mr. Coddington's automatic appeal, prior petition for writ of habeas corpus, and

6 the instant petition demonstrate that Mr. Coddington was denied his right to a fair trial and due

7 process in violation of international law as evidenced by Articles 2, 3, 6, 7, 9, 10, 14, 16, 17, 18,

8 19 and 26 of the International Covenant on Civil and Political Rights as well as Articles 1 and 26

9 of the American Declaration." (ECF No. 59 at 752-53.) Petitioner presented this claim to the

10 California Supreme Court in his second petition for writ of habeas corpus and that court denied

11 relief summarily, on the merits. (LD 41-1 at 19-56; In re Coddington, No. S107502 (Cal. Sup. Ct.

12 May 20, 2010).) That determination was not contrary to nor an unreasonable application of

13 clearly established federal law nor an unreasonable factual determination. See 28 U.S.C. §

14 2254(d).

15       As a threshold matter, to the extent that Petitioner argues that his claim relies on

16 allegations he raised in his "prior petition for writ of habeas corpus" (ECF No. 59 at 752-53),

17 those argument are barred. Upon its filing, Petitioner's Amended Petition for Writ of Habeas

18 Corpus superseded his earlier-filed petition (see ECF No. 16) and therefore this Court may only

19 consider the allegations and argument in the operative petition, the Amended Petition. See

20 Washer v. Bullitt County, 110 U.S. 558, 562 (1884) (when "a petition is amended by leave of the

21 court the cause proceeds on the amended petition" and the court cannot consider averments or

22 allegations contained in "the original petition"); Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668

23 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the

24 original and renders it of no legal effect."); In re Atlas Van Lines, Inc., 209 F.3d 1064, 1067 (8th

25 Cir. 2000) (same); London v. Coopers & Lybrand, 644 F.2d 811, 814 (9th Cir. 1981), overruled

26 on other grounds by Lacey v. Maricopa Cnty., 693 F.3d 896 (9th Cir. 2012) ("It has long been the

27 rule in this circuit that a plaintiff waives all causes of action alleged in the original complaint

28 which are not alleged in the amended complaint."); Barnes v. D.C., 42 F. Supp. 3d 111, 117

1    (D.D.C. 2014) ("When a plaintiff files an amended complaint as of right within 21 days after the

2    filing of the motion to dismiss under Rule 12(b), (e), or (f), the amended complaint becomes the

3    operative pleading"); see generally 28 U.S.C. § 2242 (rules governing civil actions apply to

4    habeas corpus proceedings). The undersigned, therefore, does not consider those allegations and

5    arguments only raised in the original Petition when ruling on the instant claim.

6          The California Supreme Court may have reasonably denied relief on this claim because

7    there is no United States Supreme Court precedent clearly establishing that any of the

8    constitutional violations for which Petitioner alleged a prima facie case as well, either singly or

9    cumulatively, reflect violations of international law giving rise to habeas corpus relief. Petitioner

10   cites no case law indicating such federal precedent has been clearly established within the

11   meaning of AEDPA and the undersigned has discovered none. Instead, the courts that have

12   confronted the question appear to uniformly conclude that there is no such clearly established

13   federal law. See, e.g., Estate of Ferdinand Marcos, 25 F.3d 1467, 1475 (9th Cir. 1994)

14   ("International law does not require any particular reaction to violations of law. . . . Whether and

15   how the United States wishes to react to such violations are domestic questions."); Rowland v.

16   Chappell, 902 F. Supp. 2d 1296, 1339 (N.D. Cal. 2012) (holding, "[p]etitioner cannot

17   demonstrate that any claim of a violation of international law is even cognizable on federal

18   habeas review, given that such review is designed to address claims that a petitioner is in custody

19   in violation of the Constitution or laws or treaties of the United States"); see also Medellin v.

20   Texas, 552 U.S. 491 (2008) (even where the State had violated international treaties that give

21   arrested foreign nationals the right to consular support after arrest, the relevant treaties do not

22   bind federal courts and do not give rise to an individual claim for relief); Medellin v. Dretke, 544

23   U.S. 660, 664 (2005) (expressing skepticism that any such claim, even if cognizable, could satisfy

24   the showing that the state court's denial of such a claim was contrary to or an unreasonable

25   application of clearly established federal law); cf. Buell v. Mitchell, 274 F.3d 337, 376 (6th Cir.

26   2001) (collecting cases and explaining, "courts that have considered the question of

27   whether international law bars capital punishment in the United States have uniformly concluded

28   that it does not"). As such, the California Supreme Court was not unreasonable if it denied relief

1   on this basis. Carey, 549 U.S. at 77.

2          Additionally, Petitioner's allegations rest on interpretations of the application and self-

3   execution of various modalities of international law, and these interpretations themselves seem at

4   odds with the existing jurisprudence interpreting these forms of international law. For instance,

5   many of Petitioner's allegations rely on the application of the International Covenant on Civil and

6   Political Rights (ECF No. 59 at 743, 750, 753-55, 757-71), but the United States Supreme Court

7   and the Ninth Circuit have both held that this treaty is not enforceable in the federal courts. Sosa

8   v. Alvarez-Machain, 542 U.S. 692, 735 (2004); Serra v. Lappin, 600 F.3d 1191, 1197 (9th Cir.

9   2010). Moreover, the United States ratified the ICCPR subject to reservation of the right to

10  impose capital punishment subject only to constitutional constraints. See 138 Cong. Rec. S-4781-

11  01, S4783 (1992). Thus, even if the ICCPR were viewed as self-executing and applicable to

12  individual criminal defendants, its provisions do not prohibit the death penalty, but rather merely

13  limit its application in accordance with the United States' constitutional principles.

14         Clearly established federal law is also contrary to Petitioner's allegations that other

15  international treaties, agreements, or accords, or customary international law, give rise to

16  cognizable habeas corpus relief in the federal courts or, put differently, that these instruments

17  create, preserve, or guarantee rights for American criminal defendants such that their violation is

18  remedial via reversal of the defendant's conviction or sentence. Medellin v. Dretke, 544 U.S. 660,

19  664 (2005) (Vienna Convention did not create individual judicially enforceable rights); Sosa, 542

20  U.S. at 734-35 (UN Charter and Universal Declaration of Human Rights do not create obligations

21  enforceable in federal court); Buell, 274 F.3d at 376 (application of customary international law

22  to a American state's criminal justice administration is a question that is reserved to the executive

23  and legislative branches of the United States government); Serra, 600 F.3d at 1197

24  ("customary international law is not a source of judicially enforceable private rights in the

25  absence of a statute conferring jurisdiction over such claims").

26         Accordingly, the California Supreme Court's denial of this claim did not reflect a decision

27  contrary to, or an unreasonable application of, clearly established federal law, nor an

28

1  unreasonable fact determination. See 28 U.S.C. § 2254(d). The undersigned recommends it be
2  dismissed.

3  **CLAIM 159**

4        In Claim 159, Petitioner alleges his rights under the Fifth, Eighth, and Fourteenth
5  Amendments and international law are violated by his having received not only a death sentence,
6  but "multiple punishments consisting of managed penal and juridical harms" engendered by the
7  delay in adjudication of his appeal and habeas corpus petitions, political bias in the adjudication
8  of his direct appeal, errors in the California Supreme Court's adjudication of constitutional
9  claims, and some conditions of his confinement. (ECF No. 59 at 773, 774-856.) Petitioner
10  presented this claim to the California Supreme Court in his second petition for writ of habeas
11  corpus and that court denied the claim summarily, on the merits. (LD 41-1 at 57-158; In re
12  Coddington, No. S107502 (Cal. Sup. Ct. May 20, 2010).) That determination was not contrary to,
13  nor an unreasonable application of, clearly established federal law and was not an unreasonable
14  factual determination. See 28 U.S.C. § 2254(d). As such, the undersigned recommends it be
15  dismissed.

16        Preliminarily, the state court denied this claim, fully, on the merits. In denying relief, the
17  California Supreme Court stated the denial was "on the merits." (In re Coddington, No. S107502
18  (Cal. Sup. Ct. May 20, 2010).) Despite this, Petitioner argues that the state court did not actually
19  deny the claim as alleged, but only adjudicated it in part, because Respondent's Brief had only
20  addressed it in part. (ECF No. 209 at 743-44.) This argument is unavailing. Under Richter, 562
21  U.S. at 99-100, because Petitioner's constitutional claim "ha[d] been presented to a state court
22  and the state court has denied relief," this Court must "presume[]that the state court adjudicated
23  the claim on the merits in the absence of any indication or state-law procedural principles to the
24  contrary." Petitioner points to no state-law procedural principles that would have limited the
25  scope of the California Supreme Court's consideration to only those arguments raised by
26  Respondent. In fact, the California post-conviction review process appears not to be so
27  circumscribed; as the Supreme Court described in Pinholster, when adjudicating a petition for
28  writ of habeas corpus, the California Supreme Court assumes the allegations in the petition to be

1    true, reviews the entire record before it, and, based on that, determines whether the petitioner has

2    stated a prima facie case of entitlement to relief. Pinholster, 563 U.S. at 188 n.12 (citing Clark, 5

3    Cal.4th at 770, and Duvall, 9 Cal.4th at 474). Petitioner thus has not rebutted the presumption that

4    the California Supreme Court denied his constitutional claim fully and on the merits.

5            The state court's denial of this claim was not contrary to, or an unreasonable application

6    of, clearly established federal law, as there is no clearly established federal law setting forth the

7    rule that Petitioner asserts governs his claim. For the most part, Petitioner alleged in his Amended

8    Petition for Writ of Habeas Corpus that a number of factors and events occurring after judgment

9    was entered in his case had given rise to Eighth Amendment and due process violations, and

10   violations of international law, such that his convictions and sentences were infirm and must be

11   set aside. (ECF No. 59 at 773-856.) He also alleged that the taxing conditions of his confinement

12   pretrial and during trial alone violate the same constitutional and international law principles.

13   (ECF No. 59 at 774-77.) In his Traverse, however, Petitioner clarified that many of these

14   allegations comprise mere subclaims to an overarching claim that the flaws alleged render

15   Petitioner's death sentence arbitrary and therefore violative of the Eighth Amendment, i.e., that

16   Petitioner's constitutional claim ultimately only arises under the Eighth Amendment. (See ECF

17   No. 209 at 741-42 (identifying the Supreme Court's Eighth Amendment jurisprudence as the

18   governing law), 743 (describing the claim as a composite of "separate subclaims"), 744 (same),

19   744 n.123 (describing the "claim" as alleging that "execution after more than 16 years of

20   confinement on death row would be cruel and unusual punishment in violation of the Eighth

21   Amendment"), 745 (describing the claim as alleging that California's capital appeals process

22   "inflicts constitutional harms and results in the arbitrary imposition of the death penalty"), 745-46

23   (arguing that state court unreasonably applied clearly established federal law because Petitioner

24   had "stated a prima facie case of unconstitutional punishment"), 748 (describing the claim as a

25   "fact-based Eighth Amendment challenge").) He also apparently abandoned the argument that his

26   convictions should be vacated as a remedy. (ECF No. 209 at 740, 745-47.)

27           Although "[m]any agree with Petitioner that California's capital punishment system is

28   dysfunctional and that the delay between sentencing and execution in California is extraordinary,"

1  Jones v. Davis, 806 F.3d 538, 553 (9th Cir. 2015), no clearly established law supports his position

2  that the problems he alleges gave rise to Eighth Amendment infirmities to his convictions and/or

3  sentences. Petitioner posits that the state court should have understood that "[c]learly established

4  federal law, going back to Furman and Gregg, does not permit the arbitrary infliction of the death

5  penalty by the state." (ECF No. 209 at 742.) The undersigned cannot agree. "Clearly established

6  federal law," under section 2254(d), reflects "the holdings" of Supreme Court decisions.

7  Williams, 529 U.S. at 412. Holdings are confined to those points actually decided by the court,

8  based on the facts before it, and do not encompass argument not considered by the court or

9  discussed in the opinion. See generally 21 C.J.S. Courts § 215; see, e.g., Arizona Christian Sch.

10  Tuition Org. v. Winn, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither

11  noted nor discussed in a federal decision, the decision does not stand for the proposition that no

12  defect existed."); Abraugh v. Altimus, 26 F.4th 298, 305 (5th Cir. 2022) ("To be sure,

13  a precedent that does not discuss standing or jurisdiction cannot be invoked as a precedent on

14  standing or jurisdiction."); Hart v. Burnett, 15 Cal. 530, 598 (1860) ("A decision is not even

15  authority except upon the point actually passed upon by the Court and directly involved in the

16  case. But even then, the mere reasoning of the Court is not authority. The point decided by the

17  Court, and which the reasoning illustrates and explains, constitutes a judicial precedent."); see

18  also Andrew C. Michaels, The Holding-Dictum Spectrum, 70 Ark. L. Rev. 661, 664 (2017)

19  (while the definition of a holding may have some imprecision, "Statements narrowly tailored to

20  the facts have greater constraining force and approach the status of binding holding. Broader or

21  more general statements have less constraining force and tend to approach dicta."); Marc

22  McAllister, Dicta Redefined, 47 Willamette L. Rev. 161, 164-66 (2011) (describing as "divergent

23  dicta" those statements in a case that were not essential to the holding, did not later "flower into

24  law," but also have not been "dismissed outright" and may therefore "prompt[] scholarly

25  commentary and lower court development of the issue").

26         In each of the cases on which Petitioner relies to set forth clearly established federal law—

27  and, to the undersigned's knowledge, in every post-Furman Supreme Court case considering

28  Eighth Amendment challenges to the administration of the death penalty—the holdings of the

1   cases have been confined to consideration of arbitrariness in the imposition of the death penalty

2   by the sentencer, not arbitrariness in carrying out the sentence after judgment has been entered.

3   See Kennedy v. Louisiana, 554 U.S. 407, 436 (2008); Woodson v. North Carolina, 428 U.S. 280,

4   305 (1976); Gregg, 428 U.S. 153; Furman, 408 U.S. 238; see, e.g., Clemons v. Mississippi, 494

5   U.S. 738, 748 (1990) (collecting cases and observing, "[t]he primary concern in the Eighth

6   Amendment context has been that the sentencing decision be based on the facts and

7   circumstances of the defendant, his background, and his crime"); see generally Preiser v.

8   Rodriguez, 411 U.S. 475 (1973) (describing the historical use of habeas corpus and holding that it

9   encompasses, quintessentially, attacks on the validity of the judgment of conviction or length of

10  sentence). (See ECF No. 209 at 741-42.) For instance, in both Furman and Gregg, the Court

11  considered and held on whether the statutory schemes in question sufficiently guided the

12  sentencer in their decision to elect a death sentence for a particular defendant, with the statute

13  accomplishing an adequate narrowing function of death-eligible defendants and allowing for

14  adequate consideration of mitigation evidence. Gregg, 428 U.S. 153; Furman, 408 U.S. 238; see

15  Jones v. Davis, 806 F.3d 538, 547-48 (9th Cir. 2015) (describing same), id. at 550

16  ("Although Furman condemned one specific form of arbitrariness related to the death penalty, it

17  does not necessarily follow that Furman dictates the result in all other challenges to the death

18  penalty under the banner of 'arbitrariness.'"). In Kennedy and Woodson, the Supreme Court

19  continued to apply these principles in the context of analyzing the imposition of the death penalty

20  by the sentencer, not in reference to any aspect of carrying out the sentence or Petitioner's

21  experiences post-judgment. In Kennedy, 554 U.S. 407, the Court considered whether the Eighth

22  Amendment was offended by a defendant being sentenced to death for rape of a child and, in

23  Woodson, 428 U.S. 280, the Court considered the validity under the Eighth Amendment of a

24  statute whereby a defendant would be automatically sentenced to death if found guilty of first-

25  degree murder. Cf. Harmelin v. Michigan, 501 U.S. 957, 995 (1991) (considering whether the

26  Eighth Amendment permitted a defendant to be sentenced to life imprisonment without the

27  possibility of parole regardless of available mitigation evidence). (See ECF No. 209 at 741 (citing

28  same).) In none of these cases was the Court confronted with nor did it decide the question of

1   how, whether, or to what extent the state's actions post-judgment would violate the Eighth

2   Amendment. As such, their holdings do not stand for the proposition urged by Petitioner, that his

3   sentence, although it may have been valid at the time of judgment was rendered, would now

4   reflect the "arbitrary infliction of the death penalty" should it be carried out, due to factors that

5   have occurred post-judgment. There was simply no clearly established federal law cognizing the

6   Eighth Amendment in this manner at the time of the state court's adjudication.

7        Petitioner relies heavily on the findings of the district court in <u>Jones v. Chappell</u>, 31 F.

8   Supp. 3d 1050 (C.D. Cal. 2014), characterizing his claim as similar to the petitioner's in that case.

9   (ECF No. 209 at 744-48.) There, the district court held that the systemic delays and dysfunction

10  in the administration of California's death penalty resulted in "only a trivial few" persons on

11  death row ever being executed, who were selected for execution not for penological reasons but

12  due to the "arbitrary" factor of their post-conviction review proceedings completing, and this

13  result violated the Eighth Amendment. 31 F. Supp. 3d at 1062. The Ninth Circuit, however,

14  reversed the district court's grant of relief, concluding that this conception of the Eighth

15  Amendment reflected a "new rule" under <u>Teague</u>. The Court explained that although

16  "<u>Furman</u> condemned one specific form of arbitrariness related to the death penalty," neither it nor

17  any related Supreme Court case law established a highly generalized rule forbidding the state

18  from "arbitrarily inflict[ing] the death penalty." <u>Jones</u>, 806 F.3d at 550. While this is not

19  determinative to the question before the undersigned, it is informative to the analysis of the status

20  of clearly established Supreme Court precedent at the time of the state court adjudication.

21  <u>Williams</u>, 529 U.S. at 412 ("the 'clearly established Federal law' phrase bears only a slight

22  connection to our <u>Teague</u> jurisprudence. With one caveat, whatever would qualify as an old rule

23  under our <u>Teague</u> jurisprudence will constitute 'clearly established Federal law, as determined by

24  the Supreme Court of the United States' under § 2254(d)(1)").

25       The undersigned is further persuaded that the holdings of Supreme Court precedent do not

26  encompass the allegations Petitioner raises here because, in considering similar claims, the

27  undersigned is aware of no court that has held that the Eighth Amendment was violated by the

28  kinds of state actions raised by Petitioner, let alone that such a conclusion was compelled by the

1    holdings of <u>Furman</u>, <u>Gregg</u>, or related precedent. First, to the extent Petitioner's claim relies on

2    the conditions of confinement he experienced before and during trial, the undersigned has found

3    no case cognizing this as an Eighth Amendment infirmity to the sentence the defendant later

4    receives. In fact, governing precedent holds that such a claim is non-justiciable as moot, rather

5    than giving rise to any form of constitutional violation for which the remedy would be setting

6    aside defendant's conviction or sentence. <u>See</u>, <u>e.g.</u>, <u>Barker v. Estelle</u>, 913 F.2d 1433, 1440 (9th

7    Cir. 1990) (holding, for habeas corpus purposes, challenges to aspects of petitioner's pre-

8    conviction detention become moot upon his conviction). Similarly, the undersigned has found no

9    case applying <u>Furman</u>, <u>Gregg</u>, or other Eighth Amendment jurisprudence to encompass

10   challenges the conditions of Petitioner's current confinement; rather, these types of allegations are

11   not typically cognizable on habeas corpus at all. <u>See</u>, <u>e.g.</u>, <u>Nettles v. Grounds</u>, 830 F.3d 922, 931

12   (9th Cir. 2016).

13        To the extent Petitioner's claim alleges that the delay in his execution and post-conviction

14   process have heightened his punishment, reflect additional punishment, or are otherwise

15   unauthorized under the Eighth Amendment generally, no clearly established law supports this

16   principle. <u>See</u> <u>Allen v. Ornoski</u>, 435 F.3d 946, 956-59 (9th Cir. 2006) ("The Supreme Court has

17   never held that execution after a long tenure on death row is cruel and unusual punishment. . . .

18   Allen cannot credibly claim that there is any clearly established law, as determined by the

19   Supreme Court, which would support this . . . claim."); <u>see also</u> <u>Andrews v. Davis</u>, 866 F.3d 994,

20   1039 (9th Cir. 2017) (rejecting similar claim); <u>Chambers v. Bowersox</u>, 157 F.3d 560, 570 (8th

21   Cir. 1998) (same); <u>White v. Johnson</u>, 79 F.3d 432, 439 (5th Cir. 1996) (same); <u>see generally</u>

22   <u>Knight v. Fla.</u>, 528 U.S. 990 (1999) (opn. of Thomas, J., concurring with the denial of certiorari)

23   (rejecting theory that delay in post-trial review violates a capitally-sentenced person's Eighth

24   Amendment rights); <u>Lackey v. Texas</u>, 514 U.S. 1045 (1995) (opn. of Stevens, J., dissenting from

25   the denial of certiorari) (describing this theory as "novel" under Eighth Amendment

26   jurisprudence); <u>Coleman v. Balkcom</u>, 451 U.S. 949 (1981) (opn. of Stevens, J., concurring in the

27   denial of certiorari) (explaining that some delay in judicial review of capital cases is inevitable

28   and serves the function of ensuring reliability).

1        Petitioner relies on Barker v. Wingo, 407 U.S. 514 (1972), arguing that its principles

2   relating to the right to a speedy trial should be extended to the appellate process. Although some

3   appellate courts have endorsed this view, see, e.g., Coe v. Thurman, 922 F.2d 528, 530 (9th Cir.

4   1990) (collecting cases), others have rejected it, noting the disparate purposes and concerns of the

5   trial and post-trial review processes. See Heiser v. Ryan, 15 F.3d 299, 305 (3d Cir. 1994)

6   (collecting cases). In light of this discrepancy, the undersigned cannot conclude that no

7   reasonable jurist would have failed to extend Barker in the manner Petitioner urges, let alone that

8   such a violation should necessarily be held to be also violative of the Eighth Amendment's

9   prohibition on arbitrary death sentences.

10       Petitioner also raises allegations of bias in the state appellate process for capital cases. The

11  Supreme Court has held that "meaningful appellate review" may play a "crucial role . . . in

12  ensuring that the death penalty is not imposed arbitrarily or irrationally" under the Eighth

13  Amendment. Parker v. Dugger, 498 U.S. 308, 321 (1991), holding modified by Brown v.

14  Sanders, 546 U.S. 212 (2006). (See ECF 59 at 780.) This holding, however, has never, to the

15  undersigned's knowledge been held to encompass claims of judicial bias, which are cognized as

16  due process violations and are analyzed under the standards set forth in the undersigned's

17  discussion of Claim 3, ante. Cf. Kugler v. Helfant, 421 U.S. 117, 126 n.6 (1975) (where petitioner

18  alleges state court appellate justices were biased against him, the "gravamen" of the complaint is

19  one of violation of due process, not that his sentence would violate the Eighth Amendment). If the

20  undersigned construes Petitioner's allegations to encompass a due process argument, then the

21  state court was not unreasonable in concluding that the facts alleged did not show that the

22  appellate justices were biased against him nor that their bias might be implied by the justices'

23  pecuniary interests implicated by Petitioner's case, a personal controversy they had engaged in

24  with Petitioner, or their prior involvements in the accusatory process. See Bracy v. Gramley, 520

25  U.S. 899, 904-05 (1997); Martinez v. Ryan, 926 F.3d 1215, 1226-27 (9th Cir. 2019); Crater v.

26  Galaza, 491 F.3d 1119, 1131 (9th Cir. 2007).

27       Finally, for the reasons set forth in the undersigned's discussion of Claim 158, ante,

28  international law does not give rise to the right to relief that Petitioner seeks.

Accordingly, the California Supreme Court was not unreasonable in denying this claim on the merits, because no federal law had clearly established the rule that Petitioner asserts governs his claim. See 28 U.S.C. § 2254(d). The undersigned recommends that it be dismissed.

**CLAIM 160(A)**

In Claim 160(A), Petitioner alleges that, during voir dire, juror Suzanne Tiopan misrepresented and concealed material information that rendered her biased and, as a result, Petitioner was convicted and sentenced to death via a process that violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments and under international law. This claim was fairly presented to the California Supreme Court in his second petition for writ of habeas corpus, which the state court denied summarily. The undersigned concludes that the state court's denial of this claim was an unreasonable application of clearly established federal law.

1.  Proceedings In State Court

During jury selection, the judge read the charging document and then asked the entire jury panel if any of them

> had any prior experience which might influence you in this type of a case, and if some of you – in other trials similar to this we've had people that wish to respond in private, and if you wish to, we can accommodate that. My question now is: Have any of you had any prior experience which might influence you in this type of case?

(6 RT 1190; see 6 RT 1098-1101.) One prospective juror responded affirmatively and requested to speak to the court privately, which the court granted. (6 RT 1190, 1233-1237.) Prospective Juror Suzanne Tiopan did not respond. (6 RT 1190.) The court then asked the prospective jurors if, having heard the charges, any of them had "any belief or feeling toward any of the parties . . . that would make it impossible or difficult for you to act fairly and impartially both as to the defendant and as to the People?" (6 RT 1199.) Mrs. Tiopan again did not respond. (6 RT 1199.)

The court then asked the members of the jury panel,

> Have any one of you or any member of your family or any close friends, to your knowledge, ever been arrested for a charge similar in this case? We could generally call these crimes of violence, with murder and molestation and rape being the specific areas we're talking about.

1    (6 RT 1200.) One prospective juror responded that a family member had been charged with

2    sexual molestation; two other prospective jurors responded that their daughters had been raped. (6

3    RT 1200-1202.) The court then asked, "Anyone else? Have any of you, or any member of your

4    family, or any close friends to your knowledge, ever been a complaining witness, or a victim, in a

5    case of this kind?" (6 RT 1203.) In response, an additional prospective juror replied that their

6    family member had been sexually molested and raped. (6 RT 1203.) The court engaged in a

7    colloquy with that prospective juror about whether it would affect their ability to be fair in

8    Petitioner's case. (6 RT 1203-1204.) After this colloquy, the court asked the panel, "Anyone

9    else?" (6 RT 1204.) Mrs. Tiopan did not respond. (Ibid.) After further voir dire on other possible

10   sources of bias, the court asked the entire panel if any prospective juror, "based upon what has

11   been stated here in this courtroom, or upon anything else," had a reason "why [they] could not or

12   would not give a fair trial to both sides in this case." (6 RT 1215.) Mrs. Tiopan did not respond.

13   (Ibid.)

14            During voir dire, Mrs. Tiopan responded to other of the court's questions. In response to

15   questioning about hardships, Mrs. Tiopan submitted a note to the court reporting a planned

16   vacation. (6 RT 1167.) The court questioned her about it and Mrs. Tiopan replied. (Ibid.) Later,

17   the court identified counsel in the case and asked if any members of the jury panel knew them;

18   Mrs. Tiopan offered that she knew defense counsel Steven Tapson and District Attorney Ronald

19   Tepper. (6 RT 1183-1184.) The court questioned Mrs. Tiopan about these relationships and Mrs.

20   Tiopan explained that her husband had served on the county's grand jury, to which Mr. Tepper

21   had acted as advisor. (6 RT 1184.) The court then recalled to Mrs. Tiopan having attended a

22   dinner at a local casino with members of the grand jury and Mr. Tepper; Mrs. Tiopan confirmed

23   that she and her husband had attended that dinner, as well. (6 RT 1184-1185.)

24            After this initial round of voir dire, the court requested the members of the jury panel who

25   remained, including Mrs. Tiopan, to complete juror questionnaires. (6 RT 1215-1216.) The

26   questionnaire informed prospective jurors that their written responses should be answered

27   truthfully "under . . . oath as a prospective juror." (SACT 2516.) Mrs. Tiopan responded "no" to

28   questions that asked if the prospective juror or one of their close friends, relatives, or former

1  spouses had "ever undergone treatment or care provided by a psychiatrist or psychologist" (SACT

2  2522); if the prospective juror or one of their friends or relatives had "ever been the victim of a

3  crime" (SACT 2529); if the prospective juror or any of their friends or relatives had even been

4  accused of a crime (SACT 2530); and if the prospective juror or any of their friends or relatives

5  had ever been arrested. (SACT 2530.) A final question asked if the prospective juror knew of any

6  reason why they could not be completely fair and impartial in the case, to which Mrs. Tiopan also

7  responded no. (SACT 2533.)

8          After returning the questionnaire, Mrs. Tiopan was questioned individually by counsel.

9  When asked by the prosecutor if she "ever [knew] anybody that [she] thought was insane," Mrs.

10 Tiopan replied that her "best friend's mother-in-law is" but she "appears normal." (RT 2682.) The

11 prosecutor asked her if she could understand why two adolescent witnesses may have difficulty in

12 testifying about sexual events and Mrs. Tiopan replied that she could, without further elaboration.

13 (RT 2692.) Mrs Tiopan was selected for and served on the jury. (5 CT 1030; 15 RT 3258.)

14         In his state habeas petition, Petitioner alleged that these responses reflected a failure to

15 disclose material information, indicating Mrs. Tiopan's bias in favor of the prosecution. (LD 41-1

16 at 166, 168-171.) In support of this allegation, Petitioner tendered a declaration signed by Mrs.

17 Tiopan after Petitioner's trial, in which she described facts about her life and her family that, per

18 Petitioner, should have been disclosed during jury selection. (LD 41-2, Ex 4.) Specifically, Mrs.

19 Tiopan declared that she had been "shocked" to have been selected to serve on the jury because,

20 inter alia, she "had been a rape victim at age 16," her "youngest brother had been in trouble with

21 the law," and she "knew something about [mental health problems] based on [her] own

22 experience with [her] family," including that her "aunt committed suicide after receiving

23 psychiatric care and electric shock therapy for schizophrenia" when Mrs. Tiopan was 25 years

24 old. (Ibid.)

25         Per Petitioner, Mrs. Tiopan's failure to disclose any or all of this information during jury

26 selection demonstrated that she was actually biased or, alternatively, engaged in conduct from

27 which bias could be implied or presumed under McDonough Power Equip., Inc. v.

28 Greenwood, 464 U.S. 548 (1984). (LD 41-1 at 170-171.) Petitioner alleged that, under either

1    standard, Mrs. Tiopan's presence on his jury violated his rights under the Fifth, Sixth, Eighth, and

2    Fourteenth Amendments and was presumptively prejudicial. (LD 41-1 at 172.) The California

3    Supreme Court denied relief summarily, on the merits.[39] In re Coddington, No. S107502 (Cal.

4    Sup. Ct. May 20, 2010).)

5         2.   Legal Standard

6         The Sixth Amendment guarantees to a criminal defendant a fair trial by a panel of

7    impartial jurors. U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v.

8    White, 232 F.3d 671, 676 (9th Cir. 2000). The due process clause of the Fourteenth Amendment

9    also requires that the defendant be tried by "a jury capable and willing to decide the case solely

10   on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982); see also United States v.

11   Plache, 913 F.2d 1375, 1377-78 (9th Cir. 1990). These standards are only met where the juror or

12   prospective juror "can lay aside his impression or opinion [of the merits of the case] and render a

13   verdict based on the evidence presented in court." Irvin, 366 U.S. at 722 & n.3. A defendant is

14   denied the right to an impartial jury if even one juror is biased or prejudiced. Fields v.

15   Woodford, 309 F.3d 1095, 1103 (9th Cir. 2002), amended, 315 F.3d 1062 (9th Cir.2002); Dyer v.

16   Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). Where a juror's actions or misconduct

17   create "destructive uncertainties" about her impartiality, bias should be presumed. Green, 232

18   F.3d at 677.

19        A juror may evince bias through her conduct during voir dire, and the Ninth Circuit has

20   described three distinct theories of such bias: (1) McDonough-style bias, where the prospective

21   juror fails to answer honestly and, had she answered correctly, the information would have

22   provided a basis for a challenge for cause, see McDonough Power Equip., Inc. v. Greenwood, 464

23   U.S. 548 (1984), (2) "actual bias, which stems from a preset disposition not to decide an issue

24   impartially," and (3) "implied (or presumptive) bias, which may exist in exceptional

25

26        [39] Petitioner had also alleged two additional subclaims to this claim—subclaims B and
     C—which the California Supreme Court denied both on the merits and as procedurally barred
27   under state law. In re Coddington, No. S107502 (Cal. Sup. Ct. May 20, 2010).) Petitioner has
     conceded that those bars were properly imposed (ECF No. 131 at 78) and thus the Court proceeds
28   only on subclaim A.

1   circumstances where, for example, a prospective juror has a relationship to the crime itself or to

2   someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." <u>Fields</u>

3   <u>v. Brown</u>, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).

4          The Ninth Circuit has clarified, however, that these categories are structured somewhat

5   differently when a federal court is charged with reviewing under AEDPA a state court's

6   determination of a claim of juror bias premised on misstatements during voir dire, consistent with

7   Supreme Court jurisprudence. Where the theory of relief relies on <u>McDonough</u>-style bias, the

8   Supreme Court has not held as clearly established federal law that reversal is mandated if

9   <u>McDonough</u>'s two prongs are met; instead, if Petitioner shows that <u>McDonough</u>'s two elements

10  have been met, it is not unreasonable for a state court to require a showing of the juror's actual

11  bias before granting relief. <u>Scott v. Arnold</u>, 962 F.3d 1128, 1130-33 (9th Cir. 2020); <u>see</u> <u>Smith v.</u>

12  <u>Phillips</u>, 455 U.S. 209, 215 (1982); <u>Remmer v. United States</u>, 347 U.S. 227, 230 (1954).

13         Similarly, the Ninth Circuit has also held that, under clearly established federal law, relief

14  is not required merely upon a showing of "implied (or presumptive) bias," <u>Fields</u>, 503 F.3d at

15  766, but rather that, where "a prospective juror has a relationship to the crime itself or to someone

16  involved in a trial, or has repeatedly lied about a material fact to get on the jury," Petitioner must

17  also show that those facts rendered the prospective juror actually biased. <u>Hedlund v. Ryan</u>, 854

18  F.3d 557, 573-74 (9th Cir. 2017) (citing <u>Smith</u>, 455 U.S. at 215; <u>Remmer</u>, 347 U.S. at 230). Thus,

19  while the prospective juror's intentionality in making misstatements or omissions during voir dire

20  may be dispositive to a showing of relief on an implied bias theory arising outside of the AEDPA

21  context (<u>see</u>, <u>e.g.</u>, <u>Fields v. Brown</u>, 503 F.3d 755, 771 (9th Cir. 2007); <u>Dyer v. Calderon</u>, 151 F.3d

22  970, 981-84 (9th Cir. 1998)), under AEDPA, it would not be contrary to or an unreasonable

23  application of clearly established federal law for the state court to consider the fact that the juror

24  intentionally dissembled in her voir dire responses only as evidence of whether or not she was

25  actually biased. <u>See</u> <u>Hedlund</u>, 854 F.3d at 572-74; <u>see</u>, <u>e.g.</u>, <u>Williams v. Taylor</u>, 529 U.S. 420,

26  444 (2000) (when determining whether petitioner was entitled to relief on claim that juror

27  misrepresented material facts during voir dire, lower courts should determine whether the

28  petitioner had proven "'actual bias' . . . tak[ing] due account of the District Court's earlier

340

1   decision . . . that 'Juror Stinnett deliberately failed to tell the truth on voir dire'"); <u>Clark v. United</u>

2   <u>States</u>, 289 U.S. 1, 10 (1933) (the juror's "[b]ias is to be gathered from the disingenuous

3   concealment which kept her in the [jury] box").

4          Actual bias – whether arising from <u>McDonough</u> theory, implied bias theory, or some other

5   basis – simply reflects "'bias in fact'—the existence of a state of mind that leads to an inference

6   that the person will not act with entire impartiality.'" <u>United States v. Gonzalez</u>, 214 F.3d 1109,

7   1111-13 (9th Cir. 2000) (quoting <u>United States v. Torres</u>, 128 F.3d 38, 43 (2d Cir. 1997)); <u>see</u>

8   <u>also</u> Code of Civ. Proc. § 225(b)(1)(C) (defining actual bias as "the existence of a state of mind

9   on the part of the juror in reference to the case, or to any of the parties, which will prevent the

10  juror from acting with entire impartiality, and without prejudice to the substantial rights of any

11  party"). This is a factual question. <u>Patton v. Yount</u>, 467 U.S. 1025, 1036-37 (1984); <u>see also</u>

12  <u>Fields v. Brown</u>, 503 F.3d 755, 767 (9th Cir. 2007) ("The determination of whether a juror is

13  actually biased is a question of fact . . ."). As such, under clearly established federal law, actual

14  bias can only be determined via some form of fact-finding, i.e., an informal or formal hearing.

15  See <u>Smith</u>, 455 U.S. at 215 ("This Court has long held that the remedy for allegations of juror

16  partiality is a hearing in which the defendant has the opportunity to prove actual bias."); <u>Remmer</u>,

17  347 U.S. at 230 (ordering a remedy of "a hearing with all interested parties permitted to

18  participate" to determine whether bribery of a juror resulted in his actual bias); <u>see also</u> <u>Hedlund</u>

19  <u>v. Ryan</u>, 854 F.3d 557, 574 (9th Cir. 2017) (clearly established federal law required that, upon a

20  prima facie showing of juror bias, the state court engage in a "fact-finding process [that was]

21  objective and reasonably explore[d] the issues presented"); <u>Dyer v. Calderon</u>, 151 F.3d 970, 974-

22  75 (9th Cir. 1998) ("An informal in camera hearing may be adequate for this purpose; due process

23  requires only that all parties be represented, and that the investigation be reasonably calculated to

24  resolve the doubts raised about the juror's impartiality."); <u>cf</u>. <u>Thompson v. Keohane</u>, 516 U.S. 99,

25  111 (1995) (deference should be accorded to a trial court's resolution of factual issues, including

26  juror impartiality, because the resolution of such issues "depends heavily on the trial court's

27  appraisal of witness credibility and demeanor").

28  ////

1          3.   The State Court Unreasonably Applied Clearly Established Federal Law In Summarily

2               Denying Petitioner's Claim for Relief

3          In state court proceedings, Petitioner alleged that Juror Tiopan evinced bias under,

4   alternatively, a theory of implied bias, McDonough-style bias, or actual bias. (LD 41-1 at 166-

5   71.) The California Supreme Court denied relief summarily on the merits, indicating it concluded

6   that Petitioner had not shown that he could establish his entitlement to relief under the governing

7   legal standards. The conclusion was an unreasonable application of clearly established federal

8   law.

9          The allegations and evidentiary support Petitioner placed before the state court constituted

10  a prima facie showing of juror Tiopan's actual bias, under clearly established federal law at the

11  time of the state court adjudication. In the state habeas proceeding, Petitioner pled and presented

12  documentary evidence to support that juror Tiopan did not answer truthfully on voir dire; that her

13  falsehoods related to material issues she would as a juror be charged with considering fairly and

14  resolving per the court's instructions when rendering verdicts in Petitioner's case; that, had she

15  answered truthfully, the defense would have had a basis to seek her removal for cause; and that

16  the factual allegations supported the inference that juror Tiopan's falsehoods were not

17  inadvertent. Specifically, juror Tiopan had failed to disclose that she had been a victim of rape as

18  a teenager, that her sibling had "been in trouble with the law," and that her aunt "committed

19  suicide after receiving psychiatric care and electric shock therapy for schizophrenia" when Mrs.

20  Tiopan was 25 years old. (LD 41-2, Ex 4.) The trial court had repeatedly asked the prospective

21  jurors about these kinds of experiences, both during voir dire and in the juror questionnaire. (6 RT

22  1190, 1098-1101, 1200-04; SACT 2516, 2522, 2529-30.) In response to the court's questions,

23  other prospective jurors volunteered the type of information that Mrs. Tiopan had failed to

24  disclose, suggesting that the court's inquiries were unambiguous. (6 RT 1200-14.) In other times

25  during her voir dire, Mrs. Tiopan appeared comfortable responding to the court's questions and

26  engaging in colloquy with the court, including divulging information that may have led to her

27  excusal. (6 RT 1167, 1183-85.) These are all indications from which it could be deduced that

28

1  Mrs. Tiopan's nondisclosure of her rape as a teen, her sibling's criminal legal troubles, or her

2  aunt's serious mental health problems were intentional omissions and obfuscations.

3        These factual allegations are indistinguishable from cases in which the courts, including

4  the United States Supreme Court, have held the allegations sufficiently made a prima facie

5  showing of actual bias, requiring evidentiary development to resolve. In <u>Williams</u>, 529 U.S. at

6  440-42, the Supreme Court held that a habeas petitioner had pled facts sufficient to entitle him to

7  an evidentiary hearing on the issue of juror bias on facts indistinguishable from the case at bar.

8  There, during voir dire, the judge asked the prospective jurors if they had been represented by any

9  of the attorneys in the case or were related to any of the people who would be called as witnesses,

10 including a particular deputy sheriff. One prospective juror sat silent in response to those

11 questions, indicating a no answer. <u>Williams</u>, 529 U.S. at 440-41. She had, in fact, previously been

12 married to the deputy at issue and one of the prosecuting attorneys had handled that divorce. <u>Ibid.</u>

13 When petitioner raised this as a claim in habeas proceedings, the juror submitted an affidavit

14 stating she had believed her answers were truthful because she was no longer "related to" her ex-

15 husband and she did not think the prosecutor had "represented" her in the divorce. <u>Id.</u> at 441-42.

16       The Supreme Court held that this sufficed to make a prima facie showing of the juror's

17 actual bias against the defendant, such that evidentiary development was necessary:

18
19
20
21
22
23
24
25
26
> Even if Stinnett had been correct in her technical or literal interpretation of the question relating to Meinhard, her silence after the first question was asked could suggest to the finder of fact an unwillingness to be forthcoming; this in turn could bear on the veracity of her explanation for not disclosing that Woodson had been her attorney. Stinnett's failure to divulge material information in response to the second question was misleading as a matter of fact because, under any interpretation, Woodson had acted as counsel to her and Meinhard in their divorce. Coupled with Woodson's own reticence, these omissions as a whole disclose the need for an evidentiary hearing. It may be that petitioner could establish that Stinnett was not impartial, see *Smith v. Phillips,* 455 U.S. 209, 217, 219–221, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), or that Woodson's silence so infected the trial as to deny due process, see *Donnelly v. DeChristoforo,* 416 U.S. 637, 647–648, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

27 <u>Id</u>. at 441-42.

28 *////*

343

Other courts have similarly held that, where a juror fails to disclose something on voir dire and the circumstances suggest that the omission was intentional, reflecting "an unwillingness to be forthcoming," Williams, 529 U.S. at 441, then those facts alone suffice to make a prima facie showing of actual bias. See, e.g., United States v. Olsen, 704 F.3d 1172, 1189 (9th Cir. 2013) (actual bias can be shown by evidence that juror intentionally lied); Fields v. Brown, 503 F.3d 755, 769, 772-75 (9th Cir. 2007) (same); Dyer v. Calderon, 151 F.3d 970, 983-84 (9th Cir. 1998) (juror "lie[d] materially and repeatedly in response to legitimate inquiries about her background," thereby "introduc[ing] destructive uncertainties into the process" and making it "that rare case where we must presume juror bias"); In re Manriquez, 5 Cal.5th 785, 805-06 (2018) (where juror failed to disclose material information on voir dire, evidentiary hearing necessary to determine whether failure was intentional or not, which would be dispositive to claim of actual bias).

The record also demonstrated that the omissions Mrs. Tiopan made related to important issues of material dispute at trial, such that any bias she may have possessed reasonably may have affected her consideration of the evidence in this case. Specifically, her own rape as a teen would likely have impeded her ability to fairly adjudicate a case in which the defendant was charged with sexually assaulting two teens. Additionally, her knowledge of her aunt's own thought disorder and suicide may very well have impaired her ability to fairly consider and render a verdict on the evidence before her which included extensive evidence of Petitioner's disordered thinking and decompensation, and was critical to the jury's verdicts at all phases of the trial, particularly the sanity phase. Thus, this is not a case where the juror's omissions related to only collateral matters, but rather went to the heart of whether she could set aside her own personal biases in fairly considering and weighing the evidence in Petitioner's trial. See Scott v. Arnold, 962 F.3d 1128, 1130-33 (9th Cir. 2020), cert. denied, 141 S. Ct. 1392, 209 L. Ed. 2d 131 (2021); People v. Diaz, 152 Cal. App. 3d 926, 934-35 (1984); see generally Rushen v. Spain, 464 U.S. 114, 120-21 (1983).

Given this showing, clearly established federal law mandated some form of evidentiary development, as the only way to determine whether Mrs. Tiopan's omissions were innocent or intentional and whether she possessed bias in fact would be through an assessment of her

1  credibility. See Williams, 529 U.S. at 440-42; Rushen, 464 U.S. at 120-21; Smith, 455 U.S. at

2  215-21; Remmer, 347 U.S. at 230; Stevens v. Davis, 25 F.4th 1141, 1150 (9th Cir. 2022); Pappas

3  v. Miller, 750 F. App'x 556, 559-61 (9th Cir. 2018); Hamilton v. Ayers, 583 F.3d 1100, 1108-09

4  (9th Cir. 2009); Fields v. Brown, 503 F.3d at 767, 772-75; Dyer v. Calderon, 151 F.3d 970, 974–

5  75 (9th Cir. 1998); see also Wainwright v. Witt, 469 U.S. 412, 428 (1985) ("whether a venireman

6  is biased . . . is based upon determinations of demeanor and credibility that are peculiarly within a

7  trial judge's province); United States v. Gonzalez, 214 F.3d 1109, 1111-13 (9th Cir. 2000)

8  ("determinations of impartiality may be based in large part upon demeanor"). The question of

9  juror partiality "is not one of mixed law and fact. Rather it is plainly one of historical fact: did a

10  juror swear that he could set aside any opinion he might hold and decide the case on the evidence,

11  and should the juror's protestation of impartiality have been believed." Patton v. Yount, 467 U.S.

12  1025, 1036-37 (1984). Under these standards, the state court was unreasonable in failing to permit

13  evidentiary development of the question of Mrs. Tiopan's partiality, once Petitioner made a prima

14  facie showing that she failed to disclose information on voir dire that would be highly material to

15  the evidence she was to consider, and verdict she would deliver, at Petitioner's trial.

16      Accordingly, the state court's summary denial of this claim is not entitled to deference

17  under 28 U.S.C. section 2254(d).

18  **CONCLUSION**

19      Accordingly, IT IS HEREBY RECOMMENDED that:

20  1.  The court finds Petitioner has satisfied the requirements of section 2254(d) for claims 47,

21      54, 82, 157, and 160(A);

22  2.  The court finds that claim 7 is not procedurally barred;

23  3.  The court finds that claim 58 is procedurally barred;

24  4.  The court recommends the denial of habeas corpus relief on all claims and subclaims of

25      the Amended Petition except claims 47, 54, 82, 157, and 160(A).

26      These findings and recommendations are submitted to the United States District Judge

27  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within sixty days after

28  being served with these findings and recommendations, any party may file written objections with

1   the court and serve a copy on all parties. Such a document should be captioned "Objections to

2   Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file

3   objections within the specified time may waive the right to appeal the District Court's order.

4   <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

5   Dated:  May 3, 2023

6                                                                CAROLYN K. DELANEY
7                                                                UNITED STATES MAGISTRATE JUDGE

8

9

10   22/codd1290.fr

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28